## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BCG, INC. and<br>CHESAPEAKE PRODUCTS & SERVICES, | : |
| | :    C.A. No. 07-cv-207 (GMS) |
| Plaintiffs, | : |
| | : |
| v. | :    TRIAL BY JURY |
| | :    OF TWELVE DEMANDED |
| GLES, INC. d/b/a SWEET OIL COMPANY, | : |
| | :    NON-ARBITRATION CASE |
| | : |
| Defendant/Third-Party Plaintiff, | : |
| v. | : |
| SUNOCO, INC., | : |
| | : |
| Third-Party Defendant. | : |

## THIRD-PARTY DEFENDANT'S MOTION TO DISMISS COUNT II OF THE AMENDED THIRD-PARTY COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

For the reasons set forth in the accompanying Opening Brief, Third-Party

Defendant Sunoco Inc. (R&M), improperly identified as Sunoco, Inc., by and through its

undersigned counsel, hereby moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure for an order dismissing Count II of Defendant/Third-Party Plaintiff's Amended Third-

Party Complaint with prejudice.

**PEPPER HAMILTON LLP**

/s/ Matthew A. Kaplan
Matthew A. Kaplan (#4956)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
Telephone No.: 302-777-6528

A. Christopher Young
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone No.: 215-981-4190

*Attorneys for Third-Party Defendant,*
*Sunoco, Inc. (R&M)*

Dated:  November 15, 2007

-2-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BCG, INC. and                                              :
CHESAPEAKE PRODUCTS & SERVICES,    :
                                                                   :       C.A. No. 07-cv-207 (GMS)
                                                                   :
                                     Plaintiffs,            :
                                                                   :
v.                                                                 :       TRIAL BY JURY
                                                                   :       OF TWELVE DEMANDED
                                                                   :
GLES, INC. d/b/a SWEET OIL COMPANY,      :
                                                                   :       NON-ARBITRATION CASE
                                                                   :
           Defendant/Third-Party Plaintiff,      :
v.                                                                 :
                                                                   :
SUNOCO, INC.,                                             :
                                                                   :
                Third-Party Defendant.             :
                                                                   :

**THIRD-PARTY DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO
DISMISS COUNT II OF THE COMPLAINT FOR FAILURE TO STATE A CLAIM
UPON WHICH RELIEF CAN BE GRANTED**

Matthew A. Kaplan (#4956)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
Telephone No.: 302-777-6528


A. Christopher Young
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone No.: 215-981-4190


*Attorneys for Third-Party Defendant,*
*Sunoco, Inc. (R&M)*

Dated:  November 15, 2007

## **TABLE OF CONTENTS**

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ................................................1

II.   SUMMARY OF ARGUMENT ...........................................................................2

III.  STATEMENT OF THE FACTS ..........................................................................2

IV.   ARGUMENT ......................................................................................................4

   A.   LEGAL STANDARD .................................................................................4

   B.   THE LIMITED INDEMNIFICATION PROVISION IN THE AGREEMENT
      BETWEEN THE PARTIES DOES NOT PROVIDE FOR CONTRACTUAL
      INDEMNIFICATION .................................................................................5

V.    CONCLUSION ...................................................................................................8

# TABLE OF AUTHORITIES

## CASES

Alten v. Ellin & Tucker, Chartered, 854 F. Supp. 283 (D. Del. 1994)........................................4, 7

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007) ..................................................................5

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ....................................5

Christopher v. Karbury, 536 U.S. 403 (2002) ...........................................................................5

Delle Donne & Assocs. LLP v. Millar Elevator Serv. Co., 840 A.2d 1244 (Del. 2004) ...............7

Diamond State Tel. Co. v. Univ. of Del., 269 A.2d 52 (Del. 1970) .............................................4

Erickson v. Pardus, 127 U.S. 2197 (2007) ...........................................................................4-5

Howard, Needles, Tammen & Bergendoff v. Steers, Perini, & Pomeroy, 312 A.2d 621
  (Del. 1973)........................................................................................................................6

Kost v. Kozakiewicz, 1 F.3d 176 (3d Cir. 1993)........................................................................4

New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington, 825 F. Supp. 1180 (D. Del.
  1993).............................................................................................................................6, 7

Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192 (3d Cir. 1993)............5

Rock v. Del. Elec. Coop., Inc., 328 A.2d 449 (Del. Super. Ct. 1974)..........................................7

In re Rockefeller Ctr. Props. Inc. Sec. Litig., 184 F.3d 280 (3d Cir. 1999) ..............................5, 6

## STATUTES

Fed. R. Civ. P. 12(b)(6) .......................................................................................................4

## MISCELLANEOUS

41 Am. Jur. 2d Indemnity § 7 ...............................................................................................6

## I.     NATURE AND STAGE OF THE PROCEEDINGS

Count II of the Amended Third Party Complaint filed by Third-Party Plaintiff/Defendant Sweet Oil (hereinafter referred to as "Sweet Oil") is an improper attempt to shift its contractual liability to Third-Party Defendant Sunoco, Inc. (R&M) (hereinafter referred to as "Sunoco"). Sunoco does not have a contract with plaintiffs which would obligate it to pay them anything and the contract it does have with Sweet Oil contains an express indemnification provision which does not afford Sweet Oil the indemnity protection it seeks in this lawsuit. Rather, it limits Sunoco's indemnity obligation to bodily harm or property damage caused by its negligent or tortious conduct.

### a.     State Court Proceedings

After a dispute over the payment of incentive fees for sales of Mobil branded gasoline, the Plaintiffs, BCG, Inc. and Chesapeake Products & Services, Inc. (hereinafter collectively referred to as "BCG") sued Sweet Oil in Delaware state court for, among other things, payment of those incentive fees based upon a Dealer Agreement to which they were parties. In turn, Sweet Oil joined Sunoco to the cause of action by filing a Third-Party Complaint seeking to interplead the amount of incentive payments due but not paid under the Dealer Agreement, for a declaration of Sweet Oil's rights under the Dealer Agreement with the plaintiffs and separate agreements it had with Sunoco and, for indemnity. Sunoco filed an answer to the Third Party Complaint denying any liability to Sweet Oil and claiming the Third Party Complaint failed to state a claim for which relief could be granted as an affirmative defense.

      b.      **Federal Court Proceedings**

The cause of action was subsequently removed to this Court after BCG amended

its complaint to state a claim against Sweet Oil under the Petroleum Marketing Practices Act, 15

U.S.C. §§ 2801, et seq.  Sweet Oil filed an answer to the Amended Complaint in this Court

denying any liability to BCG, and separately, sought leave to amend its Third Party Complaint

against Sunoco to substitute a conversion claim for its interpleader claim.  On November 5,

2007, the Court granted Sweet Oil's motion for leave to amend its Third Party Complaint and the

Amended Third Party Complaint was deemed filed.  Count II of the Amended Third-Party

Complaint seeks indemnity from Sunoco for Sweet Oil's contractual obligations to BCG.

## II.     SUMMARY OF ARGUMENT

Third-party plaintiff's indemnification claim in Count II fails to state a claim upon

which relief can be granted because a contract between the parties contains an express

indemnification provision which does not obligate Sunoco to indemnify Sweet Oil for its

contractual liability to others.  Further, that same indemnification provision precludes Sweet Oil

from claiming it is entitled to indemnity implied by law because implied indemnification claims

are found only where an express indemnification provision between the parties does not exist.

## III.    STATEMENT OF THE FACTS

      a.      **Agreements Between Sunoco and Sweet Oil.**

Sweet Oil and Sunoco were parties to a Mobil Branded Distributor Agreement

(the "Distributor Agreement" and attached hereto as Exhibit 1) and a Distributor Image Incentive

#9007678 v2

Program Agreement (the "Incentive Agreement" and attached hereto as Exhibit 2). (Am. Compl. ¶ 5 & 9.)[1]

Under the terms of the Incentive Agreement, Sunoco paid Sweet Oil an incentive payment of 3¢ per gallon for each gallon of Mobil branded motor fuel Sweet Oil sold to BCG's retail motor fuel facility located at 9521 Ocean Highway, Delmar, Maryland ("Delmar Mobil"). (Am. Compl. ¶ 10.) Sweet Oil was obligated to pay back the incentive payments to Sunoco on a fixed amortization schedule if Sweet Oil's contract was terminated or not renewed or the Delmar Mobil debranded. (Am. Comp. ¶ 11.)

**b.    Agreement Between Sweet Oil and BCG.**

BCG was not a party to the Incentive Agreement and Sweet Oil was not obligated to pass along to it any portion of the incentive fees Sweet Oil received from Sunoco. Nevertheless, in a separate Dealer Agreement with BCG[2], Sweet Oil agreed to pay BCG 3¢ per gallon of motor fuel sold at the Delmar Mobil station during the four-year period beginning on March 1, 2002 and terminating on March 1, 2006. (Am. Compl. ¶ 16.) Similar to the terms of the Incentive Agreement, if BCG breached the Dealer Agreement, BCG was required to return the incentive payments to Sweet Oil. (Am. Compl. ¶ 17.)

**c.    Debranding of the Delmar Mobil.**

At the expiration of the Distributor Agreement on September 30, 2005, Sunoco and Sweet Oil extended the Distributor Agreement on a month by month basis. (Am. Compl. ¶ 6.) In 2006, Sunoco informed Sweet Oil that Sunoco's rights to the Mobil brand would end in

---

[1] Tosco Refining, L.P. and Peninsula Oil Company were original parties to the Distributor and Incentive Agreements. However, each subsequently and separately assigned all of their right, title and interest in those Agreements to Sunoco and Sweet Oil, respectively. (Am. Compl. ¶ 6, 7, 13 & 14)
[2] Peninsula Oil Company was an original party to the Dealer Agreement but assigned all of its right, title and interest in it to Sweet Oil on August 31, 2005. (Am. Compl. ¶ 18)

February 2007 and Sunoco offered to rebrand the Delmar Mobil station as a Sunoco station. (Am. Compl. ¶ 23.) Sunoco also informed Sweet Oil that the Delmar Mobil station would need to be converted to a Sunoco station pursuant to the terms of the Distributor Agreement and that Sweet Oil should inform BCG of the rebranding. (Am. Compl. ¶ 24.) According to Sweet Oil, BCG refused to rebrand and sell Sunoco branded motor fuel. (Am. Compl. ¶ 25.)

The debranding of the Delmar Mobil triggered Sweet Oil's obligation to pay Sunoco liquidated damages under the Incentive Agreements.

## IV.    ARGUMENT

Sweet Oil's claim for indemnity from Sunoco (Count II) fails because the express indemnity provision in the Distributor Agreement does not require Sunoco to indemnify Sweet Oil for its contractual obligations to others. Further, Sweet Oil may not expand Sunoco's indemnity obligation under a theory of implied indemnity where the parties already have an existing indemnity provision in their contract. Since Sweet Oil's allegations fail to adequately state a claim for relief against Sunoco, Count II of the Complaint should be dismissed with prejudice. Fed. R. Civ. P. 12(b)(6).

### A.    LEGAL STANDARD

Pursuant to Rule 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the allegations in the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). All factual allegations in the complaint are accepted as true and viewed in a light most favorable to the complainant. Erickson v. Pardus, 127 U.S. 2197, 2200 (2007); Christopher v. Karbury, 536 U.S. 403, 406 (2002). A complaint

-4-

does not need detailed and specific factual allegations, but it must be more than a recitation of the elements of a cause of action. <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964-65 (2007).

When deciding a motion to dismiss, courts generally consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993). However, a court may consider "document[s] *integral to or explicitly relied* upon in the complaint" without converting a motion to dismiss to a motion for summary judgment. <u>In re Rockefeller Ctr. Props. Inc. Sec. Litig.</u> 184 F.3d 280, 287 (3d Cir. 1999); <u>see also In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997). More specifically, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." <u>Pension Benefit Guar. Corp.</u>, 998 F.2d at 1196.

**B.    THE LIMITED INDEMNIFICATION PROVISION IN THE AGREEMENT BETWEEN THE PARTIES DOES NOT PROVIDE FOR CONTRACTUAL INDEMNIFICATION**

Sweet Oil's indemnification claim fails to state a claim upon which relief can be granted because the limited indemnification provision in the Distributor Agreement does not provide Sweet Oil with indemnity for its contractual obligations to others. In light of the parties' express indemnification provision and the law which will not enlarge that obligation by implication, no set of facts could be proved to support Sweet Oil's claim for indemnity against Sunoco. Accordingly, Count II of the Amended Third Party Complaint should be dismissed.

**1.  Sweet Oil Is Not Entitled To Express Indemnification**

Sweet Oil's claim for indemnity from Sunoco is generally stated in the Amended Third Party Complaint: it neither relies upon a specific contractual indemnification provision nor

-5-

claims entitlement to an implied indemnity. Whether this omission was an oversight or intentional, Sweet Oil cannot ignore the fact that its relationship and legal rights against Sunoco are principally governed by the Distributor Agreement. Indeed, the Amended Third Party Complaint relies almost exclusively on the terms of the Distributor and Incentive Agreements. (See, e.g., Am. Compl. ¶ 43-45 & 5-8.) Consequently, the Court can consider the Distributor Agreement in deciding this motion to dismiss because it is specifically relied upon in the Amended Third-Party Complaint. In re Rockefeller Ctr. Props. Inc. Sec. Litig. 184 F.3d at 287.

Delaware law recognizes both express and implied indemnification. Alten v. Ellin & Tucker, Chartered, 854 F. Supp. 283, 288 (D. Del. 1994); see also Diamond State Tel. Co. v. Univ. of Del., 269 A. 2d 52 (Del. 1970). Express contractual indemnification allows a party to be indemnified against specific situations or under certain circumstances. 41 Am. Jur. 2d Indemnity § 7. The presence of an indemnification provision clearly indicates that the parties contemplated the issue and extent of indemnification. See New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington, 825 F. Supp. 1180, 1195 (D. Del. 1993).

The Distributor Agreement limits the parties' indemnity obligations to circumstances where personal injury or property damage to another is caused by one of the parties' negligent or tortious conduct. Importantly, the provision does not permit Sweet Oil to recover from Sunoco for its own failure to abide by its contractual obligations to other parties, like BCG. (Ex. 1). The Distributor Agreement provides, in pertinent part:

> To the fullest extent permitted by law, [Sunoco] shall indemnify and hold harmless [Sweet Oil]...from and against all claims, damages, losses, and expenses, including but not limited to attorneys' fees, arising out of or resulting from or occurring from any cause directly connected with the operation and conduct of [Sunoco's] business and which i) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom and ii) is caused in whole or in part by an intentional or negligent acts or omission of [Sunoco]...

(Ex. 1, Section 19(C)).  Sweet Oil does not allege it is entitled to indemnity from Sunoco for personal injury or property damage caused by a negligent or tortious act of Sunoco.  Rather, it claims indemnity for a contractual obligation it may have to BCG.  Under the Distributor Agreement, Sunoco is not liable to Sweet Oil for indemnity in these circumstances and Count II should be dismissed.

### 2.  Sweet Oil Is Not Entitled To Implied Indemnification

Sweet Oil cannot obtain indemnity from Sunoco based on an indemnity obligation implied in the contract.  Delaware courts have recognized implied-in-contract indemnification claims, but limit their application to situations in which there is no express indemnification provision between the parties.  New Zealand Kiwifruit Mktg. Bd., 825 F. Supp. at 1194 (citing Howard, Needles, Tammen & Bergendoff v. Steers, Perini, & Pomeroy, 312 A.2d 621, 624 (Del. 1973)).  Claims for implied indemnification are legally unavailable to parties to a written contract.  Delle Donne & Assocs. LLP v. Millar Elevator Serv. Co., 840 A.2d 1244, 1251, n. 12 (Del. 2004) (citing Rock v. Del. Elec. Coop., Inc., 328 A.2d 449, 455 (Del. Super. Ct. 1974).  Further, the courts will not "create indemnification where the parties intended none to exist."  New Zealand Kiwifruit Mktg. Bd., 825 F. Supp. at 1194.

As discussed above, Sweet Oil and Sunoco were parties to the Distributor Agreement, which contained an indemnification provision which limited the scope of the parties' indemnity obligations.  (Ex. 1, Section 19.)  Specifically, the indemnity provision cannot be interpreted to allow Sweet Oil to be indemnified for its contractual undertakings with third parties such as BCG.  Since the Distributor Agreement contained an express indemnification provision, the law will not expand either parties' contractual obligation to the other through a theory of implied indemnity.

-7-

Further, Sweet Oil cannot claim it is entitled to implied-in-tort indemnification from Sunoco because Sweet Oil is not seeking tort-related indemnity protection. Even if the implied-in-tort indemnification did apply, Sunoco is not a party to a contract with BCG. Implied-in-tort indemnification requires that the parties have common liability to the initial plaintiff. _Alten_, 854 F. Supp. at 293 (D. Del. 1994). Here, the Dealer Agreement between BCG and Sweet Oil is a separate and distinct contract from the Distributor Agreement between Sweet Oil and Sunoco. No contract obligates Sunoco to pay BCG incentive fees.

## V.    CONCLUSION

For the foregoing reasons, Count II of Defendant/Third-Party Plaintiff's Amended Third-Party Complaint should be dismissed with prejudice for failing to state a claim upon which relief can be granted.

**PEPPER HAMILTON LLP**

_/s/ Matthew A. Kaplan_
Matthew A. Kaplan (#4956)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
Telephone No.: 302-777-6528

A. Christopher Young
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone No.: 215-981-4190

_Attorneys for Third-Party Defendant,_
_Sunoco, Inc. (R&M)_

#9007678 v2

EXHIBIT 1

*Sweet Oil File*

# ConocoPhillips Mid-Atlantic Marketing Assets

## Marketer

Marketer #: **3138913**

✓

————————— PMPA Franchise Agreement

————————— Amendment(s) to PMPA

————————— Reimbursement Agreement

————————— Equipment Lease Agreement

————————— Purchase Money Security Agreement

————————— Maintenance & Information Services Agreement

————————— Maintenance & Systems Access Agreements

————————— Point of Sale Agreement

————————— Confidentiality Agreement

————————— Rent waiver

————————— Defaults

————————— Assignments

————————— Other

*Strictly private & confidential*

JPMorgan

ConocoPhillips



# TOSCO

Tosco Refining, L.P.
1500 N. Priest Drive
Tempe, Arizona 85281
P.O. Box 52085
Phoenix, Arizona 85072-2085

September 18, 2000

Peninsula Oil Co., Inc.
P O Box 389
Seaford, DE 19973

JOBBER #: ~~3138913~~   ~~3263432~~

## MOBIL BRAND TEN DAY ACKNOWLEDGMENT

This Ten Day Acknowledgment ("Acknowledgment") is made as of <u>September 18, 2000</u> between Tosco Refining, L.P. ("TOSCO") and <u>Peninsula Oil Co., Inc.</u> ("JOBBER") whose principal place of business is at <u>P O Box 389, Seaford, DE 19973</u>

Attached for JOBBER's review and execution is a Mobil Branded Distributor Agreement and other related documents dated <u>September 18, 2000</u>. The undersigned and/or JOBBER's advisors are provided ten (10) business days prior to the receipt by TOSCO of any consideration from the undersigned.

**JOBBER's failure to return all signed documents after the above mentioned 10-day review period may result in the non-renewal/non-execution of the petroleum marketing franchise.**

TOSCO REFINING, L.P.

ACKNOWLEDGED AND UNDERSTOOD ON THE DAY OF RECEIPT:

This  _21st_  day of  _September_ , 2000.

Peninsula Oil Co., Inc.

John Willey Jr.
President

John Willey II
Vice President

Witnessed By: _____
Brian D. Astroth, Business Development Manager

(Revised 9/18/00 an)



MOBIL BRANDED DISTRIBUTOR AGREEMENT

## TABLE OF CONTENTS

| SUBJECT | SECTIONS | PAGE |
|---|---|---|
| PREAMBLE | 1 | 3 |
| GRAND AND PREMISES | 2 | 4 |
| TERM | 3 | 4 |
| RECORD KEEPING/ AUDIT | 4 | 5 |
| MINIMUM VOLUMES | 5 | 5 |
| PRICE AND DELIVERY | 6 | 5 |
| TERMS OF PAYMENT | 7 | 7 |
| INDEPENDENT CONTRACTOR | 8 | 8 |
| OPERATIONS, IMAGE AND STANDARDS OF QUALITY | 9 | 8 |
| TOSCO'S MOBIL BRANDED OPERATOR STANDARDS | 10 | 8 |
| TRADEMARKS | 11 | 9 |
| TAXES | 12 | 12 |
| ALLOCATION AND EXCEEDING MAXIMUM QUANTITY | 13 | 12 |
| FORCE MAJEURE | 14 | 12 |
| CREDIT CARDS | 15 | 13 |
| BUSINESS PLAN | 16 | 13 |
| ENVIRONMENTAL COMPLIANCE | 17 | 13 |
| ASSIGNMENT, TRANSFER AND SALE | 18 | 13 |
| INDEMNIFICATION | 19 | 14 |
| INSURANCE | 20 | 15 |
| TERMINATION | 21 | 16 |
| NOTICE | 22 | 18 |
| RIGHT OF FIRST REFUSAL | 23 | 18 |
| WAIVER | 24 | 18 |
| MODIFICATION | 25 | 19 |
| CHOICE OF LAW | 26 | 19 |
| SEVERABILITY | 27 | 19 |
| JOINT LIABILITY | 28 | 19 |
| ATTORNEY FEES | 29 | 19 |
| REPRESENTATIONS | 30 | 19 |

**Mobil**

| | | |
|---|---|---|
| REVIEW OF AGREEMENT | 31 | 19 |
| SECTION TITLES | 32 | 19 |
| EXHIBITS | 33 | 19 |
| ENTIRE CONTRACT | 34 | 20 |

**EXHIBITS**

| | |
|---|---|
| Station(s) | Exhibit A |
| Quarterly Contract Volumes | Exhibit B |
| Specified Terminal(s) | Exhibit C |
| Tosco's Mobil Branded Operator Standards | Exhibit D |
| Petroleum Marketing Practices Act (PMPA) | Exhibit E |

**ADDENDUM**

**Mobil**

## MOBIL BRANDED DISTRIBUTOR AGREEMENT
### Branch No. 2000432

This Mobil Branded Distributor Agreement ("Agreement") is dated and entered into this 18 day of September, 2000, by and between Tosco Refining, L.P., a Delaware Limited Partnership (hereinafter referred to as "TOSCO") and **Peninsula Oil Co., Inc.,** a **Delaware** corporation, whose principal place of business is at **PO Box 389, Seaford, DE   19973** (hereinafter referred to as "DISTRIBUTOR").

### *RECITALS*

1.    As of March 1, 2000 TOSCO entered into a Branded Marketer Agreement with Mobil Oil Corporation ("Mobil") whereby Mobil granted to TOSCO the right to license to use the Mobil trademarks and service marks (hereinafter sometimes collectively referred to as "Mobil Trademarks" or "Trademarks") in the States of New Jersey, Pennsylvania, Maryland, Delaware, Virginia, and the District of Columbia (referred to as the "Licensed Territory") the license including other marketing indicia of Mobil for the promotion and sale of motor fuel and certain related services ("Branded Marketer Agreement");

2.    TOSCO is permitted by the Branded Marketer Agreement to license and authorize distributors, independent operators, dealers and resellers to use the Mobil Trademarks in connection with the resale of motor fuels and related services through Mobil Branded Service Stations to the consuming public, which stations include the use of Mobil's proprietary credit card and other payment systems, trade secrets, specialized equipment, stylized station premises, trade dress, slogans, and identification schemes, all of which may be changed, improved, and further developed from time to time (such systems being hereinafter collectively referred to as the "MOBIL FORMATS");

3.    DISTRIBUTOR desires to be assisted, trained, authorized and licensed to use the MOBIL FORMATS licensed by TOSCO, and recognizes and acknowledges the benefits to be derived from being identified with MOBIL FORMATS and being assisted, trained, and licensed by TOSCO for the use thereof;

4.    DISTRIBUTOR understands and acknowledges the importance of Mobil's and TOSCO's uniform standards of quality, appearance, and service and the necessity of conforming the DISTRIBUTOR's Station(s) to the MOBIL FORMATS therewith; and

5.    DISTRIBUTOR wishes to purchase from TOSCO and distribute Mobil branded products for resale through service station outlets owned and operated by DISTRIBUTOR or by DISTRIBUTOR's dealer and reseller customers.

**Mobil**

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **PREAMBLE**
   The preamble and recitals to the Agreement are incorporated herein and made a part hereof by this reference.

2. **GRANT AND PREMISES**
   (A)   Subject to the terms and conditions of this Agreement and DISTRIBUTOR's continuing good faith performance, TOSCO hereby grants to DISTRIBUTOR a license and franchise to establish and operate Mobil Service Stations utilizing the Trademarks and the MOBIL FORMATS only at the locations set forth in **Exhibit A** (which locations are hereinafter referred to as the "Station(s)").

   (B)   The franchise granted herein is only for the Station(s) in Exhibit A and nothing herein shall be construed as, or shall be a grant of, any exclusive area, market, or territorial rights in or around the Station(s); provided, however, DISTRIBUTOR shall be and hereby is permitted to advertise and solicit business for the Station(s) within any area, market or territory, it being acknowledged and agreed to by DISTRIBUTOR that other Mobil branded service station resellers, dealers, car washes, and TOSCO itself may advertise, solicit business, and locate Mobil branded service stations within any area, market or territory inclusive of, but not necessarily limited to, the vicinity of the Station(s).

   (C)   Pursuant to TOSCO's prior written consent, DISTRIBUTOR may be authorized to own and operate additional Stations under the Mobil Trademarks; provided, however, that said Stations shall meet or comply with TOSCO's then current standards for operation of a Mobil Service Station in accordance with the Tosco's Mobil Branded Operator Standards (as defined below) and with the physical image, appearance, and trade dress standards as set forth in the Mobil Marketing Branding Guidelines which TOSCO will furnish to DISTRIBUTOR at the commencement of this Agreement and from time to time thereafter if updated, revised or changed.

   (D)   Pursuant to TOSCO's prior written consent, DISTRIBUTOR may further sublicense to its dealer and reseller customers to use the Mobil Trademarks at Stations but only to the extent such dealer and reseller customers agree, in writing, to be bound, to the extent applicable and reasonable, to the terms and conditions set forth in the following sections and subsections of this Agreement:  Section 9, Section 11, Section 19, Section 20(A)(2) and Section 20(A)(3).  It is a material condition of the grant of license by TOSCO to DISTRIBUTOR to display the Mobil Trademarks and the grant of any sublicense by DISTRIBUTOR to its dealer and reseller customers, that each Station whether operated by DISTRIBUTOR or DISTRIBUTOR's dealer or reseller customers who are to be identified with the Mobil Trademarks must be first approved by TOSCO.

**Mobil**

3.    **TERM**
      (A)    Subject to the early termination provisions hereinafter set forth, the term of this Agreement and the franchise herein granted shall be for a period of five (5) years, commencing on 10/4/2000 and ending on 9/30/2005. ("Term").

      (B)    DISTRIBUTOR may accept TOSCO's offer to renew the franchise granted herein for one (1) additional five (5) year term commencing on 10/1/2005 and ending on 9/30/2010 provided:
            (1)    DISTRIBUTOR shall not have been previously nonrenewed or terminated;

            (2)    DISTRIBUTOR shall, prior to the commencement of such renewal term, execute TOSCO's then current Mobil Branded Distributor Agreement which shall set forth such renewal terms and conditions;

            (3)    DISTRIBUTOR shall not be in default of any of the material terms and provisions of this Agreement and/or any ancillary agreements related to the franchise relationship, and DISTRIBUTOR shall have fully and faithfully complied with and performed all of DISTRIBUTOR's obligations hereunder; and

            (4)    DISTRIBUTOR shall renovate, improve or upgrade the Station(s) so as to conform with the then current Mobil image and trade dress standards, identification schemes and equipment standards and specifications. Such costs shall be for the sole account of the DISTRIBUTOR, however DISTRIBUTOR may avail itself of or participate in any gasoline product rebate or other financial incentive program which TOSCO may have in effect for Mobil Branded Distributors (if any) to defray such expenses.

4.    **RECORD KEEPING / AUDIT**
      DISTRIBUTOR shall at all times maintain accurate records of the Station(s) business operations. Periodically, when requested by TOSCO, DISTRIBUTOR shall provide TOSCO with detailed reports showing sales volumes, cost of goods sold, truck and trailer delivery records and other documentation evidencing that DISTRIBUTOR has met DISTRIBUTOR's minimum supply and purchase requirements, as hereinafter set forth in the MINIMUM VOLUMES Section hereof. To substantiate such documentation, TOSCO shall have the right to inspect, with prior written notice, DISTRIBUTOR's records, books of account, excise or sales tax returns and reports at reasonable times and during customary business hours at DISTRIBUTOR's principal place of business, or at the place where such records are kept, and to conduct an independent audit thereof.

5.    **MINIMUM VOLUMES**
      (A)    DISTRIBUTOR shall purchase the quantities of motor fuels set forth herein in **Exhibit B** (the "Contract Volumes") only from TOSCO and other independent TOSCO branded DISTRIBUTOR's or distributors expressly authorized in writing by TOSCO from time to time, or from any one or more of the foregoing. DISTRIBUTOR's failure to purchase at

**Mobil**

least eighty percent (80%) of the motor fuels requirements set forth in **Exhibit B** (the "Minimum Volume") from any such sources shall be cause for termination and/or non-renewal of this Agreement by TOSCO subject to DISTRIBUTOR's right to cure as set forth hereinafter. The requirement of DISTRIBUTOR to purchase Minimum Volume is a provision of this Agreement that is both reasonable and of material significance to the franchise relationship. Quarterly written volume summaries shall be furnished by TOSCO to DISTRIBUTOR. In the event DISTRIBUTOR has underlifted the Minimum Volume, for a quarterly period of this Agreement, DISTRIBUTOR shall be afforded the opportunity to cure by taking delivery of the underlifted volume from the prior quarterly period plus the Minimum Volume over the six (6) month period following the quarterly period in which DISTRIBUTOR failed to purchase the Minimum Volume (the "Cure Period"). In determining whether volume has been underlifted for a given quarterly period, volumes lifted in excess of the minimum quarterly volume(s) for the preceding two (2) quarterly periods, if any, shall be credited to the volume for the underlifted quarterly period. Failure to purchase the Minimum Volume and to effect cure during the Cure Period shall be considered an event which is relevant to the franchise relationship and as a result of which termination or nonrenewal of the franchise relationship is reasonable.

(B)   DISTRIBUTOR's termination or reduction of branded sales through Station(s) identified on **Exhibit A** will not reduce DISTRIBUTOR's Contract Volume purchase requirements under this Agreement without TOSCO's written consent, which consent shall not be unreasonably withheld.   TOSCO recognizes that there may occur extenuating and uncontrollable circumstances affecting the individual Stations such as, but not limited to, road construction, natural disasters, supply shortages or abnormal market conditions, that may affect a Station from selling its Contract Volume. In such cases, DISTRIBUTOR may make a written request for a reasonable temporary adjustment to the Contract Volumes set forth in **Exhibit B** stating specifically the reason the adjustment is being requested. TOSCO agrees to respond to all volume adjustment requests within twenty-one (21) days of receipt.

6.   **PRICE AND DELIVERY**
(A)   DISTRIBUTOR shall purchase no less than the volumes and grades of Mobil branded motor fuels as will meet consumer demands for such products in the trading area of each of the Station(s), or such other volumes as TOSCO and DISTRIBUTOR may from time to time negotiate and agree for each of the Station(s). At the commencement of this Agreement, TOSCO and DISTRIBUTOR hereby agree that DISTRIBUTOR shall exert good faith efforts to purchase and resell at each of the Station(s) the Contract Volumes of Mobil branded gasoline and diesel fuel as set forth in **Exhibit B**.

(B)   TOSCO motor fuels to be purchased by DISTRIBUTOR shall at all times be the Mobil brands and grades generally offered for sale by TOSCO in the geographic area in which the Stations are located; provided, however, that only TOSCO shall have the right to change or discontinue, from time to time, the offering for sale of such brands or grades.

(C)   At the commencement of this Agreement, TOSCO and DISTRIBUTOR hereby agree that all sales of motor fuels to DISTRIBUTOR for each of the Station(s) listed in **Exhibit**

**Mobil**

A shall be made into DISTRIBUTOR's owned truck and/or trailer or designated contract carrier at the terminal location(s) set forth in **Exhibit C** ("Specified Terminal(s)").

(D)    TOSCO shall make reasonable efforts to make motor fuels available for F.O.B. delivery into DISTRIBUTOR's owned truck or trailer or designated contract carrier 365 days per year at the Specified Terminal(s) in accordance with the terms of the Terminal Guaranty Agreement in effect for the Specified Terminal(s), however, in no instance shall TOSCO be required to load DISTRIBUTOR's owned truck or trailer or designated contract carrier during other than the normal operating hours of the terminal or on Sundays or legal holidays if the Specified Terminal(s) are not open for business during such times.

(E)    TOSCO warrants the title to all motor fuel products sold hereunder and that such products conform to applicable regulatory, pipeline grade, and TOSCO typical proprietary specifications.   NO OTHER WARRANTIES EXPRESS OR IMPLIED ARE MADE BY TOSCO INCLUDING FITNESS FOR A PARTICULAR PURPOSE.

(F)    Title to and risk of loss of TOSCO motor fuel sold and delivered by TOSCO to DISTRIBUTOR shall pass to DISTRIBUTOR at the time the motor fuel enters DISTRIBUTOR's owned truck and trailer or designated contract carrier at the Specified Terminal(s). Any claims for shortage of quantity or deficiency in quality of products purchased hereunder shall be waived unless DISTRIBUTOR notifies TOSCO in writing no later than ten (10) business days following date of delivery in the case of quantity claims, or in the case of quality claims no later than five (5) business days following the discovery of deficiency of quality. DISTRIBUTOR's written notice to TOSCO in either event must extend to TOSCO the opportunity to make a full investigation. All delivery documentation, weigh cards, summaries, reports, retain samples, laboratory analyses and the like in DISTRIBUTOR's possession or control must be preserved for TOSCO's inspection and review.

(G)    The purchase price to be paid by DISTRIBUTOR for the brands and grades of TOSCO motor fuels sold and delivered to DISTRIBUTOR shall be the posted branded DISTRIBUTOR price F.O.B. TOSCO's terminal then in effect at the time DISTRIBUTOR loads the motor fuels into DISTRIBUTOR's owned truck and trailer or designated contract carrier. TOSCO has the right to change prices at any time.  TOSCO will establish procedures to notify DISTRIBUTOR of price changes, but any such price changes shall be effective whether or not DISTRIBUTOR receives actual notice. Any special allowances, discounts or rebates which may apply to DISTRIBUTOR shall be governed by the terms of the particular program offered by TOSCO to other DISTRIBUTOR's in and around DISTRIBUTOR's trade area, geographic market or territory.

7.    **TERMS OF PAYMENT**
(A)    DISTRIBUTOR shall pay for motor fuels purchased from TOSCO in accordance with the terms of payment established by TOSCO from time to time. DISTRIBUTOR agrees to establish an account with a financial institution that provides electronic funds transfer ("EFT") services and to authorize the drafting of funds by TOSCO from that account to TOSCO's designated account for debts due and owing by DISTRIBUTOR under terms and conditions that

**Mobil**

may be established from time to time by TOSCO. TOSCO has the right to charge and collect from DISTRIBUTOR a reasonable service charge on past due accounts. Any discounts for prompt payment which may be in effect shall apply only to the price of products and not to any taxes, inspection fees, freight or container charges or any other charges which may be included in the total invoice amount.

(B)     DISTRIBUTOR is required to submit annual (and quarterly, if requested by TOSCO) financial statements to TOSCO within ninety (90) days of the end of each fiscal year (and, if requested, within sixty (60) days of the end of each fiscal quarter). TOSCO reserves the right to require a letter of credit, prepayment or personal guaranty in accordance with TOSCO's secured credit policy in effect from time to time.

(C)     No payment made to TOSCO by check, electronic funds transfer, or by any other instrument shall contain a restrictive endorsement of any kind, and any such restrictive endorsement shall have no legal effect even if the instrument restrictively endorsed is processed for payment and TOSCO retains the proceeds.

(D)     At any time the financial responsibility of DISTRIBUTOR is deemed in TOSCO's sole judgment as unsatisfactory, payment in advance, cash on delivery or cash deposits or other satisfactory security may be demanded by TOSCO. Failure of DISTRIBUTOR to comply strictly with terms of payment, or failure to comply with TOSCO's demand for cash in advance or cash on delivery or cash deposits or other security shall be cause for TOSCO to suspend further shipments and deliveries under this Agreement or terminate this Agreement.

8.     **INDEPENDENT CONTRACTOR**

DISTRIBUTOR is and shall at all times remain an independent contractor and shall not make any representations or take any action which might establish any actual or apparent agency, joint venture, partnership, or employment with TOSCO, and TOSCO shall not be obligated in any manner by any agreements, warranties, or representations made by DISTRIBUTOR to third persons.

9.     **OPERATIONS, PRODUCTS AND STANDARDS OF QUALITY**

(A)     TOSCO shall upon the full execution hereof and from time to time and at any time during the Term hereof furnish to DISTRIBUTOR the then current standards and specifications for Mobil Branded Service Station construction, image trade dress and decor, inventory, supplies, equipment and other products and services required by TOSCO to be utilized in the establishment and operation of the Station(s) (the "Mobil Marketing Branded Guidelines"). DISTRIBUTOR shall at all times make a good faith effort to conform each of the Franchise Premises with and adhere to such then current Marketing Branded Guidelines.

(B)     In order to protect the reputation and goodwill of TOSCO's Mobil Trademark and trade dress and to maintain uniform standards of operation thereunder, DISTRIBUTOR agrees to conduct (or require DISTRIBUTOR's branded reseller customers to conduct) operations at each of the Station(s) in strict compliance with such courses of instruction,

**Mobil**

procedures and policies, operating manuals and training programs as TOSCO may from time to time require of TOSCO's other Mobil branded resellers, dealers, car washes, and itself.

(C)    Any TOSCO courses of instruction, operating manuals and training programs delivered or loaned to DISTRIBUTOR shall at all times remain the sole property of TOSCO and shall promptly be returned upon the expiration or other termination of this Agreement. DISTRIBUTOR shall not at any time copy, duplicate, record, or otherwise make such materials available to any unauthorized person or source.  TOSCO may from time to time revise the contents of the materials.  In order to insure compliance with the operating standards set forth in this Agreement, representatives of TOSCO may, at any reasonable time, enter upon and inspect the Station(s).

(D)    If DISTRIBUTOR has not done so at the commencement of this Agreement, DISTRIBUTOR shall, prior to assuming the day-to-day operations of the Station(s), complete any regular course of instruction offered by TOSCO unless because of previous experience TOSCO shall expressly waive DISTRIBUTOR's compliance with the foregoing requirements, but DISTRIBUTOR agrees to undertake and complete any continuing training programs which may be offered from time to time by TOSCO in order to implement current standards.  Unless approved in advance in writing by TOSCO, TOSCO shall not provide any payments to nor shall it defray any living expenses of DISTRIBUTOR during or in connection with such initial course of instruction or during any subsequent course of instruction, all such expenses being the sole obligation of DISTRIBUTOR.

(E)    DISTRIBUTOR shall not do or allow anything to occur at DISTRIBUTOR's or at DISTRIBUTOR's customers Stations which would detract from or disparage the Mobil Trademarks licensed under this Agreement.  In particular, without limiting the foregoing, DISTRIBUTOR shall not do or permit the following:

(1)    Use the Station or any part thereof, without TOSCO's prior written consent, for (a) an automobile, truck or equipment rental business;  (b)  a vehicle towing business consisting of two (2) or more tow trucks;  (c)  a business of selling vehicles of any kind; (d) a parking lot; or storage of junk, disabled vehicles or used tires or batteries; (e) a business that involves major engine overhauls, auto body repair, welding, or any other operation that involves an open flame; or (f) a franchise or franchise business operated on or from the Franchise Premises other than any franchise or franchise business approved by TOSCO or offered by TOSCO to DISTRIBUTOR.

(2)    Obstruct any entrance, exit, pin corner, or pump island or otherwise restrict to the Franchise Premises, or any part thereof or block delivery carrier's access to storage tank fill pipes.

(3)    Store or sell any intoxicating beverages unless DISTRIBUTOR has secured all necessary permits and license and liquor liability insurance and DISTRIBUTOR and DISTRIBUTOR's branded customers and their employees are trained in the proper procedures of selling intoxicating beverages.

**Mobil**

    (4)    Store or sell any illegal substances or drugs, or any associated paraphernalia or permit the same to be used or consumed at the Franchise Premises.

    (5)    Discharge or permit the discharge of petroleum products or other products or materials onto the surface of the Franchise Premises.

    (6)    Continue the stocking, offering for sale, or selling merchandise or services (including amusement, vending and music machines) after receiving written notice from TOSCO that specific merchandise or services are, in TOSCO's opinion, in any way injurious, demeaning, or prejudicial to TOSCO's business reputation.

    (7)    Allow or condone any activity on or at the Franchise Premises that shall constitute a nuisance, or maintain or permit any animal to be present, or condition to exist which may endanger the health, safety or well being of persons at the Franchise Premises.

    (8)    Allow loitering by persons who at the time have no business purpose at the Franchise Premises or permit the use of the Franchise Premises as housing, sleeping, or living quarters. The Station is to be used for business purposes only.

    (9)    Restrict the use of Franchise Premises by the installation of coin-operated devices in restroom or on restroom doors.

    (10)    Charge for air and water dispensing or install coin-operated devices in the air/water consoles, without first having obtained TOSCO's prior written consent.

10.    **TOSCO'S MOBIL BRANDED OPERATOR STANDARDS**

    (A)    DISTRIBUTOR shall diligently develop each of the Station(s), consistent with the terms hereof and the TOSCO's MOBIL BRANDED OPERATOR STANDARDS attached hereto as **Exhibit D** and in accordance with the Mobil Marketing Branding Guidelines, both of which TOSCO reserves the right to amend from time to time.

    (B)    DISTRIBUTOR shall at all times maintain or cause to be maintained the Station(s) and all equipment and facilities in good repair, and to the fullest extent possible in conformance with the TOSCO's MOBIL BRANDED OPERATOR STANDARDS, and in such manner as required by laws, statutes, ordinances and regulations, and shall at DISTRIBUTOR's own expense (or at the expense of DISTRIBUTOR's dealer and/or reseller customers) obtain, or cause to be obtained, all applicable licenses and permits for the operations at the Station(s).

    (C)    DISTRIBUTOR acknowledges that providing superior customer service is essential not only to the success of DISTRIBUTOR's business but also to the reputation and integrity of the Mobil brand and the Mobil Trademarks. DISTRIBUTOR therefore agrees that DISTRIBUTOR will develop customer responsiveness programs designed to respond to and resolve customer inquiries or complaints within a maximum of fourteen (14) days from receipt.

**Mobil**

This program shall apply both to inquiries or complaints received directly by DISTRIBUTOR and to those received by TOSCO and referred to DISTRIBUTOR for response. DISTRIBUTOR will require that all personnel, at Station(s) supplied by DISTRIBUTOR, dress in coordinated uniforms acceptable to TOSCO. In addition, to monitor the quality of service and cleanliness at Stations supplied by DISTRIBUTOR, DISTRIBUTOR will participate in TOSCO's Mystery Shopper Program to the same extent that TOSCO's direct supplied customers participate in the TOSCO Mystery Shopper Program, and promptly take actions to correct any operations with scores lower than the baseline score, as adjusted, as set forth in the Mystery Shopper Program Description a copy of which has been furnished to DISTRIBUTOR concurrently herewith. TOSCO shall not be obligated to provide a continuous Mystery Shopper Program during the Term of this Agreement.

11. **TRADEMARKS**
    (A)    Subject to the terms and conditions of this Agreement and the March 1, 2000 Branded Marketer Agreement by and between Tosco and Mobil Oil Corporation, TOSCO grants to DISTRIBUTOR, as a sublicensee, the non-exclusive right to use the Mobil Trademarks or any substitute trademark (hereinafter "Licensed Mark") as a trademark on, in connection with, the resale of motor fuel products supplied under this Agreement which are designated by TOSCO as Mobil branded products and purchased from TOSCO (hereinafter the "Licensed Products"). TOSCO also grants to DISTRIBUTOR the right to sublicense to DISTRIBUTOR's customers the use of the Licensed Mark on Licensed Products but only to the extent that such customers agree, in writing, to be bound by the terms and conditions of this Agreement and the Branded Marketer Agreement. DISTRIBUTOR and DISTRIBUTOR's dealer and reseller customers shall diligently promote the business and goodwill associated with the Mobil Trademarks at all times during the Term of this Agreement.

    (B)    DISTRIBUTOR acknowledges that all of DISTRIBUTOR's rights to use the Mobil Trademarks are derived from and thorough this Agreement. DISTRIBUTOR further acknowledges and agrees that DISTRIBUTOR's rights are subordinate to and derived from the Branded Marketer Agreement and the DISTRIBUTOR shall be bound by the terms of the Branded Marketer Agreement related to the use and display of the Mobil Trademarks and marketing indicia and the sale of the Mobil Licensed Products. DISTRIBUTOR understands that Mobil has granted TOSCO a limited license to use Mobil's Licensed Trademark for a period of time. TOSCO's license to use Mobil's Licensed Trademark is scheduled to expire Febrauary 28, 2010, unless terminated earlier or extended by agreement between the parties. DISTRIBUTOR understands that TOSCO's license may terminate in the future, and that if the license terminates, DISTRIBUTOR and TOSCO will not be entitled to use Mobil's Trademarks and TOSCO will provide a new Licensed Trademark to DISTRIBUTOR under the license granted by this TRADEMARK Section.

    (C)    TOSCO shall have the right, at all times during the Term of this Agreement, to discontinue use of the Mobil Trademarks and substitute therefore a license for the use of a different mark and brand.

**Mobil**

(D)     DISTRIBUTOR agrees that DISTRIBUTOR's Stations and DISTRIBUTOR's dealer and reseller Stations shall conform to the criteria in Mobil Marketing Branding Guidelines and the standards for operation of a Mobil Service Station as amended from time to time, any nonconforming Stations will be promptly debranded by DISTRIBUTOR.

(E)     DISTRIBUTOR acknowledges that DISTRIBUTOR has had no part in the creation or development of, no prior knowledge of, and no property or other rights or claims in or to, any element of the MOBIL FORMATS or the Mobil Trademarks, and agrees that all materials loaned or otherwise made available to DISTRIBUTOR, and all disclosures made to DISTRIBUTOR by or at the direction of TOSCO, and not to the general public, at any time before or during the Term of this Agreement and any extension thereto, or communicated and made available, shall hereafter be kept confidential as trade secrets.

(F)     DISTRIBUTOR shall only use the existing or future Mobil Trademarks and related practices, systems, procedures, methods, devices and techniques and variations thereof as are applicable to the Station(s), at all times in conformity with the permissive provisions of this Agreement.

(G)     At no time during the Term hereof shall DISTRIBUTOR advertise the Mobil Trademarks or use the Trademarks in advertising or any other form of promotion except as may be approved by TOSCO. At no time during the Term hereof and at no time from and after the expiration or termination of the Term hereof shall DISTRIBUTOR advertise or otherwise utilize, either at the Station(s) or elsewhere, any marks, trade dress, logotypes, or names confusingly similar to the Trademarks.

(H)     DISTRIBUTOR shall not use the Mobil Trademarks in DISTRIBUTOR's own trade or corporate name and shall not use DISTRIBUTOR's own name or any other name in connection with the Trademarks, without the prior written consent of TOSCO. DISTRIBUTOR's dispensing equipment and the dispensing equipment of DISTRIBUTOR's dealer and reseller customers shall be painted, decaled or portrayed in accordance with TOSCO's Mobil visual or image standards as may be in effect from time to time. TOSCO shall make available for erection at DISTRIBUTOR's Franchise Premises appropriate signs and other identification materials. Such signs and other identification materials shall remain the property of TOSCO. DISTRIBUTOR or DISTRIBUTOR's dealer and reseller customers, at their respective expense, shall make all repairs and maintenance to keep the signs and other identification materials clean and in good operating condition.

(I)     Upon the expiration or termination of this Agreement for any reason, DISTRIBUTOR shall take such action as shall be necessary to cancel any assumed business name, fictitious firm name statement, or equivalent registration which contains any of the Trademarks, and DISTRIBUTOR shall furnish evidence satisfactory to TOSCO of compliance with this obligation within thirty (30) days after such expiration or termination. As soon as practicable but in any event within one (1) year from the date of such expiration or termination, DISTRIBUTOR shall discontinue or cause to be removed any such telephone directory or yellow page listing that displays the Trademarks.

**Mobil**

(J)     DISTRIBUTOR shall be responsible for DISTRIBUTOR's dealer and reseller customer's compliance with the use of Trademarks in accordance with this Agreement. DISTRIBUTOR shall take all steps necessary to insure compliance by DISTRIBUTOR's dealer and reseller customers including termination of supply of branded products to and of the use of Trademarks by any noncomplying customer.  Any DISTRIBUTOR dealer or reseller customer that does not correct a defect or noncompliance with the visual or image standards for the display of the Mobil Trademarks as set forth in this Agreement, the Mobil Marketing Branding Guidelines, or written materials, guidelines or standards as TOSCO may establish from time to time (the "Approval Criteria") within five (5) days, or such longer time as TOSCO may consider to be reasonable under the circumstances, after notice of such defect or noncompliance shall be terminated.

(K)     DISTRIBUTOR shall not use, or allow the use of any TOSCO "Mobil" identified sign at any Station operated by, or supplied by DISTRIBUTOR, without the written consent of TOSCO.  Each sign approved for use and the Station where the sign is to be used shall be listed in TOSCO's standard agreement with respect to such matters and shall be entered into at the time TOSCO approves a Station for display or use of the Trademarks.  It is a condition precedent of TOSCO's grant of a license herein to DISTRIBUTOR for the use of Trademarks that TOSCO must first approve each Station whether operated by DISTRIBUTOR or by DISTRIBUTOR's dealer and reseller customers which will be identified by the Trademarks.  Approval will be based on the appearance, location and mode of operation of any Station operated by DISTRIBUTOR or DISTRIBUTOR's dealer and reseller customers and such other criteria, standards or qualifications as TOSCO may consider reasonable and appropriate.  TOSCO expressly reserves the right to determine the appropriate geographic density of the area, market, or territory in and around the Stations to be identified by the Trademarks including outlets operated or planned to be operated directly by TOSCO.  TOSCO shall have the right at any time, to withdraw its approval of any Station utilizing the Trademarks if such Station fails to comply with the Approval Criteria, and in such cases, DISTRIBUTOR shall promptly debrand or cause to be debranded such Station and return all brand identification materials from such Station to TOSCO's designated terminal, at DISTRIBUTOR's cost, it being further provided however, TOSCO's right to withdraw approval shall be limited to the foregoing and TOSCO shall not withdraw approval for Stations licensed to use the Trademarks hereunder based solely on TOSCO's determination as to appropriate geographic density.  DISTRIBUTOR shall on a prompt basis when requested advise TOSCO in writing of all DISTRIBUTOR's Stations and all of DISTRIBUTOR's dealer and reseller customers Stations bearing the Trademarks and the average monthly quantity of branded motor fuel sold for each such Station bearing the Trademarks.  **Exhibit A** will be amended from time to time to reflect the addition or deletion of DISTRIBUTOR's and DISTRIBUTOR's dealer and reseller customers Stations.  TOSCO has the right at least once one (1) year, and upon any termination of this Agreement to make a physical audit of all brand identification materials in the possession of DISTRIBUTOR and DISTRIBUTOR's dealer and reseller customers.

**Mobil**

(L)     TOSCO shall, at all times, have the right to control the nature and quality of the motor fuel products in connection with which the Trademarks are used. DISTRIBUTOR or DISTRIBUTOR's dealer and reseller customers selling under the Trademarks shall not use the Trademarks in connection with any motor fuel products other than products designated as Mobil branded motor fuel products by and purchased from TOSCO. DISTRIBUTOR and DISTRIBUTOR's dealer and reseller customers shall not adulterate, add to, mix, commingle, or blend any of TOSCO's motor fuel products in connection with which DISTRIBUTOR or DISTRIBUTOR's dealer and reseller customers use the Mobil Trademarks, with any products, additives, material or substances without first obtaining the written consent of TOSCO.

(M)     This Agreement is subject to termination partially or in full in the event DISTRIBUTOR is in material default of or breaches any provision of this Section 11 or in the event DISTRIBUTOR fails to terminate the grant of the use of the Trademarks by DISTRIBUTOR's branded dealer or reseller customers if DISTRIBUTOR knows or has been notified that DISTRIBUTOR's branded dealer or reseller customer(s) are or have engaged in conduct constituting a material default or breach of the provision of this Section 11. Any termination of this Agreement also automatically terminates the grant of DISTRIBUTOR's license to use the Trademarks. Upon termination, DISTRIBUTOR and DISTRIBUTOR's dealer and reseller customers using the Trademarks shall discontinue such use immediately. Whenever the grant of license to use the Trademarks is terminated with respect to any Station, all signs or other identification bearing the Trademarks shall be returned to TOSCO's designated terminal, at DISTRIBUTOR's expense, in the same condition as received by DISTRIBUTOR or DISTRIBUTOR's dealer and reseller customer, normal wear and tear excepted, within ten (10) days. In addition, DISTRIBUTOR or DISTRIBUTOR's dealer and reseller customers will promptly repaint the Station to eliminate the distinctive colors associated with the Mobil image and trade dress and make such other modifications so that there is no suggestion to the general public that the Station is a source of TOSCO's Mobil branded products or services.

12.     **TAXES**
In addition to the prices for motor fuel products specified in PRICE AND DELIVERY Section, unless DISTRIBUTOR furnishes TOSCO with exemption certificates therefor, DISTRIBUTOR agrees to pay TOSCO any taxes, fees, duties, or other charges not already included in the price which TOSCO is required to pay or collect and which may be imposed directly or indirectly by any municipal, State or Federal law or governmental authority upon the sale, use, storage, transportation, delivery or handling of any of the motor fuel products purchased hereunder or otherwise resulting from or measured by the purchase of products hereunder.

13.     **ALLOCATION AND EXCEEDING MAXIMUM QUANTITY**
(A)     If TOSCO, because of force majeure, shortage or threatened shortage of supply, either of TOSCO's own products, including raw materials, or its other regular sources of supply, or in the industry generally, by reason of governmental regulations affecting product allocation and supply or for any other reason, determines that TOSCO is unable to supply all demands upon it for any petroleum products sold by TOSCO to its various classes of customers, TOSCO

**Mobil**

shall make a reasonable effort to allocate and distribute products equitably among its various customers and itself pursuant to such plan, method, or formula as TOSCO believes will reasonably and fairly accomplish such purpose. During the period such shortage of supply is determined by TOSCO to exist, the provisions of this Agreement relating to Contract Volume shall not be effective and the Contract Volume delivered under this Agreement shall be such part or proportion of the Contract Volume set forth herein that DISTRIBUTOR would be entitled to under TOSCO's allocation plan, method, or formula. Upon cessation of any such shortage, neither TOSCO or DISTRIBUTOR shall be obligated to make up any Contract Volumes omitted pursuant to this Section, but TOSCO and DISTRIBUTOR may do so by mutual agreement.

(B)     TOSCO reserves the right to establish different prices for motor fuel purchases by DISTRIBUTOR that exceed 110 % of the specified maximum *monthly* quantities as calculated by reference to **Exhibit B** hereto (the "Overlifting Price Differential"). The Overlifting Price Differential shall be determined in TOSCO's sole discretion, and may, in Tosco's sole discretion, be capped at 20% incremental to TOSCO's posted price in effect on the date(s) of lifting.

14.     **FORCE MAJEURE**
No failure or omission by either party in the performance of any obligation of this Agreement shall be deemed a breach of this Agreement, nor create any liability for damages, if same arises from any cause or causes beyond the reasonable control of the nonperforming party including, but not limited to, the following which for the purposes of this Agreement, shall be regarded as beyond the control of the parties: acts of God, acts of Federal, State or local governments or agencies, compliance with requests, recommendations, rules, regulations or orders of any governmental authority or any officer, department, agency or instrumentality thereof, fire, storm, riot, sabotage, strikes, lockouts, disputes or differences with workmen, accidents, equipment failure, reduction or unavailability of refined products or refinery capacity, failures or delays in transportation, or exhaustion, reduction or unavailability of petroleum products at the source of supply from which deliveries are made hereunder, or exhaustion or reduction or unavailability or delays in delivery of any product or material necessary in the manufacture of petroleum products deliverable hereunder, including crude oil, natural gas supplies and raw materials. In the event that either party finds it necessary to assert the existence of the foregoing force majeure, the Term of this Agreement shall not be extended for the duration of the force majeure event thereby, but the Contract Volumes specified in this Agreement and **Exhibit B** shall be ratably reduced for the period during which such condition of force majeure may exist. In no event shall TOSCO be liable for loss of profits or special or consequential damages because of delay or failure to make deliveries.

15.     **CREDIT CARDS**
(A)     TOSCO may from time to time offer, develop or sponsor credit cards or other payment systems for use at the Station(s). DISTRIBUTOR and DISTRIBUTOR's branded reseller customers shall honor and participate in any credit card or other payment system programs sponsored by TOSCO in accordance with the terms and conditions of those programs. However, TOSCO is not obligated to sponsor or participate in any credit card or other payment

**Mobil**

system program and may withdraw its sponsorship or participation at any time, or condition such sponsorship or participation upon payment of service and equipment fees by DISTRIBUTOR. DISTRIBUTOR agrees that it will comply strictly with the terms and conditions of any credit card program TOSCO may sponsor and in the absence of such strict compliance DISTRIBUTOR acknowledges that it will not be eligible for participation in the credit card or other payment system program.

(B)     DISTRIBUTOR shall install or cause to be installed approved electronic point of sale ("EPOS") equipment at the Station(s) for the processing of credit card and debit card transactions.

16.  **BUSINESS PLANS**
Unless DISTRIBUTOR has previously submitted a market development plan, DISTRIBUTOR shall prepare a comprehensive market development plan for the representation of TOSCO's Mobil branded motor fuels and present the plan to TOSCO within fifteen (15) months of the effective date of this Agreement. The plan shall be based on DISTRIBUTOR's analysis of DISTRIBUTOR's primary marketing area which is not exclusive as to DISTRIBUTOR, and shall provide for the selection and acquisition of key sites, the development of optimal facilities, effective operating practices, and the necessary financial and management resources.

17.  **ENVIRONMENTAL COMPLIANCE**
(A)     DISTRIBUTOR agrees to observe all valid laws, ordinances and regulation pertaining to the composition, handling, storage and dispensing of petroleum products purchased hereunder, including all regulation pertaining to unleaded gasolines, oxygenated gasolines, reformulated gasolines and the volatility or vapor pressure of gasolines and the storage of petroleum products in underground storage tanks. DISTRIBUTOR agrees to comply with any program instituted by TOSCO to assure compliance with applicable regulations including programs for the handling of unleaded, oxygenated and reformulated gasolines.

(B)     DISTRIBUTOR agrees that DISTRIBUTOR will indemnify TOSCO and hold it harmless against any liability, penalty or loss which may result from a violation of environmental regulations and regulations relating to the sale and delivery of unleaded, oxygenated and reformulated gasoline which arises out of or is attributable to the operations and conduct of DISTRIBUTOR's business except and to the extent that such liability, penalty or loss is attributable to the intentional or negligent acts or omissions of TOSCO, in which case TOSCO shall be responsible for its proportionate share.

18.  **ASSIGNMENT, TRANSFER AND SALE**
(A)     DISTRIBUTOR acknowledges that the existing ownership and control of DISTRIBUTOR is material to TOSCO's willingness to enter into this Agreement. DISTRIBUTOR expressly agrees not to sell, assign, or transfer this Agreement or any rights hereunder, in whole or in part, without TOSCO's prior written consent which shall not be

**Mobil**

unreasonably withheld. This Agreement may not be assigned by operation of law. If DISTRIBUTOR is a corporation or partnership, any sale or transfer or any series of sales or transfers by the principal shareholder or shareholders or partners of DISTRIBUTOR of a controlling interest in the voting shares of DISTRIBUTOR or the merger of DISTRIBUTOR into another corporation, either of which has the effect of transferring control of DISTRIBUTOR to another person, persons or corporation shall constitute an assignment requiring Tosco's prior written consent. Any attempt by DISTRIBUTOR to assign this Agreement or any rights hereunder without TOSCO's prior written consent shall be void and of no force and effect and shall be an event which makes termination of this Agreement reasonable, and upon the occurrence thereof TOSCO shall have the immediate right to terminate this Agreement and the franchise relationship created hereunder.

(B)    The provisions of the above Section 18(A) notwithstanding, provided DISTRIBUTOR shall be in full compliance with all the terms and provisions of this Agreement, DISTRIBUTOR may transfer this Agreement and DISTRIBUTOR's rights hereunder to a corporation in which the DISTRIBUTOR owns beneficially and of record, and shall continue to own, beneficially and of record throughout the term of this Agreement more than fifty percent (50%) of the capital stock and voting power of such a corporation. Prior to such acquisition, an appropriate resolution shall be duly adopted by such corporation acknowledging the foregoing requirement of ownership and regulating the issuance, assignment, transfer, sale or other disposition of the corporation's capital stock accordingly, and the contents of such resolution shall be reflected in the corporation's records and noted conspicuously on all stock certificates issued by the corporation. At least thirty (30) days prior to such transfer, TOSCO shall be notified immediately following said resolution in writing of same. Upon any such transfer, and from time to time thereafter, DISTRIBUTOR shall execute such instruments, including personal or corporate guarantees of the obligations of the corporation to which this Agreement and the rights hereunder have been transferred, as may be requested by TOSCO.

(C)    Upon the death or incapacity of DISTRIBUTOR, if DISTRIBUTOR is not incorporated, the rights granted under this Agreement may be transferable as provided by State or Federal law, or, if no valid State or Federal law shall be applicable, to the adult child or spouse of DISTRIBUTOR, provided arrangements have been made satisfactory to TOSCO for the continued active and competent management of DISTRIBUTOR's business and the Station(s). Upon the death or incapacity of the controlling stockholder or stockholders, if DISTRIBUTOR is incorporated, this Agreement will continue in effect, provided the active management of DISTRIBUTOR's business and the Station(s) continues in a manner which fully and completely complies with all of the terms of this Agreement.

19.    **INDEMNIFICATION**
(A)    The business conducted by DISTRIBUTOR in marketing branded motor fuels under the Trademarks licensed hereunder is the independent business of DISTRIBUTOR, and neither this Agreement, nor any attempt by TOSCO to enforce the terms and conditions of this Agreement, shall be construed as reserving to or conferring upon TOSCO any right to direct or control any of DISTRIBUTOR's employees or agents or the manner in which the business

**Mobil**

operations of DISTRIBUTOR shall be conducted. DISTRIBUTOR agrees to acquaint itself and strictly comply with all Federal, State and local laws, ordinances, orders and regulations relating to DISTRIBUTOR's business and the sale, handling and distribution of petroleum products including those relating to environmental protection and compliance.

(B)     To the fullest extent permitted by law, DISTRIBUTOR shall indemnify and hold harmless TOSCO and its parent, officers, directors, employees, subsidiaries, agents and Mobil from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees arising out of or resulting from or connected with any accident or anything whatever occurring from any cause directly or indirectly in connection with the operation and conduct of DISTRIBUTOR's business, and the business of DISTRIBUTOR's retail motor fuel customers, and which (i) is attributable to bodily injury, sickness, disease or death or to injury to or destruction of tangible property including loss of use resulting therefrom and (ii) is caused in whole or in part by any intentional or negligent acts or omission of the DISTRIBUTOR or anyone directly or indirectly employed by DISTRIBUTOR or anyone for whose acts DISTRIBUTOR may be liable, except and to the extent caused in whole or in part by TOSCO's intentional or negligent acts or omissions, or those of anyone directly or indirectly employed by TOSCO or anyone for whose acts TOSCO may be liable, in which case TOSCO shall be responsible for TOSCO's proportionate share of any such liability. Where personal injury, death or loss or damage to property is the result of joint or concurrent negligence or intentional acts of DISTRIBUTOR and TOSCO, each party's duty of indemnification shall be in proportion to its allocable share of such joint negligence or intentional act, provided however that with respect to any accident in which a truck or other motor vehicle of DISTRIBUTOR may become involved after leaving a supply and distribution facility of TOSCO, DISTRIBUTOR shall indemnify and hold TOSCO harmless entirely, without any reservation of rights as against TOSCO.

(C)     To the fullest extent permitted by law, TOSCO shall indemnify and hold harmless DISTRIBUTOR and its parent, directors, officers, employees, subsidiaries and agents from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from or occurring from any cause directly connected with the operation and conduct of TOSCO's business and which (i) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom and (ii) is caused in whole or in part by any intentional or negligent acts or omission of TOSCO or anyone (except DISTRIBUTOR) for whose acts TOSCO may be liable except and to the extent caused in whole or in part by DISTRIBUTOR's intentional or negligent acts or omissions, or those of anyone directly or indirectly employed by DISTRIBUTOR or anyone for whose acts DISTRIBUTOR may be liable, in which case DISTRIBUTOR shall be responsible for DISTRIBUTOR's proportionate share.

20.     **INSURANCE**

(A)     With respect to operations performed by DISTRIBUTOR under or incident to this Agreement, the conduct of DISTRIBUTOR's business (which shall include, without limitation, any liability arising from the conduct of DISTRIBUTOR's retail customers' businesses or any incidents occurring at DISTRIBUTOR's retail customer's businesses),

**Mobil**

DISTRIBUTOR shall obtain and at all times during the Term hereof maintain insurance in accordance with this INSURANCE Section. Such insurance shall include:

(1)     Worker's Compensation and Occupational Disease Insurance, including Employer's Liability Insurance with coverage and limits in compliance with the state laws in the state(s) in which DISTRIBUTOR's premises are located or operations conducted;

(2)     Commercial General Liability and Auto Liability Insurance, covering DISTRIBUTOR's business and operations, premises liability, completed operations and products liability with endorsement or coverage for contractually assumed tort liability for bodily injury and property damages in accordance with the indemnity obligations of DISTRIBUTOR under this Agreement. Such insurance shall have a minimum combined single limit of $1,000,000 each occurrence, $2,000,000 in the aggregate where applicable, for bodily injury and property damage, including personal injury. As respects auto liability such insurance shall be Comprehensive Automobile Insurance covering all owned, hired, or otherwise operated non-owned vehicles, with a minimum combined single limit of $1,000,000 each occurrence (or the equivalent) for bodily injury and property damage;

(3)     DISTRIBUTOR further agrees to include in its Commercial General Liability insurance an endorsement to include TOSCO and its subsidiaries and affiliates as Additional Insureds thereunder and to provide that such coverage shall be primary as to any valid and collectible insurance TOSCO may obtain and carry for its own account to cover its own risks.

(4)     TOSCO may change the minimum insurance limits from time to time and DISTRIBUTOR agrees to maintain coverage which meets or exceeds those limits provided such changes are implemented by TOSCO on a non-discriminatory basis among all similarly situated TOSCO Mobil Branded DISTRIBUTOR's in the relevant geographic market or trade area. The insurance policies required by this INSURANCE Section shall be written by companies satisfactory to TOSCO.

(B)     DISTRIBUTOR or DISTRIBUTOR's insurance carrier shall furnish TOSCO with a certificate of insurance certifying the existence of the above coverage and stating specifically that TOSCO will be given written notice thirty (30) days prior to cancellation or material change. The original certificate and any notice of cancellation or change shall be sent to TOSCO in accordance with NOTICE Section or such other address as TOSCO designates from time to time.

(C)     TOSCO and all corporations affiliated with and/or owned and controlled by TOSCO that may become liable, including Mobil, shall be named as Additional Insureds as their interests may appear and the certificate or policy of insurance, reflecting full compliance with the foregoing requirements, shall at all times be kept on deposit with TOSCO. Subrogation against TOSCO shall be waived as respects Workers' Compensation and Employer's Liability Insurance except in matters shown by final judgment to have been caused by the negligence of TOSCO.

**Mobil**

(D)     The insurance required hereunder in no way limits or restricts DISTRIBUTOR's obligation as to indemnification of TOSCO and further, the insurance to be carried shall be in no way limited by any limitation placed upon the indemnity herein given as a matter of law and any deductibles shall in all instances be for the account of DISTRIBUTOR and not an obligation or liability of TOSCO. DISTRIBUTOR shall immediately notify its insurance carrier, with a copy to TOSCO, of all claims, liabilities, losses, liens, demands, or lawsuits and any other matters covered by any of DISTRIBUTOR's insurance.

21.     **TERMINATION**
(A)     TOSCO may terminate this Agreement if DISTRIBUTOR shall have defaulted in or breached the performance of any of the duties, responsibilities or obligations provided for in this Agreement, or fails reasonably to adhere to any service and operating standards in effect from time to time and fails to cure and correct the foregoing within fifteen (15) calendar days after TOSCO gives written notice to DISTRIBUTOR thereof.

(B)     In addition, TOSCO shall also have the right to terminate or nonrenew this Agreement immediately and without other cause or prior notice if DISTRIBUTOR either:

(1)     Makes an assignment for the benefit of creditors or makes a written admission of its inability to pay its debts or obligations as they become due;

(2)     Files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent;

(3)     Files any petition or other pleading seeking reorganization, arrangement, composition, readjustment, dissolution, or similar relief under any statute, law or regulation, or admitting or failing to contest the material allegations of a petition or other pleading filed against DISTRIBUTOR in any such proceeding;

(4)     Seeks, consents to, or acquiesces in the appointment of any trustee, receiver, or liquidator of his business, or all or a substantial part of its assets, or fails to vacate the appointment of any trustee, receiver, or liquidator for any such purpose within thirty (30) days of such appointment;

(5)     Permits the continuance for more than thirty (30) days of any proceeding against DISTRIBUTOR seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(6)     Allows a levy of execution to be made upon the franchise or any of the Station(s);

(7)     Voluntarily abandons or fails to actively operate any or all of the Station(s) for a period of more than seven (7) consecutive days;

**Mobil**

(8)    Contests in any manner the validity of TOSCO's ownership of and/or rights to the Trademarks and/or any patents now existent or hereafter obtained;

(9)    Has its lease for any of the Station(s) terminated or mortgage foreclosed by reason of DISTRIBUTOR's failure to pay rent or mortgage payments or for any other cause for which DISTRIBUTOR is responsible;

(10)    Submits any report or statement which understates its gross sales for any or all of the Station(s) for any period;

(11)    Makes an unauthorized assignment or transfer of this Agreement, the franchise relationship created hereby, or any or all of the Station(s);

(12)    Willfully or fraudulently misrepresents any fact or condition required by this Agreement or fails to disclose information to TOSCO, its agents or employees concerning any material fact for the purpose of inducing TOSCO to make any payment, deliver product, extend or continue to extend credit or increase credit or issue a credit memorandum to DISTRIBUTOR or any other party acting in cooperation with DISTRIBUTOR;

(13)    Willfully or fraudulently misrepresents any brand name product or service sold by DISTRIBUTOR, including but not limited to the commingling or misrepresentation and/or adulteration of TOSCO's Mobil branded motor fuels resold to the consuming public;

(14)    Is in default (or if DISTRIBUTOR is a corporation, if any officer, director, or shareholder of DISTRIBUTOR is in default) of any other Franchise Agreement or any other Agreement with TOSCO;

(15)    Commits fraud or criminal misconduct in the operation of the Station(s);

(16)    Becomes severely physically or mentally disabled rendering DISTRIBUTOR (or DISTRIBUTOR's principal managers) unable to provide for the continued operation of DISTRIBUTOR's business or the Station(s);

(17)    Knowingly fails to comply with Federal, State, or local laws or regulations that are relevant to the operation of the Station(s);

(18)    Is convicted (or any officer of DISTRIBUTOR who actively is involved in the management of DISTRIBUTOR is convicted) of any felony involving moral turpitude;

(19)    if TOSCO determines in good faith and in the normal course of business that renewal of the franchise relationship as to any or all of the Station(s) would be uneconomical to TOSCO; or

**Mobil**

    (20)    If TOSCO determines in good faith and in the normal course of business to withdraw from the resale of motor fuels through retail outlets in the relevant geographic market in and around the area or territory of the Station(s).

    (C)    In addition, DISTRIBUTOR and TOSCO agree that the occurrence of the following events, but not limited to such events, are both reasonable and of material significance to the parties' relationship the result of which termination or nonrenewal of the franchise relationship is reasonable: (1) Upon default in the payment of any sum due TOSCO from DISTRIBUTOR; (2) DISTRIBUTOR's failure to comply with use and standards for display of the Trademarks and the image and operation of the Station(s) as set forth herein and in the attachments hereto; (3) DISTRIBUTOR's failure to comply with any applicable law, ordinance, regulation, judicial or administrative order, or other legal requirement of any governmental authorities pertaining to this Agreement and/or the loading, unloading, storage, transportation or sale of petroleum products.

    (D)    This Agreement is subject to and governed by Title I of the Petroleum Marketing Practices Act, 15 USC 2801 *et seq.* ("PMPA"), which is made part of this Agreement. To the extent, if any, a provision of this Agreement conflicts with PMPA, that provision shall be deemed modified so as to comply with PMPA. Notice of termination or nonrenewal of this Agreement shall be provided in the manner prescribed by PMPA. A copy of the PMPA is attached to this agreement as **Exhibit E.** TOSCO and DISTRIBUTOR may agree in writing to mutually terminate or nonrenew this Agreement. The effective date of such mutual termination or nonrenewal shall be the date agreed to by DISTRIBUTOR and TOSCO.

    (E)    Except as otherwise provided for herein, all rights and obligations between the parties under this Agreement shall terminate at Noon on the date of expiration of the term hereof or, if applicable, of any extension thereto (or immediately upon termination by virtue of any default hereunder, as aforesaid) except for those obligations of DISTRIBUTOR which specifically or by their nature survive the termination of this Agreement. Termination of this Agreement does not relieve DISTRIBUTOR from any accrued liability to TOSCO.

22.  **NOTICES**
    (A)    All written notices and other communications permitted or required to be given under this Agreement shall be deemed so given if by DISTRIBUTOR, when actually delivered or when placed in the U.S. Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid, and addressed to TOSCO at: *Tosco Refining, L.P., 1500 North Priest Drive, Tempe, Arizona 85281, Attn: Contracts Administration - DC75,* or to such other address as TOSCO may from time to time designate in writing.

    (B)    All written notices and other communications permitted or required to be given under this Agreement shall be deemed so given if by TOSCO, when actually delivered or when placed in the U.S. Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid, and addressed to DISTRIBUTOR at the address first referenced above, or to such other address as DISTRIBUTOR may from time to time designate in writing.

**Mobil**

23. **RIGHT OF FIRST REFUSAL**

If during the Term of this Agreement or any renewal term hereof, DISTRIBUTOR shall decide to accept any bona fide offer to purchase or lease DISTRIBUTOR's petroleum business or any material portion of DISTRIBUTOR's property used in such business, DISTRIBUTOR shall notify TOSCO in writing of such offer and of DISTRIBUTOR's willingness to accept it and shall concurrently submit to TOSCO a complete copy of the offer. TOSCO shall have a continuing right of first refusal and option to purchase or lease DISTRIBUTOR's business or property at the same price and on the same terms as those contained in the offer. For purposes of this Section, an offer to buy a controlling interest in DISTRIBUTOR, if DISTRIBUTOR is a corporation or a partnership, shall be deemed an offer triggering TOSCO's right of first refusal. TOSCO shall have fifteen (15) business days after receipt of DISTRIBUTOR's notice and a complete copy of the offer to exercise its first refusal option which shall be done by giving written notice to DISTRIBUTOR designating therein a closing date which shall not be earlier than the thirtieth (30th) day following TOSCO's furnishing of the notice to DISTRIBUTOR. Should TOSCO exercise its option, DISTRIBUTOR agrees to execute and deliver to TOSCO at the closing date such warranty deeds, bills of sale and other instruments of assignment as may be necessary to transfer to TOSCO good and marketable title to all of the physical properties and chattels comprised in the sale, free and clear of all liens and encumbrances of every nature and description, excepting only current taxes and assessments not yet due and payable, and such other encumbrances as may be specifically excepted by the terms of the written offer. If the right of first refusal or option exercised by TOSCO is one to lease marketing premises or other business assets of DISTRIBUTOR, DISTRIBUTOR shall submit to TOSCO a lease setting forth the terms and other appropriate covenants and conditions for execution by the parties on the closing date.

24. **WAIVER**

Waiver by TOSCO or DISTRIBUTOR of a default of any provision or obligation under this Agreement shall not be construed as a continuing waiver or a waiver of default of any other provision or obligation or any subsequent default of the same provision or obligation.

25. **MODIFICATION**

No amendment or other modification of this Agreement shall be valid or binding on either party hereto unless reduced to writing and executed by the parties hereto.

26. **CHOICE OF LAW**

This Agreement shall be governed and construed under and in accordance with the laws of the state in which the Stations served by DISTRIBUTOR are principally located, whether or not such State is the location of DISTRIBUTOR's principal place of business. DISTRIBUTOR irrevocably consents to exclusive jurisdiction of the state courts of said State and, if applicable, of any Federal Court located in said State in connection with any action or proceeding arising out of or relating to this Agreement.

27. **SEVERABILITY**

**Mobil**

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such prohibition shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

28.    **JOINT LIABILITY**
If DISTRIBUTOR consists of more than one (1) person, each partner's liability under this Agreement shall be joint and several.

29.    **ATTORNEY FEES**
In the event either party to this Agreement retains counsel and/or institutes a lawsuit for violation of or to enforce any of the covenants, obligations and/or conditions of this Agreement, or if either party initiates a lawsuit against the other for a declaration of rights under this Agreement, or if either party intervenes in a lawsuit in which the other is a party, to enforce or protect its interests or rights hereunder, the prevailing party shall be entitled to all of its costs, expenses and reasonable attorneys' fees incurred in connection therewith.

30.    **REPRESENTATIONS**
DISTRIBUTOR ACKNOWLEDGES THAT DISTRIBUTOR HAS ENTERED INTO THIS AGREEMENT AFTER MAKING AN INDEPENDENT INVESTIGATION OF TOSCO'S Mobil SERVICE STATION SYSTEM AND OPERATIONS AND NOT UPON ANY REPRESENTATION AS TO PROFITS WHICH DISTRIBUTOR IN PARTICULAR MIGHT BE EXPECTED TO REALIZE, NOR HAS ANYONE MADE ANY OTHER REPRESENTATION WHICH IS NOT EXPRESSLY SET FORTH HEREIN TO INDUCE MARKETER TO ACCEPT THE FRANCHISE GRANTED HEREIN AND EXECUTE THIS AGREEMENT.

31.    **REVIEW OF AGREEMENT**
DISTRIBUTOR acknowledges that DISTRIBUTOR has received a copy of this Agreement and all of its exhibits and addendums which were given to DISTRIBUTOR at least ten (10) business days prior to the date DISTRIBUTOR executes this Agreement.

32.    **SECTION TITLES**
The section titles contained in this Agreement are for convenience only and shall be without substantive meaning or content of any kind whatsoever.

33.    **EXHIBITS**
**Exhibits A, B, C, D** and **E** referenced herein are hereby incorporated by this reference and made a part hereof.

34.    **ENTIRETY**
This Agreement constitute the entire agreement of the parties, and except as herein provided, the parties hereto acknowledge that there are no other oral or written understandings or agreements between them relating to the subject matter hereof. Further, DISTRIBUTOR and

**Mobil**

TOSCO hereby agree that this Agreement supersedes, cancels, and replaces in all material aspects all prior agreements (if any) between DISTRIBUTOR and TOSCO with respect to each and all of the Station(s) set forth herein. This Agreement shall be binding on the parties hereto, their heirs, administrators, executors, successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Mobil BRANDED DISTRIBUTOR AGREEMENT on the day and year first above written.

TOSCO:
Tosco Refining, L.P.

By: _____

Brian D. Astroth
Business Development Manager

DISTRIBUTOR:
Peninsula Oil Co., Inc.

By: _____

John Willey Jr.
President

## EXHIBIT A

### FRANCHISED PREMISES
Branch No.3138913

MONTHLY VOLUMES

| STATIONS | | | | | | | |
|----------|------|------|-------|-------|-------|-------|-------|
| UNIT# | NAME/LOCATION | SIGN # | QUANTITY | UL 87 | UL 89 | UP 92 | DIESEL |

**Mobil**

TOSCO hereby agree that this Agreement supersedes, cancels, and replaces in all material aspects all prior agreements (if any) between DISTRIBUTOR and TOSCO with respect to each and all of the Station(s) set forth herein. This Agreement shall be binding on the parties hereto, their heirs, administrators, executors, successors and assigns.

     IN WITNESS WHEREOF, the parties have executed this Mobil BRANDED DISTRIBUTOR AGREEMENT on the day and year first above written.

TOSCO:
Tosco Refining, L.P.

By: _____
    Brian D. Astroth
    Business Development Manager

DISTRIBUTOR:
Peninsula Oil Co., Inc.

By: _____
    John Willey Jr.
    President

By: _____
    John Willey II
    Vice President

**Mobil**

**EXHIBIT A**

FRANCHISED PREMISES
Branch No. 2000432

| STATIONS | | | | MONTHLY VOLUMES | | | | |
|---|---|---|---|---|---|---|---|---|
| UNIT# | NAME/LOCATION | SIGN # | QUANTITY | UL 87 | UL 89 | UP 92 | DIESEL |



**EXHIBIT B**

QUARTERLY CONTRACT VOLUMES (in Gallons)

Branch No. 2000432

### *BRANDED MOTOR FUEL*

**From the commencement date of this Agreement through the first year, the quarterly Contract Volumes shall be as follows:**

| PRODUCTS | JAN-MAR | APR-JUN | JUL-SEPT | OCT-DEC | ANNUAL |
|---|---|---|---|---|---|
| UL 87 | 710,400 | 888,000 | 1065,600 | 888,000 | 3,552,000 |
| UL 89 | 153,600 | 192,000 | 230,400 | 192,000 | 768,000 |
| UP 92 | 96,000 | 120,000 | 144,000 | 120,000 | 480,000 |
| | | | | | |
| DIESEL | 24,000 | 24,000 | 24,000 | 24,000 | 96,000 |
| | | | | | |
| TOTAL | 984,000 | 1224,000 | 1,464,000 | 1,224,000 | 4,896,000 |

**From the first anniversary date of the commencement date of this Agreement through the end of the Term, the quarterly Contract Volumes shall be as follows:**

| PRODUCTS | JAN-MAR | APR-JUN | JUL-SEPT | OCT-DEC | ANNUAL |
|---|---|---|---|---|---|
| UL 87 | 710,400 | 888,000 | 1065,600 | 888,000 | 3,552,000 |
| UL 89 | 153,600 | 192,000 | 230,400 | 192,000 | 768,000 |
| UP 92 | 96,000 | 120,000 | 144,000 | 120,000 | 480,000 |
| | | | | | |
| DIESEL | 24,000 | 24,000 | 24,000 | 24,000 | 96,000 |
| | | | | | |
| TOTAL | 984,000 | 1224,000 | 1,464,000 | 1,224,000 | 4,896,000 |

**Mobil**

**EXHIBIT C**

SPECIFIED TERMINAL(S)

| Terminal Name | Location |
|---|---|
| Wilmington-Motiva | Delaware City,DE (Millsboro, Laurel, Seaford) |
| CATD | Salisbury, MD (Snow Hill, Berlin) |

**Mobil**

**EXHIBIT D**

TOSCO'S MOBIL BRANDED OPERATOR STANDARDS

(to be provided)



## EXHIBIT E

## PETROLEUM MARKETING PRACTICES ACT

AN ACT To provide for the protection of franchised distributors and retailers of motor fuel and to encourage conservation of automotive gasoline and competitor in the marketing of such gasoline by requiring that information regarding the octane rating of automotive gasoline be disclosed to consumers.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Petroleum Marketing Practices Act".*

TABLE OF CONTENTS

TITLE I-FRANCHISE PROTECTION

Sec. 2801. Definitions.
Sec. 2802. Franchise relationship; termination and nonrenewal.
Sec. 2803. Trial franchises and interim franchises; nonrenewal.
Sec. 2804. Notification of termination or nonrenewal.
Sec. 2805. Enforcement.
Sec. 2806. Relationship of this title to State law.

## TITLE 1-FRANCHISE PROTECTION

DEFINITIONS
Sec. 2801.  Definitions

As used in this subchapter:

(1)  (A)  The term **"franchise"** means any contract-

      (i)  between a refiner and a distributor,

      (ii)  between a refiner and a retailer,

      (iii) between a distributor and another distributor, or

      (iv)  between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

    (B)  The term **"franchise"** includes-

      (i)  any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy;

      (ii)  any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed-

        (I)  under a trademark owned or controlled by a refiner; or

**Mobil**

(II)  under a contract which has existed continuously since May 15, 1973, and pursuant to  which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner; and

(iii) the unexpired portion of any franchise, as defined by the preceding provisions of this paragraph, which is transferred or assigned as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

(2)  The term **"franchise relationship"** means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

(3)  The term **"franchisor"** means a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(4)  The term **"franchisee"** means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(5)  The term **"refiner"** means any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.

(6)  The term **"distributor"** means any person, including any affiliate of such person, who-

(A)  purchases motor fuel for sale, consignment, or distribution to another; or

(B)  receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

(7)  The term **"retailer"** means any person who purchases motor fuel for sale to the general public for ultimate consumption.

(8)  The term **"marketing premises"** means, in the case of any franchise, premises which, under such franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

(9)  The term **"leased marketing premises"** means marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment or distribution of motor fuel.

(10) The term **"contract"** means any oral or written agreement. For supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels.

(11) The term **"trademark"** means any trademark, trade name, service mark, or other identifying symbol or name.

(12) The term **"motor fuel"** means gasoline and diesel fuel of a type distributed for use as a fuel in self-propelled vehicles designed primarily for use on public streets, roads, and highways.

(13) The term **"failure"** does not include-

(A)  any failure which is only technical or unimportant to the franchise relationship;

(B)  any failure for a cause beyond the reasonable control of the franchisee; or

**Mobil**

(C)  any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).

(14)  The term **"fail to renew"** and **"nonrenewal"** mean, with respect to any franchise relationship, a failure to reinstate, continue, or extend the franchise relationship-

(A)  at the conclusion of the term, or on the expiration date, stated in the relevant franchise;

(B)  at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date; or

(C)  following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978, and has not been renewed after such date.

(15)  The term **"affiliate"** means any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.

(16)  The term **"relevant geographic market area"** includes a State or a standard metropolitan statistical area as periodically established by the Office of Management and Budget.

(17)  The term **"termination"** includes cancellation.

(18)  The term **"commerce"** means any trade, traffic, transportation, exchange, or other commerce-

(A)  between any State and any place outside of such State; or

(B)  which affects any trade, transportation, exchange, or other commerce described in subparagraph (A).

(19)  The term **"State"** means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and any other commonwealth, territory, or possession of the United States.

FRANCHISE RELATIONSHIP; TERMINATION AND NONRENEWAL

Sec. 2802.  Franchise relationship

(a)  General prohibition against termination or nonrenewal

Except as provided in subsection (b) of this section and section 2803 of this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may-

(1)  terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2)  fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

(b)  Precondition and grounds for termination or nonrenewal

(1)  Any franchisor may terminate any franchise (entered into or renewed on or after June 19, 1978) or may fail to renew any franchise relationship, if-

(A)  the notification requirements of section 2804 of this title are met; and

**Mobil**

(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

(B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if-

(i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and

(ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence-

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) in this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) in this title.

(D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if-

(i) such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

(ii) the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and

(iii) within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.

(E) In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, if-

**Mobil**

(i)  such determination-

    (I)  was made after the date such franchise was entered into or renewed, and

    (II)  was based upon the occurrence of changes in relevant facts and circumstances after such date;

(ii)  the termination or nonrenewal is not for the purpose of converting the premises, which are the subject of the franchise, to operation by employees or agents of the franchisor for such franchisor's own account; and

(iii)  in the case of leased marketing premises-

    (I)  the franchisor, during the 180-day period after notification was given pursuant to section 2804 in this title, either made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises, or, if applicable, offered the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such franchisor's interest in such premises; or

    (II)  in the case of the sale, transfer, or assignment to another person of the franchisor's interest in such premises in connection with the sale, transfer, or assignment to such other person of the franchisor' interest in one or more other marketing premises, if such other person offers, in good faith, a franchise to the franchisee on terms and conditions which are not discriminatory to the franchisee as compared to franchises then currently being offered by such other person or franchises then in effect and with respect to which such other person is the franchisor.

(3)  For purposes of this subsection, the following are grounds for **nonrenewal of a franchise relationship:**

(A)  The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if-

    (i)  such charges or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and

    (ii)  such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

(B)  The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if-

    (i)  the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and

    (ii)  if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

(C)  A failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

(D)  In the case of any franchise entered into prior to June 19, 1978 (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if-

**Mobil**

    (i)  such determination is-

        (I)  to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

        (II)  to materially alter, add to, or replace such premises,

        (III)  to sell such premises, or

        (IV)  that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;

    (ii)  with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

      (iii)  in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this section, either-

        (I)  made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

        (II)  if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

(c)  Definition

As used in subsection (b)(2)(C) of this section, the term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as-

    (1)  fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;

    (2)  declaration of bankruptcy or judicial determination of insolvency of the franchisee;

    (3)  continuing severe physical or mental disability of the franchisee of at least 3 months duration which renders the franchisee unable to provide for the continued proper operation of the marketing premises;

    (4)  loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if-

      (A)  the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise-

        (i)  of the duration of the underlying lease; and

        (ii)  of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);

      (B)  during the 90-day period after notification was given pursuant to section 2804 of this title, the franchisor offers to assign to the franchise any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor, except that the franchisor may condition the assignment upon receipt by the franchisor of-

**Mobil**

(i)   an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for–

(I)   financial obligations under the option (or the resulting extended lease or purchase agreement);

(II)   environmental contamination to (or originating from) the marketing premises; or

(III)   the operation or condition of the marketing premises; and

(ii)   an instrument executed by both the landowner and the franchisee that ensures the franchisor and the contractors of the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises; or

(C)   in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession (through an assignment pursuant to subparagraph (B) or by obtaining a new lease or purchasing the marketing premises from the landowner), the franchisor (if requested in writing by the franchisee not later than 30 days after notification was given pursuant to section 2804 of this title), during the 90-day period after notification was given pursuant to section 2804 of this title–

(i)   made a bona fide offer to sell, transfer, or assign to the franchisee the interest of the franchisor in any improvements or equipment located on the premises; or

(ii)   if applicable, offered the franchisee a right of first refusal (for at least 45 days) of an offer, made by another person, to purchase the interest of the franchisor in the improvements and equipment.

(5)   condemnation or other taking, in whole or in part, of the marketing premises pursuant to the power of eminent domain;

(6)   loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor;

(7)   destruction (other than by the franchisor) of all or a substantial part of the marketing premises;

(8)   failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled;

(9)   failure by the franchisee to operate the marketing premises for–

(A)   7 consecutive days, or

(B)   such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(10) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee;

(11) knowing failure of the franchisee to comply with Federal, State or local laws or regulations relevant to the operation of the marketing premises; and

(12) conviction of the franchisee of any felony involving moral turpitude.

**Mobil**

(d)  Compensation, etc., for franchisee upon condemnation or destruction of marketing premises

In the case of any termination of a franchise (entered into or renewed on or after June 19, 1978), or in the case of any nonrenewal of a franchise relationship (without regard to the date on which such franchise relationship was entered into or renewed)-

(1)  if such termination or nonrenewal is based upon an event described in subsection (c)(5) of this section, the franchisor shall fairly apportion between the franchisor and the franchisee compensation, if any, received by the franchisor based upon any loss of business opportunity or good will; and

(2)  if such termination or nonrenewal is based upon an event described in subsection (c)(7) of this section and the leased marketing premises are subsequently rebuilt or replaced by the franchisor and operated under a franchise, the franchisor shall, within a reasonable period of time, grant to the franchisee a right of first refusal of the franchise under which such premises are to be operated.

TRIAL FRANCHISES AND INTERIM FRANCHISES; NONRENEWAL

Section 2803. Trial and interim franchises

(a)  Nonapplicability of statutory nonrenewal provisions

The provisions of section 2802 of this title shall not apply to the nonrenewal of any franchise relationship-

(1)  under a trial franchise; or

(2)  under an interim franchise.

(b)  Definitions

For purposes of this section-

(1)  The term **"trial franchise"** means any franchise-

(A)  which is entered into on or after June 19, 1978;

(B)  the franchisee of which has not previously been a party to a franchise with the franchisor;

(C)  the initial term of which is for a period of not more than 1 year; and

(D)  which is in writing and states clearly and conspicuously-

(i)    that the franchise is a trial franchise;

(ii)   the duration of the initial term of the franchise;

(iii)  that the franchisor may fail to renew the franchise relationship at the conclusion of the initial term stated in the franchise by notifying the franchisee, in accordance with the provisions of section 2804 of this title, of the franchisor's intention not to renew the franchise relationship; and

(iv)  that the provisions of section 2802 of this title, limiting the right of a franchisor to fail to renew a franchise relationship, are not applicable to such trial franchise.

(2)  The term **"trial franchise"** does not include any unexpired period of any term of any franchise (other than a trial franchise, as defined by paragraph (1)) which was transferred or assigned by a franchisee to the extent

**Mobil**

authorized by the provisions of the franchise or any applicable provision of State law which permits such transfer or assignment, without regard to which provision of the franchise.

(3)  The term **"interim franchise"** means any franchise-

(A)  which is entered into on or after the date of June 19, 1978;

(B)  the term of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed 3 years;

(C)  the effective date of which occurs immediately after the expiration of a prior franchise, applicable to the marketing premises, which was not renewed if such nonrenewal-

(i)  was based upon a determination described in section 2802(b)(2)(E) of this title, and

(ii)  the requirements of section 2802(b)(2)(E) of this title were satisfied; and

(D)  which is in writing and states clearly and conspicuously-

(i)  that the franchise is an interim franchise;

(ii)  the duration of the franchise; and

(iii)  that the franchisor may fail to renew the franchise at the conclusion of the term stated in the franchise based upon a determination made by the franchisor in good faith and in the normal course of business to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located if the requirements of section 2802(b)(2)(E) (ii) and (iii) of this title are satisfied.

(c)  Nonrenewal upon meeting statutory notification requirements

If the notification requirements of section 2804 of this title are met, any franchisor may fail to renew any franchise relationship-

(1)  under any trial franchise, at the conclusion of the initial term of such trial franchise; and

(2)  under any interim franchise, at the conclusion of the term of such interim franchise, if-

(A)  such nonrenewal is based upon a determination described in section 2802(b)(2)(E) of this title; and

(B)  the requirements of section 2802((b)(2)(E) (ii) and (iii) of this title are satisfied.

### NOTIFICATION OF TERMINATION OR NONRENEWAL

Sec. 2804. Notification of termination or nonrenewal of franchise relationship

(a)  General requirements applicable to franchisor

Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship-

(1)  in the manner described in subsection (c) of this section; and

**Mobil**

(2)  except as provided in subsection (b) of this section, not less than 90 days prior to the date on which such termination or nonrenewal takes effect.

(b)  Additional requirements applicable to franchisor

(1)  In circumstances in which it would not be reasonable for the franchisor to furnish notification, not less than 90 days prior to the date on which termination or nonrenewal takes effect, as required by subsection (a)(2) of this section-

(A)  such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable; and

(B)  in the case of leased marketing premises, such franchisor -

(i)  may not establish a new franchise relationship with respect to such premises before the expiration of the 30 day period which begins-

(I)  on the date notification was posted or personally delivered, or

(II)  if later, on the date on which such termination or nonrenewal takes effect; and

(ii)  may, if permitted to do so by the franchise agreement, repossess such premises and, in circumstances under which it would be reasonable to do so, operate such premises through employees or agents.

(2)  In the case of any termination of any franchise or any nonrenewal of any franchise relationship pursuant to the provisions of section 2802(b)(2)(E) of this title or section 2803(c)(2) of this title, the franchisor shall-

(A)  furnish notification to the franchisee not less than 180 days prior to the date on which such termination or nonrenewal takes effect; and

(B)  promptly provide a copy to such notification, together with a plan describing the schedule and conditions under which the franchisor will withdraw from the marketing of motor fuel through retail outlets in the relevant geographic area, to the Governor of each State which contains a portion of such area.

(c)  Manner and form of notification

Notification under this section-

(1)  shall be in writing;

(2)  shall be posted by certified mail or personally delivered to the franchisee; and

(3)  shall contain-

(A)  a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor,

(B)  the date on which such termination or nonrenewal takes effect; and

(C)  the summary statement prepared under subsection (d) of this section.

(d)  Preparation, publication, etc., of statutory summaries

(1)  Not later than 30 days after June 19, 1978, the Secretary of Energy shall prepare and publish in the Federal Register a simple and concise summary of the provisions of this subchapter, including a statement of the

**Mobil**

respective responsibilities of, and the remedies and relief available to, any franchisor and franchisee under this subchapter.

(2) In the case of summaries required to be furnished under the provisions of section 2802((b)(2)(D) of this title or subsection (c)(3)(C) of this section before the date of publication of such summary in the Federal Register, such summary may be furnished not later than 5 days after it is so published rather than at the time required under such provisions.

ENFORCEMENT

Sec. 2805. Enforcement provisions

(a) Maintenance of civil action by franchisee against franchisor; jurisdiction and venue; time for commencement of action

If a franchisor fails to comply with the requirements of section 2802 or 2803 of this title, the franchise may maintain a civil action against such franchisor. Such action may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business, except that no such action may be maintained unless commenced within 1 year after the later of—

(1) the date of termination of the franchise or nonrenewal of the franchise relationship; or

(2) the date the franchisor fails to comply with the requirements of section 2802 or 2803 of this title.

(b) Equitable relief by court; bond requirements; grounds for nonexercise of court's equitable powers

(1) In any action under subsection (a) of this section, the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 2802 or 2803 of this title, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

(2) Except as provided in paragraph (3), in any action under subsection (a) of this section, the court shall grant a preliminary injunction if—

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship to which he is a party has not been renewed, and

(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

(3) Nothing in this subsection prevents any court from requiring the franchisee in any action under subsection (a) of this section to post a bond, in an amount established by the court, prior to the issuance or continuation of any equitable relief.

(4) In any action under subsection (a) of this section, the court need not exercise its equity powers to compel continuation or renewal of the franchise relationship if such action was commenced—

**Mobil**

(A) more than 90 days after the date on which notification pursuant to section 2804(a) of this title was posted or personally delivered to the franchisee;

(B) more than 180 days after the date on which notification pursuant to section 2804(b)(2) of this title was posted or personally delivered to the franchisee; or

(C) more than 30 days after the date on which the termination of such franchise or the nonrenewal of such franchise relationship takes effect if less than 90 days notification was provided pursuant to section 2804(b)(1) of this title.

(c)   Burden of proof; burden of going forward with evidence

In any action under subsection (a) of this section, the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor complied with the requirements of section 2802(d) of this title.

(d)   Actual and exemplary damages and attorney and expert witness fees to franshisee; determination by court of right to exemplary damages and amount; attorney and expert witness fees to franchisor for frivolous actions

(1)   If the franchisee prevails in any action under subsection (a) of this section, such franchisee shall be entitled-

(A)   consistent with the Federal Rules of Civil Procedure, to actual damages;

(B)   in the case of any such action which is based upon conduct of the franchisor which was in willful disregard of the requirements of section 2802 or 2803 of this title, or the rights of the franchisee thereunder, to exemplary damages, where appropriate; and

(C)   to reasonable attorney and expert witness fees to be paid by the franchisor, unless the court determines that only nominal damages are to be awarded to such franchisee, in which case the court, in its discretion, need not direct that such fees be paid by the franchisor.

(2)   The question of whether to award exemplary damages and the amount of any such award shall be determined by the court and not by a jury.

(3)   In any action under subsection (a) of this section, the court may, in its discretion direct that reasonable attorney and expert witness fees be paid by the franchisee if the court finds that such action is frivolous.

(e)   Discretionary power of court to compel continuation or renewal of franchise relationship; grounds for noncompulsion; right of franshisee to actual damages and attorney and expert witness fees unaffected

(1)   In any action under subsection (a) of this section with respect to a failure of a franchisor to renew a franchise relationship in compliance with the requirements of section 2802 of this title, the court may not compel a continuation or renewal of the franchise relationship if the franchisor demonstrates to the satisfaction of the court that-

(A)   the basis for such nonrenewal is a determination made by the franchisor in good faith and in the normal course of business-

(i)   to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(ii)   to materially alter, add to, or replace such premises,

**Mobil**

(iii)  to sell such premises,

(iv)  to withdraw from the marketing of motor fuel through retail outlets in the relevant geographic market area in which the marketing premises are located, or

(v)  that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee; and

(B)  the requirements of section 2804 of this title have been complied with.

(2)  The provisions of paragraph (1) shall not affect any right of any franchisee to recover actual damages and reasonable attorney and expert witness fees under subsection (d) of this section if such nonrenewal is prohibited by section 2802 of this title.

(f)  Release or waiver of rights

(1)  No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive-

(A)  any right that the franchisee has under this subchapter or other Federal law; or

(B)  any right that the franchisee may have under any valid and applicable State law.

(2)  No provision of any franchise shall be valid or enforceable if the provision specifies that the interpretation or enforcement of the franchise shall be governed by the law of any State other than the State in which the franchisee has the principal place of business of the franchisee.

## RELATIONSHIP OF THIS TITLE TO STATE LAW

Sec. 2806. Relationship of statutory provisions to State and local laws

(a)  Termination or nonrenewal of franchise

(1)  To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing to notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

(2)  No State or political subdivision of a State may adopt, enforce, or continue in effect any provision of law (including a regulation) that requires a payment for the goodwill of a franchisee on the termination of a franchise of nonrenewal of a franchise relationship authorized by this subchapter.

(b)  Transfer or assignment of franchise

(1)  Nothing in this subchapter authorizes any transfer or assignment of any franchise or prohibits any transfer or assignment of any franchise as authorized by the provisions of such franchise or by any applicable provision of State law which permits such transfer or assignment without regard to any provision of the franchise.

**Mobil**

(2)   Nothing in this subchapter shall prohibit any State from specifying the terms and conditions under which any franchise or franchise relationship may be transferred to the designated successor of a franchisee upon the death of the franshisee.

## MAINTENANCE AND INFORMATION SERVICES AGREEMENT
### For Electronic Point of Sale Terminal and Related Equipment

THIS maintenance and information service agreement ("Agreement") dated <u>October 04, 2000,</u> ("Effective Date") is by and between Tosco Refining, L.P., a Delaware limited partnership ("TOSCO"), having an office at 1500 N. Priest Drive, Tempe, AZ 85281 and <u>Penninsula Oil Co., Inc.,</u>a <u>Delaware</u> corporation ("SYSTEM USER") having a place of business at <u>PO Box 389, Seaford, DE 19973</u> ("Marketing Premises").

### ARTICLE I-DEFINITIONS

The following terms, when capitalized in this Agreement, have the meanings set forth below:

1.1     **"Equipment"** includes the Point-of-Sale ("EPOS") Terminals, Electronic Cash Registers ("ECRS"), Customer Activated Terminals ("CATS") and Hand Activated Terminals ("HATS") set forth in **Attachment A** of this Agreement.

1.2     **"EPOS Program"** means Mobil's proprietary system designed to process credit, debit and prepaid cash transactions which has been made available to TOSCO, and it's Mobil branded dealers, resellers, and jobbers pursuant to the Branded Marketer Agreement dated March 1, 2000 by and between TOSCO and Mobil Oil Corporation.

### ARTICLE II-PARTICIPATION

2.1     **Acknowledgment.** SYSTEM USER acknowledges that TOSCO has fully described to SYSTEM USER TOSCO's EPOS Program, which will enable SYSTEM USER to electronically authorize and process credit, debit and prepaid card transactions under TOSCO's Retail Credit Card Program in accordance with TOSCO's Credit Card Instructions as modified from time to time ("Instructions"). As a participant in the EPOS Program, SYSTEM USER understands that SYSTEM USER must comply with these Instructions.

2.2     **Discontinuance of EPOS Program.** SYSTEM USER agrees that TOSCO may modify, amend or discontinue its EPOS Program or any portion of the EPOS Program at TOSCO's sole discretion.

2.3     **Warranties.** TOSCO does not warrant or guarantee the Equipment .

### ARTICLE III-MAINTENANCE, INSTALLATION & TRAINING

3.1     **Maintained Equipment-Lease Locations.** TOSCO agrees to maintain the TOSCO authorized Equipment set forth in **Attachment A** for use by SYSTEM USER to access the TOSCO EPOS Program at the Marketing Premises. SYSTEM USER shall pay for the services at rate set forth in this Section 3.3. SYSTEM USER agrees that **Attachment A** may be amended from time to time by TOSCO.

3.2     **Maintained Equipment- Non-Lease Location.** For locations where TOSCO does not own or have a long term lease interest in the Marketing Premises, SYSTEM USER agrees to maintain the Equipment if SYSTEM USER furnishes TOSCO with written evidence on or before the Effective Date that SYSTEM USER or its designated contractor is certified and qualified by the original Equipment Vendor to perform such service during the term of this Agreement. SYSTEM USER shall provide such evidence to TOSCO on the Effective Date of this Agreement. If SYSTEM USER fails to furnish the evidence on or before the Effective Date, TOSCO shall perform the maintenance services and SYSTEM USER shall pay for such services at the rates set forth in this Section 3.2.

3.3     **Maintenance and Information Services.** As payment for TOSCO providing satellite and telephone line access and maintaining the Equipment, SYSTEM USER agrees to pay TOSCO monthly Maintenance and Information Services fees for the Equipment as set forth in **Attachment A**. All fees and charges are payable monthly and in advance. TOSCO may, at any time during the term of this Agreement, increase Maintenance and Information Services Fees by giving SYSTEM USER not less than 30 days' prior written notice. If TOSCO exercises its option to increase fees, SYSTEM USER may terminate this Agreement by providing TOSCO with written notice prior to the effective date of the increase in fees.

3.4     **TOSCO's Obligations.** TOSCO will repair and maintain all Equipment covered by this Agreement. TOSCO's maintenance and repair obligations do not include the cost of providing or paying for appropriate electric current. TOSCO's repair and maintenance obligations arise only when a repair is required as a result of ordinary wear and tear or defects in material or workmanship and if SYSTEM USER notifies TOSCO that the Equipment is not in good operating condition. Any repairs or maintenance, which are determined in TOSCO's sole discretion, arising as the result of (i) damage by accident, negligence, abuse or misuse; or (ii) operation for which the Equipment was not intended; or (iii) any alteration or modification of the dedicated power source, telephone connecting line, or satellite equipment shall be at the expense of SYSTEM USER.

3.5     **SYSTEM USER's Specific Maintenance Obligations.** SYSTEM USER agrees to replace at its expense and as required, Terminal ribbons, batteries, battery chargers and paper except for CO-65 forms, and SYSTEM USER agrees to pay for recurring local electric charges. SYSTEM USER shall allow TOSCO to make such changes in both SYSTEM USER owned and TOSCO owned Equipment, and software as TOSCO deems necessary.

3.6     **Installation Obligations and Telephone Line and Satellite Expenses.**

    A.     **TOSCO-Owned Lease Line or Satellite EPOS Equipment.** TOSCO will arrange for the installation and connection of the required telephone line or satellite equipment to the Equipment located at the Marketing Premises, and ensure that the Equipment is in operable condition. TOSCO will pay for installation of EPOS Terminal(s) and for site preparation, including an appropriate dedicated A/C power outlet at locations where TOSCO owns or has a long term Lease interest in the real property. SYSTEM USER shall bear the expense for site preparation at all other locations. TOSCO will pay for recurring charges for the telephone or satellite line connecting the Equipment to TOSCO's system.

    B.     **TOSCO-Owned Auto-dial Equipment.** SYSTEM USER agrees to arrange for and pay the costs of installation of the necessary telephone line. TOSCO will connect the telephone lines to the Equipment located at the Marketing Premises and ensure the Equipment is in operable condition. TOSCO will pay for site preparation, including an appropriate dedicated A/C power outlet at locations where TOSCO owns or has a long term Lease interest in the real property. SYSTEM USER shall bear the expense for site preparation at all other locations. SYSTEM USER will pay for the recurring local telephone line expense.

    C.     **SYSTEM USER Owned EPOS Equipment.** TOSCO will arrange for installation of the necessary telephone line or satellite equipment and connect the Terminal(s) to the lines. SYSTEM USER will pay all installation costs of the EPOS equipment. TOSCO will pay for site preparation costs at those locations where TOSCO has an ownership or long term Lease interest in the real property or improvements. SYSTEM USER will pay all site preparation expenses at any other location. TOSCO will pay for recurring charges for the telephone line or satellite connecting the Terminal(s). Only SYSTEM USER owned equipment which has been previously approved by TOSCO may be connected to and access the TOSCO System/Network. SYSTEM USER will be responsible for acquiring any necessary PIN Pads.

3.7     **Training.** Prior to installation of the CATs or HATs System, SYSTEM USER will receive operating instructions from TOSCO and shall be required to complete all necessary training programs approved by TOSCO. SYSTEM USER pays for all lodging, meals and transportation expenses to and from the training site. TOSCO will maintain a "Help Desk" to answer any day-to-day questions regarding the operation of the EPOS system.

## ARTICLE IV-SYSTEM USER'S GENERAL OBLIGATIONS

4.1     **General Obligations.** With respect to the Equipment, SYSTEM USER shall (a) make no additions or alterations; (b) make no movement or rearrangement of the Terminal(s); (c) comply with all applicable credit/debit card policies covering use of the Terminal(s); (d) comply with all laws and regulations applicable to the use of the Terminal(s); (e) do or permit to be done nothing prejudicial to any title or ownership interest TOSCO may have in the Terminal(s) or equipment; (f) not remove the TOSCO owned Terminal(s) or deliver the Terminal(s) to anyone but TOSCO or TOSCO's representative; (g) not sell a SYSTEM USER owned Terminal(s) without first removing and returning to TOSCO any TOSCO owned software contained in said Terminal(s); and (h) exercise the degree of care necessary to prevent damage to the terminals and other related equipment.

EpcsAgree-TRLP                                    2

4.2     **Indemnity.** SYSTEM USER agrees to indemnify and hold TOSCO harmless against all losses and claims (including those of the parties, their agents and employees) for death, personal injury or property damage arising out of the use of or conditions of the Terminal(s) and related equipment.

## ARTICLE V-TERM AND TERMINATION

5.1     **Term.** The term of this Agreement shall begin on October 04, 2000, or the date the EPOS equipment is installed and operational and shall end on September 30, 2010, unless terminated earlier as provided in this Agreement.

5.2     **Termination by SYSTEM USER.** Notwithstanding Section 5.1 of this Article, SYSTEM USER may terminate this Agreement at any time provided that SYSTEM USER gives TOSCO 90 days' advance written Notice of its desire to terminate this Agreement.

5.3     **Termination by TOSCO.** Notwithstanding Section 5.1 of this Article, this Agreement shall automatically terminate (a) on the Effective Date of any termination or nonrenewal of any PMPA Motor Fuels Franchise Agreement, or PMPA Distributor Franchise Agreement, or PMPA Franchise Agreement between the parties; (b) in the event SYSTEM USER elects not to participate in the TOSCO Credit/Debit Card Program at the Marketing Premises; (c) in the event that SYSTEM USER's participation in the TOSCO Credit/Debit Card Program is terminated by TOSCO; (d) in the event that TOSCO withdraws from electronic point-of-sale credit/debit card processing in SYSTEM USER's area; or (e) TOSCO discontinues the EPOS Program as outlined herein. In addition, TOSCO reserves the right to terminate this Agreement, in the event of any default by SYSTEM USER or failure of SYSTEM USER to meet any performance criteria established by TOSCO from time to time or for any other reason if TOSCO gives SYSTEM USER 90 days' advance written notice of the termination. In the event of termination of the Agreement, TOSCO may terminate SYSTEM USER's access to the EPOS network system. On the Effective Date of any termination of the Agreement, TOSCO may also remove TOSCO owned Terminal(s), equipment and software without liability and without obligation for any restoration of the Marketing Premises or damage incidental to such removal.

5.4     **Performance Criteria.** Notwithstanding any other provision in this Agreement, TOSCO reserves the right to remove any TOSCO owned Terminal(s), at any time and cancel this Agreement under the terms of Section 5.3 in the event that the SYSTEM USER processes fewer than the minimum credit and debit transaction volumes per dealer equipment via the EPOS system in any given calendar month during the Term of this Agreement as follows:

| | |
|---|---|
| CATS | 1200 transactions per month |
| Other lease line or satellite terminals | 1000 transactions per month |
| Auto-dial terminals | 400 transactions per month |

or in the event that the SYSTEM USER processes fewer than 80% of all credit and debit card transactions with said Terminal(s) in any given calendar month during the Term of this Agreement.

## ARTICLE VI-MISCELLANEOUS

6.1     **Replacement of TOSCO-owned Equipment.** TOSCO reserves the right to remove TOSCO owned EPOS Terminal(s) at any time and to replace same with similar or different equipment

6.2     **Force Majeure.** TOSCO shall not be responsible for or liable to SYSTEM USER for any loss or damage due to down-time of the Terminal(s) and related equipment because of repair or maintenance or due to failure of connecting telephone lines or satellite to TOSCO's equipment.

6.3     **Assignments.** Any assignment of this Agreement without TOSCO's express written consent shall be void.

6.4     **Notices.** All notices shall be in writing and shall be delivered personally (to an officer or manager at TOSCO) or sent by registered or certified mail to the parties at the addresses specified in the paragraph immediately preceding Article I of this Agreement. Notice by mail shall be deemed given on the date such notice is deposited in

the United States mail, postage prepaid and properly addressed. This instrument contains the entire agreement covering the subject matter and supersedes any and all prior understandings or dealings between the parties relative to this subject matter.

6.5    **Amendments**.  No modification of the Agreement shall be binding on TOSCO unless in writing and signed by TOSCO's authorized representative.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

WITNESS:

L.P.

TOSCO
By:
        Brian D. Asaroth
Title:    Business Development Manger, of Tosco Refining,

WITNESS:

SYSTEM USER:
By:
        John Willey Jr.
Title    President

Mobil

Jobber Name:                    Peninsula Oil Co., Inc.        Jobber # 2000432

Exhibit A- Product and Station Schedule:        Sign, EPOS and Imprinter Listin

Branded Jobber Agreement Dated:

Set forth below are the annual quantities of gasoline to be purchased and sold in every
continuous 12 month period during the term of the above agreement. The total quantity
shall be adjusted at such time(s) as new locations are approved for branding or locations
are debranded with Tosco's consent.

| Site # | Trade Name | Street Address | City | ST | Zip | Exhibit A Volume | Sign Type | Primary Terminal | EPOS (L) | EPOS (O) | Imprinter |
|--------|-----------|----------------|------|----|----|-----------------|-----------|------------------|----------|----------|-----------|
| 2438917 | Deluxe Dairy | RTE 20 East | Seaford | DE | 19973 | 600,000 | 10 ID | Delaware City, DE | ✓ | ☐ | ✓ |
| 2438914 | Duck In #2 | 5610 Market St | Snow Hill | MD | 21863 | 600,000 | 10 ID | Salisbury, MD | ✓ | ☐ | ✓ |
| 2438915 | Millsboro Mobil | RTE 113 & 24 | Millsboro | DE | 19966 | 1,800,000 | 10 ID | Delaware City, DE | ☐ | ✓ | ✓ |
| 2438918 | Berlin Uncle Willie's | RET 113 & Bay St | Berlin | MD | 21811 | 1,200,000 | 10 ID | Salisbury, MD | ☐ | ✓ | ✓ |
| 2438916 | Laurel Uncle Willie's | West & Townsend St. | Laurel | DE | 19956 | 600,000 | 10 ID | Delaware City, DE | ☐ | ✓ | ☐ |

Exhibit A Total        4,800,000

Total EPOS Fee= $140.00 /month (owned)
Total EPOS Fee= $75.00 /month (leased)
Total Imprinter Fee=$ 24.00 /year

September 18, 2000

**Knox, Antoinette:**

| | |
|---|---|
| **From:** | Vega, Karen: |
| **Sent:** | Tuesday, October 03, 2000 8:41 AM |
| **To:** | Knox, Antoinette: |
| **Subject:** | Peninsula Oil Co., Inc. - site #2000432 - insurance is in compliance |

I have received the certificates and they are in compliance.

**_Karen J. Vega_**
Insurance Coordinator
602-728-3214
602-728-5280 Fax

1

EXHIBIT 2

# Tosco Distributor Image Incentive Program Agreement    Mid-Atlantic

## Project Proposal/Completion/Termination Statement

Distributor: Peninsula Oil Company

Project Name: Delmar Mobil

Project Address: 9521 Ocean Hwy.
Delmar, MD 21895

Distrib Cust #: 7-9-8-6-0-7-2-1

Distrib Lease #: 3-1-3-8-9-1-3

Project Site #: 2-4-4-9-0-2-2

**Level 5**

☑ "Super Site" Incentive
3.0 cpg - 48 months

✻ Starts August 2002    Business Enhancement Fund

Ends July 2006

☐ .20 cpg of total gasoline
purchases (Jan-Dec)
50% re-imbursement up to fund total.
(submit separate reimbursement form)

**Level 4**

☐ New to Industry Program
2.0 cpg - 48 months

**Level 3**

☐ Competitive Conversion
Program
2.0 cpg - 36 months

☐ Razed or New
2.0 cpg - 36 months

**Level 2**

☐ Gas Bar Program
1.0 cpg - 36 months

*Participation in all programs requires Tosco's Wholesale Strategy Specialist pre-approval. Additionally Distributor must meet all criteria as outlined in program brochure.

**Level 1**

Pay-at-the -Pump Card Terminal Programs

| | # of units | Reimbursement per unit | Project Reimbursement |
|---|---|---|---|
| ☑ Pay-at-the-Pump Incentive | 7 | $ 2,000 | 14,000.00 |
| ☑ Speedpass Incentive | 7 | $ 1,000 | 7000.00 |

Gasoline Volume Projections:

EYG YEAR 1  1.9mm    EYG YEAR 2  2.1mm    EYG YEAR 3  2.3mm    EYG YEAR 4  2.4mm

Note:  • Acceptance of this proposal by Tosco in no way implies or guarantees any increase in gasoline volume to Distributor's existing base as stated in Distributor's PMPA -Motors Fuels Franchise Agreement.
• Wholesale Strategy Specialist has reviewed applicable plot plans, elevation drawings, paint schedules and equipment lists for all three zones. Plans for all three zones will meet Tosco's retail imaging standards.
• Distributor acknowledges that the financial aspects of this program are confidential and agrees to treat them accordingly. A failure of Distributor to do so is a violation of this Agreement.

Distributor Signature                                    Date: 2/25/02

Accepted:
Wholesale Strategy Specialist                            Date: 2/25/02

**Distributor Certification:**

I hereby certify that all work and construction, in accordance with plans and specifications submitted to and approved by Tosco, was completed on 2/25/02. This project opened for business on ___

Distributor Signature                Date: ✻

**Certification of Project Completion:**

I inspected this project on 2/25/02, and found the work to be completed in accordance with the project proposal, program guidelines and Mobil standards of appearance and graphics.

Wholesale Strategy Specialist        Date: 2/25/02

**Project Termination:**

This project was not completed by the date specified in the applicable Incentive Agreement. The project is therefore terminated effective ___

Accepted:  Distributor Signature      Date: ___

Wholesale Strategy Specialist        Date: ___

Mid-Atlantic
2001

# Terms & Conditions

## Pre-Approval Qualifications

To be eligible to participate in any of Tosco's image incentive programs, and to receive reimbursement throughout the specified program term, Distributors must obtain prior project approval from Tosco's Wholesale Strategy Specialist and must agree to the following criteria:

1] participate in a Mystery Shopper program at the station,

2] have all station employees in Tosco approved uniforms, and

3] participate in all Tosco's sponsored promotional programs

4] If the station sells diesel, it must be Mobil branded diesel and identified accordingly

5) Participate in Tosco's Five Star Appearance Standards Program

## Distributor Image Incentive Program Requirements:

■ A project proposal/completion/termination statement for the proposed project will be jointly prepared by the Distributor and Tosco's Wholesale Strategy Specialist

■ Distributor must receive Tosco's prior written acceptance for the project to be covered by the image incentive program. Distributor must then complete the project and brand the location to Mobil's image specifications. If the project is not completed by the specified date, the proposal will terminate.

■ A final inspection of the project by Tosco's Wholesale Strategy Specialist is required before the project is eligible for the program.

■ Distributor is responsible for obtaining all licenses and permits, and is responsible for all aspects of construction.

■ The term during which Tosco will make incentive payments is 36 (or 48 months, depending upon the program) consecutive months beginning with the first month for which Distributor reports volume for the project after Tosco's Wholesale Strategy Specialist verifies that the project was properly completed.

■ Distributor forfeits all rights, present and future, under the image incentive program for all locations if Distributor is in violation of the Distributor PMPA Motor Fuels Franchise Agreement or if Distributor commingles Mobil brand with non-Mobil brand product.

■ Distributor agrees to allow an audit of gasoline sales at any location where Distributor reports volume to Tosco for an incentive payment, including locations that receive up front incentive payments.

■ Distributor will return to Tosco all incentive payment made by Tosco as a result of distributor overstating volume reports.

■ Distributor forfeits all rights, present and future, under the image incentive program for all of the Distributor's locations of Distributor knowingly submits an overstated gasoline volume report for any location that is eligible to receive an incentive payment.

■ Distributor recognizes that it would be difficult to quantify Tosco's economic losses if Distributor's franchise relationship with Tosco terminated or non-renewed or the retail facility is debranded. Thus, Distributors agrees that if Distributor's contract is terminated/ non-renewed, or the retail facility is debranded within ten (10) years after the first month Distributor reports volume for incentive payment purposes, Distributor will pay to Tosco as liquidated damages, to compensate Tosco for such losses, the following amounts:

### Reimbursement Schedule

| Year/Location Debranded | % of Incentive to be Reimbursed to Tosco by Distributor |
| --- | --- |
| Years/1 - 5 | 100% |
| Year    6 | 80% |
| Year    7 | 60% |
| Year    8 | 40% |
| Year    9 | 30% |
| Year   10 | 20% |

* Year One begins with the first month the Distributor reports volume for reimbursement.

■ The damages here liquidated are confined to losses resulting from your repudiation of this Incentive Agreement, and shall not affect such other rights and remedies as Tosco may have under this Incentive Agreement, under any other agreement with Tosco, and under applicable law including, but not limited to, the PMPA and the Uniform Commercial Code.

■ Tosco reserves the right to stop accepting new entrants into the Distributor Image Incentive Programs at any time.

■ Tosco also has the right it cancel these programs at any time in the event of supply disruptions or to withdraw these program at any time from any relevant geographic/market area.

■ Distributor acknowledges that this Incentive Agreement supplements the terms and conditions of the Distributors PMPA Motor Fuels Franchises Agreement.

■ Distributor represents that it will brand the retail facility as a Mobil facility for not less than 10 years or the remaining term of Tosco's license agreement for the Mobil brand, and Distributor acknowledges that Tosco has relied upon this representation in making incentive payment under this agreement.

■ Incentive payments shall be make by credit to Distributor's accounts receivable or other mutually acceptable method and shall be paid quarterly or as one-time lump sum payment, depending upon the program.

■ For quarterly payments, Tosco shall make such payment within a reasonable time after Tosco's receipt of Distributor's statement certifying the volume of Mobil gasoline purchased by Distributor and sold through the retail location during the preceding three (3) calendar months.

■ If the retail location fails to comply with this Incentive Agreement, of Distributor fails to comply with Distributor's PMPA Motor Fuels Franchise Agreement, or retail facility is debranded, then, in addition to any other rights or remedies available to Tosco, Tosco may cancel this Incentive Agreement and all other incentive programs in which Distributor participates and immediately cease making incentive payment for all of Distributor's locations. Distributor's shall also be required to reimburse Tosco for any incentive payments made prior to such cancellation.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BCG, INC. and<br>CHESAPEAKE PRODUCTS & SERVICES,<br><br>          Plaintiffs,<br><br>v.<br><br>GLES, INC. d/b/a SWEET OIL COMPANY,<br><br>    Defendant/Third-Party Plaintiff,<br>v.<br><br>SUNOCO, INC.,<br><br>     Third-Party Defendant. | :<br>:<br>:<br>: C.A. No. 07-cv-207 (GMS)<br>:<br>:<br>: TRIAL BY JURY<br>: OF TWELVE DEMANDED<br>:<br>: NON-ARBITRATION CASE<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## <u>ORDER</u>

And now, on this ___ day of ___, 2007, upon consideration of Third-Party

Defendant's Motion to Dismiss and supporting Brief, and Third Party Plaintiffs' response

thereto, it is hereby ORDERED that the Motion is GRANTED and Count II of Defendant/Third-

Party Plaintiff's Amended Third-Party Complaint is dismissed with prejudice.


           _____
           GREGORY M. SLEET
           CHIEF U.S. DISTRICT JUDGE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2007, a copy of Third-Party Defendant,

Sunoco, Inc. (R&M)'s Motion to Dismiss Count II of the Amended Third-Party Complaint was

served electronically upon the following counsel of record via *LexisNexis File and Serve*:

| | |
|---|---|
| Seth J. Reidenberg, Esq. | Ben D. Snyder, Esq. |
| YOUNG CONAWAY STARGATT & TAYLOR, LLP | John W. Paradee, Esq. |
| The Brandywine Building | Glenn C. Mandalas, Esq. |
| 1000 West Street, 17th Floor | PRICKETT JONES & ELLIOTT |
| P.O. Box 391 | 11 North State Street |
| Wilmington, DE  19899-0391 | Dover, DE  19901 |
| *Attorneys for Defendant/Third Party Plaintiff  GLES,* | *Attorneys for Plaintiffs* |
| *Inc., a Delaware Corporation, d/b/a Sweet Oil Company* | |

/s/ *Matthew A. Kaplan*
Matthew A. Kaplan (#4956)