**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BCG, INC. and | : |
| CHESAPEAKE PRODUCTS & SERVICES, | : |
| | :     C.A. No. 07-cv-207 (GMS) |
| Plaintiffs, | : |
| | : |
| v. | :     TRIAL BY JURY |
| | :     OF TWELVE DEMANDED |
| GLES, INC. d/b/a SWEET OIL COMPANY, | : |
| | :     NON-ARBITRATION CASE |
| Defendant/Third-Party Plaintiff, | : |
| v. | : |
| | : |
| SUNOCO, INC., | : |
| | : |
| Third-Party Defendant. | : |
| | : |

**THIRD-PARTY DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT ON COUNT I OF THE AMENDED THIRD-PARTY**
**COMPLAINT PURSUANT TO FED. R. CIV. P. 56**

Matthew A. Kaplan (#4956)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
Telephone No.: 302-777-6528

A. Christopher Young (*pro hac vice*)
Jennifer Lori Lambert (*pro hac vice*)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone No.: 215-981-4000

Dated: April 7, 2008

*Attorneys for Third-Party Defendant,*
*Sunoco, Inc. (R&M)*

## TABLE OF CONTENTS

**Page**

I.     NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

II.    SUMMARY OF ARGUMENT ..................................................................... 3

III.   STATEMENT OF THE FACTS ................................................................... 3

    A.   Agreements Between Sunoco and Sweet Oil. ....................................... 3

    B.   Non-Renewal of the Distributor Agreement and Debranding of the
        Stations. ................................................................................................. 5

IV.    ARGUMENT ............................................................................................ 6

    A.   Legal Standard ...................................................................................... 6

    B.   Sunoco is Entitled to Summary Judgment on the Declaratory Judgment
        Claim Because the Incentive Agreements Obligate Sweet Oil to Pay Sunoco
        Liquidated Damages ............................................................................. 7

        a.   The Incentive Agreements Are Clear and Unambiguous. .................. 8

        b.   The Non-renewal of the Distributor Agreement and the Debranding
            of the Facilities Entitled Sunoco to Liquidated Damages ................... 9

V.     CONCLUSION ....................................................................................... 10

#9116234 v4

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)...................................................................................6

Assaf v. Fields,
    178 F.3d 170 (3d Cir. 1999)......................................................................6

Boyle v. County of Allegheny Pa.,
    139 F.3d 386 (3d Cir. 1998)......................................................................6

E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.,
    693 A.2d 1059 (Del. 1997) ........................................................................7

Johnson v. Geico Cas. Co.,
    516 F. Supp. 2d 351 (D. Del. 2007)..........................................................7

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)...................................................................................6

N.I. Petroleum Ventures Corp. v. GLeS, Inc.,
    333 F. Supp. 2d 251 (D. Del. 2004)..........................................................7

O'Brien v. Progressive N. Ins. Co.,
    785 A.2d 281 (Del. 2001) ..........................................................................7

## STATUTES

28 U.S.C. § 1444 (2006)..................................................................................2

28 U.S.C. § 2201 (2006)..................................................................................7

15 U.S.C. §§ 2801 et seq. (2006)....................................................................2

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)...................................................................................2

Fed. R. Civ. P. 56 ........................................................................................6, 9

## I.       NATURE AND STAGE OF THE PROCEEDINGS

On October 19, 2006, Plaintiffs, BCG, Inc. and Chesapeake Products & Services, Inc. (hereinafter collectively referred to as "BCG") sued GLeS, Inc. d/b/a Sweet Oil (hereinafter referred to as "Sweet Oil") in the Court of Common Pleas, Kent County, Delaware for, among other things, breach of a Dealer Agreement dated October 3, 2002 ("Dealer Agreement"), tortious interference with contract, and violations of Delaware Franchise Security Law.  BCG owned and operated a Mobil branded retail motor fuel facility located at 9521 Ocean Highway, Delmar, Maryland (hereinafter referred to as the "Delmar Station") and, by the terms of the Dealer Agreement, contracted with Sweet Oil to supply it with Mobil branded motor fuel for resale at the Delmar Station.  Sweet Oil purchased Mobil branded motor fuel from Third-Party Defendant Sunoco, Inc. (R&M) (hereinafter referred to as "Sunoco") pursuant to a Mobil Branded Distributor Agreement dated September 18, 2000 ("Distributor Agreement").  The Distributor Agreement also contained a license permitting Sweet Oil to use the Mobil trademarks in connection with the sale of motor fuel at three retail facilities, including the Delmar Station and another retail motor fuel facility not operated by the Plaintiffs located at 5610 Market Street, Snow Hill, Maryland (hereinafter referred to as the "Duck-In Station").

Sweet Oil and Sunoco (by reason of certain and separate assignments) were also parties to two Tosco Distributor Incentive Agreements which entitled Sweet Oil to receive any incentive payments due from Sunoco on and after the assignment from Sweet Oil's predecessor for its purchases of Mobil branded motor fuel for resale to the Delmar and Duck-In Stations. With respect to sales of motor fuel at the Delmar Station, Sweet Oil agreed to pass the incentive payments it received under the Incentive Agreement on to BCG.  (Dealer Agreement at ¶ 2(b), attached as Exhibit "4" to Statement of Undisputed Facts, D.I. 38 at ¶ 11).

-1-

Sweet Oil answered the Complaint and denied any liability to BCG.  However, it joined Sunoco to the cause of action by filing a Third-Party Complaint seeking to interplead the amount of incentive payments due but not paid to BCG under the Dealer Agreement, for a declaration of the parties' rights and liabilities with respect to the Delmar Station, and for indemnity.  Sunoco filed an answer to the Third-Party Complaint denying any liability to Sweet Oil.

On March 1, 2007, BCG filed an Amended Complaint stating a claim against Sweet Oil for violation of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801, et seq. ("PMPA").  Thereupon, Sweet Oil removed the case to federal court pursuant to 28 U.S.C. § 1444 (2006).

Following removal, Sweet Oil amended the Third-Party Complaint to include additional allegations concerning the Duck-In Station and substituting a conversion claim for its interpleader claim.  (Am. Compl., D.I. 23).  Sweet Oil voluntarily dismissed its indemnification claim after Sunoco filed a Rule 12(b)(6) motion to dismiss.  (Mot. to Dismiss, D.I. 25 & Stipulation, D.I. 27).  Sunoco filed an answer to the Amended Third-Party Complaint again denying any liability to Sweet Oil on the remaining declaratory judgment and conversion claims. (Answer, D.I. 30).  Discovery has concluded and Sweet Oil's declaratory judgment claim is ripe for summary adjudication.

By its motion for summary judgment, Sunoco respectfully requests this Court to declare that the non-renewal of the Distributor Agreement and the debranding of the Delmar and Duck-In Stations entitled Sunoco to liquidated damages under the respective Incentive Agreements.

-2-

## II.      SUMMARY OF ARGUMENT

1.  The Incentive Agreements obligate Sweet Oil to reimburse Sunoco 100% of the incentive payments it received if the Distributor Agreement between them should non-renew or terminate or if the Delmar or Duck-In Stations should debrand within the first 5 years of the Incentive Agreements' effective dates.  The non-renewal of the Distributor Agreement and the debranding of the Delmar and Duck-In Stations within five years of the Incentive Agreements' effective date triggered Sweet Oil's obligation to pay Sunoco liquidated damages, thus, entitling Sunoco to judgment as a matter of law on Sweet Oil's declaratory judgment claim.  Since the material facts are undisputed, Sunoco respectfully requests this Court to declare that Sunoco is entitled to liquidated damages from Sweet Oil.

## III.     STATEMENT OF THE FACTS

### A.      Agreements Between Sunoco and Sweet Oil.

On April 28, 2004, Conoco Phillips assigned all of its right, title, and interest under a Mobil Branded Distributor Agreement (the "Distributor Agreement") and two Tosco Distributor Incentive Program Agreements ("Incentive Agreements") it had with Peninsula Oil Company ("Peninsula") to Sunoco.  (Distributor Agreement, Delmar Incentive Agreement dated Feb. 25, 2002, and Incentive Agreement dated May 2, 2001, attached as Exhibits "1," "2," and "3" to Statement of Undisputed Facts, D.I. 38 at ¶¶ 3, 6, 8).  Under the terms of the Incentive Agreements, Sunoco paid Peninsula an incentive payment for each gallon of motor fuel Peninsula sold to the Delmar and Duck-In Stations.  (Am. Comp., D.I. 23 at ¶ 10; Delmar Incentive Agreement dated Feb. 25, 2002 and Incentive Agreement dated May 2, 2001, Ex. 2 & 3 to Statement of Undisputed Facts, D.I. 38 at ¶¶ 6, 8).  Importantly, for purposes of this motion, the Incentive Agreements provide, in pertinent part, as follows:

> Distributor recognizes that it would be difficult to quantify [Sunoco]'s economic losses if Distributor's franchise relationship terminated or non-renewed or the retail facility debranded. Thus, Distributor agrees that if Distributor's contract is terminated/non-renewed, or the retail facility is debranded within ten (10) years after the first month Distributor reports volume for incentive payment purposes, Distributor will pay to [Sunoco] liquidated damages, to compensate for such losses. . . . (Delmar Incentive Agreement dated Feb. 25, 2002 and Incentive Agreement dated May 2, 2001, Ex. 2 & 3 to Statement of Undisputed Facts, D.I. 38 at ¶¶ 6, 8).

Peninsula was obligated to pay back the incentive payments to Sunoco on a fixed amortization schedule if the Distributor Agreement was terminated or non-renewed, if the Delmar Station was debranded prior to July 31, 2012, or if the Duck-In Station was debranded prior to March 31, 2011. (Am. Compl., D.I. 23 at ¶ 11; Delmar Incentive Agreement dated Feb. 25, 2002 and Incentive Agreement dated May 2, 2001, Ex. 2 & 3 to Statement of Undisputed Facts, D.I. 38 at ¶¶ 6, 8).

On August 31, 2005, Sweet Oil purchased, among other things, Peninsula's right, title, and interest in the Distributor Agreement and the Incentive Agreements through an Assignment and Assumption Agreement ("Assignment Agreement"). (Assignment and Assumption Agreement at ¶ 2, attached as Exhibit "6" to the Statement of Undisputed Facts, D.I. 38 at ¶ 16). Sweet Oil signed the Assignment Agreement with full knowledge that the Delmar and Duck-In Stations were subject to the Incentive Agreements and that the full amortization dates for the incentive payments were July 31, 2012 and March 31, 2011, respectively. (*Id.* at ¶ 7). Importantly, Sweet Oil knew the Distributor Agreement would expire on September 30, 2005 and would not be renewed under the Mobil trademark. (*Id.* at ¶ 2). Instead, Sweet Oil agreed that the Delmar and Duck-In Stations, among others, would be "promptly" rebranded Sunoco. (*Id.* at ¶ 3).

-4-

**B.    Non-Renewal of the Distributor Agreement and Debranding of the Stations.**

Despite their stated intentions in the Assignment Agreement, the Distributor Agreement was not non-renewed at the end of September, 2005.  Rather, in order to allow for an orderly transition from the Mobil to the Sunoco brand, Sunoco and Sweet Oil extended the Distributor Agreement on a month by month basis.  (Am. Comp., D.I. 23 at ¶ 6).  From September 2005 until late in 2006, Sweet Oil made frequent and repeated efforts to rebrand the Delmar Station to Sunoco.  Sunoco assisted Sweet Oil in this effort by offering to waive its right to demand liquidated damages under the Incentive Agreements if the Delmar Station would rebrand Sunoco.  (March 26, 2008 deposition of Mark Greco ("Greco Deposition"), 224:11-225:12, attached hereto as Exhibit "A").  Sunoco also offered to pay for all brand conversion expenses and an additional incentive payment if BCG would sign a new Dealer Agreement with Sweet Oil under the Sunoco brand.[1]  BCG refused to rebrand the Delmar Station to Sunoco.

On November 2, 2006, Sunoco informed Sweet Oil that the Distributor Agreement would be terminated and non-renewed as of February 2, 2007 due to the fact that Sunoco's license to use the Mobil trademarks would expire at the end of February, 2007.  (Letter dated Nov. 2, 2006, attached as Exhibit "9" to the Statement of Undisputed Facts, D.I. 38 at ¶ 25).  On February 2, 2007, Sweet Oil debranded the Delmar and Duck-In Stations as Mobil stations by removing all indicia of the Mobil trademarks.  (Greco Dep., 247:4-14, Ex. A; Statement of Undisputed Facts, D.I. 38 at ¶ 33).  Thereafter, these stations sold unbranded motor fuel to the motoring public.

---

[1] Both the Distributor Agreement and Dealer Agreement allowed Sunoco and Sweet Oil, respectively, to change the brand of motor fuel they supplied.  (Distributor Agreement at ¶6(B) & ¶11(C), and Dealer Agreement at ¶8, Ex. 1 & 4 to the Statement of Undisputed Facts, D.I. 38 at ¶¶ 3, 11).  Thus, Sunoco could supply the Delmar Station, through Sweet Oil, with Sunoco branded motor fuel until the Dealer Agreement expired in 2012.  Sunoco preferred that BCG sign a new Dealer Agreement with Sweet Oil pursuant to which it expressly agreed to purchase and resell Sunoco branded motor fuel to the motoring public.

Upon the non-renewal of the Distributor Agreement and the debranding of the stations, Sunoco became entitled to a return of the incentive payments as liquidated damages pursuant to the express terms of the Incentive Agreements.

## IV.     ARGUMENT

The non-renewal of the Distributor Agreement and the debranding of the Delmar and Duck-In Stations entitles Sunoco to liquidated damages based on a plain reading of the Incentive Agreements.  The Distributor Agreement was terminated and non-renewed as of February 2, 2007 and the Delmar and Duck-In Stations were debranded prior to the full amortization date of the incentive fees.  These material facts are not in dispute.  The occurrence of each of these events obligated Sweet Oil to pay liquidated damages to Sunoco, therefore, entitling Sunoco to judgment as a matter of law on Sweet Oil's declaratory relief claim.

### A.     Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Boyle v. County of Allegheny, Pa., 139 F.3d 386, 392 (3d Cir. 1998). Summary judgment is appropriate when the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party.  Boyle, 139 F.3d at 392.

In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party.  Assaf v. Fields, 178 F.3d 170, 173-74 (3d Cir. 1999).  However, the party opposing a properly supported motion for summary

#9116234 v4

judgment may not rest upon the mere allegations of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).

      **B.**      **Sunoco is Entitled to Summary Judgment on the Declaratory Judgment Claim Because the Incentive Agreements Obligate Sweet Oil to Pay Sunoco Liquidated Damages**

      The Declaratory Judgment Act permits this Court to declare the rights and duties of the parties with respect to contractual disputes.  28 U.S.C. § 2201 (2006);  See Johnson v. Geico Cas. Co., 516 F. Supp. 2d 351, 357 (D. Del. 2007).  This Court has jurisdiction over this action pursuant to the PMPA.  See N.I. Petroleum Ventures Corp. v. GLeS, Inc., 333 F. Supp. 2d 251, 253 (D. Del. 2004).

      Sunoco is entitled to summary judgment because the non-renewal of the Distributor Agreement and the debranding of the Delmar and Duck-In Stations obligated Sweet Oil to pay liquidated damages to Sunoco.  A termination and/or non-renewal of the Distributor Agreement or a debranding of the stations entitles Sunoco to liquidated damages pursuant to the plain language of the Incentive Agreements.  The Distributor Agreement was terminated and non-renewed and the facilities were debranded on February 2, 2007.  These events triggered Sweet Oil's contractual obligation to pay Sunoco liquidated damages under the Incentive Agreements.

a.    **The Incentive Agreements Are Clear and Unambiguous.**

Contract interpretation is a question of law for the court to decide.  O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 286 (Del. 2001).  Under Delaware law, contract provisions are only considered ambiguous when the terms are "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  E.I. du Pont de Nemours & Co. v. Allstate Ins. Co., 693 A.2d 1059, 1061 (Del. 1997).

Here, the contractual provisions are not only clear on their face, but there is no factual dispute between the parties regarding the provision that triggered Sweet Oil's obligations to repay the incentive payments.  The Incentive Agreements specifically provide that if the Distributor Agreement is "terminated/non-renewed, or the retail facility is debranded within ten (10) years," Sweet Oil will reimburse Sunoco for all incentive payments paid for the Delmar and Duck-In stations as liquidated damages.  (Delmar Incentive Agreement dated Feb. 25, 2002 and Incentive Agreement dated May 2, 2001, Ex. 2 & 3 to Statement of Undisputed Facts, D.I. 38 at ¶¶ 6, 8).  The amount of the liquidated damages depends on the length of time the Incentive Agreement was in effect and a schedule in the Incentive Agreements allows the parties to easily calculate the amount due.  (*Id.*)

The terms contained in the pertinent section of the Incentive Agreements are plain and clear.  A termination or non-renewal of the Distributor Agreement is a discontinuance of the contractual relationship between the parties.  Debranding is a term of art used in the motor fuel industry and simply means to remove or cover all indicia of a trademark associated with a particular brand of motor fuel at a retail motor fuel facility.  (Greco Dep., 235:15-22, Ex. A).  In this case, the term meant to remove or cover any and all indicia of the Mobil trademark from the Delmar or Duck-In Stations.  Sweet Oil, as an experienced motor fuel distributor, understood that Sunoco was entitled to a return of the incentive moneys if, and when, the Distributor

#9116234 v4

Agreement terminated or non-renewed or the Delmar and Duck-In Stations no longer sold Mobil branded motor fuel.  (*Id*. at 235:3-13).

        **b.**      **The Non-renewal of the Distributor Agreement and the Debranding of the Facilities Entitled Sunoco to Liquidated Damages.**

        The non-renewal of the Distributor Agreement entitled Sunoco to liquidated damages.  Sweet Oil does not dispute that the Distributor Agreement was non-renewed on February 2, 2007.  Under the plain language of the Incentive Agreements, Sunoco is and was entitled to reimbursement of the incentive payments from Sweet Oil as liquidated damages upon the occurrence of the non-renewal of the Distributor Agreement.

        Any debranding of the subject facility, regardless of the reason for the debranding, entitled Sunoco to return of the incentive payments as liquidated damages.  (Delmar Incentive Agreement dated Feb. 25, 2002 and Incentive Agreement dated May 2, 2001, Ex. 2 & 3 to Statement of Undisputed Facts, D.I. 38 at ¶¶ 6, 8).  Specifically, Sunoco was entitled to liquidated damages if the Delmar Station was debranded prior to July 31, 2012 or the Duck-In Station was debranded prior to March 3, 2011. (Delmar Incentive Agreement dated Feb. 25, 2002, Incentive Agreement dated May 2, 2001, and Dealer Agreement at ¶ 7, Ex. 2, 3, & 4 to the Statement of Undisputed Facts, D.I. 38 at ¶¶ 6, 8, 11).  In February 2007, Sweet Oil debranded the Delmar and Duck-In Stations, more than four years prior to the full amortization of the incentive payments.  Sweet Oil does not dispute these facts.  As a result of the debranding, Sunoco was entitled to full reimbursement of all incentive payments made for the two retail facilities as liquidated damages under the Incentive Agreements.  (Delmar Incentive Agreement dated Feb. 25, 2002 and Incentive Agreement dated May 2, 2001, Ex. 2 & 3 to Statement of Undisputed Facts, D.I. 38 at ¶¶ 6, 8).

## V.  CONCLUSION

For the foregoing reasons, Sunoco respectfully requests that this Court grant its

motion for summary judgment in Sunoco's favor pursuant to Rule 56 of the Federal Rules of

Civil as there is no genuine issue as to any material fact and Sunoco, Inc. (R&M) is entitled to

judgment as a matter of law.  Sunoco respectfully requests that this Court declare that the non-

renewal of the Distributor Agreement and the debranding of the Delmar and Duck-In Stations

entitled Sunoco to liquidated damages under the respective Incentive Agreements.


Respectfully Submitted,

/s/ Matthew A. Kaplan
Matthew A. Kaplan (#4956)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE  19899-1709
Telephone No.: 302-777-6528

A. Christopher Young (*pro hac vice*)
Jennifer Lori Lambert (*pro hac vice*)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone No.: 215-981-4190

*Attorneys for Third-Party Defendant,*
*Sunoco, Inc. (R&M)*

#9116234 v4

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2008, a copy of Third-Party Defendant, Sunoco, Inc. (R&M)'s Opening Brief in Support of its Motion for Summary Judgment on Count 1 of the Amended Third-Party Complaint Pursuant to Fed. R. Civ. P. 56 was served electronically upon the following counsel of record via *CM/ECF:*

Seth J. Reidenberg, Esq.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

*Attorneys for Defendant/Third Party Plaintiff,*
*GLeS, Inc., d/b/a Sweet Oil Company*

John W. Paradee, Esq.
D. Benjamin Snyder, Esq.
Glenn C. Mandalas, Esq.
PRICKETT JONES & ELLIOTT
11 North State Street
Dover, DE 19901

*Attorneys for Plaintiffs,*
*BCG, Inc. and Chesapeake Products &*
*Services*


/s/ Matthew A. Kaplan
Matthew A. Kaplan (#4956)

# EXHIBIT "A"

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
BCG, INC. and CHESAPEAKE      )
PRODUCTS & SERVICES, INC.     )
                              )
            Plaintiff,        )
                              )  Civil Action No.
v.                            )  07-CV-207 (GMS)
                              )
GLES, INC., d/b/a SWEET OIL   )
COMPANY,                      )
                              )
            Defendant/Third-Party )
                 Plaintiff,   )
                              )
v.                            )
                              )
SUNOCO, INC.,                 )
                              )
            Third-Party Defendant )
```

Deposition of MARK GRECO, taken
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, The Brandywine Building,
1000 West Street, Wilmington, Delaware, beginning at
10:00 a.m., on Wednesday, March 26, 2008, before Terry
Barbano Burke, RMR-CRR and Notary Public.

APPEARANCES:

        HARRY C. STORM, ESQUIRE
        Lerch Early & Brewer
          Three Bethesda Metro Center, Suite 460
          Bethesda, Maryland  20814-5367
          For the Plaintiff

WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

2

Mark Greco

```
 1   APPEARANCES (cont'd):

 2           HUGH J. HUTCHISON, ESQUIRE
             Leonard, Sciolla, Hutchison, Leonard
 3           & Tinari, LLP
               1515 Market Street, 18th Floor
 4             Philadelphia, Pennsylvania  19102
               For the Defendant
 5             GLeS, Inc., d/b/a Sweet Oil Company

 6           A. CHRISTOPHER YOUNG, ESQUIRE
             JENNIFER L. LAMBERT, ESQUIRE
 7           Pepper Hamilton, LLP
               3000 Two Logan Square
 8             Eighteenth and Arch Street
               Philadelphia, Pennsylvania  19103-2799
 9             For the Defendant
               Sunoco, Inc.
10
     ALSO PRESENT:
11
             BILL GLENN
12           CHARLIE GLENN
             BEN LeROY
13           BILL SWEET

14                      -      -      -

15                     MARK GRECO,

16       the deponent herein, having first been

17       duly sworn on oath, was examined and

18       testified as follows:

19   BY MR. STORM:

20     Q.   Mr. Greco, good morning.  Would you state your

21   full name and home address, please.

22     A.   It's Mark Greco, 25 Wendy Way, Sewell, New

23   Jersey.

24     Q.   How about your business address?
```

3

Mark Greco

1    A.    The current today is 4501 Route 42, Suite

2  No. 2, Turnersville, New Jersey.

3    Q.    What business is at that address?

4    A.    There are several businesses at that address.

5  Specifically this -- are you asking about Sweet Oil?

6    Q.    What business are you engaged in at that

7  address, at the 4501 Route 42 address?

8    A.    I own several different businesses.

9    Q.    What are those?

10   A.    GLeS, Incorporated; Primo Properties, LLC; MLG

11  Realty, LLC; and For Sale Realty, LLC.

12   Q.    What does Primo Properties do?

13   A.    Primo Properties is a land holding company and

14  property management company.

15   Q.    Is it affiliated in some way with GLeS?

16   A.    Yes.  Primo Properties owns many properties

17  that were leased to GLeS during its operation as Sweet

18  Oil.

19   Q.    And does Primo Properties still own any

20  operating service stations?

21   A.    Yes.

22   Q.    Are those stations operated or affiliated at

23  this time with GLeS?

24   A.    No.

4

Mark Greco

1    Q.    Was there some transaction within the last

2    couple of years where that changed?

3    A.    Yes.  At one point Primo Properties leased gas

4    stations to GLeS, and on March 7th of last year, GLeS

5    sold its operational business to another company.

6    Q.    What company was that?

7    A.    GPM Investments, LLC.

8    Q.    Did GPM step into GLeS's shoes with respect to

9    those Primo Properties' locations?

10   A.    The relationship between Primo and GLeS was

11   terminated by mutual termination, and then Primo

12   negotiated a new ground lease with GPM.

13   Q.    But those sites that Primo controlled and that

14   were formerly leased to GLeS as gas stations are still

15   operating as gas stations, only through GPM at this

16   time?

17   A.    Yes.

18   Q.    Who owns Primo Properties?

19   A.    Ben LeRoy, William Sweet, and myself.

20   Q.    I take it it has a separate corporate

21   existence or organizational existence from GLeS?

22   A.    Yes.

23   Q.    Is that a Delaware entity, do you know?

24   A.    Yes.

5

Mark Greco

1    Q.    Is GLeS still in business at this time?

2    A.    Yes.

3    Q.    What does it do at this time?

4    A.    GLeS owns two properties which it leases to

5    GPM Investments.

6    Q.    It is no longer involved in the supplying of

7    motor fuel?

8    A.    No.

9    Q.    The two properties that it owns, that it

10   leases to GPM, where are those located?

11   A.    In New Castle County, Delaware.

12   Q.    The transaction that occurred in March, I

13   guess, 2007 between GLeS and GPM, was that an asset

14   sale?

15   A.    It was a sale of business assets, equipment

16   and supply contracts.

17   Q.    Either of the locations that are involved in

18   this litigation, the Laurel Oasis location or the

19   Delmar location, was there anything in the GPM

20   transaction with GLeS related to those two sites?

21   A.    Originally they were going to be included in

22   the sale, but they were excluded because of the breach

23   of agreements.

24   Q.    So the transaction that ultimately occurred

6

Mark Greco

1    between GPM and GLeS did not include anything with

2    respect to the Laurel Oasis or Delmar locations?

3        A.    No, it did not.

4        Q.    Was there any adjustment to the purchase price

5    between GPM and GLeS as a result of those two locations

6    not being part of a package that was sold?

7                MR. HUTCHISON:  Objection to foundation

8    on that.  There's no indication, it was part of it

9    originally as part of the price.  To say there's an

10    adjustment, I think is perhaps --

11                MR. STORM:  Maybe I can lay a better

12    foundation.  I thought I understood him to say that

13    originally they had been part of the package and then

14    they were later excluded.

15                THE WITNESS:  It was our intention to

16    sell all of the supply agreements, but due to the

17    breach on the two agreements, we were forced to exclude

18    them from negotiation.

19    BY MR. STORM:

20        Q.    And was there any adjustment made on the price

21    as a result of those locations being excluded?

22        A.    No.  They were excluded prior to coming up

23    with price.

24                MR. STORM:  I think, and we can go back

7

Mark Greco

1    and check, but I think that we had in the document

2    request requested documents with respect to that

3    transaction, and I don't believe that there was

4    anything produced in connection with that.  I think

5    that those documents are relevant.  Not all of the

6    documents, obviously, but certainly any of the original

7    drafts of the documents and the ultimate purchase

8    documents as related to these locations I think are

9    relevant.

10            So we can talk some more on a break about

11    that, but I think that insofar certainly as the price,

12    there may have been adjustment in the price from the

13    initial price that was agreed upon and the ultimate

14    price, I think it certainly is relevant to the question

15    of the damages here.

16            MR. HUTCHISON:  We can talk about that.

17            MR. STORM:  Okay.

18    BY MR. STORM:

19    Q.    Mr. Greco, let me direct your attention to

20    Exhibit 1 that's in front of you there, which is the

21    deposition notice, the original deposition notice,

22    which I don't think was formally amended.  But I just

23    want to establish on the record that you are here on

24    behalf of GLeS, Inc., doing business as Sweet Oil

8

Mark Greco

1   Company, to testify about the seven categories of items

2   that are set forth in the notice?

3       A.    Yes.

4       Q.    And you believe to be knowledgeable about all

5   of those areas; is that right?

6       A.    Yes.

7       Q.    I'd like to ask you a little bit, try to

8   understand some of the background about GLeS.  Can you

9   tell me when it was formed?

10      A.    April of 1997.

11      Q.    And were you and Mr. Sweet and Mr. LeRoy all

12  founders, if you will, of the organization?

13      A.    Yes.

14      Q.    At the time that GLeS was formed, were you

15  already in the motor fuels business at that time?

16      A.    Yes, each of us were.

17      Q.    Together in some way or separately?

18      A.    Separately.

19      Q.    Tell me what everybody was doing generally.

20      A.    Both Bill and Ben were long-time gasoline

21  retailers.  I was, more recently had become a gasoline

22  retailer.  Previous to that, I was actually working for

23  Texaco as a sales representative, franchise consultant.

24      Q.    And how many retail sites did you operate at

9

Mark Greco

1   that time in '97?

2       A.   I think in '97 I only had one.  Either one or

3   two.  I'm not sure.

4       Q.   Of the locations that the three of you

5   operated in some way, were any of those sites locations

6   where the individuals or their entities controlled the

7   real estate?

8       A.   Yes.

9       Q.   As opposed to being a lessee dealer of an oil

10  company?

11      A.   Yes.

12      Q.   So you had one site, and how many sites did

13  Mr. LeRoy operate, do you know?

14      A.   At the time we formed the company?

15      Q.   Right.

16      A.   I don't know.  It was either one or two.  I

17  couldn't tell you exactly.

18      Q.   And then Mr. Sweet operated some sites too?

19      A.   Yes.

20      Q.   How many did he operate, do you know?

21      A.   I think it was two, but I'm not sure.

22      Q.   At the time that the three of you came

23  together, what was the objective in bringing the three

24  together, what was GLeS going to do?

10

Mark Greco

1    A.    Initially we were going to build and/or buy a

2  service station collectively together and be supplied

3  by an oil company.  And later it evolved into an

4  opportunity for us to supply ourselves.

5    Q.    And ultimately then you became a jobber or a

6  distributor of some kind?

7    A.    Yes, through Amoco.

8    Q.    When was that, do you remember?

9    A.    It was early '97.  I couldn't tell you exactly

10  when.

11    Q.    Mr. LeRoy or Mr. Sweet, had their background

12  been with an oil company like yours with Texaco?

13    A.    Only as dealers.

14    Q.    So GLeS becomes an Amoco distributor at some

15  point?

16    A.    Yes.

17    Q.    I'm sorry, what year was that?

18    A.    1997.

19    Q.    Did you then also undertake to obtain other

20  supply accounts?

21    A.    Yes.

22    Q.    How many supply accounts ultimately with Amoco

23  do you think you acquired?

24    A.    In 1997?

11

Mark Greco

1    Q.    Well, from the time that you started in '97

2    until the time that you sold to GPM, sort of take me

3    through the history of the company, what happens with

4    it?

5    A.    We continually went out and negotiated supply

6    agreements with independent dealers who owned their own

7    properties, as well as acquiring locations or leasing

8    locations and continuing to grow our distribution

9    business.

10              GLeS -- I'm trying to think -- maybe can

11   you tell me exactly what you're trying to get?

12   Q.    So you went out and you obtained supply

13   agreements with dealers who controlled their real

14   estate; right?

15   A.    Yes.

16   Q.    Did you continue to acquire locations through

17   GLeS yourself where you acquired the interest in the

18   real estate?

19   A.    GLeS only owned a couple of locations.  We

20   formed a real estate company, which was designed to be

21   a real estate holding company.  GLeS wasn't intended to

22   purchase the real estate.

23   Q.    Was that Primo?

24   A.    Yes.

12

Mark Greco

1    Q.    And how many sites did Primo acquire that GLeS

2    ultimately supplied?

3    A.    Off the top of my head, I couldn't tell you.

4    Q.    More than ten?

5    A.    Yes, more than ten.

6    Q.    More than 20?

7    A.    Somewhere in the 20's, I would say.  I

8    couldn't tell you exactly without looking.

9    Q.    By the time we get to 2007 when you do the

10   transaction with GPM, there would have been locations

11   where GLeS and/or Primo controlled the real estate;

12   right?

13   A.    Yes.

14   Q.    And then there would have been locations where

15   GLeS was supplying motor fuel to others who controlled

16   the real estate; right?

17   A.    Correct.

18   Q.    How many locations were there at that time of

19   each of those categories?

20   A.    Off the top of my head, I couldn't tell you a

21   breakdown.

22   Q.    Give me just an approximate number.

23   A.    We had ground leases, we had some fee sites,

24   we had some supply sites.  I couldn't tell you a

13

Mark Greco

1    breakdown off the top of my head.

2        Q.    Of the sites that were transferred to GPM, you

3    have no idea how many locations were involved in the

4    transaction?

5        A.    I believe only one gas station was transferred

6    to them, the real estate.  The rest were supply

7    agreements and leases.

8        Q.    How many was that, more than 50?

9        A.    All combined?

10        Q.    Yes.

11        A.    Yes.

12        Q.    More than 75?

13        A.    No.

14        Q.    So somewhere between 50 and 75 sites that were

15    supplied by Sweet Oil?

16        A.    Yes.

17        Q.    Do you recall in 2007 what kind of volume

18    Sweet Oil was doing on an annual basis?

19        A.    Approximately 55 million gallons.

20        Q.    Let's go back.  You mentioned that you became

21    a distributor for Amoco?

22        A.    Yes.

23        Q.    I assume, then, that that ultimately became

24    the BP brand when BP acquired Amoco; is that right?

14

Mark Greco

1     A.     Yes.

2     Q.     Did GLeS become a distributor for any other

3     oil companies?

4     A.     Yes.

5     Q.     Which ones?

6     A.     With Coastal Refining & Marketing.  With

7     Sunoco.  With ExxonMobil.  With CITGO.  And I believe

8     that was it.

9                    I'm sorry, excuse me, in addition Tosco.

10    Q.     Was the ExxonMobil distributorship separate

11    and apart from that with Tosco?

12    A.     Yes.  We supplied Exxon through ExxonMobil.

13    At the time we supplied Tosco, it was the BP brand

14    before BP did their purchase of Amoco.

15    Q.     So, in other words, you were a BP distributor

16    before BP acquired Amoco?

17    A.     Yes, we were BP through Tosco, and Amoco

18    through Amoco.

19    Q.     I got that straight.  Is everybody clear on

20    that?

21                   What jurisdictions did you do business

22    in?

23    A.     New Jersey, Pennsylvania, Delaware, Maryland

24    and Virginia.

15

Mark Greco

1    Q.    Was there one jurisdiction that you

2    concentrated on more than others of those?

3    A.    Initially it was Delaware, because that's

4    where our office was, our base was, but we grew out

5    from there.

6    Q.    Did anyone else ever, aside from the

7    transaction that you ultimately did with GPM, other

8    than you, Mr. Sweet, and Mr. LeRoy, did anybody else

9    have an ownership interest in GLeS?

10    A.    No.

11    Q.    Ultimately -- not ultimately -- in 2005, I

12    believe you did, GLeS did a transaction with Peninsula

13    Oil, isn't that right?

14    A.    Yes.

15    Q.    Prior to that, had you acquired the interests

16    of any other distributor or oil company?

17    A.    Yes.

18    Q.    Which ones?

19    A.    In October of 2003, we acquired other assets

20    of Peninsula Oil.  In December of 2000, we acquired

21    assets of Amoco.  And also in December of 2000, we

22    acquired assets of Shellhorn & Hill.

23    Q.    I'm sorry, Shell what?

24    A.    Shellhorn & Hill.

16

Mark Greco

1    Q.    Okay.

2          Tell me the nature of the assets that you

3    acquired from Peninsula in 2003, what was that?

4    A.    Primo Properties acquired 14 Uncle Willie's

5    branded locations and then leased them to GLeS.

6    Q.    Had Peninsula operated Uncle Willie's itself?

7    A.    Yes.

8    Q.    Did GLeS operate those sites for any period of

9    time?

10   A.    No.

11   Q.    So GLeS sold the businesses there and retained

12   the real estate and had a lease arrangement with an

13   operator?

14   A.    GLeS never owned the real estate.  Primo owned

15   it.

16   Q.    And then GLeS supplied whoever it was who

17   became the operators of those sites?

18   A.    Yes.

19   Q.    How about the transaction with Amoco in 2000,

20   what was the nature of that?

21   A.    Amoco co-existed with us in this market.  We

22   were supplying dealers and they were supplying dealers

23   and they made a corporate decision that they weren't

24   going to continue to serve directly, and we purchased

17

Mark Greco

1  their assets, along with assignment of the existing

2  dealer leases.

3      Q.    So the portion of the territory that had been

4  both direct supplied and distributor supplied now

5  became wholly distributor supplied?

6      A.    Yes.

7      Q.    And then you said in December of 2000 you also

8  did a transaction with Shellhorn & Hill?

9      A.    Yes.

10     Q.    What was that?

11     A.    Primo Properties purchased eight pieces of

12  real estate and then leased them to GLeS.

13     Q.    In connection with the 2005 transaction with

14  Peninsula, was there any one person in particular at

15  Peninsula that you dealt with?

16     A.    Yes.   John Willie.

17     Q.    Was Mr. Willie the president of the company?

18     A.    Yes.

19     Q.    Did Peninsula continue doing business in some

20  fashion after the 2005 transaction?

21     A.    They continued to operate, but they were no

22  longer in the gasoline business.

23     Q.    They were still involved in heating oil or

24  some other type of business like that?

18

Mark Greco

1     A.     Yeah, other businesses.

2     Q.     Now, you mentioned earlier on that I think you

3     also were engaged in business with MLG Realty and I

4     think another realty company.

5     A.     Yes.

6     Q.     What are those?

7     A.     They are businesses that I wholly own outside

8     of the Primo and GLeS companies.  I own commercial real

9     estate and do property management.

10     Q.     Just so I am clear, at this time GLeS does not

11     supply motor fuel to anybody?

12     A.     No.

13     Q.     I think I saw somewhere in the documents that

14     there was a reference to a mutual cancellation that you

15     entered into with Sunoco at some point in time, I think

16     in 2006 or 2007.

17              Do you recall that?

18     A.     Yes.

19     Q.     What was that?

20     A.     After GLeS's sale and assignment of the

21     balance of our supply agreements to GPM, we terminated

22     our relationships with each of our suppliers.

23     Q.     The agreement that you had with Sunoco, was

24     that an agreement that was separate from the Tosco

19

Mark Greco

1  agreement that had been assigned to Sunoco?

2      A.    I'm not sure if I understand the question.

3      Q.    When you -- and when I say you, when GLeS --

4  when GLeS acquired the interest of Peninsula in 2005,

5  Peninsula at that time had a relationship with Tosco,

6  did it not?

7      A.    At the time I'm not sure if it was still Tosco

8  or if it was Sunoco.

9      Q.    It had an original agreement with Tosco that

10 had been assigned to Sunoco; correct?

11     A.    Yes.

12     Q.    Related to the Mobil brand; right?

13     A.    Yes.

14     Q.    And you ultimately took an assignment -- you

15 being GLeS -- took an assignment of Peninsula's

16 interest in that agreement; right?

17     A.    Yes.

18     Q.    Separate from that relationship that was

19 created through you stepping into Peninsula's shoes --

20 when I refer to you, I'm talking about GLeS --

21     A.    Okay.

22          MR. HUTCHISON:  We agree.

23          MR. STORM:  Okay.

24 BY MR. STORM:

Mark Greco

 1    Q.    Other than the relationship that GLeS stepped

 2    into through Peninsula and Sunoco stepped into through

 3    its assignment from Tosco, did GLeS have a separate

 4    relationship of some kind with Sunoco?

 5    A.    Yes.

 6    Q.    Was that pursuant to a separate Sunoco/GLeS

 7    agreement related to the Sunoco brand?

 8    A.    Yes.

 9    Q.    When was that agreement entered into, if you

10    know?

11    A.    I'd have to go back and pull the agreement.  I

12    don't know.

13    Q.    Prior to the assignment from Peninsula in 2005

14    to GLeS, did you ever supply Sunoco branded locations?

15    A.    Yes.

16    Q.    How many?

17    A.    One.

18    Q.    Where was that?

19    A.    In Glasgow, Delaware.

20    Q.    And that was pursuant to that agreement that

21    you had with Sunoco?

22    A.    Yes.

23    Q.    Was that a 2003 agreement, do you recall, that

24    you had with Sunoco?

21

Mark Greco

1    A.    I'm not sure of the date.  I'd have to pull

2    the agreement.

3                MR. YOUNG:  One point of clarification

4    while we are at a break.  You refer to the assignment

5    between Tosco and Sunoco.  I believe it was an

6    assignment from ConocoPhillips, which was a successor

7    to Tosco.

8                MR. HUTCHISON:  I think we can agree that

9    we don't have to fill in the blanks in the middle.

10               MR. STORM:  Actually ConocoPhillips was a

11   successor to Phillips under that agreement, which was a

12   successor to Tosco, but we will save that for later.

13   BY MR. STORM:

14   Q.    Was there any particular person at Sunoco

15   during the time period, from the time you signed the

16   Sunoco agreement until the time that you got out of

17   business in 2007, out of the distribution business in

18   2007, were there certain people at Sunoco with whom you

19   dealt?

20   A.    Yes.

21   Q.    I think I have seen the name Dorothy Love or

22   Dolores Love?

23   A.    Dolores Love.

24   Q.    And Jeff Byard?

22

Mark Greco

1      A.     Yes.

2      Q.     Anybody else at Sunoco you dealt with?

3      A.     Karl Beckers.

4             Dan Moore.

5             And I'm not sure who else.

6      Q.     Were those people, Miss Love, Mr. Byard,

7      Mr. Beckers, and Mr. Moore, were those all people who

8      were part of the distributor side of Sunoco's business?

9      A.     Yes.

10     Q.     Let me direct your attention to Exhibit 2 in

11     front of you there, and ask if you can identify that

12     exhibit for me?

13     A.     This is the assignment of Peninsula's rights

14     to GLeS as it related to their, Tosco/Sunoco supply

15     agreement.

16     Q.     I am going to ask you a few questions about

17     this document, but I want to just go back to ask a

18     couple of background questions about GPM for a minute,

19     the entity that GLeS did the transaction with in 2007.

20            Was GPM already involved in the motor

21     fuel business in this area?

22     A.     Yes.

23     Q.     How many sites did they operate, do you know,

24     approximately?

23

Mark Greco

1    A.    I couldn't tell you.  Something over 200.

2    Q.    They did business in what general geographic

3    area?

4    A.    Virginia, Delaware, Maryland.  I couldn't tell

5    you other states.

6    Q.    Were they a larger entity than GLeS at the

7    time that they acquired the interests of GLeS?

8    A.    Yes.

9    Q.    Do you know approximately how many sites they

10   operated or supplied?

11   A.    Something over 200, but I don't know the exact

12   number.

13   Q.    Total, not just in this area?

14   A.    Total.

15   Q.    The document, Exhibit 2, I think you mentioned

16   it's the assignment and assumption agreement related to

17   the Tosco/ConocoPhillips/Peninsula agreement; right?

18   A.    Yes.

19   Q.    Was there also an assignment and assumption

20   agreement that GLeS entered into with Peninsula as part

21   of the Peninsula/GLeS transaction that related to sites

22   that were not Mobil-branded locations?

23   A.    Can you restate the question?

24   Q.    At the time that GLeS acquired the interests

24

Mark Greco

1   of Peninsula in these various locations in 2005, which

2   included the two sites that are involved in this

3   litigation, only one of the sites involved in the

4   litigation was a Mobil-branded site; right?

5      A.   Yes.

6      Q.   And so, for example, the site, the Laurel

7   Oasis location, which at the time was branded Texaco,

8   that would not have been a location that was covered by

9   this assignment, Exhibit 2; correct?

10      A.   Correct.

11      Q.   So my question is, were there other assignment

12   documents between GLeS and Peninsula that dealt with

13   these other locations that were outside of the Sunoco

14   bailiwick?

15      A.   No, I don't believe we were.  We didn't take

16   assignment of any other supply agreements.

17      Q.   Did you take assignment of my client's

18   agreement with Peninsula related to Laural Oasis?

19      A.   Yes, we did.

20      Q.   How did you do that, pursuant to what

21   document?

22      A.   I believe we had an agreement of sale.  It was

23   probably addressed in the agreement of sale.

24      Q.   Was there a closing on that transaction?

25

Mark Greco

1    A.    Yes.

2    Q.    Did that happen in a lawyer's office?

3    A.    I'm sure that it did.  I don't remember

4    exactly where it was.

5              MR. STORM:  That's another document I

6    mentioned that was not in the documents that were

7    produced, that there were no other assignment documents

8    relating to the transaction.  Certainly not an

9    assignment document that would specifically relate to

10   Laural Oasis.

11   BY MR. STORM:

12   Q.    The document in front of you as Exhibit 2, you

13   were aware, were you not, at the time that you signed

14   this document on or about August 31st of 2005 that

15   Sunoco's right to the Mobil brand, that Sunoco and

16   ConocoPhillips in the agreement between them had

17   limited Sunoco's right to use the Mobil brand past some

18   period of time?

19             MR. YOUNG:  Objection to form.

20             You can answer.

21             THE WITNESS:  I know that there was an

22   expiration date.  I don't know what it was off the top

23   of my head.

24   BY MR. STORM:

26

Mark Greco

1     Q.     You were the -- when I say you, GLeS/Sweet

2     Oil -- was the assignee under Exhibit 2; right?

3     A.     Yes.

4     Q.     You agreed in this document with Sunoco in

5     paragraph -- well, in this document with Sunoco and

6     with Peninsula that the locations that were supplied

7     Mobil brand fuel under the expiring agreement will be

8     rebranded Sunoco promptly in accordance with a schedule

9     to be agreed upon, do you see that in Paragraph 3?

10    A.     Yes.

11    Q.     And you knew at that time that the agreement

12    between Peninsula and ConocoPhillips that had been

13    assigned to Sunoco was set to expire on September 30th

14    of 2005 pursuant to Paragraph 2 of this agreement?

15    A.     Yes.

16    Q.     Had you seen that agreement at the time that

17    you signed this assignment document or the time that

18    GLeS --

19                 MR. HUTCHISON:   Which?

20    BY MR. STORM:

21    Q.     Had you seen the distributor agreement between

22    Tosco, ConocoPhillips and Peninsula?

23    A.     I don't recall.

24    Q.     Let me direct your attention to Exhibit 8.

27

Mark Greco

1           So my question is, in late August of

2  2005, had you seen and reviewed Exhibit 8?

3      A.    I don't believe that we did.

4      Q.    Prior to signing this document, Exhibit 2, had

5  you seen the agreement between Peninsula and my clients

6  relating to the Delmar Mobil location?

7      A.    Yes.

8      Q.    And had you reviewed that?

9      A.    Yes.

10     Q.    You were aware, then, at the time you signed

11 Exhibit 2, or at the time that GLeS signed Exhibit 2,

12 that any brand change had to be mutually agreed upon?

13     A.    Yes.

14     Q.    The signature on this Exhibit 2 on behalf of

15 GLeS, is that your signature?

16     A.    Yes, it is.

17     Q.    If you go to Paragraph 7 of Exhibit 2, the

18 location that's identified as the Duck-In #2

19 location --

20     A.    Yes.

21     Q.    -- was that a Mobil-branded location that you

22 began, that Sweet Oil began supplying after it acquired

23 the Peninsula assets?

24     A.    Yes.

28

Mark Greco

1    Q.    Did the relationship between Sweet Oil and

2    Duck-In continue after that?

3    A.    Yes.

4    Q.    And for how long?

5    A.    Up until the assignment to GPM.

6    Q.    Was Duck-In one of the locations that was

7    transferred to GPM?

8    A.    Yes.

9    Q.    What was Duck-In branded at that time?

10   A.    At the time of transfer, I think it was

11   unbranded.

12   Q.    Do you remember how that happened, that it

13   went from the Mobil brand to unbranded?

14   A.    Yes.  Once the breach of the Mobil brand -- or

15   once the breach occurred at the Delmar location, we no

16   longer met the minimum criteria for Sunoco to supply

17   under the jobber agreement, and they didn't want us to

18   maintain that agreement with just the Duck-In location,

19   so we mutually agreed on terminating.

20   Q.    What supply agreement are you talking about?

21   A.    Our distributor agreement with Sunoco had

22   minimum volume requirements that we had to meet.

23   Q.    But wasn't that distributor agreement as

24   related to the Mobil brand the agreement that Sunoco

Mark Greco

1   was talking about in this assignment document as ending

2   and wouldn't be renewed on September 30th, 2005,

3   Paragraph 2?

4      A.    Yes, at the time that we signed this, it was

5   contemplated that this Tosco agreement was due to

6   expire at the end of September, and the Mobil gallons

7   were going to be rolled into our Sunoco agreement.

8      Q.    Who envisioned that?

9      A.    That's the way it was explained to us by

10  Sunoco.

11     Q.    And Sunoco told you that's the way it's going

12  to work; correct?

13             MR. YOUNG:  Objection to form.

14             THE WITNESS:  Right.

15  BY MR. STORM:

16     Q.    Who at Sunoco were you dealing with on that?

17     A.    Dolores Love and Dan Moore, I believe.

18     Q.    Did you ever say to Sunoco, well, wait a

19  minute, this contract that Peninsula has with the

20  Glenns requires the Glenns to consent?

21     A.    Yes, I actually furnished them a copy of the

22  agreement.

23     Q.    And what conversation did you have with Sunoco

24  about that?

30

Mark Greco

1    A.    To the best of my recollection, I believe that

2    they said that it was going to be a required conversion

3    because they had purchased the rights to that brand.

4    Q.    Who at Sunoco told you that?

5    A.    I believe it was Dolores, but I'm not 100

6    percent certain.

7    Q.    When do you think that occurred, that

8    conversation?

9    A.    On or about when we signed the assignment

10   agreement.

11   Q.    In 2005, at the time that GLeS was going to do

12   the transaction with Peninsula, did GLeS have an office

13   somewhere in Delaware?

14   A.    Yes.

15   Q.    Where was that?

16   A.    On Kirkwood Highway in Newark.

17   Q.    How many employees did the company have?

18   A.    Approximately ten.

19   Q.    And I take it there was an accounting and

20   bookkeeping department?

21   A.    Correct.

22   Q.    And how many employees were in the accounting

23   and bookkeeping department?

24   A.    At the time, I believe it was four.

31

Mark Greco

1    Q.    Did Sweet Oil do any of its own hauling?

2    A.    No.

3    Q.    So any hauling of product was done through

4    outside haulers; right?

5    A.    Common carriers, yes.

6    Q.    Common carriers.

7              Can you tell me which ones?

8    A.    I believe at the time it was exclusively

9    Coraluzzo.

10    Q.    Did Sweet Oil have an annual contract with

11    Coraluzzo?

12    A.    Yes.

13    Q.    And when that contract came up each year, did

14    you put the contract out to bid?

15    A.    Yes, we did.

16    Q.    What other freight companies would it have

17    been put out to?

18    A.    Numerous companies.

19    Q.    Give me some names, if you recall.

20    A.    Eagle, Penn Tank, Tipton, MIT.  Many other

21    companies.

22    Q.    You were trying to, obviously, get the lowest

23    freight rate; is that right?

24    A.    That was one of our objectives.

Mark Greco

1    Q.    What were the other objectives?

2    A.    We wanted to get the maximum amount of service

3    that we could, 24-hour-a-day/seven-day-a-week

4    deliveries.

5              One of the criteria was they had to be

6    able to deliver through the extent of our network.  Not

7    all the carriers have the capability of delivering the

8    entire network, so that was a requirement.

9    Q.    Do you know who was doing Peninsula's hauling

10   to my client's locations?

11   A.    At the time we purchased the contracts,

12   Peninsula had Coraluzzo and Eagle both supplying.

13   Q.    The product that was supplied, the

14   Mobil-branded product, was there a particular

15   distribution terminal that that came from?

16   A.    The primary terminal would have been

17   Salisbury, Maryland.

18   Q.    How about with respect to initially the Texaco

19   product and then the CITGO product?

20   A.    I believe primarily that was Delaware City.

21   Q.    How about the same for any diesel fuel for

22   those two locations?

23   A.    Yes, either of those terminals.

24   Q.    At any of the locations that GLeS or you or

33

Mark Greco

1    Mr. LeRoy or Mr. Sweet operated, did any of those sites

2    have convenience stores?

3        A.    Yes.

4        Q.    Did any of them have quick serve restaurants?

5        A.    No.

6        Q.    Did GLeS develop any locations itself?

7        A.    When you say develop?

8        Q.    As a ground up facility?

9        A.    That GLeS owned, is that what you're asking?

10       Q.    Or that one of the related, some related

11   entity owned.

12       A.    None that Primo or GLeS owned.

13       Q.    How about any other, you or Mr. Sweet or

14   Mr. LeRoy?

15       A.    No.

16       Q.    How about when you were affiliated with

17   Texaco, were you affiliated with any ground-up

18   locations?

19       A.    Many.

20       Q.    Were those facilities that included

21   convenience stores?

22       A.    Yes.

23       Q.    How about any food service?

24       A.    Yes.  Delis and things like that.

34

Mark Greco

1    Q.    Why were sites developed with convenience

2  stores and delis, things of that nature?

3    A.    Providing additional offerings to the

4  customers.

5    Q.    To tie in with the motor fuel sales?

6    A.    In some cases.

7    Q.    It was generally viewed, was it not,

8  throughout the 90's, and up to the present time, that

9  convenience stores and food service and motor fuel are

10  complimentary of one another?

11              MR. YOUNG:  Objection.

12              MR. HUTCHISON:  Objection as well.

13              THE WITNESS:  You used the

14  term "generally."  I don't know --

15  BY MR. STORM:

16    Q.    Well, most of the new facilities that you see

17  being built today include convenience stores, do they

18  not?

19    A.    They include many different uses.

20    Q.    Such as?

21    A.    Car washes, quick lube centers, repair

22  facilities, Dunkin' Donuts.  Any number of different

23  offerings.

24    Q.    Why is that?

Mark Greco

1    A.    Well, the margins continue to shrink on

2  everything as competition develops, so you increase the

3  number of offerings that you have.

4    Q.    In order to try to increase the profitability

5  of a site?

6    A.    Yes.

7    Q.    You mentioned shrinking margins.  Is the motor

8  fuel business competitive?

9            MR. YOUNG:  Objection.

10           THE WITNESS:  Yes.

11 BY MR. STORM:

12   Q.    Generally it's a business, is it not, where

13 the margins are measured in pennies per gallon?

14   A.    Yes.

15           MR. YOUNG:  Objection.

16 BY MR. STORM:

17   Q.    Is it a business where, based on your

18 experience, consumers buying at retail are price

19 sensitive to the price of gasoline?

20           MR. HUTCHISON:  Objection.

21           MR. YOUNG:  Objection.

22           THE WITNESS:  To the best of my opinion,

23 I would say yes.

24 BY MR. STORM:

Mark Greco

1    Q.    How many years have you been in the business?

2    A.    Since I was 15 years old.  30 years.

3    Q.    A typical load of gasoline that's delivered to

4    a site, how many gallons, if it is a full load?

5    A.    8900.

6    Q.    Have credit card fees become a big issue in

7    the industry?

8              MR. YOUNG:  Objection.

9              MR. HUTCHISON:  Objection.

10   BY MR. STORM:

11   Q.    Let me rephrase it.

12   A.    Yeah.

13   Q.    When GLeS was supplying locations, there was

14   generally credit card processing that was involved at

15   the retail sites, was there not?

16   A.    Correct.

17   Q.    The retail sites took either branded

18   proprietary oil company cards and they took Visa,

19   Master Card, credit cards like that; right?

20   A.    Correct.

21   Q.    And on the non-oil company cards, there were

22   generally fees associated with the processing of those

23   cards; right?

24   A.    Yes.

Mark Greco

1    Q.    And as the price of the gasoline or motor fuel

2    goes up, the credit card fees, for example, at $4 a

3    gallon are greater than they were at $2 a gallon;

4    right?

5    A.    Correct.

6    Q.    I know you know Mr. LeRoy; right?

7    A.    Yes.

8    Q.    Let me direct your attention to Exhibit 3.

9          Have you seen that article before?

10         MR. HUTCHISON:  Does the article have a

11   date?

12         MR. STORM:  There is another page to that

13   that appears not to have been copied.  It was

14   December 23rd, 2007, in the Sunday News Journal here in

15   Wilmington in the business section.

16   BY MR. STORM:

17   Q.    Have you seen that article?

18   A.    Yes, I believe so.

19   Q.    On the second page, Mr. LeRoy is quoted as

20   saying that competitive prices are the driving force.

21   You cannot be competitive in this market place.  If you

22   didn't stay competitive, you wouldn't have customers.

23         Do you see that?

24   A.    Yes.

38

Mark Greco

1    Q.    Do you agree with that?

2    A.    Competitive is a relative term.  I would say

3    to some extent, yes.

4    Q.    Later on, in the middle column on the second

5    page, he is quoted as saying, "Retailers are getting

6    killed, they're getting squashed in the middle.  One of

7    the biggest culprits is not the oil companies, it's the

8    credit card companies."

9                Do you see that?

10   A.    Yes.

11   Q.    Do you agree with that?

12   A.    I don't know if I would have stated it exactly

13   like that.

14   Q.    But the point that's being made there is it

15   relates to the credit card fees; right?

16   A.    Yes.

17   Q.    Let's go back to 2005 and the purchase of the

18   assets from Peninsula, and I think that we have already

19   established that those assets included the two

20   locations that are involved in the litigation.

21                Were there values that were allocated to

22   the various assets that were being acquired from

23   Peninsula?

24   A.    They weren't allocated by site.  We bought a

39

Mark Greco

1  package of agreements.

2      Q.    How many agreements, do you remember?

3      A.    I believe it was 18, but I'm not sure.

4      Q.    Were those all supply contracts?

5      A.    Yes.

6      Q.    I think you talked earlier that you dealt

7  primarily with Mr. Willie.

8      A.    Yes.

9      Q.    And Mr. Willie was probably the same guy that

10  Willie's were named for?

11     A.    It's the family name.

12     Q.    Did you talk to him about how Peninsula had

13  been performing under the various contracts, the method

14  of performance?  Let me give you an example.  For

15  example, on the commission site at Laurel Oasis, how

16  did monies come into Peninsula from Laurel Oasis and

17  how were commissions paid by Peninsula, did you talk at

18  all about the mechanics of how it worked?

19     A.    I don't think we got into that detail.  They

20  furnished us all the contracts and we, I guess, made

21  our own interpretation based on what the contracts

22  required us to do.

23     Q.    Did you visit with my clients before the

24  assignment took place?

40

Mark Greco

1    A.    Yes.

2    Q.    Tell me what you recall about that meeting?

3    A.    We had several meetings, myself and Bill

4    Glenn, discussing the possibility of changing the brand

5    at the Texaco truck stop.  We had meetings with Terry

6    Sullivan from CITGO Petroleum.  We discussed the

7    possibility of making them an actual distributor, a

8    subdistributor of ours where they would be able to go

9    out and hire their own trucks and supply not only their

10   locations, but potentially other locations.

11   Q.    Were those discussions before you acquired the

12   assets from Peninsula or after you acquired the assets?

13   A.    It was right in that same time frame.  I

14   couldn't tell you exactly when.

15   Q.    So just so I'm clear, before you actually

16   bought the assets from Peninsula, you didn't do a

17   review of Peninsula's method of operation to see how

18   Peninsula was performing under its contracts with the

19   various operators that --

20   A.    We actually hired their sales rep, Rod

21   Coleman, who was Peninsula's rep and then later became

22   our rep in an effort that we would not disturb customer

23   service.

24   Q.    Did he become a rep for either of my clients'

41

Mark Greco

1    locations?

2        A.    He continued to be the rep.  He was the rep

3    prior to and he was the rep afterwards.

4        Q.    Was there another rep also, somebody named

5    Adam?

6        A.    At a later date, Adam Gray became the rep.

7        Q.    When did he become the rep?

8        A.    I don't know the exact date.

9        Q.    What happened to the fellow from Peninsula?

10       A.    He was with us for a while and then eventually

11   left the company.  I couldn't tell you exactly the time

12   frames when everything occurred.

13       Q.    Do you remember how long he stayed with you?

14       A.    He was with us for a while.  He changed

15   assignments, he had various different dealers, and then

16   eventually he left the company.

17       Q.    At the time of the 2005 transaction with

18   Peninsula, you knew that my clients' Delmar location

19   was branded Mobil; right?

20       A.    Yes.

21       Q.    And you knew that my clients had been

22   receiving incentive monies from Peninsula --

23       A.    Yes.

24       Q.    -- related to that Mobil brand; right?

42

Mark Greco

1    A.    Yes.

2    Q.    Did you know how Peninsula had been submitting

3    requests to Sunoco for payment with respect to that

4    incentive money?

5    A.    Yes.  We requested copies of the incentive

6    paperwork that was submitted.

7    Q.    And it was based on a three-cent a gallon

8    incentive, was it not?

9    A.    I believe it was, yes.

10    Q.    Who in your office was responsible for

11    submitting that paperwork?

12    A.    I believe the person who ultimately submitted

13    it was John Collins.

14    Q.    John Collins?

15    A.    Collins.

16    Q.    And what was his position?

17    A.    He was marketing support.

18    Q.    Where is Mr. Collins now, do you know?

19    A.    He lives in Delaware, but he's not employed by

20    GLeS any more.

21    Q.    Do you know where in Delaware he is?

22    A.    I believe he lives in Smyrna.

23    Q.    You were aware, were you not, that there was a

24    transaction in 2000 where Exxon and Mobil merged?

43

Mark Greco

1     A.     Yes.

2     Q.     That was common knowledge in the industry, was

3  it not?

4     A.     Yes.   It was on the news, newspaper,

5  everything.

6     Q.     And you also knew as a result of that that as

7  part of the regulatory approval that the Mobil brand

8  had to be divested in certain geographic areas?

9     A.     Yes.

10     Q.     And that included the Mid-Atlantic states?

11     A.     Yes.

12     Q.     And ultimately you were aware, were you not,

13  that Tosco acquired rights to the Mobil brand within

14  the Mid-Atlantic area?

15     A.     Yes.

16     Q.     And you knew, did you not, that Tosco had a

17  licensing agreement that ran from 2000 to 2010?

18     A.     Yes.

19     Q.     There was something that Mobil had that was

20  known as Speedpass, was there not?

21     A.     Yes.

22     Q.     What was that, can you explain what that is?

23     A.     It was a payment method that the Mobil

24  customer, at their option, had the ability to process

44

Mark Greco

1   their credit card transactions through a receiver that

2   they kept on their key chain.

3        Q.    I think you testified earlier that you were an

4   ExxonMobil distributor; right?

5        A.    Yes.

6        Q.    And was that a technology ultimately that

7   Exxon also adopted following the merger?

8        A.    Yes, some time after, but yes.

9        Q.    And that was viewed as a convenience to the

10  customer, was it not, to be able to wave the key in

11  front of the dispenser rather than inserting a credit

12  card?

13                  MR. YOUNG:  Objection.

14                  THE WITNESS:  I think that they believed

15  that it was.

16  BY MR. STORM:

17       Q.    Was there some device or mechanism that had to

18  be installed on the dispenser in order to allow you to

19  wave the key in front of the dispenser?

20       A.    Yes.

21       Q.    And there was a cost associated with that at

22  any site that had Speedpass, was there not?

23       A.    Yes.

24       Q.    Do you remember what that was?

45

Mark Greco

1    A.    Off the top of my head, I don't.

2    Q.    Was that something that Mobil and later Exxon

3    advertised?

4    A.    For a period of time, they did.

5    Q.    Was that a technology that was -- I don't know

6    if it still is -- but at that time back in 2000 to

7    2005, let's say, unique to ExxonMobil?

8    A.    I know other companies were experimenting with

9    it also in different markets, but originally it was

10   Mobil's -- Mobil I guess was the first to come out with

11   it.

12   Q.    You have been involved with a lot of different

13   brands, it sounds like, throughout your career?

14   A.    Yes.

15   Q.    You have been involved, obviously, in

16   situations where a location changes the brand; right?

17   A.    Yes.

18   Q.    And there is an effort made at the time that a

19   location changes the brand to promote that new brand,

20   is there not?

21   A.    Yes.

22   Q.    And to try to develop a customer base or a

23   customer following for that brand?

24   A.    Yes.

46

Mark Greco

1    Q.    And then if the location then changes brands

2    again, then you have to go through that process again;

3    right?

4    A.    Yes.

5    Q.    So, for example, if you convert the location

6    to the BP brand and you then try to attract all of the

7    customers to your BP site and then you change the BP to

8    Exxon, then you have to go through that process again,

9    right, of trying to get the customers back, bring them

10   to the Exxon station now as opposed to the BP station?

11   A.    To some extent that's true, depending on a

12   large number of factors.  When we converted all of our

13   Amoco sites to BP, the entire market converted and we

14   didn't see any erosion in volume.

15   Q.    That was a whole market of those sites; right?

16   A.    Yes.

17   Q.    During the time that you were supplying, after

18   you acquired the Peninsula assets in 2005 until the

19   time that Sunoco stopped supplying Sweet Oil with Mobil

20   branded product, did Sunoco support the Mobil brand in

21   any way?  In other words, did it have any kind of

22   marketing program for the Mobil brand?

23             MR. YOUNG:  Objection.  It is two

24   questions, but you can answer.

47

Mark Greco

 1                THE WITNESS:  I don't recall.

 2    BY MR. STORM:

 3       Q.    You understood from the time that you acquired

 4    the Peninsula locations that it was Sunoco's intention

 5    to convert all of the Mobils to Sunocos; right?

 6       A.    Correct.

 7       Q.    And that was true not just in Delaware, but

 8    everywhere else that Sunoco had acquired the rights to

 9    the Mobil brand?

10       A.    Yes.  You are talking Mid-Atlantic area.

11       Q.    These stations that were Mobil branded, I take

12    it that the stations had the Mobil sign; right?

13       A.    Yes.

14       Q.    And it had the Mobil color scheme?

15       A.    Yes.

16       Q.    Which was certainly a color scheme different

17    from, say, a Sunoco color scheme; right?

18       A.    Yes.

19       Q.    There was a Mobil proprietary card that went

20    along with the Speedpass thing, wasn't there?

21       A.    It was an ExxonMobil card.

22       Q.    So customers that had that card could use the

23    card either at an Exxon or at a Mobil?

24       A.    Correct.

48

Mark Greco

1      Q.    I may have asked you this, and if I did I

2    apologize, but in addition to the Delmar location and

3    then the Duck-In site, were there any other Mobil

4    locations that were involved in the transaction between

5    GLeS and Peninsula?

6      A.    Yes.  One more.

7      Q.    And what was that?

8      A.    Deluxe Mobil in Seaford.

9      Q.    What happened to that site ultimately?

10     A.    It was an extremely low volume location and

11   was not acceptable to be converted to Sunoco, so it was

12   converted to another brand.

13     Q.    Still supplied by Sweet Oil?

14     A.    GPM.

15     Q.    GPM?

16     A.    Yes.

17     Q.    So, in other words, it stayed Mobil up until

18   the very end as well?

19     A.    Yes.

20     Q.    In February?

21     A.    Yes.

22     Q.    So my clients' location wasn't the only one in

23   February of 2007, the only Mobil that hadn't converted?

24     A.    No.  We had three Mobils at that time.

49

Mark Greco

1    Q.    And none of the three had converted?

2    A.    No.

3    Q.    Any of the other two, the Duck-In or the

4    Deluxe location, had those locations made the switch to

5    the Sunoco credit card network prior to February of

6    2007?

7    A.    I believe they did.  I believe their equipment

8    was compatible and I believe they were on the other

9    network.

10   Q.    When you say their equipment was compatible,

11   what do you mean?

12   A.    There was a mechanical upgrade that was

13   necessary at the Delmar location due to the type of

14   equipment that they had.  I don't remember the exact

15   number, but it was a couple thousand dollars that was

16   necessary to upgrade the Delmar site to be able to be

17   compatible with Sunoco's system.

18   Q.    With respect to the credit card processing,

19   that was the issue at the Delmar location, was it not,

20   that ultimately when my clients could no longer process

21   credit cards, in I think June when Sunoco cut it off,

22   in June of 2006 --

23   A.    I think it was actually prior to that.

24               MR. YOUNG:  Objection.

50

Mark Greco

1  BY MR. STORM:

2     Q.    It had to do with the incompatibility of my

3  clients' system with the Sunoco system?

4     A.    Correct.

5     Q.    Do you remember the names of the people at

6  Duck-In and Deluxe Mobil, the names of the individuals

7  that were behind the sites and operated the sites?

8     A.    At the Deluxe location it was Larry Bradley.

9              At the Duck-In location, I'm not sure

10  off the top of my head.  I'd have to pull the

11  agreement.

12     Q.    I think you said one of the locations was also

13  receiving incentive money; right?

14     A.    Duck-In was.

15     Q.    Deluxe was not?

16     A.    No.

17     Q.    At Duck-In, did Sunoco ultimately waive any

18  repayment at that location?

19     A.    No.

20     Q.    How much was involved there?

21     A.    Approximately $12,000.

22     Q.    Did all of these locations, the Duck-In, the

23  Deluxe, and my clients' location at Delmar, did they

24  all have the same form contract between Peninsula and

Mark Greco

1   the respective operator?

2       A.      They were similar.  They weren't exactly the

3   same.

4       Q.      Was there another location known as Deepwater?

5       A.      Not that I'm aware of.  Not that we ever

6   supplied.

7       Q.      From the time that GLeS assumed the Peninsula

8   agreements with my client in September of 2005 until

9   February of 2007, going back to 2005, do you remember

10  when the first time was that GLeS made any payment to

11  my client for any of the Mobil incentive money?

12      A.      I don't know off the top of my head.

13      Q.      Did you ever make any payment of Mobil

14  incentive money?

15      A.      I believe we did.

16      Q.      And how much and when, do you remember?

17      A.      I couldn't tell you.  Without going back and

18  researching, I couldn't tell you.

19      Q.      As of February 2007, was there incentive money

20  that had been accumulated at Sweet Oil and had not been

21  paid to my client?

22      A.      Yes.

23      Q.      How much was that?

24      A.      I don't know the exact number, but I think it

52

Mark Greco

1    was approximately $11,000.

2        Q.    And the incentive monies would have been paid

3    to my clients in what form?  Would it have been by

4    check or would it have been by electronic funds

5    transfer?  How would that money have been paid if it

6    was check?

7        A.    It would either be by check or electronic

8    funds.  I couldn't tell you.

9                MR. STORM:  Is this a good time to take a

10    break?

11                MR. HUTCHISON:  Your call.

12                MR. STORM:  Let's take a break.  Five

13    minutes.

14                (Recess.)

15    BY MR. STORM:

16        Q.    Mr. Greco, I think you mentioned earlier that

17    Coraluzzo did all the hauling; right?

18        A.    For us.

19        Q.    For you?

20        A.    Yes.

21        Q.    Was that true from the time that Sweet Oil

22    took over the Peninsula locations?

23        A.    For what period?

24        Q.    Starting in September of '05?

Mark Greco

1    A.    At that point, I believe they were our only

2    carrier.

3    Q.    Did Sweet Oil, in connection with my client

4    and the Delmar location, charge something called a

5    carrier administration fee?

6    A.    Can I go back to that last question for a

7    second?

8    Q.    Yes.

9    A.    Actually, when we began to supply them in

10   September of' 05, that's when Rita and Katrina

11   hurricanes both hit the Gulf Coast and there were a lot

12   of problems in getting product.  And at that point, we

13   brought in another carrier also.  We had Murphy

14   Transport was also a carrier at that time.

15   Q.    For how long did that continue?

16   A.    They just helped to pick up the slack when

17   Coraluzzo was struggling with long lines at terminals

18   and having to go distances to get product when it

19   wasn't available.

20   Q.    This carrier administration fee, do you

21   remember charging a carrier administration fee to my

22   client?

23            Let me direct your attention to

24   Exhibit 4, which is one of the documents you provided

54

Mark Greco

1    in this litigation, and ask you to identify that.

2        A.    Okay.

3        Q.    What is that?  First of all, what is this

4    document?

5        A.    I believe this is an outline of the breakdown

6    of cost to deliver product to the Doughboy's location.

7        Q.    What is the four-tenths of a cent carrier

8    administration fee, what is that?

9        A.    That is the carrier's charge for Sunday

10   deliveries, holiday deliveries.  They allow a certain

11   amount of time for demurrage, for unloading the truck.

12   There's a whole host of fees that they charge, and what

13   we did in an effort to accommodate our customers, many

14   of the customers said they didn't like having to pay a

15   specific Sunday fee, or whatever it was, so we took the

16   charge that the carrier charged us over the course of a

17   large period of time, divided by the total number of

18   gallons over a large period of time, and spread out

19   that cost so that it was equally bourne by all of the

20   customers and it was a much more fair practice so that

21   they didn't have to manage their inventories such that

22   they didn't order on a holiday or on a Sunday.  They

23   could order seven days a week.

24       Q.    And that was a carrier administration fee,

Mark Greco

1  then, that was an amount that was retained by Sweet

2  Oil; right?

3      A.    And paid to the carrier, yes.

4      Q.    Well, it was paid to the carrier, some part of

5  it was paid to the carrier if there were Sunday

6  deliveries at some location?

7      A.    Yes.  And a portion of that fee also was for

8  managing inventories at locations where we did that.

9  Whether the carrier themselves managed the inventory or

10  whether we had an in-house dispatcher manage the

11  inventory.

12     Q.    Was that carrier administration fee something

13  that Peninsula had charged my client over and above the

14  actual freight cost?

15     A.    That I don't know.

16     Q.    Do you know whether my client ever ordered

17  product on a Sunday?

18     A.    I would assume that they did, because with the

19  volume that they did, they got deliveries almost every

20  day.

21     Q.    And do you know whether my clients' contract

22  specified anything about an additional charge for

23  Sunday deliveries?

24     A.    I don't believe that it qualified freight.

56

Mark Greco

1    Q.    The carrier, and whatever contract you had

2    with the carriers, whether it was Coraluzzo or this

3    other Murphy that you brought in for a temporary

4    period, there was nothing in the agreement between

5    Sweet Oil and the carrier about a four-cent carrier

6    administration fee, isn't that right?  Or four-tenths

7    of a cent carrier administration fee?

8    A.    They don't break it out that way.  They

9    itemize all their expenses.

10    Q.    So Sweet Oil determined as part of its method

11    of doing business, Sweet Oil, after the assignment from

12    Peninsula, determined that this is how we are going to

13    deal with this issue of these additional charges that

14    are incurred for Sunday deliveries, for example?

15    A.    That's incorrect.  That was our practice from

16    the beginning of time.

17    Q.    It wasn't something new?

18    A.    No, it wasn't new to them.

19    Q.    So, in other words, when the Peninsula Oil

20    sites came on board with Sweet, that was something that

21    got imposed on those buyers automatically because it

22    was part of the way Sweet Oil did business?

23              MR. HUTCHISON:  Objection.

24              THE WITNESS:  It was part of our cost of

57

Mark Greco

1    freight, so it was passed onto the customer.

2    BY MR. STORM:

3        Q.    But it wasn't an actual pass-through of

4    freight; it was a figure that you determined was going

5    to be added on that Sweet Oil was going to charge its

6    customers as Sweet Oil's way of dealing with these

7    additional charges that the carriers would charge you

8    for certain types of deliveries?

9        A.    There's no requirement in the contract that

10   says it has to be a direct pass-through.

11       Q.    You are talking about in my client's contract?

12       A.    Or in any of our supply contracts.

13       Q.    But you knew, did you not, that that was not

14   the way that Peninsula Oil had handled my client's

15   freight charges?

16       A.    I don't know that.

17       Q.    Did you ask?

18       A.    They used a different carrier, and we had bid

19   the carrier that they used and they were uncompetitive,

20   so we didn't hire them.

21       Q.    Getting back to Exhibit 4 for a minute, just

22   to make sure I understand the document, the top part of

23   the document where it says Doughboy's Mobil price, tell

24   me what that price reflects?  Is that the laid-in price

58

Mark Greco

1   to Doughboys' Mobil including freight, or what is that?

2       A.    Without having additional back-up

3   documentation, I'd be speculating.

4       Q.    Actually, if you look at the bottom half, it

5   looks like those numbers match the numbers at the top.

6   And the bottom part tells you how you got there.

7       A.    Okay, yes, that's correct.

8       Q.    What's the 15 percent Department of Energy

9   fuel surcharge, what's that?

10      A.    All the common carriers charge a fuel

11  surcharge as it's determined by the Department of

12  Energy.  Especially -- I believe it was imposed right

13  about the time that these contracts were assumed

14  because of the vast fluctuations in product cost due to

15  the hurricanes and other conditions.

16      Q.    Take me through the pages.  It looks like

17  there is a page for each grade of product, right,

18  regular and then premium?

19      A.    And then diesel.

20      Q.    Diesel; right?

21      A.    Yes.

22      Q.    Then there is the same for the Laurel Oasis

23  CITGO, same type of analysis; right?

24      A.    Yes.

59

Mark Greco

1    Q.    So you were adding that four-tenths of a cent

2    to every delivery at both locations, right, regardless

3    of the type product it was?

4    A.    At every location that we supplied.

5    Q.    Let's look at Exhibit 5.

6                Do you recognize that document?

7    A.    Yes.

8    Q.    That's the contract between Peninsula and

9    Chesapeake Products & Services; right?

10   A.    Yes.

11   Q.    That was assigned to Sweet Oil --

12   A.    GLeS.

13   Q.    GLeS, when you acquired the assets of

14   Peninsula; right?

15   A.    Yes.

16   Q.    If you look at Paragraph 3, which is the

17   gasoline pricing, that describes the pricing formula

18   that was to apply to this contract; correct?

19   A.    Yeah.

20   Q.    If you read the description in that paragraph

21   regarding the common carrier freight rate, it says in

22   the fifth line down, "plus the common carrier freight

23   rate," do you see that?

24   A.    Yes.

60

Mark Greco

1    Q.    The common carrier freight rate did not

2    include the four-tenths of a cent, did it?

3    A.    No.  That's addressed later in the sentence.

4    Q.    And how is it addressed in the rest of the

5    sentence?

6    A.    It says, "Including any fuel or other

7    surcharges charged by the carrier."

8    Q.    Right.  I think we established, did we not,

9    that the four-tenths of a cent was not something that

10   was charged to you, it was something that you, Sweet

11   Oil, GLeS, determined as a way of spreading costs among

12   all your customers?

13                  MR. HUTCHISON:  Objection.

14                  THE WITNESS:  I disagree.  It was a

15   charge that we paid and our method of collecting was

16   the four-tenths of a cent.

17   BY MR. STORM:

18   Q.    And is it your testimony that that four-tenths

19   of a cent would match the amounts charged to you by the

20   carriers?  In other words, would I see a delivery for a

21   load that was delivered to my clients' Delmar location,

22   would I see an invoice from Coraluzzo that had this

23   four-tenths of a cent on it for every delivery?

24   A.    No, it wasn't billed that way.

Mark Greco

1    Q.    How was it billed by the carrier?

2    A.    As I explained earlier, they itemize all their

3    charges and there was different charges on different

4    days, depending on the length of time it took for a

5    delivery.  I believe the common carrier term is

6    demurrage.  They allow a certain amount of time for the

7    truck to unload and if there's any delays they charged

8    for the additional time.  That's a surcharge.

9              If they deliver on a Sunday, there was a

10   surcharge.  If they deliver on a holiday, there's a

11   surcharge.

12   Q.    The four-tenths of a cent did not represent an

13   actual charge that the carrier incurred to deliver fuel

14   to my clients' location; right?

15   A.    You are asking the same question over and

16   over.  I'm answering the same question.  They don't

17   bill it as four-tenths of a cent, but they do bill

18   those fees.

19   Q.    Let me ask you this:  In terms of these

20   contracts that you had with Coraluzzo, those were

21   written contracts?

22   A.    Actually, they weren't.

23   Q.    What were they?

24   A.    We put out our business for bid every year and

62

Mark Greco

1   we evaluated all of the bids and we assigned, I guess

2   based on a verbal agreement we assigned the supply for

3   that year.

4       Q.    How did you put it out to bid?

5       A.    We sent out written notices to all common

6   carrier companies and we gave them a list of locations

7   that they would be delivering to and pick-up terminals

8   that they would be getting the product from.  And we

9   asked them to provide us with rates and fee schedules.

10      Q.    You would have those for every year, then?

11  For example, there would have been one for 2005 and

12  2006?

13      A.    Yes, I'm sure there was.  I'm sure there was,

14  yes.

15      Q.    The actual freight charge that comes from the

16  carrier with respect to the delivery of a particular

17  load, does that show up on the bill of lading, or where

18  does that show up?

19      A.    No, it wouldn't show up on a bill of lading.

20  It would probably show up on a later invoice that they

21  probably would have mailed to us.

22      Q.    And would there be an invoice for each

23  delivery?

24      A.    I believe so.  I'm not 100 percent positive.

63

Mark Greco

1    I believe that's how it was.  I'd have to pull the

2    documentation to find out.

3        Q.    I'm just trying to understand what

4    documentation there would be if there's not an invoice

5    per load, what documentation would show the actual

6    charge that the carrier was imposing for a particular

7    delivery?

8        A.    I believe when they provided us the invoice,

9    they billed us -- and I don't remember if it was weekly

10   or biweekly, but we got a statement of all deliveries

11   that they had made, mileage and so on and so on.  It

12   was a cumulative invoice.

13       Q.    Do you still have those?

14       A.    I'm not sure if we do or not.  At the time we

15   sold the company and assumed all the contracts to GPM,

16   we also sold them our office building and we boxed up

17   and moved everything to storage, and some things made

18   it to storage and some things didn't.

19              We actually just concluded audits with

20   each of the states that we did business in.  As part of

21   closing out all of our licenses, the states required

22   final audits to verify the gallons and the taxes and

23   all those things, and everything.  Now that that's all

24   complete, some of those documents weren't kept.

64

Mark Greco

1    Q.    Just so I am clear, and I think I'm clear on

2    this, on whatever invoice Coraluzzo sent to you for a

3    delivery to Delmar Mobil, there would not be an

4    itemization of a .004 for carrier administration fee?

5    A.    No, they wouldn't have called it that.

6    Q.    In Paragraph 8, the last sentence of

7    Paragraph 8, that's the sentence that says that if the

8    Mobil brand becomes unavailable, the company and the

9    dealer shall mutually agree on what brand the dealer

10    will resell; right?

11    A.    Yes.

12    Q.    You were aware of that provision in this

13    contract --

14    A.    Yes.

15    Q.    -- at the time that you were assigning the

16    assignment document with Sunoco in late August of 2005;

17    right?

18    A.    Yes.

19                MR. HUTCHISON:    Objection.

20    BY MR. STORM:

21    Q.    You have maybe had a little bit of time to

22    think about this.  Do you recall now whether any

23    payments were made on the Mobil incentive monies to my

24    clients' Delmar location?

65

Mark Greco

1    A.    To the best of my recollection, I believe we

2    made one payment to them.  We received a second payment

3    from Sunoco, which right about the time that we

4    received it, Sunoco notified us that the location was

5    in breach because they were not accepting Mobil cards

6    at the Mobil site.  And at that point, we escrowed the

7    money because Sunoco, under the agreement, had the

8    ability to request repayment.

9    Q.    You've reviewed this agreement, Exhibit 5;

10   right?

11   A.    Yes.

12   Q.    Can you show me in that agreement anywhere

13   that obligated my client to accept Mobil credit cards?

14   A.    (Pause.)

15             I don't see where it specifically says

16   that.

17   Q.    Let me ask you about Exhibit 6.  Have you seen

18   that before?

19   A.    Yes.

20   Q.    And what is that?

21   A.    This is a request by Peninsula for incentive

22   payments.

23   Q.    This is actually the agreement, is it not,

24   between Tosco and Peninsula related to the incentive

66

Mark Greco

1   payments?

2      A.     Yes, I believe it is.

3      Q.     This was under the, quote, level super site

4   incentive, if you look in the --

5      A.     Yes.

6      Q.     And that was the three-cent per gallon for 48

7   months?

8      A.     Yes.

9      Q.     And then Level 1 below that says that it has

10  pay at the pump incentive and Speedpass incentive;

11  right?

12     A.     Yes.

13     Q.     When it is talking about super site, do you

14  know what that means?

15     A.     Generally it's any gas station that has

16  greater than four MPD's and meets a minimum criteria

17  for the size of the store.

18     Q.     The Delmar location, what physically was at

19  the Delmar location?

20     A.     They had six gasoline dispensers under a

21  canopy on the side of the building.  They had diesel on

22  the back of the building.  They had a convenience store

23  that housed two quick serve restaurants and sold beer

24  and wine and other convenience products.

67

Mark Greco

1    Q.    Was this document, this agreement, part of the

2    Peninsula agreement that was assigned to GLeS when it

3    took over the Peninsula locations?

4    A.    I believe it was.

5    Q.    My client was not a signatory on this

6    document, was it?

7    A.    No.

8    Q.    This agreement is between the distributor and

9    Tosco; right?

10   A.    Yes, between Peninsula and Tosco.

11   Q.    You weren't involved at the time certainly

12   when my clients entered into their contract with

13   Peninsula in 2002?

14   A.    No.

15   Q.    Do you know, did anybody ever tell you from

16   Peninsula or from Sunoco whether my clients had even

17   seen this Exhibit 5 at the time that they signed their

18   contract with Peninsula?

19   A.    To the best of my recollection, I remember

20   having a conversation with Dan Moore, who is now a

21   Sunoco employee, but was previously a

22   Tosco/ConocoPhillips employee.  And he was involved in

23   the negotiation of the branding of the location with

24   the Glenns, and I believe -- I don't remember exactly

68

Mark Greco

1   the conversation, but I remember him telling me that he

2   was part of the negotiation of the incentives with

3   them.

4      Q.    So he was involved in some way?

5      A.    Yes.

6      Q.    Let's look at Exhibit 7.

7             Have you seen that document before?

8      A.    I don't believe this was furnished to us with

9   the contract.  This is merely a letter of intent, not a

10  binding contract.

11     Q.    This came from your file.  Was this something

12  that was provided to you by Peninsula?

13     A.    It's possible it was provided by Peninsula or

14  it's possible it was provided by the Glenns.

15     Q.    Do you see the fifth paragraph down where it

16  says, "Peninsula will allow Glenns to buy down the

17  Laurel contract," do you know what that was referring

18  to?

19     A.    I have no idea.

20     Q.    Do you see the sentence in the second

21  paragraph, the last sentence in the second paragraph

22  that says, "Glenns will be responsible for all

23  reimbursement of incentive if they fail to meet the

24  terms of supply agreement?"

69

Mark Greco

1    A.    Yes, I see it.

2    Q.    Is it your position that the Glenns failed in

3  some way to meet the terms of the supply agreement?

4    A.    Yes.  They breached the agreement.

5    Q.    How did they breach the agreement?

6    A.    They stopped accepting Mobil credit cards and

7  they stopped purchasing fuel from us.

8    Q.    They stopped purchasing fuel from you after

9  you sent them a letter saying that you weren't going to

10  supply them with Mobil product any more; right?

11    A.    Under the terms of the supply agreement, it

12  provided for a replacement brand to be mutually

13  accepted, and we offered them just about every brand in

14  the marketplace, including BP, Coastal, Sunoco, CITGO,

15  Mystic.  We actually offered them some brands that GPM

16  supplied, including Valero.  Every possible brand

17  alternative, including no brand, and they didn't

18  negotiate in good faith in an effort to try and replace

19  the brand.

20    Q.    Hadn't you already committed to Sunoco that

21  you were going to change the brand to Sunoco?

22    A.    At the time we did the initial assignment in

23  September, it was our intention to do that because it

24  was put to us by Sunoco that that was going to be a

70

Mark Greco

 1   requirement.

 2              Later they backed off that position and

 3   said that they would allow us to repay the money and

 4   release us, which would give us the opportunity to

 5   rebrand the Glenns to another brand.  And we offered

 6   them every imaginable brand that we could obtain, and

 7   they didn't accept any of them.

 8   Q.    Had you ever paid the Glenns all of the Mobil

 9   incentive money that they were due under that contract?

10   A.    No.  It was in escrow because Sunoco had

11   notified us that they were in breach.

12   Q.    Sunoco notified you that the Glenns were in

13   breach of their contract with you, is that right, is

14   that what you are saying?

15   A.    They were in breach of the Mobil brand

16   franchise by not accepting Mobil cards from Mobil

17   customers.

18   Q.    Did you say to Sunoco, wait a minute, I don't

19   think their contract says anywhere that they are

20   required to accept those cards?

21              MR. YOUNG:  Objection.

22              THE WITNESS:  It's implied as part of

23   branding a station, whether it be their locations or

24   any other locations in the 30 years I have been in this

Mark Greco

1    business, that if you are branded with any oil company

2    franchise, that you have to comply with their standards

3    of appearance and their payment requirements.

4                The customer expects when they go to a

5    Mobil site and has a Mobil credit card in their wallet

6    that it's going to be accepted there.

7    BY MR. STORM:

8        Q.    Go back to Exhibit 5 a minute, Paragraph 10.

9        A.    Exhibit, I'm sorry, Exhibit 4?

10       Q.    Yes.  Excuse me, the agreement between

11   Peninsula and Chesapeake Products & Service.

12   Exhibit 5.  I'm sorry.

13       A.    Okay.

14       Q.    Paragraph 10 says, "The dealer agrees to pay

15   all equipment and communication costs associated with

16   the acceptance of credit cards whether or not processed

17   through the company."

18                Do you see that?

19       A.    Yes.

20       Q.    Meaning the company is defined as Peninsula,

21   right, on the first page?

22       A.    Yes.

23       Q.    When did you offer the Glenns, at this

24   location, a brand other than the Sunoco brand?

72

Mark Greco

1    A.    You want a specific date?

2    Q.    Tell me about when you think you offered that.

3    A.    Many times between September and when it was

4    finally, I guess, when it stopped being Mobil in

5    February.

6    Q.    September of 2006?

7    A.    No.  When we took assignment of the contracts,

8    we knew that the Mobil agreement was -- even at the

9    time that this agreement was signed between the Glenns

10   and Peninsula, it was contemplated that the Mobil brand

11   wouldn't exist.  Tosco's right to have Mobil only went

12   until 2010 and this agreement goes until 2012.  So they

13   knew at the time they signed this agreement that they

14   would not be Mobil for the duration of the agreement.

15   Q.    My question to you is, I'm trying to learn

16   when it was that you had conversations with the Glenns

17   about some brand other than Sunoco?

18   A.    I think initially we went to them with Sunoco

19   and I went back to Sunoco and said that they were

20   considering their options, they weren't sure what they

21   wanted to do.  And actually Sunoco came back with an

22   additional incentive over and above the incentive that

23   they were currently receiving -- and I don't remember

24   the exact specifics, but we have it -- that they would

73

Mark Greco

1   offer them an additional incentive to become Sunoco.

2       Q.      Did you personally have conversations with

3   them about this?

4       A.      Yes.

5       Q.      And with Bill, Charlie or both?

6       A.      I believe with Bill.

7       Q.      And did you tell them that if they didn't

8   become Sunoco they'd have to repay the $112,000?

9       A.      Yes.

10      Q.      So their choice is to become Sunoco, as you

11  agreed with Sunoco in August of 2005 they would, or if

12  they were going to accept any other brand that you had

13  to offer, they had to repay $112,000?

14      A.      Excuse me for a second.  Let me restate that.

15              We agreed as one of the many offers that

16  we made them to go to other brands that we would

17  actually absorb that cost at our expense only as part

18  of rebranding to another brand.

19      Q.      Did you put that in writing?

20      A.      I believe we did, yes.

21      Q.      By the time that you were having these

22  conversations, it would have been some time after

23  September of 2006; right?

24      A.      I don't know the exact time frame.

74

Mark Greco

1    Q.    You had already committed to sell all your

2    assets to yet another party; right?

3    A.    I don't know the exact timing.

4    Q.    Certainly by August of 2006, you knew that

5    GLeS was getting out of the motor fuel distribution

6    business if the agreement with GPM went through?

7    A.    If it went through, yes.

8    Q.    And that any agreement that would envision

9    some long-term relationship wasn't going to be with

10   GLeS performing; it was going to be with GPM

11   performing?

12   A.    Yes.  That the president of GPM actually met

13   with the Glenns personally.

14   Q.    Do you know how long the Glenns had been in a

15   relationship with Peninsula?

16   A.    I believe it dated back to 1990.

17   Q.    Let's look at Exhibit 9.

18         Tell me what that is.

19   A.    That's a request for incentive payments for

20   two of the Mobil branded locations supplied by Sunoco.

21   Q.    So in February of '06, you had been requesting

22   the incentive for the fourth quarter of '05; right?

23   A.    Yes.

24   Q.    And then according to this document, the

75

Mark Greco

1  Delmar location was entitled to 7719.08; right?

2      A.    Yes.

3      Q.    And was that ever paid to the Glenns, do you

4  know?

5      A.    I don't know.

6      Q.    How about Exhibit 10, the same document for

7  the first quarter of '06?

8      A.    Yes.

9      Q.    Do you know whether that money was ever paid

10  to the Glenns, the 5,539.76?

11      A.    I don't know.

12      Q.    Now, by this time, it looks like that other

13  location is no longer included, by the time we get to

14  Exhibit 10.  Duck-In, had their contract expired by

15  that time?

16      A.    No, their contract didn't expire, but they

17  were no longer eligible for additional incentive

18  monies.  They were just in the amortizing phase of

19  their contract.

20      Q.    What do you mean, the amortizing phase?

21      A.    Typically supply agreements go for durations

22  of approximately ten years and incentives are paid over

23  the first two years or three years or four years of

24  that term.

Mark Greco

1    Q.    So at least they were through the period where

2    incentives were being paid?

3    A.    Correct.

4    Q.    On both Exhibit 9 and Exhibit 10, it shows the

5    rate as two cents a gallon, and the program as being

6    the clip program.

7              Do you see that?

8    A.    Yeah.  That's Sunoco's acronym for their

9    incentive.  I don't know exactly what that stands for.

10   Q.    That's a Sunoco program, that wasn't a Tosco

11   program that applied to the Glenns' location?

12   A.    It's Sunoco's terminology for how they pay

13   incentive.

14   Q.    The rate of two cents is wrong, right, it's

15   supposed to be three cents?

16   A.    Yes, I believe so.

17   Q.    And that's true on both Exhibit 9 and

18   Exhibit 10, it looks like?

19   A.    Yes.

20   Q.    Let me ask you some questions about

21   Exhibit 11.

22              Have you seen this indemnity mortgage

23   document before?

24   A.    Yes.

77

Mark Greco

1    Q.    Now I am going to ask you about another

2    document that's all the way back at, I think 73.

3    A.    Okay.

4              MR. HUTCHISON:  I am sorry, what?

5              MR. STORM:  73.

6    BY MR. STORM:

7    Q.    My question is this:  The indemnity mortgage

8    between Delmar Real Estate Holdings and Peninsula Oil

9    Company related to the supply agreement, did it not,

10   between Peninsula and my clients at Delmar, is that

11   your understanding of what this related to?

12   A.    Say that one more time?

13   Q.    What was your understanding of what this

14   indemnity mortgage was given to secure?

15   A.    It was collateral securing the performance of

16   their requirements under the agreements.

17   Q.    The performance under the agreements that we

18   are talking about was the performance by my client at

19   the Delmar location.

20              Is that your understanding?

21              MR. HUTCHISON:  Objection.

22   BY MR. STORM:

23   Q.    Let's go through the recitals.  The first

24   recital says, Whereas, Chesapeake Product & Services,

78

Mark Greco

1   Inc., and BCG, Inc. -- and I am skipping some of the

2   language -- entered into a dealer agreement with

3   mortgagee dated October 3rd, 2002.  That's the location

4   for the Delmar location, isn't it?

5       A.    Yes.

6       Q.    That's the agreement for the Delmar location?

7       A.    Yes.

8       Q.    That agreement for the Delmar location was

9   assigned to GLeS?

10      A.    Yes.

11      Q.    Right?

12      A.    Yes.

13      Q.    Now, if we go back to 73, there's an

14  assignment, there appears to be an assignment of this

15  mortgage from Peninsula to Primo Properties.

16      A.    Yes, it is.

17      Q.    Why was that assigned to Primo?

18      A.    I don't know.

19      Q.    And Primo didn't enter into any agreement

20  with -- in other words, Primo wasn't going to be

21  performing any of the obligations of Peninsula under

22  that 2002 supply agreement; right?

23      A.    No.  I think they just did this in error.

24      Q.    Do you see the second recital, Whereas,

79

Mark Greco

1   pursuant to the purchase agreement pursuant to right of

2   first offer agreement, do you see that?

3       A.    Yes.

4       Q.    What was the right of first offer agreement?

5       A.    At the time we made our first purchase from

6   Peninsula back in 2003, they granted us a first right

7   of refusal against if they decided to sell this dealer

8   business at a later date.  And because Primo was the

9   purchaser of the Uncle Willie's real estate, Primo held

10  that right and then I guess through assignment allowed

11  GLeS to be the purchaser.

12      Q.    Your only explanation for Primo on Exhibit 73

13  was it was probably an error?

14      A.    Yes, it had to be a typo or something.

15      Q.    Exhibit 12 is another document I want to ask

16  you about that was produced by you in this litigation,

17  and I'd like to ask if you recognize that exhibit?

18      A.    Yes.

19      Q.    What is that?

20      A.    That's a copy of a market report provided to

21  us by Sunoco made out by the Lundberg Group, which does

22  competitive pricing analysis.

23      Q.    This exhibit includes both the Delaware and

24  the Maryland market share; right?

80

Mark Greco

1    A.    Yes.

2    Q.    Are you familiar with Lundberg?

3    A.    Yes.

4    Q.    And what is Lundberg?

5    A.    It's an independent service that monitors

6    competitive pricing.

7    Q.    And it is recognized in the industry as

8    providing this type of information; right?

9    A.    Yes.

10   Q.    If you look at the page, the second page of

11   that exhibit, for the period December '05, the

12   ExxonMobil share of the Maryland market appears to be

13   46.72; is that right?

14   A.    Yes.

15   Q.    And Sunoco is 17.30?

16   A.    Yes.

17             Is that relevant?

18   Q.    I am just trying to understand.  This is

19   showing market share within the state; right?

20   A.    Yes.  But the ExxonMobil brand that's

21   referenced on here is supplied by Exxon of Exxon

22   branded locations.  It's not Mobil branded locations.

23   Q.    Or Exxon distributor locations; right?

24   A.    Yes.

81

Mark Greco

1    Q.    And I think you indicated earlier that those

2    same customers could use the Speedpass at Exxon or

3    Mobil locations; right?

4    A.    Yes.

5    Q.    Let me ask you about Exhibit 13.

6              What is that?

7    A.    This is our outside CPA evaluated some

8    spreadsheets that we prepared internally documenting

9    volume by grade and month sold to each of the two

10   locations that we're talking about.

11   Q.    Tell me exactly what the accountant did versus

12   what you did internally?

13   A.    He went through our, we call it our load

14   deliveries system, which we record every gallon that we

15   deliver to every location from every terminal in every

16   state by every brand, and he verified that all the

17   gallons that are in this spreadsheet are the exact

18   gallons that were delivered to these sites.

19              Let's see what else is in here.

20   Q.    And who prepared that data that was provided

21   to Mr. Sanderson?

22   A.    All of the gallonage information is recorded

23   daily as it occurs, and I just printed the sheet out of

24   the system.

82

Mark Greco

1    Q.    And in terms of him verifying that, what did

2    he do?

3    A.    Well, as I explained earlier, as part of

4    closing out our licenses and as part of relinquishing

5    our licenses to each of the states we did business,

6    each of the states came in and did final closing out

7    audits of our license and verified all our gallons.

8    And the way they did that was they looked at our

9    records for what we showed that we picked up from each

10   of our suppliers, and then they went back to our

11   suppliers and verified it was the same number.

12            They went to our common carrier and

13   verified that the number of gallons picked up at the

14   terminal were put in the truck and dropped out of the

15   truck at each location.  And then they verified with

16   each location that the same exact number of gallons all

17   tied out.  And he verified that all of our numbers were

18   exactly the same numbers.

19   Q.    In terms of gallons delivered to these two

20   locations; right?

21   A.    Yes.

22   Q.    And then he says that I compared the delivery

23   information and average margins in the report with the

24   accounting records.

83

Mark Greco

1           Tell me what information was provided to

2      him with respect to average margins?

3      A.    Well, he came to the office and he went into

4      our accounting system and he verified that from the

5      first day we did business with them to the last day

6      that we did business with them.  Based on our costs and

7      our selling prices, he established and verified that

8      the average margin over the entire duration of time

9      agreed with what's on the sheet.

10     Q.    What information was he relying on?  He was

11     relying on information that was in your computer

12     system?

13     A.    Within our accounting system, yes.

14     Q.    Is that information reflected -- and we can

15     mark this exhibit as 75 -- the documents that were

16     provided to me this morning, that Mr. Hutchison had

17     e-mailed last night that I really wasn't able to print.

18     Let's go ahead and do that.

19           MR. HUTCHISON:  Are you attaching

20     originals to this transcript?

21           MR. STORM:  That wasn't going to be my

22     intention to do that.  Because everybody's going to

23     have a copy, so I don't see any reason to.

24           MR. HUTCHISON:  Chris, do you have a copy

84

Mark Greco

1    of this?

2                    MR. YOUNG:   Electronically.

3                    MR. STORM:   This will be 75.

4                    (Exhibit 75 was marked for

5    identification.)

6    BY MR. STORM:

7        Q.    Mr. Greco, can you just tell me what

8    Exhibit 75 is and whether 75 was a document that was

9    used and/or related to the calculations that are

10   reflected in Exhibit 13?

11       A.    The data that's within 75 is data that was

12   exported from our accounting system to Excel for the

13   purposes of printing all the detail at your request.

14                    He didn't print this report, but he

15   actually looked at it electronically within the

16   accounting system, but it's the same information.

17       Q.    Now, where on this report -- and I'm just

18   skimming through it quickly and I'll look at it a

19   little more carefully on another break -- but can you

20   show me on this report, is there margin information

21   that is shown on this report, meaning Exhibit 75?

22       A.    When you say margin information?

23       Q.    Well, in other words, Mr. Sanderson talks

24   about average margins, and you said he went into your

Mark Greco

1   system and he got the average margins, and so is that

2   part of what's in Exhibit 75?

3       A.    I don't know that it actually calculates it

4   down to a cents per gallon in this data.

5       Q.    In 75?

6       A.    This is a report that we generated at your

7   request.  This isn't what he used for his report.

8             He had access to this and additional

9   information within our accounting system.

10      Q.    So tell me what he used to calculate this

11  average margin?

12      A.    Let me take a look in here real quick.

13            I don't know that I could say

14  specifically what he did to validate his numbers.  I

15  can tell you what I did to get my numbers.  I mean he

16  spent hours and hours going through the accounting

17  system to establish his verification.

18      Q.    Did you provide him with what you thought the

19  average margin was?

20      A.    I provided him with this attached spreadsheet

21  in No. 13.

22      Q.    You did provide him, then, with the page

23  that's the last page of this exhibit?

24      A.    Yes.

86

                          Mark Greco

1       Q.     That at the top says Sweet Oil Estimate of

2   Damages?

3       A.     Yes.

4       Q.     That was a document that Mark Greco prepared?

5       A.     Yes.

6       Q.     And all Sanderson did was review that and say,

7   "Yep, it looks accurate"?

8                    MR. HUTCHISON:  Objection.

9                    THE WITNESS:  I don't know what his

10  procedure was to establish it, but I know he spent

11  quite a long time going through our system before he

12  came up with that conclusion.

13  BY MR. STORM:

14      Q.     But this page, this last page of Exhibit 13 --

15  and I'm just trying to understand who prepared this

16  page.  If I understand your testimony, it is Mark Greco

17  prepared this?

18      A.     Yes.

19      Q.     And then Sanderson reviewed it and determined

20  that it was accurate?

21      A.     Yes.

22      Q.     So tell me this process of determining the

23  average margin, what you look at to get that?

24      A.     We look at what our costs were and what our

Mark Greco

1  revenue was, and that produces a net income divided by

2  the gallons that were sold and that produces a cents

3  per gallon value.

4           Would it be easier to go through the

5  sheet with you?

6  Q.    Sure.

7  A.    Okay.

8           Beginning at the top, it shows total

9  purchases.  That ties into all the attached

10  spreadsheets by gallon by month by product.

11  Q.    I understand that.

12  A.    That's where that column comes from.

13  Q.    Right.

14  A.    Months purchased began on September 1st of

15  '05, and that's the duration of time that they bought

16  product from us, based, again, on the attached volume

17  history.

18           Took the total gallons divided by the

19  total number of months that they bought and came up

20  with an average for that duration of time.  That's the

21  third column.

22           Months due but not honored, that's the

23  remaining number of months on the contract after they

24  stopped purchasing products from us.

88

Mark Greco

1          And underneath is the termination date

2    of when the contract was due to expire had it run its

3    full course.

4          In the middle of the page --

5    Q.    Let me stop you a minute.  If it had run its

6    full course as of some time in 2007 -- what was the

7    date of your closing with GPM?

8    A.    March of 2007.

9    Q.    So as of March of 2007, GLeS wouldn't have

10   been performing under this contract; right?

11   A.    GLeS still owns these contracts to this day,

12   and if we needed to supply, we would make arrangements

13   for supply.

14   Q.    Do you have a supply agreement right now?

15   A.    No.  We could subcontract.

16   Q.    But as of March of 2007, you didn't have a

17   Mobil contract; right?

18   A.    No.

19   Q.    You didn't have a Sunoco contract?  You

20   mutually terminated with Sunoco; right?

21   A.    Not in March.  Some time thereafter.

22   Q.    But you entered into a mutual cancellation of

23   the Sunoco agreement; right?

24   A.    At some point later, yes.

Mark Greco

1     Q.     Did you mutually cancel the CITGO agreement?

2     A.     At some point later, yes.

3     Q.     When later?

4     A.     Some time in the summer of '07.

5     Q.     And after you did that, are there various

6     licenses in the State of Delaware that you need to haul

7     motor fuel or to supply motor fuel?

8     A.     Yes.

9     Q.     And are those licenses currently in effect?

10     A.     No.

11     Q.     And because you were no longer in that

12     business; right?

13     A.     Yes.

14     Q.     Take me through the rest of the document.

15     A.     Okay.  In the center of the page, average

16     margin over the term honored, I took the amount of

17     gallons that they purchased, actual purchases from us.

18     I took the net income, which is the difference between

19     our cost of goods and the revenue that we derived from

20     selling the product to them, and came up with a total

21     revenue.  I divided that by total gallons and came up

22     with an average margin per gallon over that duration.

23              Then the next column is average margin

24     times the months that they did not honor.  Again, going

90

Mark Greco

1   to the top of the page far right column.  The number of

2   months times average gallons times the average margin

3   is the amount of revenue that had they not breached the

4   contract and fulfilled their agreement, this is the

5   amount of revenue that would have been derived from

6   that agreement.

7       Q.    Let me stop you, as to Laurel Oasis CITGO, it

8   says that's 98,451.73; right?

9       A.    No, that's not correct.

10               MR. HUTCHISON:  Objection.

11  BY MR. STORM:

12      Q.    I'm sorry.

13      A.    It's $81,378.19.

14      Q.    I see.  That 98 included something else,

15  right, okay.

16      A.    What that includes is, the next column is

17  equipment recapture agreement as part of their

18  agreement, the equipment that was, the investment that

19  was made for all the pumps and canopies and other

20  equipment was amortizing, and every month that they

21  honored the contract it was reduced by $948.53.

22               When they ceased honoring the agreement,

23  that amortization stopped.  So $948.53 times the

24  remaining number of months equals 17,073.54, which is

Mark Greco

1  still owed on that equipment.

2    Q.    Let me ask you this, and maybe I misunderstood

3  you, but I think that I asked you when we were talking

4  about the transaction that GLeS did with Peninsula --

5    A.    Yes.

6    Q.    -- back in 2005, and you acquired these rights

7  that Peninsula had to supply these various locations, I

8  think you indicated that the locations weren't broken

9  out by site, that values weren't allocated to each of

10  the supply locations?

11    A.    In our agreement with Peninsula, it was not.

12  Internally we did, based on gallons.  Many of the 18

13  locations that we purchased were extremely low volume

14  locations, and they came along as part of the package.

15  But a lot of the weight of the reason that we purchased

16  it was based on the large number of gallons.

17    Q.    But the contract that you had with Peninsula

18  did not specify a value for this Laurel Oasis

19  agreement, for example?

20    A.    No, it wasn't broken down in the agreement.

21    Q.    And the monies that were paid by Peninsula,

22  for example, to install equipment at this Laurel Oasis

23  location --

24    A.    Uh-huh.

92

Mark Greco

1    Q.    -- that was money that was paid by Peninsula;

2    correct?

3    A.    Yes.

4    Q.    The margin, the .02925 margin for the Laurel

5    Oasis location, the margin at this site, since it

6    was -- Laurel Oasis was a commission arrangement on

7    gasoline, was it not?

8    A.    Only on gasoline, yes.

9    Q.    And on diesel, it was a fixed price in the

10   contract, right, for the diesel fuel?

11   A.    Yes.

12   Q.    In terms of the margin calculation on gasoline

13   for Laurel Oasis, the margin would have been the

14   difference between the rack price and the retail price;

15   correct?

16   A.    Less all expenses.

17   Q.    Less expenses?

18   A.    Yes.

19   Q.    And this .02925 number, that includes, I

20   assume, both gasoline and diesel?

21   A.    Yes, it's everything.

22   Q.    And in order to obtain that number, what is

23   the backup that Mark Greco has for that number?

24   A.    I went into our accounting system and I

93

Mark Greco

1   generated a query report from September 1st of '05

2   through the last day of purchase, the last purchase

3   that they made, and generated a revenue number and a

4   cost of goods number and a net income number, which I

5   then divided by the gallons.

6       Q.    And the net income number, is that broken out

7   per location or is it broken out generally within the

8   organization?

9       A.    No.  Specific to the site.

10      Q.    It is, okay.

11      A.    Yes.

12      Q.    So those are reports that you could produce;

13  right?

14      A.    Yes.

15              MR. STORM:  I think that's something else

16  we would add to our list.

17              MR. HUTCHISON:  I think you have it.

18              MR. STORM:  As back-up.

19              MR. HUTCHISON:  I think Exhibit 75 has

20  it.

21  BY MR. STORM:

22      Q.    Is that information in Exhibit 75?

23      A.    I don't know that the calculation for the

24  pennies per gallon is in there, but the data is in

94

Mark Greco

1    here.

2        Q.     Show me the data for the margins.

3        A.     I don't have a calculator in front of me, but

4    if you go to -- I just happened to flip to one page --

5    it is actually -- there's two stapled packages.  Go

6    back to the third, which is actually just an individual

7    page.  Handwritten on it it says "Delmar summary."

8        Q.     Okay.

9        A.     That is fuel sales, which represents invoices

10   that were sent to the Glenns to be paid for fuel.

11              Under that is our cost of goods, which

12   includes transportation, taxes.

13              The one percent discount is something

14   that's excluded in their contract, so we back that back

15   out.  And the cost of the fuel.  And that produces a

16   net, it says gross profit on the bottom line there, but

17   that number needs to be adjusted for the one percent

18   discount because that's something that the Glenns

19   weren't -- that's not subject to their agreement.

20   That's something that we enjoyed as part of the

21   contract for payment terms.

22              So the difference is -- I don't have a

23   calculator sitting here -- but approximately $30,000.

24   Take that number, divide it by the total number of

95

Mark Greco

1    gallons over the duration --

2    Q.    Hold on.  Let me stop you a second.

3              When the one percent discount was

4    subtracted from the cost of goods sold, right,

5    initially, you're saying you added it back in?

6    A.    Yes, we would have -- that's revenue that GLeS

7    would have received.  Had we continued to supply the

8    location, GLeS would have continued to receive

9    incentives for prompt payment from our supplier.

10   Q.    It just reduces your cost, doesn't it,

11   ultimately, because you are paying less because you are

12   getting a one percent discount off of what you are

13   paying?

14   A.    You could apply it that way.

15   Q.    I am just trying to right now follow your

16   methodology.

17             We have the total fuel sales, which are

18   the 3,998,347; right?

19   A.    Yes.

20   Q.    And that's the total gross number of the sales

21   to the Laurel Oasis location?

22   A.    No.  This is to the Delmar location.

23   Q.    I am sorry, we are on Delmar now.

24   A.    Yes.

96

Mark Greco

1    Q.    Okay.

2             From that we subtract what you

3    determined to be the cost of goods sold?

4    A.    Yes.

5    Q.    What backup do you have to support these

6    numbers?  In other words, the transportation of 42,475,

7    where does that number come from other than you hitting

8    a button and saying the computer spits it out?

9    A.    It comes from all the invoices, all the

10   payments that were made to the carrier as it relates to

11   this location.  The accounting system records, every

12   time we write a check, it records it.

13   Q.    So that the four-tenths of a cent that is

14   being collected for carrier administration fee, which

15   is actually a number that, as a number, doesn't get

16   paid to the carrier, right, because --

17             MR. HUTCHISON:  Objection.

18             THE WITNESS:  I'm not sure exactly what

19   you're saying.

20   BY MR. STORM:

21   Q.    You don't pay the carrier an amount equal to

22   .004 per gallon?

23   A.    An amount equal to or the exact amount?

24   Q.    That exact amount.

Mark Greco

1    A.    If you're asking if there's a line item that

2    says .004, I don't believe there is.  They itemize all

3    their fees.

4    Q.    Okay.

5          My question is, is that 42,475, then,

6    wherever you got that number from, if it is actual

7    invoices from the carriers, it doesn't match up with a

8    .004 per gallon, there is not a charge on the invoice

9    from the carrier for that amount?

10   A.    I don't know that.

11   Q.    The taxes are what?  The 1602.11, what taxes?

12   A.    That would have been taxes that were not

13   collected at the rack.  Some states and some products

14   collect at the rack.  Our suppliers collect and

15   others -- and I don't know exactly what this 1600

16   was -- but at some point product was picked up at a

17   terminal without the tax being collected and we had to

18   remit it to the state.

19   Q.    Then the one percent discount, you've applied

20   one percent to what, to the three million 998 number,

21   right, to get to 38,000?

22   A.    This is an actual number that was received for

23   actual invoices for these locations.  It's not a one

24   percent times something.  I didn't do a calculation to

98

Mark Greco

1    come up with this number.  This is the exact number.

2       Q.    How is that received for those locations?

3       A.    Every oil company treats it different.  In

4    most cases when we receive our EFT debit, they generate

5    invoices for us for the product, and then on our EFT

6    settlement they make an adjustment for payment terms.

7       Q.    It is reduced, then, by the one percent

8    discount?

9       A.    Yes.  The amount that they debit our account

10   for.

11      Q.    The amount that you pay the supplier is

12   reduced by the one percent?

13      A.    Yes.

14      Q.    And then the bottom number for fuel is what?

15      A.    That's the actual cost of fuel that we pay the

16   supplier.

17      Q.    Now, if I said, Mr. Greco, furnish me with the

18   backup for these numbers that you have just talked

19   about, what would you provide me?

20      A.    All the pages that are attached here

21   (indicating).

22      Q.    But there's no backup, for example, on

23   transportation charges.

24      A.    No, I don't believe there is.  I'd have to go

99

Mark Greco

1  back and see if we still have copies of carrier

2  invoices.

3      Q.    That's Delmar.  How about for Laurel?

4      A.    That's also in here.  That is further back in

5  the package.  If you're going from the back of the

6  package, there's two stapled packages and then there's

7  one loose page also for that.  And it's labeled Oasis

8  summary.

9      Q.    How did you do that one?

10     A.    The same exact methodology.  The fuel sales is

11 diesel invoices that were sent to the Glenns for

12 payment and fuel invoices that we generated for the

13 gas.  Transportation, taxes, all of that is exactly the

14 same.  And net of the cost of the fuel transportation,

15 et cetera, produced $30,320.07 in gross profit for that

16 location.

17     Q.    For what period?

18     A.    For the entire duration of time that we did

19 business with them.

20     Q.    And then you divided that per month?

21     A.    I divided it by the total number of gallons.

22     Q.    By the gallons?

23     A.    Yes.  To come up with a cents per gallon.

24     Q.    And then multiplied that times the months

100

Mark Greco

1  remaining?

2      A.    Yes.

3      Q.    Then that gave you the 81,378.19?

4      A.    Yes.

5      Q.    And that gave you the margin of .02925; right?

6      A.    Yes.

7      Q.    The average margin on the Mobil location of

8  .01667, do you see that?

9      A.    Yes.

10     Q.    The contract specified that your margin was to

11 be one cent, did it not?

12     A.    Yes.

13     Q.    So what's the other 667 for?

14     A.    Again, payment terms, prompt pay discount was

15 excluded from that contract, that the Glenns weren't

16 entitled to that, we were, and that represents the

17 difference.

18     Q.    And is part of that also a factor, that .004

19 amount that you have received as a carrier

20 administration fee?

21     A.    Again, there's cost in and cost out.  We have

22 gone through this over and over and over and I keep

23 saying the same thing.  I don't know if you're looking

24 for a different answer.

Mark Greco

1     Q.    But that's factored into this, isn't it, as

2     part of your margin?

3     A.    Yes, all of our costs and all of our revenues.

4     Q.    And again, the supporting documentation for

5     the Oasis summary, if I ask you for the supporting

6     documentation, in order to calculate the margins and to

7     show what all went into that margin calculation, you'd

8     be able to print out something; right?

9     A.    Yes.  Yes, I believe so.

10    Q.    On this same page of Exhibit 13, the equipment

11    recapture, I think you've talked about that, and the

12    recapture times the months not honored, right, that

13    gives you the 17,000?

14    A.    Yes.

15    Q.    Are there any other damages that you are

16    claiming that GLeS is entitled to?

17    A.    Just the remaining open balance for unpaid

18    fuel, whatever's in their accounts receivable.

19    Q.    And what is that, what do you believe that

20    amount to be?

21    A.    If you go to the second stapled package, it

22    has --

23    Q.    Of Exhibit 75?

24    A.    Yes.  I'm sorry.

Mark Greco

1           That is Delmar invoices versus actual

2    payments and reflects their open balance, which many,

3    many pages back is $408.61, is the open balance for

4    Delmar.

5           I'm sorry, it's the very first page.

6    The very first section in the front is Oasis summary of

7    invoices and payments.  If you go to the last page of

8    that the remaining open balance is $35,332.42.

9    Q.    I take it if you go back to Exhibit 60 -- I'm

10   sorry, 66 in your stack there?

11   A.    Okay.

12   Q.    You recognize that letter, do you not, that

13   was the termination letter related to Laurel Oasis?

14   A.    I received the letter, yes.

15   Q.    If you look on the second page of that letter,

16   various amounts are itemized totaling 39,705.17.  Do

17   you see that?

18   A.    Yes.

19   Q.    Your number that you just gave for this

20   location, Laurel Oasis, as reflected in Exhibit 75, the

21   35,332.42, that does not give, or does not recognize

22   the amounts that the Glenns subtracted pursuant to this

23   Exhibit 66; correct?

24   A.    Yes.  I don't know that there's any basis for

Mark Greco

1   this, for the amount that they have on this paper.

2        Q.    Did you recognize that the Glenns were

3   entitled to gas commissions for this location?

4        A.    Yes.

5        Q.    Did you ever pay gas commissions for this

6   location?

7        A.    Yes.

8        Q.    Did you ever pay all the commissions that were

9   owed for this location?

10       A.    Yes.

11       Q.    You did?

12       A.    Yes, sir.

13       Q.    All the way up through the date of this

14   termination?

15       A.    Yes, and they are itemized in Exhibit 75.

16       Q.    Show me where they are itemized?  Is that on

17  the first page of the document on the open balance

18  where it says "commission"?

19       A.    That is a journal entry for a period of time

20  for a portion of the commissions.  Actually, some of

21  the commissions were deducted automatically by the

22  Glenns before remitting funds to us, but this

23  represents a portion of it.

24                      The contract actually provided for them

Mark Greco

1   to collect the money, deduct their commission, and then

2   remit the balance.

3       Q.    So you are saying that 11,536.92 was paid in

4   commission?

5       A.    It was applied against the money that they

6   owed us, and that's how the payment was applied.  It

7   was money earned by them and applied to their open

8   balance.

9       Q.    On July 31st, 2006?

10      A.    Yes.

11      Q.    Show me where any other commissions were paid?

12      A.    They were deducted by the Glenns before

13  remitting funds to us.

14      Q.    That's your understanding?

15      A.    Yes.

16      Q.    The amount that you are claiming in

17  Exhibit 75, how were credit card fees handled on this?

18      A.    Exhibit, I'm sorry?

19      Q.    The 35,332.42 that you claim the Glenns owe

20  for the Laurel Oasis location, how were credit card

21  fees handled?

22      A.    I'm not sure I understand.

23      Q.    Did you believe that for Laurel Oasis that the

24  Glenns were responsible for credit card fees or was

Mark Greco

1    that something that GLeS was responsible for?

2        A.    They were responsible for the fees associated

3    with the diesel, but not on the gas.  The gasoline was

4    a sale that we were doing and they were just a

5    commissioned agent and we were responsible to pay our

6    fees on that.

7                    And on the diesel fuel, they purchased

8    it strictly at a price over cost, and then they, in

9    turn, sold it to their customer.

10        Q.    And is that how, in fact, the relationship

11    worked with the Glenns at Laurel Oasis, that you did

12    not charge them for credit card fees?

13        A.    Say that one more time.

14        Q.    Did you or did you not charge the Glenns for

15    credit card fees at Laurel Oasis on gasoline?

16        A.    On gasoline?

17        Q.    Right.

18        A.    No.

19        Q.    So it's your testimony that GLeS absorbed all

20    the credit card fees on gasoline?

21        A.    Yes.

22        Q.    And that the Glenns were to absorb on diesel?

23        A.    Yes.

24        Q.    Was that pursuant to the contract for that

106

Mark Greco

1   location that you assumed from Peninsula?

2       A.    I don't know if it's specifically explained or

3   not.  Without going through, I don't know.

4       Q.    Let me ask you about Exhibit 14.

5       A.    Okay.

6       Q.    Have you seen that letter before?

7       A.    Yes, I have seen this letter.

8       Q.    You responded to that letter, did you not, in

9   Exhibit 15?

10      A.    Yes, many times.

11      Q.    Is Exhibit 15 your response?

12      A.    Yes.

13      Q.    Now, you say on Exhibit 15 in the response

14  paragraph, the big paragraph in the middle, about the

15  fourth or fifth sentence, "As you are aware, we have

16  made you an extremely competitive offer to extend our

17  relationship another ten years"; right?

18      A.    Yes.

19      Q.    And by this time you were already having

20  discussions with GPM, were you not, by March of 2006?

21      A.    I don't know.

22      Q.    And then you say, "I believe this shows our

23  commitment to you as our customer"; right?

24      A.    Yes.

Mark Greco

1    Q.    And did you know what they were talking about

2    that monies that they had not received from you where

3    Mr. Glenn said in Exhibit 14 that we have not received

4    payment of all monies owed and by being overcharged the

5    freight?

6    A.    Yeah.  I read his, what he was asking for, but

7    there's no provision in the agreement that says what

8    freight is.  It's not specifically provided for.

9    Q.    Wasn't he questioning you about that freight

10   administration charge that had not been imposed by

11   Peninsula?

12   A.    No.  What he was asking was that they told me

13   that Eagle had quoted them substantially cheaper rate

14   to deliver fuel and that we were obligated to use the

15   lowest possible freight carrier, which is not a

16   provision in the contract.  And we actually took the

17   handwritten piece of paper that didn't have any

18   letterhead and went to Eagle and said is this correct,

19   and they came back and said, there's no way that they

20   could possibly deliver for the price that was on that

21   paper.

22   Q.    What was that paper, the handwritten paper?

23   A.    It was a handwritten blank sheet of paper with

24   their location and a number written on it that they

Mark Greco

1    said Eagle could deliver freight for, and quite

2    frankly, I couldn't understand how they could.  And I

3    went to Eagle myself and they said, no, they could not

4    do that.

5        Q.     Well, the freight rate, there's a specified

6    rate per gallon, is there not, to a location from the

7    terminal?

8        A.     Yeah.

9        Q.     And in this case, it was, what, about 1.57, or

10   something like that?

11       A.     I don't know off the top of my head what it

12   would have been.

13       Q.     On any documentation that the Glenns received

14   with respect to deliveries to Delmar --

15       A.     Uh-huh.

16       Q.     -- was the actual freight charge shown on

17   there?

18       A.     I don't believe so.  I believe that's why we

19   had the other exhibit that we went through earlier that

20   broke down what the price was.

21       Q.     And then you say in Exhibit 15 that you are

22   being charged Sweet Oil's applicable delivery to your

23   locations, which is not subject to audit under the

24   contract.  I do not see how you could establish if you

Mark Greco

1  were overcharged when there's no businesses for this

2  discrepancy.

3                 So you didn't believe that they had a

4  right to question the amount that you were charging

5  them for freight under the agreement?

6      A.    I didn't believe that the basis of their

7  allegation was correct.  What they expressed to me was

8  that we had an obligation in the contract to provide

9  them with the lowest possible carrier and the contract

10  doesn't say that.

11     Q.    The ten-year agreement that you mention in

12  here that you made a very generous or competitive offer

13  to extend the relationship another ten years --

14     A.    Yes.

15     Q.    -- did you tell the Glenns at that time that

16  you were contemplating transferring these supply

17  agreements to GPM?

18     A.    I don't believe at that time we had any firm

19  agreements with GPM.  I don't know the exact time

20  frame, but I'm sure that we didn't have anything signed

21  at that point.

22                 MR. STORM:  This might be a good place if

23  we want to break.

24                 MR. YOUNG:  I'll agree.

110

Mark Greco

1          (Lunch recess, 12:40 p.m.)

2          (Resumed, 1:20 p.m.)

3   BY MR. STORM:

4     Q.    Mr. Greco, let me direct your attention to

5   2006, and we are still on the Delmar location.

6     A.    Okay.

7     Q.    An issue developed in 2006 about the credit

8   card processing at that site; right?

9     A.    It actually existed prior to that.

10    Q.    Ultimately my clients were no longer able to

11  process Mobil credit cards; right?

12    A.    Yes.

13    Q.    And that was, I think we talked about this, it

14  was due to their system not being able to communicate

15  with the Sunoco system; right?

16    A.    Yes.

17    Q.    If you will look at Exhibit 16, can you tell

18  me what that is?

19    A.    It looks like a page out of a bank statement.

20    Q.    Do you see the ACH withdrawal that is the

21  third from the bottom, the Sunoco payments?

22    A.    Yes.

23    Q.    And then there's a note, somebody's note

24  there.

111

Mark Greco

1          Do you recognize that?

2     A.    Yes.

3     Q.    Is that yours?

4     A.    Yes, I believe it is.

5     Q.    And it says, "Sunoco unauthorized debit of

6   Mobil incentives"?

7     A.    Correct.

8     Q.    What is that?

9     A.    That was, Sunoco went into our checking

10  account and debited the amount of the incentive

11  payments for Delmar and Duck-In, just took the money

12  out of our account.

13    Q.    That was in, it looks like, March of probably

14  2007; right?

15    A.    Yes.

16    Q.    And your view was that Sunoco wasn't

17  authorized to do that; right?

18    A.    Correct.

19    Q.    Let's look at Exhibit 17, and the next 20 or

20  so exhibits, I think, are really e-mails that came

21  from, was part of the document production.

22    A.    Okay.

23    Q.    So I'm going to have you identify most of

24  these, but I'm going to try not to spend any more time

Mark Greco

1   on them than we have to.

2       A.     Okay.

3       Q.     Let's look at Exhibit 17, and I think you

4   previously mentioned Dolores Love was the Sunoco rep;

5   right?

6       A.     Yes.

7       Q.     And this was a memo or an e-mail from you to

8   Dolores Love; right?

9       A.     Yes.

10      Q.     Dated December 16, 2005?

11      A.     Yes.

12      Q.     And just one clarification, all of these, I

13  think, or a lot of these have Kimberly Kelly's name,

14  and I'm assuming she is somebody who printed them out?

15             MR. HUTCHISON:  I actually can explain

16  that.  She is my secretary and when things were sent to

17  me, I simply sent them to her to print, and so that is

18  an addition that is not part of the original.

19             MR. STORM:  Understood.  That's what I

20  assumed happened.  I just wanted to clarify that.

21             THE WITNESS:  I see a reference, you had

22  asked before about Deepwater.

23  BY MR. STORM:

24      Q.     Right.

Mark Greco

1    A.    That was a Coastal branded location that we

2    made an offer to supply when his contract ran out, but

3    we eventually never did supply, he was never a Sweet

4    Oil customer.

5    Q.    Then you say, "I understand the rebranding

6    cost from Mobil to Sunoco can come from a program, but

7    how about the ones entitled to Mobil money which is

8    contractually passed from us to the dealers?  Will that

9    continue until it is done?"

10              What were you referring to there?

11    A.    Sunoco had offered an additional incentive for

12    the Glenns to convert from Mobil to Sunoco, and what I

13    was asking was would they continue to receive the money

14    that was due under the original Mobil agreement, plus

15    the additional incentive.  That was the question.

16    Q.    And what did she say?

17    A.    Yes.

18    Q.    And that was if they signed a longer-term

19    contract; right?

20    A.    Yes.

21    Q.    And then the reference in the last paragraph

22    to the EOL issue, what is that?

23    A.    End of life issue.

24    Q.    What's that refer to?

114

Mark Greco

1   A.    That was, some time in 2005, ExxonMobil

2   started sending out letters to all ExxonMobil dealers

3   that were on their, I think they call it a tandem, or

4   whatever their platform is that processed credit,

5   saying that that platform was going to be eliminated at

6   some point, and they gave a series of different dates,

7   which I guess were pushed back at different times.

8            But the eventuality was that that

9   platform was going to be discontinued and everyone was

10  going to have to go to another platform, which

11  eventually became the Sunoco platform.

12  Q.    Weren't credit cards being processed through

13  Sunoco already for the Mobil cards, or how was that

14  being done?

15  A.    It was being done, the actual credits were

16  being paid to us by Sunoco, but Sunoco was receiving

17  them somehow through Exxon, ExxonMobil's network.  And

18  I think they actually had a third-party provider.

19  Q.    Go to the second page of this.  Dolores Love

20  is saying that they are still working, with the

21  economic group to finalize a Sweet Oil deal, which will

22  cover all conversions you make to Sunoco.

23            Do you see that?

24  A.    Yes.

Mark Greco

1    Q.    Did you ever reach any agreement with Sunoco

2    about that?

3    A.    We did, but we didn't convert any of the sites

4    to Sunoco.  Without the gallons from the Delmar

5    location, the other two remaining Mobil branded sites

6    didn't qualify.

7    Q.    In the middle of this page, she says, "In the

8    meantime, you have the one Mobil EOL situation.  I

9    would recommend that we bag the sign and change the

10   station over to Sunoco."

11            Was that the Glenns location she is

12   talking about?

13   A.    Yes.  Because their credit card processing

14   system, cash register, whatever it was, was not

15   compatible, that's what she was referring to with the

16   end of life situation.

17   Q.    How about Exhibit 18?

18   A.    That was, after numerous conversations where

19   the current contract did not provide what the Glenns

20   believed that it did, requiring the lowest possible

21   carrier -- I don't know the exact, what their request

22   was, but this actually gave them or proposed to give

23   them the ability to go out and find their own trucking

24   company.

116

Mark Greco

1    Q.    Wasn't the Glenns complaint about the freight,

2    that the freight was so much higher with GLeS than it

3    had been with Peninsula?

4    A.    I don't know that it was so much higher.  I

5    mean that's kind of a -- I don't know -- a generality.

6    I think it may have been different.  I don't know.  I

7    don't know what Peninsula was being charged or what

8    they were charging the Glenns.  It's possible that they

9    weren't even charging what Eagle was charging them.  I

10   have no idea.

11   Q.    In the conversations that you had with the

12   Glenns about the freight, that was the complaint,

13   wasn't it, that the freight was higher now since GLeS

14   took over?

15   A.    I guess they were not happy that we changed

16   carriers, but Eagle was not capable of serving our

17   entire network and when we went out and bid, we got the

18   best carrier that could satisfy all of our customers as

19   best as possible.

20   Q.    How about 19, can you identify that for me?

21   A.    Yes.  That's an e-mail from John Collins, who

22   was one of the employees in our office.  And this is

23   talking about what would be necessary in order to bring

24   the Glenns' Delmar location up to the compatibility

Mark Greco

1    with Sunoco's network.

2        Q.    And this is in December that he is saying that

3    he spoke with Vern at JCV and gave him the go-ahead to

4    order the materials to convert the site to Sunoco's

5    network; right?

6        A.    Yes.  Vernon is the owner of JCV, or one of

7    the owners of JCV.  And he came back, and I don't

8    remember the exact price, but it was a very small

9    amount, a couple thousand dollars was all that was

10   necessary.  And anticipating that because it was such a

11   small amount of money that he didn't think the Glenns

12   were going to have a problem with it, he told them to

13   go ahead and order it and then later we had to cancel

14   it.

15       Q.    His e-mail was in response to your e-mail just

16   before that that said we are going to be Sunoco; right?

17       A.    Yes, at that time I believe we were.

18       Q.    Where you gave him the go-ahead?

19       A.    Yes.

20       Q.    That was obviously without having reached any

21   agreement with the Glenns about Sunoco?

22       A.    We actually were going back and forth, myself

23   and Bill, and I think there are several e-mails that

24   discuss that.

Mark Greco

1   Q.   How about Exhibit 20?

2   A.   Yes.  This was a correspondence from Dolores

3   at Sunoco back to me.

4   Q.   And this is in December, right, her telling

5   you what you are supposed to be doing in order to be

6   getting the incentive money; right?

7   A.   Yes.

8   Q.   So obviously at this time you hadn't yet

9   submitted any request to get the Mobil incentive money?

10   A.   Yeah.  Upon completion of a quarter, there's a

11   form that gets filled out, and December would have been

12   the end of the quarter.

13   Q.   Were the Glenns taking other credit cards at

14   the Delmar location, do you know?

15   A.   I believe they were accepting Fuel Man.  I'm

16   not sure about others.

17   Q.   So they were still able to process, even after

18   the Mobil card was cut off, they were still processing

19   credit cards; right?

20   A.   Yeah, bank cards and -- I'm sure some other

21   cards.

22   Q.   Can you identify Exhibit 21 for me?

23   A.   Yes.  This is an e-mail from myself to Bill.

24   Q.   Among other things, you say in the paragraph

119

Mark Greco

1   at the bottom of the page, "If you elect to stay on the

2   ExxonMobil system, which I do not recommend, it will

3   cost you approximately $4,500, and you will eventually

4   need to move to the Sunoco system anyway since Sunoco

5   owns your Mobil contract."

6          And then you say, "I would suggest we

7   make a complete conversion to the Sunoco POS at the

8   same time we convert your signage, et cetera, so

9   there's no confusion on the customers' part."

10          Now, what did you mean by that, that

11  there wasn't any confusion?

12     A.   Well, there's an expectation of a customer

13  carrying Mobil plastic, Mobil credit cards to be able

14  to accept a Mobil card at a Mobil station.  The same

15  with Sunoco.  And if we were to brand the site Sunoco,

16  the customer with Sunoco credit cards would expect that

17  it would be accepted, so we should make one complete

18  conversion all at one time.

19     Q.   And in order to make this conversion, it was

20  going to cost $4,500; is that right?

21     A.   Approximately.

22     Q.   22, another e-mail?

23     A.   I don't have a 22.  I have a 21, 23.

24          Wait a minute, it's stapled to this one.

120

Mark Greco

1    Q.    All right.

2    A.    This is another e-mail correspondence between

3    myself and Bill Glenn.

4    Q.    23, how about 23?

5    A.    Same.

6    Q.    By this time, Speedpass was already turned

7    off?

8    A.    Speedpass and debit.

9    Q.    Do you know at the time that the Delmar

10   location was converted to a Mobil station in 2002,

11   whether all of the credit card processing equipment at

12   that time was new equipment to allow the Mobil credit

13   card and Speedpass to be used?

14   A.    I honestly don't know.  I wasn't there in

15   2002.

16   Q.    And then in the second paragraph, you say, "In

17   addition, Sunoco purchased your Mobil supply agreement

18   and intends to convert your Mobil, as well as all other

19   Mobils."

20              Do you see that?

21   A.    Yes.

22   Q.    Was that a true statement?

23   A.    Yes.

24   Q.    24, do you recognize that letter?

121

Mark Greco

1    A.    Yes.  That's a letter from Charlie Glenn to my

2    office.

3    Q.    And did you respond to that letter?

4    A.    Yes, I did.

5    Q.    How about, in this letter, Mr. Glenn asks when

6    we can expect to receive our Mobil incentive money.

7                    Do you see that?

8    A.    Yes.

9    Q.    I assume there had been no multiple incentive

10   money paid as of April 18th of 2006?

11   A.    I don't know that to be the case.  It doesn't

12   say if any previous payments were made or not and

13   without documentation, I couldn't tell you if it was.

14   Q.    25, can you identify that for me?

15   A.    This is an e-mail from Dolores at Sunoco to

16   myself and Ben LeRoy.

17   Q.    Below this is an e-mail from Dolores Love to

18   Jeff Byard at Sunoco; right?

19   A.    Yes.

20   Q.    Where she is saying, "Jeff, one of the Sweet

21   Oil dealers is giving Sweet a hard time about

22   everything.  They want something in writing that proves

23   to them that Sunoco has the right to convert him."

24                    Do you see that?

Mark Greco

1    A.    Yes.

2    Q.    Then at the end of that it states, "But what

3    is my next move if he doesn't want to convert to

4    Sunoco?"

5              Do you see that?

6    A.    Yes.

7    Q.    You would agree, would you not, Mr. Greco,

8    that the Glenns and their entities didn't have an

9    agreement with Sunoco; Sunoco wasn't a party to any

10   agreement that they were in?

11   A.    Not directly.

12   Q.    And then as a result of this e-mail, Sunoco

13   was going to have their lawyer look into all this;

14   right?

15   A.    Yes.

16   Q.    And that's Dick Gaines, is it not?

17   A.    Yes.

18   Q.    26 appears to be an e-mail back to Dolores

19   from you saying that a letter from Sunoco's lawyer

20   would help; right?

21   A.    Yes.

22   Q.    Because this dealer thinks he can choose to

23   rebrand or not?

24   A.    Yes.

123

Mark Greco

1    Q.    And 27 is what?

2    A.    It is an e-mail message from myself to Bill

3    Glenn.

4    Q.    With fee schedules on the Sunoco, what, credit

5    card processing?

6    A.    I believe it was, it was the cost of the

7    satellite rental for processing credit and other credit

8    card fees.

9    Q.    Let me ask you, your Exhibit 27 goes to, what

10   pages are included in 27?

11   A.    One, two, three, four, and then one that

12   doesn't have a number.

13              MR. HUTCHISON:  I think it goes to 236 in

14   terms of the Bates numbers, just for point of

15   reference.

16              MR. STORM:  Mine has some additional

17   pages here.

18   BY MR. STORM:

19   Q.    Let's look at 28, tell me about that, what is

20   that?

21   A.    This is a letter from myself to Bill and

22   Charlie Glenn.

23   Q.    Dated May 16th, 2006; right?

24   A.    Yes.

124

Mark Greco

1     Q.     In this letter, the second paragraph, it says

2     that if you choose not to extend, Sunoco will still

3     rebrand; right?

4     A.     Yes.

5     Q.     Is that what Sunoco was telling you, that it

6     was going to rebrand this site?

7     A.     Yes, that it was going to go from Mobil to

8     Sunoco and they had a choice, they could either just

9     run the balance of the existing contract term, or if

10    they accepted the additional incentives, they wanted us

11    to issue a new contract for a new ten-year term.

12    Q.     Let's look at Exhibit 29.

13           Is this the letter that Sunoco generated

14    in response to your earlier e-mails?

15    A.     I believe it is.

16    Q.     This was, if you will, a friendly letter from

17    Sunoco, wasn't it, that you could pass onto the

18    Glenns --

19    A.     Yes.

20    Q.     -- that describes Sunoco's position on this;

21    right?

22    A.     Yes.

23    Q.     And at the end of this first page, Mr. Byard

24    says, "The agreement you have, or your assignor

125

Mark Greco

1   Peninsula Oil had, with Delmar is and always has been,

2   subject to this brand change right"; right?

3      A.   Where is that at?

4      Q.   At the bottom of Page 244.

5      A.   Yes.

6      Q.   But they are talking about the agreement

7   between Peninsula and Tosco; right?

8      A.   Yes.

9              MR. HUTCHISON:  Objection.  When you

10  said "the agreement between Peninsula and Tosco," I

11  don't think that's what it refers to.

12             MR. STORM:  Actually, you might be right

13  now that I look at it.

14             MR. HUTCHISON:  Thank you.

15             THE WITNESS:  "The agreement you have, or

16  your assignor Peninsula had, with Delmar."

17  BY MR. STORM:

18     Q.   Do you know what agreement he is talking

19  about, whether he is talking about the distributor

20  agreement or whether he is talking about the dealer

21  agreement?

22     A.   It sounds like it is the dealer agreement.

23     Q.   But obviously you didn't write the letter;

24  right?

Mark Greco

1     A.    No.  It's from Sunoco.

2     Q.    And he then says, "Sunoco has advised you that

3     your remaining Mobil accounts must be converted

4     immediately"; right?

5     A.    Yes.

6     Q.    Then the next exhibit, Exhibit 30, Dolores

7     writes back to you and says, "Mark:  How did you make

8     out with the letter from Jeff?", right, which I'm

9     assuming is that letter we just looked at; right?

10    A.    Yes.

11    Q.    Then she says, "I saw Scott Cheek today in a

12    meeting and he said he finally is able to shut off the

13    EOL platform, that they did allow some stragglers extra

14    time, but it is over tomorrow."

15              Do you see that?

16    A.    Yes.

17    Q.    This is something that Sunoco was in control

18    of, was it not?

19    A.    Yes.

20              MR. YOUNG:  Objection to form.

21    BY MR. STORM:

22    Q.    Then when you write back and say, "Dolores,

23    thanks for the preview.  I will not circulate outside

24    the office.  I will keep it to myself and partners."

127

Mark Greco

1               What does that mean?

2       A.     Where do you see that?  Oh, down below?

3       Q.     At the bottom, right.

4       A.     That must be referring to some previous

5    correspondence that we had.

6       Q.     You are talking about the letter, is that what

7    you are talking about?

8       A.     I don't know.  It doesn't say.

9       Q.     When you say, "They may not react until it

10   becomes real.  They may not believe us that it is going

11   to go away," what are you talking about there?

12      A.     That was the end of life of the credit card

13   platform.  Originally ExxonMobil issued a date and then

14   another date and then Sunoco gave us a date, and there

15   were several extensions of that date, and I think

16   that's what is being referred to at the top of

17   Exhibit 30, that they allowed some additional time for

18   stragglers, but it is over tomorrow.  That means that

19   it's not going to be extended any further.

20      Q.     And when you say that ExxonMobil issued a

21   letter --

22      A.     Yes.

23      Q.     -- did you see a letter like that from

24   ExxonMobil?

Mark Greco

1    A.    I actually spoke to John Evans, the controller

2    for Peninsula Oil, who told me that they had received

3    correspondences from ExxonMobil that they had passed on

4    to the Glenns letting them know that this was coming.

5    And I don't know what the original date of the end of

6    life was proposed to be, but all of our correspondences

7    came through Sunoco.

8    Q.    How about 31?

9    A.    It's an e-mail correspondence from Dolores at

10   Sunoco to myself.

11   Q.    Saying, "The site has been shut off.  What is

12   the status on your end"; right?

13   A.    Correct.

14   Q.    If the Glenns had spent this $4,500 that you

15   were telling them to spend, would Mobil cards still

16   have been processed at that time?

17   A.    Yeah, I believe so.

18   Q.    But only until February; right?

19   A.    Yes, I believe so.

20          MR. YOUNG:  Point of clarification,

21   February of '07.

22   BY MR. STORM:

23   Q.    February of '07.

24   A.    Yes.  As part of the conversion from Mobil to

129

Mark Greco

1   Sunoco, Sunoco was picking up the cost of anything to

2   make it accept Sunoco, including the reimage of the

3   station, the signs, the colors, the painting, all those

4   things.

5       Q.    Was this end of life issue an issue that was

6   unique to sites that were going to go from Mobil to

7   Sunoco?

8       A.    I believe it was, yes.

9               MR. YOUNG:  Can you read back that

10  question and answer.

11              (The question and answer were then read

12  back by the reporter.)

13  BY MR. STORM:

14      Q.    Exhibit 32, can you identify that?

15      A.    Yes.  This is a letter from Charlie Glenn to

16  myself or to our company.

17      Q.    He is asking, A, when do you intend to remove

18  the Mobil brand; right?

19      A.    Yes.

20      Q.    And then he is asking when can they receive

21  their Mobil incentive money; right?

22      A.    Yes.

23      Q.    So this is May of 2006 and you have been in

24  the contract since, what, September of '05; right?

130

Mark Greco

1    A.    Yes.

2    Q.    And they are writing to you asking when they

3    can receive their monies, and he says, Third request,

4    first from letter dated 3-15-06, second from letter

5    dated 4-18-06.

6                    Do you see that?

7    A.    Yes.

8    Q.    I think the next exhibit, Exhibit 33, responds

9    to that letter; right?

10   A.    Yes.

11   Q.    It was your position, was it not, that this

12   whole change from Mobil to Sunoco was something that

13   the FTC had somehow mandated?

14   A.    Yeah, that's the way I understood it to be.

15   Q.    But you know now that wasn't the case; right?

16   A.    I don't know that.

17   Q.    Well, have you ever seen a document that says,

18   from the FTC, that the Mobil brand has to be changed to

19   Sunoco?

20   A.    No, I haven't.

21   Q.    What basis did you have for making that

22   statement in this letter of June the 5th of 2006?

23   A.    We were instructed by Sunoco that they were

24   converting all the Mobil sites in the Mid-Atlantic

131

Mark Greco

1   area, that they had purchased the rights to supply

2   those locations.

3       Q.    And that's how you interpreted what they had

4   told you?

5       A.    Yes.

6       Q.    Then you say that Sunoco's market share should

7   help them feel good about the conversion, right, do you

8   see that at the end of the first paragraph?

9       A.    Yes.

10      Q.    And that market share was the document we

11  already talked about?

12      A.    The Lundberg report that was produced by

13  Sunoco, yes.

14      Q.    And that was supposed to make them feel good

15  that Sunoco had a lower market share?

16      A.    They had a substantially larger market share

17  than Conoco did, who was the Mobil supplier.

18      Q.    But not the combined ExxonMobil market share?

19      A.    The ExxonMobil that's listed on there was

20  Exxon, not Mobil.  So to get the Mobil brand, you had

21  to look at the Conoco listing on that report.

22      Q.    Because that's what you were referring to?

23      A.    Yes.

24      Q.    But anything with Conoco, to the public in

132

Mark Greco

1  this area, in the Mid-Atlantic region, at least in

2  Delaware and Maryland and Virginia and District of

3  Columbia, the public saw the Mobil sign, right, they

4  didn't see a ConocoPhillips sign?

5     A.    Correct.  All the Mobil branded sites were

6  supplied through a Conoco agreement.

7     Q.    So unless the public was attuned to the fact

8  that the sign that said Mobil was really Tosco to

9  ConocoPhillips, later Sunoco, that the public would see

10  a Mobil sign; right?

11    A.    Yeah, the public would see the Mobil sign.

12  But what this is referencing is the Lundberg report,

13  which describes market share, and the Mobil branded

14  market share was listed as Conoco on that report.

15    Q.    So in your mind, in terms of this being a good

16  thing, it was that you should be looking at the

17  ConocoPhillips market share, not the ExxonMobil market

18  share?

19    A.    Correct.

20    Q.    I think we established earlier, though, that

21  the ExxonMobil customer could use the ExxonMobil card

22  at ConocoPhillips Mobil stations?

23    A.    Yes.

24    Q.    Such as the Delmar station?

133

Mark Greco

1    A.    Yes.

2    Q.    Then later at the bottom of this letter, in

3    the fourth paragraph, you say that, "This is not the

4    case, as Mobil has become Sunoco in the Mid-Atlantic

5    states by FTC decree."

6              Do you see that?

7    A.    Yes.

8    Q.    You are telling Mr. Glenn that they have no

9    say in whether they want the Sunoco brand, right, isn't

10   that what you are saying in this letter?

11   A.    The way that it was explained to us was that

12   the FTC had to qualify the successor.  Originally at

13   the time of the ExxonMobil merger and divestment and

14   then all future successors down the line to Sunoco.

15   And the FTC qualified and approved Sunoco to be that

16   successor.

17   Q.    And you are saying that for some reason that

18   was going to negate the right that the Glenns had in

19   their contract to have any say in the brand at their

20   station?

21   A.    As it was explained to us by Sunoco, that they

22   were rebranding all of the sites in that Mid-Atlantic

23   area.

24   Q.    And Sunoco told you, this is what we are

                        Mark Greco

1    doing; right?

2        A.    Yes.

3                    MR. YOUNG:   Objection.

4    BY MR. STORM:

5        Q.    Exhibit 34.   Another e-mail; right?

6        A.    Yes.

7        Q.    This one to Dolores Love?

8        A.    Yes.

9        Q.    And you say, "They refuse to respond to my

10   letters and e-mails."  This is on June the 9th, 2006?

11       A.    Yes.

12       Q.    "We are keeping pressure on them to rebrand."

13       A.    Yes.

14       Q.    Well, they weren't refusing to respond, were

15   they, they were corresponding with you?  You had just

16   gotten a letter from them dated May 22nd when they were

17   asking where is our money?

18       A.    They were corresponding, but they weren't

19   answering the question whether they were going to

20   accept the Sunoco incentive to convert.   There was just

21   non-response.

22       Q.    On Exhibit 35, June 20th, '06, Mr. Glenn

23   writes to you and makes it very clear that it is not

24   their intention to change to Sunoco; correct?

Mark Greco

1    A.    Yes.

2    Q.    And he disputes your position about the FTC

3    decree; right?

4    A.    Yes.

5    Q.    And then he tells you that they spent four

6    years building up the ExxonMobil credit card base?

7    A.    Yes.

8    Q.    And then he says in the next paragraph that

9    you have been overcharging on freight and that you

10   failed to pay us three cents per gallon incentive money

11   due us for the last ten months; right?

12   A.    That's what it says.

13   Q.    And your letter states you intend to pay us

14   only two cents per gallon, do you see that?

15   A.    I don't know that we intend to pay them

16   anything.  Whatever they were due is what we would have

17   paid them.  It was just a typo or something.

18   Q.    But do you agree that by June of '06 you

19   hadn't paid them any incentive money?

20   A.    No.  Any money that we had received from

21   Sunoco after the notice that Sunoco gave us that they

22   were in breach went into escrow and we still hold that

23   money.

24   Q.    My question is, as of June 20th of '06, had

Mark Greco

1   you paid them any incentive money?

2       A.    I don't know that.

3       Q.    Exhibit 36, another e-mail from Dolores Love.

4   Dolores Love is saying that my clients are in violation

5   of their contract; right?

6               MR. YOUNG:  Objection to the form, unless

7   you are just asking what the e-mail states.

8               THE WITNESS:  Can you state the question

9   one more time?

10  BY MR. STORM:

11      Q.    Miss Love states that, "Now that they are not

12  processing credit cards, they are in violation of their

13  contract.  You should no longer supply them

14  Mobil-branded gas and the sign needs to be bagged until

15  we get it debranded or preferably converted to Sunoco";

16  is that right?

17      A.    Yes.

18      Q.    And after this e-mail of June 20th, did you

19  continue to supply them with Mobil-branded product

20  after she's telling you not to?

21      A.    I don't know what the last day is that we

22  supplied.

23      Q.    On the delivery documents that my clients

24  would have received with any motor fuel delivery at

137

Mark Greco

1    Delmar, it would have identified the product that was

2    being delivered to the site, right, as either Mobil

3    product or some other product; right?

4        A.    Yes.

5        Q.    Because it shows the point of origin; right?

6        A.    Yes.

7        Q.    And that's on the bill of lading and also on

8    the invoice; correct?

9        A.    Yes.

10       Q.    37.  Another e-mail from Miss Love; right?

11       A.    Yes.

12       Q.    And then she again tells you you can't even

13   deliver Mobil product to the site.  Mobil is very

14   strict on situations such as this, so we need to move

15   quickly.

16             And then she says, "He is no longer a

17   Mobil dealer.  His options are to convert to Sunoco or

18   pay all penalties and go unbranded."  Right?

19       A.    Yes.

20       Q.    So nothing being said up until this point in

21   June of 2006 about any other potential brand that you

22   indicated you had discussed with the Glenns; right?

23       A.    No.  This is a correspondence from Sunoco.

24   They don't have the ability to offer other brands.

138

Mark Greco

1    Q.    Sunoco is still telling you that it's either

2    going to go Sunoco or it's going to go unbranded?

3    A.    Yeah.  But that's not what the intent of the

4    letter is.  It's going to go Sunoco or not be a Sunoco

5    branded site.  It can be someone else's brand.  By

6    unbranded it just meant not Mobil.

7    Q.    38.  You are writing Dolores back; right?

8    A.    Yes.

9    Q.    And you are copying her on a letter from

10   Mr. Glenn regarding their position, which I assume is

11   that letter we just talked about, the June 26th letter?

12   A.    It says June 20th.

13   Q.    June 28th.

14   A.    No, the attachment says June 20th.  062006.

15   Q.    So is that likely the Exhibit 35 letter?

16   A.    Yes.

17   Q.    And then you were asking Miss Love to have

18   Sunoco's legal department help out with the FTC issue;

19   right?

20   A.    Yes, I was asking documentation from them.

21   Q.    Then the last thing you say is, "We are all in

22   this together and want the same goal to get them

23   converted to Sunoco."

24   A.    Yes.

Mark Greco

1    Q.    The next exhibit, 39, is an e-mail that you

2    appear to have been copied on from Miss Love to Jeff

3    Byard at Sunoco and Dick Gaines, Richard Gaines at

4    Sunoco; right?

5    A.    Yes.

6    Q.    Exhibit 40 is an e-mail back to you from --

7    well, you are sending an e-mail to Mr. LeRoy and to

8    Bill Sweet and John McTear.  Who is he?

9    A.    He was our controller at the time.

10    Q.    And to Steve Labroli, who was one of your

11    lawyers at the time; right?

12    A.    Yes.

13    Q.    Attaching a memo from Bonnie Chong in the

14    Sunoco legal department; correct?

15            MR. YOUNG:  Objection.

16            THE WITNESS:  Yes.

17    BY MR. STORM:

18    Q.    At the bottom of that memo, on the first page

19    of that memo that's Page 381, at the bottom, do you see

20    that?

21    A.    Yes.

22    Q.    She says that with respect to the dealer's

23    claim that it is owed incentive money by Sweet Oil,

24    that issue does not involve Sunoco and should be

140

Mark Greco

1  addressed between Sweet Oil and the dealer.

2           Do you see that?

3   A.   Where is that?

4   Q.   The last sentence at the bottom of the page.

5   A.   Okay.

6   Q.   What did you do with this memo after you

7  received it?  Did you ever provide that to my clients?

8   A.   I don't know.  That's a long time ago.

9   Q.   The next exhibit, 41, it is an e-mail from

10  Dolores Love to you; right?

11  A.   Yes.

12  Q.   Attaching the documentation for incentive

13  payments; right?

14  A.   Yes.

15  Q.   And she is saying no second quarter affidavit

16  has yet been received; correct?

17  A.   Yes.

18  Q.   And that's in July; right?

19  A.   Yes.

20  Q.   Until you submit the affidavit, you don't get

21  your money, so the Glenns wouldn't get their money;

22  right?

23  A.   Correct.  Because we escrowed the previous

24  incentives, we didn't apply for any additional

141

Mark Greco

1    incentives until it was resolved.

2    Q.    When did you first notify the Glenns that you

3    were escrowing any monies?

4    A.    I couldn't tell you.

5    Q.    If you look at the second page of this e-mail,

6    there appears to be another e-mail from Inga Wilson to

7    Karl Beckers at Sunoco, you recognize that?

8    A.    Yes.

9    Q.    Somebody is saying to Karl, 12,222.52 for the

10   fourth quarter 2005 was paid on March 28th, 2006.

11              Do you see that?

12   A.    Yes.

13   Q.    And you don't know whether you paid that to

14   the Glenns or not; right?

15   A.    That amount is made up of more than just their

16   location.

17   Q.    Right below that it says, "No first quarter

18   '06 credit has been issued yet.  I do not have the

19   affidavit for first quarter '06."

20              MR. YOUNG:  I think it says "I do have."

21              MR. STORM:  Excuse me.

22   BY MR. STORM:

23   Q.    I do have the affidavit in the amount of

24   $5,539.76; right?

Mark Greco

1    A.    Yes.

2    Q.    And then the question, "Am I to hold 4,503.44,

3  the amount issued for Duck-In, in error and pay the

4  balance?  Also are gallons to be paid at two cents per

5  gallon.  Are all gallons to be paid at two cents per

6  gallon"; right?

7    A.    Yes.  It was a typo on the form.  It should

8  have been three.

9    Q.    Then if you go back to Page 388 of that same

10  exhibit, there's an e-mail from Mr. Gaines to Dolores

11  Love.

12          Do you see that?

13    A.    Yes.

14    Q.    In Item No. 3, Mr. Gaines said, "The dealer's

15  right to use the Mobil marks is subject to Peninsula's

16  rights, which in turn are subject to Sunoco's rights,

17  so dealer has no superior right to keep the Mobil mark.

18  If his contract with Peninsula somehow said this, which

19  I don't know not having seen it, then his complaint is

20  against Peninsula who had no authority to provide such

21  a right to the Mobil mark."

22          Do you see that?

23    A.    Yes.

24    Q.    And that was in August of 2005, I guess, that

143

Mark Greco

1    Mr. Gaines is saying that; is that right?

2        A.    Yes.

3        Q.    And that was before you even acquired the

4    interest in Peninsula; right?

5        A.    Yes.

6        Q.    Was that in response to a question on the page

7    that follows that says, "What happens if one of the

8    sites that is still collecting an incentive payment

9    refuses to change to Sunoco and wants to remain Mobil

10   until the end of their contract?"

11       A.    That's a correspondence that occurred prior to

12   our involvement.

13       Q.    Was that an issue that you had raised with

14   Sunoco prior to the time that the assignment document

15   was executed between GLeS and Sunoco?

16       A.    It may have been.  I don't know.

17       Q.    42, another e-mail from Miss Love.  She is

18   saying that, asking you to confirm that the sign has

19   been bagged, right, has been covered?

20       A.    Yes.

21       Q.    And once that's been resolved, we can move

22   forward with either the Sunoco brand or he can pay back

23   the penalties and you can offer him BP, that's what

24   Dolores Love is saying; right?

144

Mark Greco

1    A.    Yes.

2    Q.    So by this time, you are having conversations

3    with Dolores Love about converting it to a BP; right?

4    A.    I think she made the assumption BP because we

5    had a lot of BP locations, but I think her intention

6    was we can offer them something other than Sunoco.

7    Q.    Then she says he also has issues with getting

8    his incentive money and freight rates.  I am not

9    involved with the freight rates but Sunoco did pay you

10   the incentive money.  Was he confused?

11             Do you see that?

12   A.    Yes, I see it.

13   Q.    This was incentive money that she is talking

14   about that Sunoco has paid to GLeS, but that GLeS

15   hasn't yet paid to my clients; correct?

16   A.    Yes, that's correct.

17   Q.    I think Exhibit 43 gets us out of the e-mails.

18             Let's look at 43 a minute, and this was

19   an announcement that you sent out to your customers,

20   was it not, announcing that you have signed preliminary

21   agreements with GPM?

22   A.    Yes.

23   Q.    And this is on August 30th of 2006; correct?

24   A.    Yes.

Mark Greco

1    Q.    And by that time, I'm sure that there had been

2    communications back and forth between GPM and GLeS over

3    trying to reach a potential structure; right?

4    A.    Yes.

5    Q.    And I think I asked you earlier whether the

6    price that GPM was willing to pay you, whether that

7    price was a price that was allocated per site or per

8    supply contract and whether that price ever varied as a

9    result of these two sites being taken out of the

10   package?

11   A.    No, it wasn't allocated by site and, no, there

12   was no adjustment for these locations.

13   Q.    Do you remember what the total purchase price

14   was?

15   A.    At the time we signed the agreement that's

16   referenced in here, I don't remember the original

17   number, but I know that it changed several times from

18   that point forward.  There were some further

19   negotiations.  I don't remember what the number was at

20   that time.

21   Q.    What did the number end up being?

22           MR. HUTCHISON:  Objection.  I don't see

23   how that's relevant.

24           MR. STORM:  Again, it is relevant to the

Mark Greco

1    extent, although I guess he said now that the price

2    never changed as a result of these two sites coming

3    out, so if I understand --

4                    THE WITNESS:  It didn't change because of

5    these locations.  It changed for other factors.

6    BY MR. STORM:

7        Q.    I think, again, that information -- and you

8    and I will have further discussion about this, but I

9    think it was within the scope of the document

10   request --

11                   THE WITNESS:  Can I clarify a little bit?

12                   MR. HUTCHISON:  No.

13                   THE WITNESS:  Okay.

14   BY MR. STORM:

15       Q.    I will give you an opportunity.  If you want

16   to clarify it, you said that the price adjusted for

17   some other things, I assume?

18       A.    The original agreement contemplated selling

19   all the real estate that Primo held also, and later the

20   agreement was changed and Primo retained that real

21   estate and just leased it to GPM.  So that's the nature

22   of the change.  Nothing related to these locations.

23       Q.    With respect to Exhibit 43 where you say there

24   will be no immediate brand changes or personnel

147

Mark Greco

1    changes, what was that referring to?

2        A.    That was GPM's intention, at least what they

3    disclosed to us was their intention, not to change any

4    of the brands of the sites.  They were just going to

5    continue to do business as usual.

6        Q.    Did they become a distributor for BP?

7        A.    Yes.

8        Q.    They did?

9        A.    Yes.

10       Q.    How about for Sunoco?

11       A.    No.  They were prepared to.  I know that they

12   actually went through the application process and were

13   approved by Sunoco.  But because of the breach and the

14   gallons and all that, they didn't pursue.

15       Q.    So they elected not to pursue a

16   distributorship, for whatever reason, with Sunoco?

17       A.    Well, because the gallons weren't there

18   without the Delmar location.

19       Q.    When you say in this announcement, "Our entire

20   chain will benefit from GPM's buying power in terms of

21   guaranteed supply, better pricing and more competitive

22   brand offerings.  We anticipate this transition to be

23   smooth with absolutely no interruption of service to

24   you."

148

Mark Greco

1          What are you talking about, better

2     pricing?

3        A.    The company operated many, many convenience

4     stores.  They had alliances with many of the

5     convenience store vendors.  Not only the grocery

6     vendors, but other soda vendors and chip vendors and

7     people that were supplying all of our locations also.

8     The way they explained it to us, that they had

9     negotiated deals that would be extended to the dealers

10    also.

11       Q.    In connection with the ancillary sales, not

12    the motor fuel is what you were referring to?

13       A.    Yes, related to the stores.

14       Q.    There seems to be somewhat of a gap between

15    August 30th, and then we jump to November 2nd, the next

16    exhibit, 44.  I believe it is a letter to GLeS and

17    Mr. Sweet from Jeff Byard at Sunoco.

18              Have you seen that before?

19       A.    Yes.

20       Q.    During the time between the August 30th

21    announcement, Exhibit 43, and the date of Sunoco's

22    letter, November 2nd, 2006, GLeS continued to supply

23    the Glenns' location at Delmar, did it not?

24       A.    I have to go back and verify the dates.

149

Mark Greco

1    Q.    Let me direct your attention to Exhibit 47.

2              Have you seen that before?

3    A.    Yes.

4    Q.    And then Exhibit 48 is a letter from me to

5    Mr. Hutchison.

6    A.    Yes.

7    Q.    Does that refresh your recollection as to when

8    the relationship ended at Delmar?

9    A.    Yes, yes.

10   Q.    So what I'm trying to understand is, between

11   the summer of '06 and February of '07 when the

12   relationship ended, did your company continue to supply

13   motor fuel to the Delmar location?

14   A.    Yes.

15   Q.    What type of motor fuel was it?

16   A.    Without going through records, I couldn't tell

17   you what it was.  I know the station wasn't branded

18   anything, so it would have been whatever product was

19   available at the time.  Wherever we had allocation.

20   Q.    Wasn't the Mobil brand still up at that time?

21   Maybe I can refresh your recollection.

22   A.    No.  Based on the date of this letter, they

23   non-renewed the Mobil agreement in November and we

24   continued to supply the Glenns until, based on your

150

Mark Greco

1    letter, until the end of January of '07.  So it

2    couldn't have been Mobil.

3                    It's possible that the template --

4                    MR. HUTCHISON:  Do you mind if I just, if

5    this refreshes --

6    BY MR. STORM:

7        Q.    Look at Exhibit 49, which is an e-mail dated

8    January 30th.  That might help.

9        A.    Okay.

10                    So it wasn't debranded.  It was still

11    branded Mobil.

12       Q.    Does that at all refresh your recollection as

13   to what type of product was being sold to the Glenns?

14       A.    Yes.  If it was still branded Mobil, then we

15   would have sold Mobil product to them.

16       Q.    Between August of '06 and this letter of

17   November 2nd of '06 from Sunoco to Mr. Byard, had there

18   been any more communications that you recall with

19   Sunoco given Sunoco's position in the summer of 2006

20   that you couldn't sell Mobil gas there any more?

21       A.    To the best of my knowledge, I don't think

22   there were.

23       Q.    And I assume that you were engaged to some

24   extent during that period following the August

151

Mark Greco

1   announcement with trying to finalize things with GPM;

2   right?

3       A.    Yes, due diligence and other activities.

4       Q.    Let's look at Exhibit 44.   Sunoco's

5   essentially saying that it is going to non-renew the

6   distributor agreement; right?

7       A.    Yes.

8       Q.    And in fact, the distributor agreement between

9   Sunoco and Peninsula, which GLeS assumed, had been set

10  to expire in 2005, hadn't it?

11      A.    Yes, September 30th of 2005.

12      Q.    Let's look at 45.

13            Can you identify that for me?

14      A.    This is a letter from Sunoco to our company

15  outlining unamortized balances of the incentive

16  payments that they wanted to be repaid.

17      Q.    And they are advising you that you should tell

18  GPM that; right?

19      A.    Yes.   Because it was GPM's intention to become

20  a Sunoco branded distributor should the Glenns have

21  decided that they were going to rebrand to Sunoco.

22      Q.    Now, Mr. Byard refers at the bottom of Page 1,

23  carrying over to Page 2, "the long dormant Sunoco

24  distributor agreement."

Mark Greco

1              What's that referring to?

2       A.    We only had one Sunoco branded site in

3    Glasgow, Delaware, which was rebranded to CITGO at some

4    point during the duration of the contract, and our

5    Sunoco agreement was just never mutually terminated, so

6    it just sat dormant.

7       Q.    So unrelated to this issue, you had had this

8    one Sunoco branded location --

9       A.    Yes.

10      Q.    -- that for whatever reason went CITGO?

11      A.    Yes.

12      Q.    And then you didn't have any Sunoco sites,

13   although you still had an agreement with them?

14      A.    Yes.

15      Q.    And then that agreement was mutually

16   terminated at some point?

17      A.    Yes.

18      Q.    Exhibit 46 appears to be another letter to you

19   from Mr. Byard dated January 23rd, 2007.  And this is

20   the letter telling you to debrand the premises

21   immediately; right?

22      A.    Yes.

23      Q.    And then 47 is the document that we already

24   talked about from Mr. Hutchison communicating to

153

Mark Greco

1    Mr. Snyder, another lawyer for the Glenns, that Sunoco

2    January 23rd letter; right?

3        A.    Yes.

4        Q.    And then 48 is the letter from me to

5    Mr. Hutchison, where I appear to spell his name

6    incorrectly in at least one place -- and I apologize

7    for that -- disagreeing with the position and saying

8    that this conduct amounts essentially to -- well, the

9    letter says what it says.  You had received this

10   letter, did you not?

11       A.    Yes.

12       Q.    We talked about 49, and I assume that you did

13   in fact go in to my client's site and accomplish the

14   debranding; right?

15       A.    Yes.

16       Q.    And you did what Sunoco asked to be done?

17       A.    Yes.

18       Q.    This must have also been true, then, at the

19   same time for the Duck-In and Delaware City; right?

20       A.    Duck-In and Deluxe, yes.

21       Q.    Now, at the end of this e-mail, John --

22             MR. HUTCHISON:  This is 49?

23             MR. STORM:  Yes, 49.

24   BY MR. STORM:

154

Mark Greco

1   Q.    Who is John?

2   A.    John Collins.

3   Q.    He is --

4   A.    He is an employee or was an employee.

5   Q.    And John asks whether, on the third page of

6   this e-mail -- well, at the bottom he says, "Is Sweet

7   Oil still supplying them?  If so, what brand fuel is to

8   be delivered?  Or is GPM supplying them?  Also, you

9   told me Doughboy's Mobil is to go unbranded with

10  another distributor so is Chad supposed to stop

11  delivering Mobil fuel to them on 2-2-07?  Also, what

12  about daily price notifications for all of these sites?

13              Do you see that?

14  A.    Yes.

15  Q.    The daily price notifications, what's that

16  referring to?

17  A.    Whether a dealer buys fuel or not, we send out

18  a daily price fax at the end of the day every day when

19  prices are announced by each of the oil company

20  suppliers, so the dealer knows what the price will be

21  for the next business day.

22  Q.    So that's your price notification --

23  A.    Yes.

24  Q.    -- to the --

Mark Greco

1    A.    To the dealer.

2    Q.    To the dealer, okay.

3          On a location that was a commissioned

4    marketer location where the dealer isn't buying the

5    product, would the dealer still get notifications like

6    that?

7    A.    I don't believe so.  It wouldn't be necessary.

8    Q.    And I assume that the notification that would

9    be sent out, for example, to the Delmar location where

10   there was a cost plus price term in the contract, that

11   that price notification for that location wouldn't

12   necessarily be the same as the price notification that

13   was being sent to somebody else who had a different

14   price term?

15   A.    No.  Every location was different because the

16   freight to every location was different.  Pickup supply

17   point may be different.  So they were unique to each

18   site.

19   Q.    So when you would give, for example, at the

20   Delmar location when you do a price notification, would

21   that price notification just be -- it would be a price

22   for the product for that next day and it would include

23   the freight?

24   A.    I believe the price notification included

Mark Greco

1   everything but taxes.  I'd have to go back to the

2   system, though, to verify that.  I believe that's the

3   way it was done.

4       Q.    And you said that the freight varied from

5   location to location?

6       A.    Yes.

7       Q.    Based on distance differences from the

8   terminal; right?

9       A.    Mileage, tolls, any of those factors.

10      Q.    So those were all factored into the freight

11  rates that the freight company was charging to you?

12      A.    Yes.

13      Q.    Let's look at 50.  That's an e-mail from

14  Dolores Love to Mark Greco.  "Hi, Mark:  Please let me

15  know when the penalty for Delmar has been wired."

16            What is she talking about there?

17      A.    At that point, I believe GPM had notified them

18  that they were not going to pursue a Sunoco agreement,

19  and based on that fact, they knew that the site wasn't

20  going to be converted to Sunoco.  So Sunoco said, if

21  it's not going to Sunoco, the fee needed to be paid and

22  they wanted it paid prior to our sale to GPM.

23      Q.    And then at the bottom they say, "See attached

24  mutual termination of our Sunoco jobber agreement.  As

157

Mark Greco

1  part of this, they want the immediate debranding of

2  Delmar Mobil due to the credit card violation.

3  Additionally, they have waived the Duck-In repayment in

4  the amount of 13,720."

5           Do you see that?

6  A.    Yes.

7  Q.    Did they in fact waive that?

8  A.    No.

9           In one of the previous exhibits that we

10 went over earlier, I think I labeled it as unauthorized

11 debit.

12 Q.    From bank account to bank account?

13 A.    And they took that fee also.

14 Q.    Again, that was another document I think we

15 still need to see, is the mutual cancellation with

16 Sunoco.

17           MR. HUTCHISON:  I thought it was in

18 there.

19           MR. YOUNG:  Do you want to see it?

20           MR. HUTCHISON:  I thought it was in

21 there.

22           MR. STORM:  I didn't see it.

23           Do you have it?

24           MR. YOUNG:  Yes.

158

Mark Greco

```
1              MR. STORM:  Let's take a break.

2              (Recess.)

3              MR. STORM:  Let's make this 76.

4              (Exhibit 76 was marked for

5    identification.)

6    BY MR. STORM:

7         Q.    Mr. Greco, let me show you what's been marked

8    as Exhibit 76, which appears to be a mutual

9    cancellation agreement.

10        A.    Yes.

11        Q.    Did you sign that?

12        A.    Yes.

13        Q.    And you signed it on January 25th of '07?

14        A.    Yes.

15        Q.    Is that right?

16        A.    Yes.

17        Q.    And Sunoco appears to have signed it on

18   February 5th of '07; right?

19        A.    Yes, that's correct.

20        Q.    I'm a little confused.  This says it is dated

21   January 23rd, 2007, and it says it is effective

22   January 25th, 2007, and the letter from Mr. Hutchison

23   to Mr. Snyder is dated January 29th of 2007,

24   Exhibit 47.
```

159

Mark Greco

1           Do you see that?

2    A.    Yes.

3    Q.    And Mr. Hutchison's letter says that BCG,

4    Inc., and Chesapeake Products & Services is in breach

5    of its obligation to accept Mobil credit cards.

6    Sunoco, Inc., will no longer provide Mobil branded

7    products to the station.

8           Do you see that?

9    A.    Yes.

10   Q.    Before that letter was sent, you had already

11   terminated or agreed to terminate the relationship with

12   Sunoco; correct?

13   A.    Yes.

14   Q.    And I take it from what has subsequently

15   happened with respect to the $102,000 incentive payment

16   issue, that the release that's in this document where

17   each side mutually releases each other, that somehow

18   Sunoco and GLeS does not interpret that as applying to

19   this issue?

20   A.    No.   The incentive agreement was a completely

21   separate agreement from the jobber contract, and the

22   mutual termination discusses termination of the jobber

23   supply agreement.

24           MR. HUTCHISON:  We don't agree with what

160

Mark Greco

1   you just said.

2               MR. YOUNG:  Gary, would you permit me to

3   ask a question just for convenience at this point?

4               MR. STORM:  Sure.

5   BY MR. YOUNG:

6     Q.    Mr. Greco, as you know, I represent Sunoco and

7   I just want to ask you a question about P-76.

8                  P-76, which is the mutual cancellation

9   agreement, applies only to the Sunoco branded

10  distributor motor fuel agreement and branded distiller

11  agreement dated March 21, 2003; correct?

12    A.    Yes.

13              MR. HUTCHISON:  Objection.

14  BY MR. YOUNG:

15    Q.    You did not supply the Delmar Mobil with Mobil

16  fuels and the license to use the Mobil trademark based

17  on the Sunoco brand in the distributor motor fuel

18  agreement, did you?

19    A.    I don't know how internally you view that.

20  The way it was explained to us was at the time that we

21  did the assignment, was we were taking assignment of

22  Peninsula's agreement, which only lasted from

23  September 1st of '05 to September 30th of '05, and then

24  they contemplated an amendment to our Sunoco jobber

Mark Greco

1   agreement, which would incorporate the Mobil gallons

2   into the Sunoco jobber agreement, which was then

3   terminated by this.

4       Q.    This agreement isn't referring to the

5   distributor agreement that was assigned to you by

6   Peninsula; is it?

7               MR. HUTCHISON:  Objection.

8               THE WITNESS:  No, it isn't.

9   BY MR. YOUNG:

10      Q.    It was that agreement under which you sold

11  Mobil branded product to Delmar Mobil; correct?

12              MR. HUTCHISON:  Objection.

13              THE WITNESS:  Only until September 30th

14  of 2005.

15  BY MR. YOUNG:

16      Q.    So it is your position that that agreement

17  terminated on September 30th, 2005, the Peninsula

18  agreement?

19      A.    Yes.

20      Q.    Doesn't Mr. Byard state in one of his letters

21  that you agreed to extend that Peninsula agreement on a

22  month-to-month basis?

23      A.    I don't know.  You have to show me that.

24      Q.    I refer you to --

162

Mark Greco

1    A.    I don't remember exactly, but I believe we got

2    an e-mail from Dolores prior to signing the assumption

3    agreement saying that that agreement, that the

4    Peninsula agreement was not going to be renewed, that

5    they were going to amend our Sunoco agreement to

6    include the Mobil gallons in the Sunoco agreement.

7    Q.    Let me refer you to Plaintiff's Exhibit 45,

8    which is the November 27th, 2006 letter from Mr. Byard

9    to Mr. Bill Sweet.

10   A.    35 is from --

11   Q.    45.

12   A.    Oh, I'm sorry.

13         I see the letter.

14   Q.    In this letter do you see where Mr. Byard

15   refers at the top of the second page to the long

16   dormant Sunoco distributor agreement?

17   A.    Yes.

18   Q.    Do you recall Mr. Storm asking you questions

19   about that agreement?

20   A.    Yes.

21   Q.    And you indicated that there was one Sunoco

22   station that had been converted from Coastal that

23   eventually changed brands?

24   A.    It was Sunoco and went to CITGO, yes.

163

Mark Greco

1    Q.    Is it your understanding that what Mr. Byard
2    describes as the long dormant Sunoco distributor
3    agreement, isn't that the agreement that's referred to
4    in this mutual cancellation agreement?
5    A.    Yes.
6              MR. HUTCHISON:  Objection.
7              MR. YOUNG:  That's all the questions I
8    have for now.
9    BY MR. STORM:
10   Q.    Did you sign another agreement with any other
11   mutual cancellation other than this one with Sunoco?
12   A.    Yes.
13   Q.    You did?
14   A.    Yes.
15   Q.    And when was that?
16   A.    It may have been the same day.  I'm not sure.
17             MR. STORM:  Do we have that one?
18             MR. YOUNG:  Let me ask a question, if you
19   don't mind.
20             THE WITNESS:  Okay.
21   BY MR. YOUNG:
22   Q.    Was that the Coastal agreement?
23   A.    Yes.
24   Q.    There was another agreement that Sweet Oil had

Mark Greco

1   with Sunoco which allowed you to sell Coastal-branded

2   fuel; correct?

3       A.    It was actually a Coastal Refining & Marketing

4   agreement that I believe was assigned to Sunoco.

5       Q.    And the other mutual cancellation agreement

6   you are referring to canceled that agreement?

7       A.    Yes.

8                MR. YOUNG:   Okay.

9   BY MR. STORM:

10      Q.    So were you still marketing under the Coastal

11  brand at any location?

12      A.    At that time I don't believe we were.

13      Q.    But Sunoco had assumed the Coastal brand at

14  some point?

15      A.    Yes.

16      Q.    Do you know when you stopped using the Coastal

17  brand?

18      A.    I don't know sitting here.  I'd have to go

19  back and research it.

20      Q.    Is that brand still around at all, do you

21  know?

22      A.    Yes.

23      Q.    It is?

24      A.    Yes.

Mark Greco

1    Q.    Through Sunoco?

2    A.    Yes.

3    Q.    So when we talked earlier about whether there

4    was another brand option through Sunoco, Sunoco also

5    had a right to the Coastal brand?

6    A.    Yes.

7    Q.    I think we are at 51, if we go back to where

8    we were.  That's another e-mail from you to Dolores

9    Love; right?

10   A.    Yes.

11   Q.    It was this e-mail, right, where you indicated

12   that you were going to pay the money, you were going to

13   file an interpleader action with the court, right,

14   because Sunoco was claiming that it was entitled to the

15   102,000 back and my clients were claiming they were

16   entitled to the balance of the incentive money; right?

17   A.    Yes.  Our position was it was either Sunoco

18   money or the dealer's money, but in either case it was

19   our money, so we really didn't take a position on whose

20   money it was.

21   Q.    Had there been any provision in the agreement

22   that GLeS had with Peninsula regarding incentive monies

23   that had been paid by Sunoco to Peninsula before GLeS

24   took over?  My question is whether there was any kind

166

Mark Greco

1   of indemnity provision in that agreement related to

2   these incentive monies that had been paid before GLeS

3   came into the relationship?

4       A.     No, the indemnity agreement was between the

5   Glenns and Peninsula and they issued a mortgage on the

6   Delmar site as collateral security of that indemnity.

7   And in the supply agreement it says that if Peninsula

8   had to pay, at that time I guess it was Tosco,

9   eventually Sunoco, if they had to pay anything, that it

10  would be reimbursed by the Glenns and it was secured by

11  the mortgage.

12      Q.     Where was that, that agreement?

13      A.     It's in their supply agreement for the Delmar

14  location.

15      Q.     In the agreement between the Glenns and

16  Peninsula?

17      A.     Exactly.

18      Q.     The supply agreement that you are referring to

19  is the one that we have already talked about, right,

20  Exhibit 5?

21      A.     Yes.

22      Q.     There's no other agreement; right?

23      A.     Other than the mortgage and security

24  agreement.

167

Mark Greco

1     Q.     And if you go back to Exhibit 5, in Paragraph

2     2 (b), it says that if the dealer breaches any of the

3     provisions of this agreement, dealer agrees to

4     reimburse the company, does it not?

5          A.     Yes.

6                    MR. HUTCHISON:  Objection.  Half a

7     paragraph.

8                    MR. STORM:  Yes, there is more to it.

9                    MR. HUTCHISON:  It says what it says.

10                   MR. STORM:  It says what it says.

11    BY MR. STORM:

12         Q.     Among other things, it says that; right?

13         A.     Yes.

14         Q.     You also indicate in this e-mail to Dolores

15    Love that the obligation is secured with a mortgage on

16    the dealer site and we will assign our rights to the

17    mortgage to the court, also to ensure the dealers'

18    obligation if they are found to not be entitled to the

19    money.

20                    Do you see that?

21         A.     Yes.

22         Q.     Has there been any further assignment of the

23    mortgage as it was assigned from Peninsula to Primo

24    Properties?

168

Mark Greco

1    A.    No, I don't believe so.

2    Q.    So right now the holder of that mortgage on

3    its face is Primo Properties?

4    A.    Yes.

5    Q.    And 52, Dolores writes back and says, Thanks

6    for the update.  I will forward this to the Sunoco

7    people involved.  I'll make sure you get copies of the

8    mutual; right?

9    A.    Yes.

10    Q.    53 was a page that was produced to us.  Was

11    this the first page of your Sunoco distributor

12    agreement?

13    A.    Yes, I believe so.

14    Q.    Just one last question about the Mobil site.

15    The damage summary that we have talked about, which is

16    Exhibit 13, that contains a summary of all of the

17    damages that you are seeking in this action; correct?

18    And we can limit it right now, if you want, to the

19    Mobil location.

20    A.    This is, the only damage is related to gallons

21    not purchased due to the breach.  But if there is, if

22    the court determines that Sunoco's entitled to the

23    incentives, then pursuant to the agreement, the dealers

24    then have to reimburse us for that.  But we don't take

169

Mark Greco

1   a position on whose money it is.  It is the court's

2   decision.  It is either the dealers' or Sunoco's.

3       Q.     But other than the Sunoco incentive issue,

4   these are all the damages?

5       A.     And the balance of their accounts receivables,

6   which we went over in Exhibit 75, yes.

7       Q.     Let's move on to some questions about Laurel

8   Oasis.  Starting with Exhibit 54, which is a group of

9   documents that have been Bates stamped SO 94 through

10  SO 119.  Were those the documents that were provided to

11  you by Peninsula as constituting the agreements between

12  Peninsula and the Glenns?

13      A.     Well, several of these are outdated.  The

14  current agreement is the one dated 1994.  Attached here

15  are some old agreements that were replaced.

16      Q.     I take it that all of this was provided to you

17  by Peninsula originally?

18      A.     No, not originally.  They gave us the binding

19  agreement and at later dates -- I don't remember if it

20  was Charlie -- I forget -- one of the Glenns had said

21  to us, "No, no, no, there's other additional

22  paperwork."  And I said, "I got what I got from

23  Peninsula."  And I believe they furnished us additional

24  documents, which actually related to these previous

170

Mark Greco

1    agreements.

2        Q.     Do you see on the fax at the top up there,

3    March 23rd, 2006, that fax number?

4        A.     Yes.

5        Q.     Do you recognize that number?

6        A.     Yes.

7        Q.     Whose number is that?

8        A.     That was the fax number at our office.

9        Q.     And was that an incoming fax or does that show

10   an incoming fax?

11       A.     That actually was, at the time our office

12   system wasn't capable of scanning, so we faxed it to

13   our scanning system.  So it was an internal us to us.

14       Q.     So at least as of March 23rd, 2006, you had

15   all these documents; right?

16       A.     Yes.

17             MR. HUTCHISON:  Well, objection.

18             THE WITNESS:  Assuming the date stamp is

19   correct.

20   BY MR. STORM:

21       Q.     Do you have any reason to think it is not?

22             MR. HUTCHISON:  Well, when you say "all

23   these documents."

24             MR. STORM:  The documents --

171

Mark Greco

1    MR. HUTCHISON:  That have that legend on

2  it?

3    MR. STORM:  Right.  Which appears to be

4  the first --

5    MR. HUTCHISON:  Eleven.

6    MR. STORM:  94 through 104, anyway.

7    THE WITNESS:  Yes, we must have received

8  them at a different time than the others.

9  BY MR. STORM:

10    Q.    The ones that are starting at 105 --

11    A.    July 12th of '05, we received other

12  agreements.

13    Q.    And then at the bottom of the page, on 105,

14  there's a date January 25th of 2006.

15    A.    Yes.

16    Q.    So is it your position that the documents, all

17  the 1990 documents are replaced by the '94 documents?

18    A.    That's correct.

19    Q.    Let me direct your attention to the second

20  page of that exhibit, which is SO 095.

21    A.    Okay.

22    Q.    You agree, do you not, that under the

23  agreement that was in place at the time that you

24  assumed the contract from Peninsula with respect to

172

Mark Greco

1    this location, that gasoline was being handled on a

2    commission basis with the Glenns?

3        A.    Pursuant to this agreement, is that what you

4    are saying?

5        Q.    Pursuant to any agreement?

6        A.    Yes, it was on commission, gasoline only.

7        Q.    They were actually purchasing the diesel fuel?

8        A.    Yes, correct.

9        Q.    Did you have any conversation with Peninsula

10   about what the terms were other than what was in the

11   actual documents and what their course of dealing had

12   been, what Peninsula's course of dealing had been with

13   the Glenns?

14       A.    As far as the commission?  The commissions are

15   spelled out in the agreement.

16       Q.    And how about diesel fuel?

17       A.    I don't believe that it actually is addressed

18   in the agreement, the price of diesel fuel, if I

19   remember right.  I have to go through it again to

20   verify that.

21       Q.    Well, you recognize in the exhibit, on

22   Page 95, and I understand that you say that the 1990

23   agreement wasn't in place any longer.

24       A.    Correct.

173

Mark Greco

1  Q.    That diesel fuel was to be the posted

2  transport price at the time of delivery, do you see

3  that?

4  A.    Where does it say that?

5  Q.    The top of the document, starting on the

6  fourth line.

7  A.    Yeah.  I assume by this statement that

8  Peninsula posted a price.  That's what it says.

9  Q.    Then do you see the asterisk that says not to

10  exceed Salisbury rack prices by more than

11  two-and-a-half cents?

12  A.    Yes.

13  Q.    When you began supplying this location, what

14  terms were you supplying the diesel fuel on?

15  A.    Because it wasn't specifically outlined in the

16  agreement that was given to us, the '94 agreement, we

17  sold them at the same price as in the Delmar agreement,

18  which was a penny over the cost, penny over the rack,

19  plus transportation.

20  Q.    When you added that cost to the freight that

21  you were charging, it exceeded two-and-a-half cents,

22  did it not?

23  A.    There was no provision that said that.

24  Q.    I am just asking you, did it exceed

174

Mark Greco

1    two-and-a-half cents?

2        A.    It probably did.  I don't know.

3        Q.    Do you remember having a conversation with the

4    Glenns in the fall of 2005, shortly after you assumed

5    these contracts, do you remember visiting the Glenns at

6    their stations?

7        A.    Many times.

8        Q.    Do you remember having a conversation with

9    them about the price term in this contract?

10       A.    Yes.  They told me that there was other

11   documents that I didn't have, and I asked them many

12   times to furnish them to me and they gave me a lot of

13   outdated contracts, previous contracts.

14       Q.    Including this document; correct?

15       A.    I couldn't say this one specifically, but they

16   gave me documents.

17       Q.    Didn't they tell you that their deal with

18   Peninsula was that the diesel price was not to exceed

19   Salisbury rack plus two-and-a-half cents?

20       A.    It didn't.  It was a penny.

21       Q.    With freight?

22       A.    It doesn't say that.  It doesn't say including

23   freight.

24       Q.    My question is, did they tell you that?

Mark Greco

1    A.    It's possible they did.

2    Q.    Did you go back to Peninsula and ask about it?

3    A.    I don't know if I did or not.  In the course

4    of business, when you have been in this business for

5    this long, dealers tell you all kinds of things, but

6    you have to go by what's in the written contract.

7    That's the only thing that I can follow that is for

8    certain.

9    Q.    Well, you saw in the papers that you

10    ultimately received, did you not, the page that is part

11    of this same exhibit at 105, which is a letter to the

12    Glenns from Mr. Williams of Peninsula Oil dated

13    November 15th, 1993, where it talks about the extension

14    of the contract, and the last sentence of the letter

15    says, "All of the other terms of the 12-13-90 agreement

16    remain the same, with the exception of the extension of

17    expiration date, which will also read January 31st,

18    2008."

19                Did you see that?

20    A.    Yes.

21    Q.    And you never went back to inquire what all

22    these other terms were?

23    A.    Mr. Williams wasn't with the company when we

24    purchased this from Peninsula, and this agreement was

176

Mark Greco

1    many, many months before the '94 agreement.

2    Q.    Well, wasn't that letter talking about the

3    extension that they were going to enter into, that they

4    were going to expend 130,000 toward the purchase and

5    installation of new pumps, canopy, console, signage,

6    et cetera, needed for the resale of motor fuels?

7    A.    Yes.  But evidently they didn't sign a

8    contract back in November.  They may have changed other

9    terms too.

10   Q.    Let's look at the page that is SO 100.  That's

11   an agency agreement dated 2-13-90.

12   A.    Okay.

13   Q.    Do you see Paragraph 4 of that agreement?

14   A.    Yes.

15   Q.    And the price of the fuel of gasoline will be

16   at all times under the absolute control of principal,

17   right, except that the price shall be competitively

18   priced with locations in that area?

19   A.    Okay.

20   Q.    Do you see that?

21   A.    Yes.

22   Q.    What locations did you view as competitive

23   with the Laurel location?

24   A.    Well, there's no other location in their trade

177

Mark Greco

1    area that's a truck stop.  Their location is unique for

2    that area, but in that they sold gasoline, we would

3    look at the closest competitors to their site, which

4    would be Sunoco directly across from them.  I think the

5    next closest was Royal Farms and Exxon.

6        Q.    Okay.  So you'd recognize those locations as

7    competitive locations?

8        A.    Yes.  Similar.

9              Again, none of them were the same.

10   There weren't any other truck stops.

11       Q.    Well, this location didn't just sell trucks,

12   did it?

13       A.    Well, based on the products that we sold to

14   them, 75 percent of what we sold to them was truck

15   diesel for the truck stop.

16       Q.    They also sold gasoline for vehicles, didn't

17   they?

18       A.    Yes, sir.

19       Q.    What else was at this location?  You described

20   a truck stop.  Tell me what was there?

21       A.    There were gasoline dispensers on the side of

22   the building.  There was a truck scale to the right of

23   that.  There were truck diesel pumps under another,

24   second canopy behind the building.

178

Mark Greco

1       There was a large convenience store with

2   truck-related accessories, I guess you could say.

3   There was a Hardee's restaurant, and I believe they had

4   other -- they had like a cafeteria of some kind, some

5   other type of restaurant in there also, in addition to

6   selling regular convenience items.

7       Q.    When you first took over the supply of that

8   location, what was it branded?

9       A.    It was branded Texaco.

10      Q.    And then what happened with that?

11      A.    Peninsula had a Texaco supply agreement

12  through Motiva Enterprise.  Motiva Enterprise was a

13  joint venture between Shelby and Texaco, which later

14  was, as part of Chevron's purchase of Texaco, was later

15  ordered to be divested by Texaco, and Shelby Oil

16  purchased Motiva and was no longer going to offer the

17  Texaco brand.  And I don't know what the exact cut-off

18  date was, but there was a date in which all the

19  locations had to be converted from Texaco to Shelby

20  under that Motiva agreement.

21          We didn't have a Motiva agreement, and

22  we approached the Glenns with the other choices that we

23  had before we went out and obtained a Shelby agreement

24  to rebrand their site from Texaco to Shelby, we offered

179

Mark Greco

1   them BP and Exxon and all the other brands that we did

2   have.

3           And the most interest they had was CITGO.

4   I set up several meetings with Terry Sullivan, who was

5   the local CITGO rep, and in addition to having meetings

6   with just Sweet Oil reps and the Glenns, we also had

7   meetings with Terry Sullivan from CITGO and the Glenns,

8   and the decision was made on their part that they

9   wanted to be CITGO.  So it was converted to CITGO.

10  Q.    But the contracts weren't modified at that

11  time, or were they?

12  A.    No.  No, we were still under the existing '94

13  agreement.

14  Q.    When you say that you sold to them the diesel

15  fuel at the same price that you were selling at the

16  Mobil location, is it your testimony that all of the

17  diesel fuel sales to the Glenns were at rack plus a

18  penny, plus freight, plus this freight administration

19  cost?

20  A.    And taxes.

21  Q.    And taxes?

22  A.    Yes.

23  Q.    And was that true from the time you first

24  started supplying them?

180

Mark Greco

1    A.    Yeah, I believe so.  To the best of my

2    knowledge.

3    Q.    Did you have a, quote, posted price for

4    diesel?

5    A.    No, we didn't post our own rack.  Peninsula

6    may or may not have.  I don't know.  This agreement

7    evidently says they did, but we didn't post our own

8    price.  We picked up product at the posted oil

9    company's rack.

10    Q.    Getting back to that, I asked you whether you

11    remember a conversation with the Glenns in the fall of

12    2005, and I think you indicated there were a lot of

13    conversations.

14    A.    Yes.

15    Q.    Do you remember ever telling them in any of

16    those conversations that you would not abide by the

17    contract and lose money?

18    A.    I don't know that I ever said we would not

19    abide by the contract.  I would never make that

20    statement.  And it's not our intention to lose money

21    intentionally.  We wouldn't go into any business deal

22    with the purpose of losing money.  No business would.

23    Q.    Did you make a statement to them in response

24    to them pointing out to you the price term for diesel

181

Mark Greco

1    in their contract that you wouldn't sell to them at

2    that price and lose money?

3        A.    There is no term for diesel.  It's not in the

4    contract.  There is no price for diesel.

5        Q.    Well, there is in the 1990 contract.  Whether

6    that contract is valid or it's not valid, the Glenns

7    pointed out to you in a conversation, did they not,

8    that their agreement with Peninsula Oil, that you

9    assumed was that they would be supplied diesel at no

10   more than rack plus two-and-a-half cents out of the

11   Salisbury terminal?

12                MR. HUTCHISON:  Objection.

13                THE WITNESS:  We didn't sell to them at

14   greater than two-and-a-half cents.

15   BY MR. STORM:

16       Q.    You did when you added the freight?

17       A.    It doesn't say that.  The agreement doesn't

18   say that.

19       Q.    My question is, did they tell you that?

20       A.    They told me a lot of things.

21       Q.    Did they also tell you that they were entitled

22   to payment of commissions for the gas of yours that

23   they were selling for you?

24       A.    Yes, that's in the agreement.

Mark Greco

1    Q.    And did you ever pay them commissions in

2    September, October, November, or December of 2005?

3    A.    I don't know if we did or not.  I know we have

4    existing commission credits on their account applied

5    against monies that they owed us, and I know that they

6    were taking commissions themselves as the agreement

7    provides.

8    Q.    And how do you know that?

9    A.    Because they told me.

10   Q.    Wasn't the money they were taking out of the

11   payments that they were making to you the credit card

12   fee amounts that were being inappropriately charged to

13   them?

14   A.    There were no credit card fees inappropriately

15   taken from them.

16   Q.    So your testimony is it isn't monies that they

17   were withholding, for monies that they were paying to

18   you did not relate to credit card fees?

19   A.    If they withheld monies, they were not

20   authorized to do so, for credit card fees.

21   Q.    You agree, do you not, that they were not

22   supposed to be paying credit card fees, at least on the

23   gasoline?

24   A.    On the gasoline, that's correct.

Mark Greco

1   Q.    You believe, do you not, Mr. Greco, that the

2   applicable agreement with respect to the gasoline was

3   this agreement dated March 16th, 1994, correct,

4   starting at Page 108?

5   A.    Yes.

6   Q.    If you look at Page 2 of that agreement,

7   Paragraph 5 at the top, it says, "Principal shall pay

8   to agent no less than once a month on all motor fuel

9   sales as dispensed through the equipment of the

10  principal as follows:"  And then it has the commission;

11  right?

12  A.    Yes.

13  Q.    And you don't know whether you paid him

14  anything or not in September, October, November,

15  December?

16  A.    I don't, because on numerous requests to

17  produce journal tapes from the registers and other

18  documentation so that we could reconcile their account,

19  we got very spotty and incomplete information to

20  reconcile their account.  And to the best of our

21  ability, we attempted to reconcile the account based on

22  the gallons that we put in the tank, rather than what

23  went through the dispenser, because that was something

24  that we could document.

184

Mark Greco

1    Q.    Is it your testimony that they didn't submit

2  weekly summaries to you?

3    A.    They submitted paperwork that did not meet all

4  the requirements that we needed.

5    Q.    Did you ever discuss with them whether the

6  paperwork they submitted to GLeS was the exact same

7  paperwork they had been submitting to Peninsula Oil for

8  the prior, at least, ten years?

9    A.    We did have a conversation and they said that

10  Peninsula, as a regular practice, was sending someone

11  to their site to mechanically read numbers off of the

12  pumps.  And I don't know how they were doing their

13  reconciliation based on that because the mechanical

14  meters are inconsistent and tend to fail frequently.

15    Q.    And the documents that you wanted them to

16  submit to you were the Veedor root readings?

17    A.    The Veedor root, the Ruby itself, the cash

18  register Ruby produces a report, in addition to other

19  documents that we asked them for.

20    Q.    Look back at Exhibit 55.  Can you identify

21  that for me?

22    A.    It's something they must have submitted to us.

23  Handwritten numbers.

24    Q.    If you look at Page 1053, is that the type of

185

Mark Greco

1   document that you were looking for from them?

2       A.    It's one of them.  This specifically gives

3   readings on what I believe were the diesel pumps, but

4   not the gas pumps.  The gas systems ran through the

5   Ruby system out front and it prints a different type of

6   report than this.

7       Q.    On Page 1054 when it is talking about unleaded

8   premium and mid, what is that showing us for product

9   totals?

10      A.    I don't know what machine this came off of,

11  but this is incomplete.

12            What we requested was the journal tape

13  from the Ruby system so we could validate all the

14  sales.

15      Q.    Well, you knew how much gas was being

16  delivered to their location; right?

17      A.    Yes.

18      Q.    Because you were delivering it; right?

19      A.    Yes.

20      Q.    And presumably if you are making another

21  delivery, right, they have sold the gas that you have

22  just delivered before that; right?

23      A.    You would think.  You would hope.

24      Q.    Look at 1056, that same exhibit.

Mark Greco

1              Which is a handwritten note that

2    says "gas payment for week ending 9-27-05, less credit

3    card fees charged by mistake from 9-12-05 to 9-17-05."

4              Do you see that?

5    A.    Yes.

6    Q.    When you were talking about monies that they

7    were deducting, is that what you were referring to?

8    A.    No.

9    Q.    Who handled the bookkeeping at your shop for

10   the Glenns' location?

11   A.    We had four individuals in the accounting

12   department.  Each handled different functions.  One

13   handled accounts receivable, one accounts payable.  Our

14   controller was John McTear, who oversaw the accounting

15   department.

16   Q.    What are the names of the other people?

17   A.    Andrea Soliday, Michelle LaBorde, Aaron

18   Johnson.

19   Q.    Is there somebody named Chad?

20   A.    Chad was our dispatcher.

21   Q.    Was Chad responsible for getting information

22   too?

23   A.    Sure, he made many calls requesting

24   information, but he wasn't in the accounting

187

Mark Greco

1   department.

2       Q.    Who is responsible for setting retail prices

3   on gasoline at this site?

4       A.    My partner, Bill Sweet.

5       Q.    And how did he do that, how was that handled?

6       A.    On any given day, we look at what our cost is.

7   We look at other competitive information that we can

8   obtain either through Opus or for other brands that we

9   supply.  We look at surveys of street prices of

10  competitive stations.  We look at what our costs are

11  related to the site.  In this case we had a commission

12  agreement, so that would be a factor.  We look at any

13  number of factors that affect our profitability at the

14  location, and then we make an educated decision based

15  on the information that we have.

16      Q.    Was there any particular margin you were

17  looking for from gasoline sales at this location?

18      A.    No, not specifically.  I mean in every

19  location obviously you are in business to make money,

20  so you try and remain on the profitable side of zero,

21  but at the time that we took over this location, the

22  first hurricane hit, I believe, two or three days prior

23  to our takeover and the gasoline market was more

24  volatile than I have ever seen in my 30 years in this

Mark Greco

1   business and prices were changing hourly, let alone

2   daily.  And they weren't changing a penny at a time,

3   they were changing 20 cents at a time.

4              And shortly thereafter, I believe maybe a

5   month later, the second hurricane hit, and that

6   contributed to allocation issues and overlifting

7   penalties and extreme volatility in price on the

8   street.  And that took months to recover from.

9   Q.    You wouldn't have expected the Glenns to

10  continue to sell your gas without being paid the

11  commissions that they were entitled to, would you?

12  A.    No.

13  Q.    Did you recognize that GLeS was responsible

14  for maintaining the equipment at the site?

15  A.    The gasoline equipment, yes.

16  Q.    As opposed to what other equipment?

17  A.    Well, because they were commissioned operators

18  on the gasoline pumps, it was our responsibility to pay

19  the cost related to the gasoline pumps.

20  Q.    How about diesel?

21  A.    No.  They purchased fuel from us and then they

22  in turn resold it to the public and they captured all

23  the margins.

24  Q.    Is diesel fuel considered motor fuel?

189

Mark Greco

1    A.    It is one of many types of motor fuel.

2    Q.    And if you will look in the commissioned

3    agency agreement at Paragraph 12, the one that you

4    recognize as being the agreement -- it's at Page 110 --

5    Paragraph 12, second sentence says, "Motor fuel

6    dispensing equipment shall at all times be maintained

7    by principal."

8              Do you see that?

9    A.    Yes.

10   Q.    Did you do that?

11   A.    I believe there's another statement somewhere

12   in this contract that further qualifies that.

13   Q.    In what way?

14   A.    I believe it's in the loaned equipment

15   agreement.  I need to go through the agreement real

16   quick.

17              On No. 114, equipment loan agreement,

18   No. 2 refers to customer, which is defined up top as

19   BCG, Incorporated, Laurel Oasis.  "Maintenance customer

20   shall maintain said equipment in good condition.  In

21   the event of partial or total destruction of all or any

22   of the same, shall reimburse seller for damage to

23   equipment or cost of replacement or restoring the

24   equipment."

Mark Greco

1    Q.    So you took that to mean that you would be

2    responsible for only the gasoline equipment?

3    A.    It also goes on further in No. 6 and

4    says, "Any and all additional equipment loaned or

5    installed or placed for the use of the customer," and

6    the diesel equipment was for the use of the customer,

7    not for us.  They were selling diesel product to their

8    customers, not our customers.  They were our customer.

9    Q.    Right.

10   A.    "Shall be deemed to be loaned upon the terms

11   of this agreement," and going back above it said that

12   loaned equipment was their responsibility to repair.

13   Q.    And because you had inherited this customer

14   from Peninsula --

15   A.    Yes.

16   Q.    -- did you go back to Peninsula and say, what

17   was the deal here, what were you doing with the Glenns?

18   A.    At some point I'm sure that I did, and the

19   problem with Peninsula's records were a lot of things

20   were either handwritten or John Willie, who is the

21   current president, was not in any capacity of his

22   father -- his father was -- and his father passed away

23   from cancer shortly before.  And either records were

24   unavailable or they couldn't find them.  I think they

191

Mark Greco

1   said they had a flood, or something, and all their
2   records were destroyed at one point.  It was very, very
3   difficult to get any information from them.  So we were
4   governed by the current contract, which we knew was
5   very specific.
6       Q.    And the commissioned agency agreement that you
7   acknowledge as being an agreement that was in effect
8   also seems to be very specific when it says that the
9   motor fuel dispensing equipment shall at all times be
10  maintained by principal?
11      A.    Motor fuel could be aircraft fuel, it could be
12  anything.
13      Q.    Did you believe that GLeS was obligated to set
14  retail prices at this location that would be
15  competitive?
16      A.    How do you define competitive?
17      Q.    Well, I'm asking you whether you believe --
18  you have been in the business 30 years; right?
19      A.    Obviously, any responsible marketer takes into
20  account all the factors that are related to the sale
21  and attempts to give the best price that they can on
22  any given day.
23      Q.    If a location is not competitively priced, the
24  location is likely to lose volume, is it not?  Is that

192

Mark Greco

1  correct?

2      A.     Yeah, yeah.

3      Q.     And --

4      A.     There's other factors that go into being

5  competitive, though.  There's competitive offerings.

6  You asked me a question earlier about why do you put

7  quick lubes and car washes and those type of things in.

8  The purpose of being competitive is to offer as many

9  possible services to your customer to give them reasons

10  to come to your facility, and it's not all price.  It's

11  cleanliness and customer service and offerings and

12  many, many different things that make you competitive.

13      Q.     I'm glad you mentioned that.  In connection

14  with either of these locations, did you ever do

15  appearance and cleanliness audits, inspections?

16      A.     Yes.

17      Q.     I haven't seen any of those, but I am

18  assuming, and I have never seen any letters of default,

19  that the locations in your mind were being properly

20  maintained?

21      A.     I have to go back in our records to find out,

22  to pull the inspections.

23      Q.     Were the inspections done on forms?

24      A.     I believe that they were.

193

Mark Greco

1    Q.    Do you recall ever sending the Glenns any

2    letter saying that the locations weren't meeting

3    appearance and cleanliness standards?

4    A.    I don't recall.

5    Q.    If I told you that the first commission

6    payment was made in January of 2006, do you have any

7    reason to disagree with me on that?

8    A.    I wouldn't know if that was the first payment

9    or not.  I know they were deducting their own payments.

10   I couldn't tell you which months it was.

11   Q.    And do you know whether after January of 2006

12   any more payments, commission payments were made?

13   A.    I don't know that.

14   Q.    You mentioned earlier, I think, that in your

15   view the contracts were very specific; right?

16   A.    Yes.

17   Q.    Including this provision, it says, at

18   Page 109, that principal shall pay to agent no less

19   than once a month on all motor fuel sales as dispensed

20   through the equipment as follows, and it sets forth the

21   commissions.

22   A.    Correct.

23   Q.    Who was responsible at GLeS for assuring that

24   the commissions were in fact being paid?

194

Mark Greco

1      A.     Our accounting department would have issued

2      the commission payment had they received enough

3      information in order to reconcile the account.

4      Q.     And it's your testimony that if commissions

5      weren't paid, it's because my clients weren't

6      furnishing them enough information to pay the

7      commissions?

8      A.     That's correct.

9      Q.     Was there any distinction between credit card

10     processing that was done for Texaco and then CITGO

11     credit cards at this location between diesel fuel

12     purchases and gasoline purchases?

13     A.     The Ruby system itself is capable of making

14     that determination, distinguishing between the

15     products.

16     Q.     The credit card loan equipment agreement

17     that's at Page 113 of that same exhibit, and this is a

18     poor copy, and I think I have a more legible one if you

19     need to look at it, with respect to the credit card

20     terminal fee and transaction fee, there's an "NA."  Do

21     you see that?

22     A.     Not really.

23     Q.     Let me show you.  We might have to make a copy

24     of this.  I will show you my copy and then we can get a

Mark Greco

1   copy on the break.

2       A.    Okay.

3       Q.    Assuming this was the applicable agreement.

4       A.    This is talking about leasing fees for any

5   leased equipment.  Credit card terminal and electronic

6   printer.

7       Q.    How about bank terminal access fees?

8       A.    That's typical of, and having been a former

9   Texaco rep, there was, I believe it was called -- I'm

10  trying to think of the name of the company.  But there

11  were terminals that were capable of being leased on a

12  monthly basis.  If your Ruby system or G-cell or

13  whatever pump controller that you had was not capable

14  of processing, you could lease a piece of equipment

15  from the credit card company.  I don't know if it was

16  VeriFone or Data Card -- I forget what the name of it

17  was -- but they had machines that you could lease.

18      Q.    Do you know whether under Peninsula Oil,

19  whether my clients paid any credit card fees with

20  respect to this site?

21      A.    They told us that they didn't.  I went back to

22  Peninsula and they couldn't really tell us much of

23  anything.  They couldn't distinguish between gas and

24  diesel.  I don't know that they were sophisticated

196

Mark Greco

1    enough to do it.

2        Q.    And so your position was that fees would be

3    charged on diesel and not on gas?

4        A.    Yeah.  The contract doesn't provide for them

5    not to pay it, and they were paying it at their other

6    location and every other dealer in this business

7    everywhere is paying it.  It's customary, it's part of

8    the business.  And where we were the dealer, quote

9    unquote, in the gas operation, we paid the credit card

10   fee related to the gas operation and they paid it for

11   the diesel.

12       Q.    Regardless of what had been the practice under

13   the contracts that you stepped into?

14       A.    I don't know what the practice was, but we

15   followed the agreement.

16       Q.    Show me in the agreements as you believe them

17   to be where it says that?

18       A.    It doesn't say that they don't pay it and it's

19   customary for every dealer in this industry that they

20   pay it.

21       Q.    Except in their case it wasn't customary?

22       A.    So they say.

23             Actually, in the agreement that you just

24   pointed out to me on 113, while it says NA at the top,

Mark Greco

1    there's a note that says, "Bank terminal fees.

2    Expressed maintenance fees are subject to any changes

3    that the bank or credit card company may make from time

4    to time, if any."

5              I think -- it also talks about retailer

6    agrees to be responsible to Peninsula for the

7    performance of their employees using the automated

8    system and handling credit cards and other further

9    changes as may be made to the program from time to

10   time.

11             Credit card fees change frequently.

12   They were across the board, they used to be three

13   percent of sales.  Then they were some percent plus a

14   transaction fee.  They have changed.  They have

15   evolved, as you know, over the years.

16   Q.    Did you ever point that out to my clients?

17   A.    I don't know if I did or not.

18   Q.    How were my clients making payments to you?

19   Were they by check or by EFT transfers or how was it

20   being done?

21   A.    I believe they were initially on checks, and

22   then they went on to EFT, and then they later went back

23   on to checks.

24   Q.    Why did they go back to checks?

198

Mark Greco

1    A.    I guess they felt they wanted to have better

2    control.

3    Q.    Let me direct your attention to Exhibit 56.

4              Can you identify that for me?

5    A.    It appears to be a fax from Pat.  I assume she

6    worked for the Travel Plaza.  To our office.

7    Q.    Do you know what these are showing, these

8    faxes are showing?

9    A.    This, again, looks like a report off of the

10   Tokheim diesel console.

11   Q.    Do you know why these would have been faxed to

12   your office?

13   A.    The second page is a credit card settlement

14   from CITGO.  So is the third page and the fourth page.

15   I don't know.  This is incomplete.

16   Q.    Credit card settlements, how were those

17   handled?

18   A.    It shows, the third page in at the top shows a

19   breakdown of products.  Gallons and dollars.  It breaks

20   out what credit cards were processed for unleaded,

21   premium, diesel, mid-grade, and so on.

22   Q.    Do you know why these were being faxed?

23   A.    It was probably one of the reports that we

24   requested them to fax to us.

199

Mark Greco

1    Q.    Tell me what 57 shows.

2    A.    57.

3              I'm not sure.

4    Q.    This is an accounting report of yours, is it

5    not?

6    A.    Yes, it is, but I'm not an accountant.

7    Q.    It is showing deposits, correct, or it appears

8    to be?

9    A.    It appears to be.

10   Q.    Deposits that were coming from Laurel Oasis to

11   CITGO?

12   A.    It's possible that that's what that is.  I

13   don't know.

14   Q.    How about 58, do you recognize that exhibit?

15   A.    Yes, it appears that dispatcher was responding

16   to Shelly Domingo.  She must have made a request for

17   him to send information.

18   Q.    And when he says to her that I have been

19   receiving your messages regarding the retail gasoline

20   prices and I cannot personally, do not have the

21   authority to determine what gas price should be posted

22   at station.  I have been passing your notes on to

23   appropriate staff.  They have met with the owners of

24   Laurel Oasis regarding this issue.  If you have any

200

Mark Greco

1  questions.

2    A.    Yes.  He is our dispatcher and does not have

3  pressing authority.  All he would do is take the

4  message.

5    Q.    Do you know whether Shelly was transmitting

6  complaints from time to time about the retail prices at

7  the station?

8    A.    Well, it's typical in this business you only

9  hear from someone when they are not happy, but when

10  they are happy you don't hear from them.  So this is an

11  example of one incident.

12    Q.    Exhibit 59, this was, I guess, the letter that

13  was sent out to the customers of Peninsula announcing

14  that they were going to be transferring their business

15  to you; right?

16    A.    Yes.

17    Q.    Exhibit 60, that's Chad supplying Shelly the

18  form that he wants her to fill out to send prices,

19  right, and reconciliations?

20    A.    Yes.

21    Q.    Showing purchases and inventory, beginning and

22  ending inventory would show sales, would it not?

23    A.    Well, it would show variance.  Sales is up at

24  the top.  Sales is the very first line at the very top.

Mark Greco

1    Q.    Was this the form that they wanted to -- well,

2    saying we need the top portion sales and retail price,

3    including competition, completed; right?

4    A.    I think he was attempting to address her

5    concern about competitive pricing, so he asked her to

6    make sure to send this information every day with sales

7    and these specific competitors' prices every day.

8    Q.    61, tell me what that is?

9    A.    It appears to be a breakdown of credit card

10   receipts.  Based on the credit card settlement, it must

11   have identified what type of products made up the

12   credit card settlement.

13   Q.    Do you know whether that included credit card

14   fees or not?

15   A.    I don't.

16   Q.    How about the pages starting at 1015.

17   A.    This looks like an activity report, credit

18   cards we received and credit cards we paid.

19   Q.    How about Page 1019, what is that?

20   A.    It's a spreadsheet prepared by someone in an

21   attempt to establish commissions.

22   Q.    Page 1020, what's that?

23   A.    Some kind of internal accounting report.  That

24   has to be incomplete.

202

Mark Greco

1    Q.    Why is that?

2    A.    Because it appears from a one-month period of

3    time we made $17,000 when the entire duration of -- I

4    don't know how many months it was -- but over the

5    entire duration, that this is probably half of the

6    income that we made the whole time we were there.

7    Q.    You made pretty big margins as a result of the

8    hurricanes, did you not?

9    A.    It's very possible.  Price was very volatile

10   during that time.

11              If this is accurate, which I don't know

12   that it is, but if it is, then there must have been

13   other months that offset this income with losses.

14   Q.    Would there be statements like this for the

15   other months for my clients' locations?

16   A.    By month?  We actually produced as part of

17   Exhibit 75, we produced the entire duration of time.

18   Q.    I think that was the only period that there

19   was one of those for that had been produced.  I will

20   just add that to my list.  If you think you have them

21   for the other periods.

22              How about Exhibit 62?

23   A.    It is from Pat to our office.  It appears to

24   be an attempt to reconcile commissions.

203

Mark Greco

1    Q.    And this is suggesting there was a commission

2    due from September 1st to November 29th; right?

3    A.    That's what it says.

4    Q.    How about Exhibit 63?

5    A.    It appears to be an attempt to get their

6    account caught up on any past due commissions with

7    someone's comment on it that there's a difference of

8    $768.  I guess between our accounting department and

9    their accounting department they still didn't agree on

10   the number.

11   Q.    You don't know for sure what this is; right?

12   Is this a Sweet Oil-generated document?

13   A.    It appears that it is, yes.  At least some of

14   it.  The first page is a check stub.  The second page I

15   don't believe is a Sweet Oil document.

16          The third one looks like it is a Sweet

17   Oil document.  The fourth one isn't.  It is a mishmash

18   of different documents here.

19   Q.    How about 64?

20          It seems to be an e-mail from you to

21   Bill Glenn dated December 27th, 2005.

22   A.    Yes.  This was during the time that we were

23   talking about terminating the existing agreements and

24   we had offered them the opportunity to become

204

Mark Greco

1   distributors of their own, and that's what this is.

2       Q.     Exhibit 65 is a letter dated March 15th, is it

3   not?

4       A.     Yes.

5       Q.     And this was telling you you are no longer

6   authorized to EFT monies from their account; correct?

7       A.     Yes.

8       Q.     And then it also says, "Per our account, agent

9   shall pay to principal net ten days from billing the

10  sums received from the sale of gasoline and agent will

11  pay for diesel fuel ten days from billing date."

12              And that was referring back to contract

13  language; right?

14      A.     Okay.

15      Q.     And you then received another letter from my

16  clients, did you not, dated July 11th, 2006?  It is

17  Exhibit 66, which I think you have already identified;

18  right?

19      A.     Yes.

20      Q.     And I think we have talked about Exhibit 67,

21  or maybe not.  Exhibit 67 is your response, is it not?

22      A.     Yes.

23      Q.     In Paragraph 3, you state that, starting at

24  the top of Page 2, "your contract" -- and I'm in the

Mark Greco

1    fourth line down -- "Your contract states, you will

2    purchase all gasoline at 'retail posted price less

3    commission' and diesel fuel at 'our posted full

4    transport price' at time of delivery.  There's a

5    footnote which states 'not to exceed Salisbury rack

6    prices by more than two-and-a-half cents per gallon.'"

7              And then you say, "In fact, we have been

8    charging you Salisbury rack price plus only one cent

9    per gallon, which means we have the right to charge you

10   more than we have been charging you in the past."

11             Do you see that?

12   A.    Yes.

13   Q.    The asterisk footnote was in the 1990

14   contract, was it not?

15   A.    Yeah.  I must have been incorrectly quoting

16   this.  I must have looked at the 1990 agreement, which

17   they had furnished me later.

18             I don't know.  Maybe it was attached to

19   his letter.  Maybe that's why I was reading from that.

20   Q.    Then you say in Paragraph 5 that in the second

21   sentence, "In fact, we paid you for the period of

22   September 2005 through January 2006 based on our best

23   estimate of what we believe due to you since you have

24   refused to provide us with the daily sales reports,

Mark Greco

1  which are VeriFone Ruby equipment, loaned equipment,

2  provides."

3           Do you see that?

4      A.    That's correct.

5      Q.    In fact, the payment that you made in January

6  of 2006 was exactly the amount that the Glenns told you

7  was owed, was it not?

8      A.    No, it wasn't, because the fax that you just,

9  we just went over a minute ago said there was a

10  difference.   Exhibit 63.

11     Q.    And is it your testimony that there was not a

12  later communication that told you what amount was owed

13  and the amount that was ultimately deposited into their

14  account?

15     A.    Again, I'm not an accountant and I didn't work

16  in the accounting department, but based on five minutes

17  ago when we went over that last exhibit, it showed that

18  there was still a variance.

19     Q.    Which exhibit?

20     A.    63, I think it was.

21     Q.    63, I think, was the document I think you said

22  you couldn't identify everything that was in that

23  exhibit; right?

24     A.    I couldn't tell you who generated each of

Mark Greco

1   these reports.  But it appears to be an attempt to

2   reconcile commissions due.

3       Q.    You knew based on the Glenns' letter to you of

4   July 11th that they deemed the contract terminated;

5   correct?

6       A.    They felt that they had the right to

7   unilaterally terminate, which they didn't have that

8   right.

9       Q.    Well, they did terminate it, though, did they

10  not?

11      A.    They believed they did.  We don't recognize it

12  as terminated.

13      Q.    They didn't buy any more gas from you; right?

14      A.    No.

15      Q.    They didn't buy any more diesel from you;

16  right?

17      A.    No.

18      Q.    And then you sent a letter dated July 19th,

19  which is Exhibit 68, did you not?

20      A.    I did not.

21      Q.    Mr. LeRoy did?

22      A.    Yes.

23      Q.    And he sent that to, I assume, all the people

24  who are copied on the letter?

208

                        Mark Greco

1     A.    Yes, correct.

2     Q.    And the purpose of that letter was to

3   discourage anybody else from selling fuel to my

4   clients, isn't that right?

5     A.    It was to enforce our rights under our

6   contract.

7     Q.    And you advised them that Sweet Oil has

8   initiated legal action to enjoin any company from

9   selling and/or transporting any motor fuel.

10                  Do you see that?

11    A.    Yes.

12    Q.    And in fact, you had not initiated any legal

13  action, had you?

14    A.    I don't know if anything was filed with the

15  court, but we were talking to the attorneys about it at

16  that time.

17    Q.    And then you say, "Said legal action may

18  include a lawsuit seeking an injunction"; right?  You

19  didn't do that, did you?

20    A.    We are here.  I don't know what --

21    Q.    You didn't seek an injunction, did you?

22    A.    No, we didn't.

23    Q.    And in fact, my client sued you, didn't they?

24    A.    And we countersued.

209

Mark Greco

1    Q.    And in fact, by July you were heavily into

2    negotiations with GPM by that point, were you not?

3    A.    I don't know what the term heavily, but we

4    were in discussions with them, yes.

5    Q.    But it was your intention in sending this

6    letter to discourage others from dealing with my

7    clients?

8    A.    Absolutely.

9    Q.    Because you knew if you sent this letter to

10   enough people and they couldn't buy gas from anybody,

11   that they'd have to come back to you?

12   A.    No.  We were trying to enforce our rights

13   under the agreement and we were notifying other

14   innocent distributors of our legal contractual rights

15   so that they didn't put themselves into a position of

16   jeopardy.

17   Q.    Well, if you were trying to enforce your

18   rights under the agreement, you would have filed a

19   lawsuit, right, either seeking damages or seeking to

20   prevent my clients from terminating the contract?

21   A.    Is that a question?

22   Q.    Yes.

23   A.    We eventually did and we are here.

24   Q.    You filed a counterclaim months later after we

210

Mark Greco

1  sued you?

2    A.    Yes.  I don't know what the exact timing of it

3  was.

4    Q.    Did anybody call you in response to that

5  letter, any of these suppliers?

6    A.    It's possible they did at the time.  I don't

7  know.

8    Q.    Had you ever received a letter like this from

9  somebody else?

10    A.    Yes.

11    Q.    You had?

12    A.    Yes.

13    Q.    And who had you received a letter like this

14  from?

15    A.    I don't remember exactly who it was.  I think

16  there was an incident in Philadelphia at some point

17  that a distributor sent us to put not just us, but to

18  put all distributors who were authorized to deliver in

19  the area on notice that one of their customers was

20  attempting to make a unilateral breach of their

21  agreements.

22    Q.    And when you got that letter, you wouldn't

23  supply that party; right?

24    A.    Absolutely not.

211

Mark Greco

1    Q.    So you knew it was likely that if you sent

2    this letter to all these other parties that it was

3    unlikely that they would want to do business with my

4    client, because the last thing they would want to do

5    was get involved in a lawsuit?

6    A.    Correct.

7    Q.    And you were, through this letter, essentially

8    notifying them that if they supplied my client, that

9    they would be interfering with this contract that you

10   had with my client; right?

11   A.    That's correct.

12   Q.    Except that my client had terminated that

13   contract; right?

14   A.    They didn't have the ability to terminate the

15   agreement.

16   Q.    Well, they sent you a letter that said it was

17   terminated; right?

18   A.    So they -- it was their wish to terminate, I

19   guess, but they did not have the right to terminate.

20   Q.    After that letter was sent, you never did

21   business with them again at that location, did you?

22   A.    No.  We continued to do business with them at

23   the Delmar location.

24   Q.    Under separate contract; right?

212

Mark Greco

1    A.    Under separate contract.  And it was our hopes

2    that we wouldn't have to go to litigation.  We were

3    continuing to supply them at another site.

4    Q.    My client responded to your letter by sending

5    you Exhibit 69, did it not?

6    A.    Exhibit 69 is the EFT letter.

7    Q.    I'm sorry.  It got copied wrong.  It should be

8    a letter dated July 20th.

9    A.    That says 69.

10    Q.    What's the next one?

11    A.    70 is --

12    Q.    Dated July 20th?

13    A.    A letter dated July 20?

14         MR. STORM:  Everybody take sticker 69 and

15    put it on 70 and put 70 on 69.

16         MR. HUTCHISON:  Just to keep the record

17    straight, 69 is 65.  So it's already a marked document.

18         MR. STORM:  I will change mine.  69,

19    these got mixed up when they were copied, it looks

20    like.  Everybody's appears to be right but mine.

21         So your 69 is the same as 65?

22         MR. HUTCHISON:  Yes.  It is a March 15th

23    letter.

24         MR. STORM:  So March 15th, mark that 69,

213

Mark Greco

1    but it is a duplicate of 65.  And Exhibit 70, then,

2    should be a letter dated July 20th.

3    BY MR. STORM:

4         Q.    Right?  Do you have that there, Mr. Greco?

5         A.    Yes, I have the letter dated July 20th.

6         Q.    And that was in response to your letter of

7    July 11th; correct?

8         A.    It's referencing past agreements.  It doesn't

9    reference the current agreement.  It references the

10   1990 agreement.

11        Q.    The body of the letter says, "We are in

12   receipt of your letter dated July 11th, 2006"; right?

13        A.    Yes.

14        Q.    And that was the letter we were just talking

15   about; correct?

16        A.    Yes.

17        Q.    Your letter of July 11th was your response to

18   my client's letter, which was your letter that was

19   Plaintiffs' Exhibit 67.

20        A.    Okay.

21        Q.    You got that letter from my clients, didn't

22   you?

23        A.    I believe we did.

24        Q.    How about 71, do you recognize that?

Mark Greco

1    A.    This is something that dates back to March.

2    Q.    Do you recognize it?

3    A.    I recognize it as a memo from my office.  I

4    didn't generate this.

5    Q.    I understand.

6          When it is talking about Coraluzzo has

7    revised your transportation rate for diesel from .0202

8    to .0209, how would that have been done by Coraluzzo?

9    A.    I don't understand the question.

10   Q.    It says Coraluzzo has revised your

11   transportation rate.  Would Coraluzzo have notified you

12   that your rate was going up for deliveries to this

13   location?

14   A.    They probably notified us that it was going up

15   to all locations and we sent out a memo like this

16   probably to every single location.

17   Q.    How was it determined that the rate was .0202

18   for this location?

19   A.    When they priced for us, they would price it

20   out by site.  Again, as I said before, the price to

21   each location was unique based on miles and tolls and

22   many other factors.

23   Q.    And was there something from Coraluzzo that

24   told you that, what the prize was to each location?

215

Mark Greco

 1     A.     There probably was.

 2     Q.     And what would that have been, a summary sheet

 3  of some kind?

 4     A.     Well, it would have been by location or by

 5  city, most likely.  From terminal to a city.

 6     Q.     So each location's freight rate varied?

 7     A.     Yes.

 8     Q.     From Coraluzzo?

 9     A.     Yes.

10     Q.     Let me ask you about Exhibit 72.  Do you

11  recognize these documents?

12     A.     Yes.

13     Q.     And what are they?

14     A.     They are documents that Laurel Oasis must have

15  sent to us either by fax or mail.

16     Q.     And this is telling you what the competitors'

17  prices are, right, retail prices?

18     A.     It was intended to do that, yes.

19     Q.     And when you look at these and receive these,

20  how did you make a determination what retail price to

21  set on gasoline at Laurel Oasis?

22     A.     We couldn't make that determination just on

23  this information.  First off, this information was

24  proven to be inaccurate.  There were many occasions

216

Mark Greco

1   when we would send our sales rep by, either we would

2   not receive this information or it would be inaccurate,

3   and we would ask someone to go by there and validate.

4   And the numbers that were on here were inaccurate.

5            There were other times that they just

6   wouldn't give it to us at all, and I don't know if

7   these, this particular sampling is complete or

8   incomplete.

9       Q.    This is just a sample.  I picked out a sample

10  of these documents so that we could establish that you

11  were receiving documents like this.

12      A.    It is incomplete.  And the closest competitor

13  to their location doesn't have any prices.

14      Q.    Which was what?

15      A.    The Sunoco.

16      Q.    On what, one of the pages you are looking at?

17      A.    On any of the pages that I see here.  It

18  appears that they crossed Sunoco out.

19      Q.    Was Sunoco a full service location?

20      A.    It may have been.

21      Q.    And were there prices posted for full serve?

22      A.    I don't know off the top of my head.

23      Q.    If you look at Page 0618, Shelly Domingo

24  frequently wrote notes like that, did she not?

217

Mark Greco

1    A.    It's very possible.  I didn't receive these

2    reports.

3    Q.    And when she would write, "As per our

4    contract, the price shall be competitively priced with

5    locations in that area, can we please get closer to our

6    competitors' prices," would somebody in your office

7    bring that to your attention?

8    A.    It's very possible that they may have, but in

9    the current agreement it doesn't say anything to that

10   effect.  Now, it is our intention to be as competitive

11   as possible, but there's nothing that says specifically

12   that we need to be, quote, competitive, and there's

13   nothing that defines competitive as a specific range or

14   anything else.

15   Q.    And on the same exhibit, Page 640, if she

16   writes, "Per our contract it states we must be

17   competitive!  Are we going to price our gasoline

18   competitive or not?  These prices have been 10 to 20

19   cents higher for the last eight months," did anybody

20   write to her and say, that's not in your contract?

21   A.    I don't know that anyone would discuss the

22   contract with her.  She's not on the contract.

23            And on the particular day she wrote that

24   we were 10 to 20 cents higher, according to the

218

Mark Greco

1    information that she provided, we weren't 10 to 20

2    cents higher.

3        Q.    Let me ask you about 74.  I think you

4    mentioned earlier that you got documents from Peninsula

5    that related to the incentive monies that had been paid

6    to Peninsula prior to your taking over the contract.

7    Is that what these documents are?

8        A.    Yes, it appears that's what this is.

9              MR. STORM:  Let's take about five

10   minutes.  I think I am about finished.

11             (P-77 was marked for identification.)

12   BY MR. STORM:

13       Q.    Let's look at Exhibit 77.  Are you able to

14   identify that document?

15       A.    It's a bank statement from Bank of Delmarva.

16   It doesn't have the name of the account holder on it.

17       Q.    GLeS, Inc., there is an entry you will see on

18   January 17th in the amount of 5,506.08, do you see

19   that?

20       A.    Yes.

21       Q.    If you look back, Mr. Greco, at Exhibit 62,

22   which was the fax from Pat at my client's office to

23   Sweet Oil dated December 9th, 2005, that stated the

24   commission due was 5,506.08, do you see that?

219

Mark Greco

1    A.    Yes.

2    Q.    The same amount?

3    A.    Yes.

4         MR. STORM:  I think those are all the

5    questions I have.

6    BY MR. YOUNG:

7    Q.    Put P-2 in front of you.

8         Mr. Storm asked you some questions about

9    this document and I have a few more.

10        Do you know who drafted this agreement?

11   A.    No, I don't.

12   Q.    At the bottom it has what appears to be a word

13   processing label, do you see that "C:/"?

14   A.    Yes.

15   Q.    At the end it says "SweetOil.doc."  Does that

16   refresh your recollection or give you any indication as

17   to whether Sweet Oil may have drafted this?

18   A.    We did not draft this.

19   Q.    Do you know whether Sunoco drafted it?

20   A.    Yes.  I can go back in my e-mails and find

21   out.  I don't know if it is in here or if it is in

22   other discovery.  But it was e-mailed to me and we

23   printed it and signed it and then sent it back to

24   Dolores.

220

Mark Greco

1  Q.   And do you think it was Dolores who sent it to

2  you?

3  A.   She would have sent it, but I don't know who

4  would have drafted it.

5  Q.   The reason I ask --

6  A.   It actually says Sunoco Engineering at the

7  top.

8  Q.   That appears to be a fax.  Let me ask this

9  question:  Do you know why there's not a signature line

10  typed into the document for Sunoco on the last page

11  that's marked SO 73?

12  A.   If there's not a signature line, I have no

13  idea.  It appears that Jeff Byard handwrote it in.

14  Q.   That's my question, I was wondering why it

15  wasn't typed in?

16  A.   I don't know.  I don't know who generated this

17  document.

18  Q.   Paragraph 7 states, "Assignee acknowledges --

19  and the assignee is you, Sweet Oil -- "acknowledges

20  that two currently branded Mobil retail sites are

21  subject to a certain Tosco distributor image incentive

22  program agreement as follows:

23           "Duck-In #2, 5610 Market Street, Snow

24  Hill, Maryland, unamortized balance as of 6/30/05

Mark Greco

1    $14,270, full amortization 3-31-11."

2              Did I read that part of Paragraph 7

3    correctly?

4      A.    Yes.

5      Q.    And then a subpart of Paragraph 7, which is

6    entitled B, says, "Delmar Mobil, 9521 Ocean Highway,

7    Delmar, Maryland.  Unamortized balance as of 6-30-05,

8    $112,077.  Full amortization 7/31/12.  Incentive three

9    cents per gallon to be paid through July 31, 2006."

10              Did I read that part of Paragraph 7

11    correctly?

12      A.    Yes.

13      Q.    The Delmar Mobil Tosco distributor image

14    incentive program, if you would turn to Plaintiffs'

15    Exhibit 6.  Is what has been marked as Plaintiffs'

16    Exhibit 6 what Paragraph 7 B of the assignment and

17    assumption agreement is referring to?

18      A.    Yes, it appears to be.

19      Q.    In Subparagraph A, it's referring to Duck-In

20    #2.

21              MR. YOUNG:  Why don't we mark this as 78.

22              (Exhibit 78 was marked for

23    identification.)

24              MR. YOUNG:  For the record, we will mark

222

Mark Greco

1    as Exhibit 78 a two-page document which is entitled

2    Tosco Distributor Image Incentive Program Agreement

3    Mid-Atlantic.

4    BY MR. YOUNG:

5        Q.    I hand this to the witness.  It is the Duck-In

6    #2 Tosco Distributor Image Incentive Program Agreement.

7                    Have you had an opportunity to review

8    what we have marked as Exhibit 78, Mr. Greco?

9        A.    Yes.

10       Q.    Is that agreement that you have and is marked

11   78, is that what is referred to in Paragraph 7 A as the

12   Duck-In #2 Tosco Distributor Image Incentive Program?

13       A.    I believe it is.

14       Q.    When you signed this agreement in September,

15   August or September 2005, you understood based upon

16   Paragraph 3 that it was Sunoco's intention to convert

17   the Duck-In #2 Mobil and the Delmar Mobil to the Sunoco

18   brand; correct?

19       A.    Yes.

20       Q.    What was your understanding as to what would

21   happen to the two agreements that are referenced in

22   Paragraph 7 once there was the conversion of those

23   stations from a Mobil branded station to a Sunoco

24   branded station?

Mark Greco

1     A.     The way I understood it was that these would

2     continue to amortize for the remainder of whatever

3     duration was left, or they were actually given an

4     opportunity to extend their term and they were offered

5     another additional incentive over and above this

6     incentive.

7     Q.     Where did you get that understanding from?

8     A.     It came from Dolores in the offering package

9     that she sent to us.

10     Q.     Dolores Love at Sunoco?

11     A.     Yes.

12     Q.     So you understand that there were balances due

13     on these agreements?

14               MR. HUTCHISON:  Objection.

15     BY MR. YOUNG:

16     Q.     You can answer.  Well, I will be more

17     specific.  In Paragraph 7 A, there's an unamortized

18     balance as of June 30th, 2005 of $14,270; correct?

19     A.     Yes.

20     Q.     Was it your understanding that if that

21     agreement terminated on June 30th, 2005, that there

22     would be a penalty of $14,270 to be paid?

23               MR. HUTCHISON:  Objection.

24               THE WITNESS:  On face value, yes.

Mark Greco

1  However, Sunoco, in one of the correspondences, had

2  agreed that they were going to waive the Duck-In

3  location amortization.

4  BY MR. YOUNG:

5      Q.    Was it your understanding that as of

6  June 30th, 2005, with regards to the Delmar Mobil, that

7  if that agreement terminated on that date, there would

8  be $112,077?

9              MR. HUTCHISON:  Objection.

10             THE WITNESS:  Yes.

11 BY MR. YOUNG:

12     Q.    But it was your understanding that if these

13 retail locations continued to purchase motor fuel

14 through you and through Sunoco, the purchases would

15 amortize this balance to zero by the dates that are

16 reflecting at 7 A and 7 B?

17             MR. HUTCHISON:  Objection.

18             THE WITNESS:  Yes.

19 BY MR. YOUNG:

20     Q.    Now, Dolores Love, you testified Dolores Love

21 told you that Sunoco would honor these agreements even

22 for Sunoco fuel; correct?  Let me rephrase that.  That

23 was a bad question.

24                 You understood from Dolores Love that

Mark Greco

1    Sunoco was willing to amortize these balances going

2    forward based on purchases of Sunoco motor fuel;

3    correct?

4        A.    Based on Sunoco fuel, yes.

5        Q.    But if these two retail locations did not

6    become Sunoco's and, say, went to another brand, was it

7    your understanding when you signed this agreement that

8    this unamortized balance would have to be paid --

9                 MR. HUTCHISON:  Objection.

10   BY MR. YOUNG:

11       Q.    -- whatever that balance was at the time?

12       A.    Yes, I believe so.

13       Q.    Paragraph 3 of this agreement --

14       A.    Which agreement?

15       Q.    Plaintiffs' Exhibit 2.

16       A.    Okay.

17       Q.    It says, "Assignee agrees that the locations

18   supplied Mobil brand Mobil fuel under the expiring

19   agreement will be rebranded Sunoco promptly in

20   accordance with a schedule."

21                 Does rebranding in your mind mean

22   converting from Mobil to Sunoco?

23                 MR. HUTCHISON:  Objection.

24                 THE WITNESS:  Yes, it contemplates change

Mark Greco

1    of brand from Mobil to Sunoco.

2    BY MR. YOUNG:

3        Q.    As of the time you signed this agreement,

4    that's what you understood would happen; correct?

5                    MR. HUTCHISON:  Objection.

6                    THE WITNESS:  Yes.

7    BY MR. YOUNG:

8        Q.    We talked about this EOL for Mobil or end of

9    life --

10       A.    Yes.

11       Q.    -- and I think you testified it was based on a

12   tandem platform that some Mobil branded locations had?

13       A.    The way it was explained to me, I don't think

14   it was from Dolores.  One of the e-mails would have the

15   name of the Sunoco engineer, whoever it was, that

16   explained it to us, but that of the three Mobil sites

17   that we were supplying, the Doughboy's location was the

18   only one that was not compatible with this change, and

19   that required some change to be made to the equipment

20   or to the software or whatever it was.

21       Q.    And that was a compatibility with something

22   that Mobil had or ExxonMobil had?

23       A.    I don't know if it was with ExxonMobil merging

24   their two tandems, or I don't know who all this -- I'm

227

Mark Greco

1   not an engineer.

2             I know that there was a requirement, and

3   Exxon sent the initial letters and then we got contact

4   from Sunoco saying that this needed to be done for them

5   to continue.  And based on the conversion schedule and

6   the end of life of their particular location, first

7   they lost the ability to accept debit cards.  Then they

8   lost the ability to accept Speedpass.  And then

9   eventually they lost the ability to process any credit.

10   Q.    And what did they need to do in order to be

11   able to maintain their ability to accept debit cards,

12   Mobil credit cards and any credit card?

13   A.    Well, we went to Vernon, as it stated in one

14   of these exhibits, we went to Vernon of JCV, who is

15   right in Salisbury near the location, a large pump and

16   tank repair contractor, and asked him what was

17   necessary.  He was very familiar with all their

18   equipment, and he told us it was approximately $4,500

19   to do whatever work was necessary.  And I don't know

20   specific, if it was hardware, software, but he gave us

21   a ballpark of approximately 4500 to make that change.

22   Q.    And who was going to have to pay that money?

23   A.    The dealer.

24   Q.    I think you mentioned under Mr. Storm's

228

Mark Greco

1   questions that if the dealer agreed to convert to

2   Sunoco, that that was an expense Sunoco was going to

3   bear?

4       A.    Not that cost.  The eventual cost of changing

5   from that platform to Sunoco's network.

6       Q.    The platform that the dealer had when you took

7   over the Delmar Mobil supply agreement, was that an

8   equipment that the dealer owned?

9       A.    Yes.

10      Q.    And is that why it was their responsibility to

11  purchase?

12      A.    Yes.

13      Q.    The next platform?

14      A.    Yes.  It's required in their supply agreement.

15      Q.    The EOL issue with ExxonMobil as you have

16  described it, was that peculiar just to Mobil stations

17  in the Mid-Atlantic area that were converted to Sunoco

18  stations, or was that, to your knowledge, nationwide?

19      A.    The way it was explained to us was it was a

20  complete network issue.  It wasn't specific to a state

21  or a site.  It was their entire network was being

22  changed in some fashion.

23      Q.    So it wasn't particular to Sunoco's conversion

24  of Mobil stations, to your knowledge?

229

Mark Greco

1    A.    No, I don't believe so.

2    Q.    In June of 2006, you received an e-mail, and

3    it was shown to you -- if you need to refresh, we will

4    go to it -- but hopefully we won't need to -- from

5    Dolores Love telling you that the Delmar Mobil was in

6    breach of the agreement.

7              Do you remember that?

8    A.    Yes.

9    Q.    Why were they in breach of the agreement in

10   June of 2006?

11             MR. HUTCHISON:  Objection.

12             THE WITNESS:  Because as part of being

13   branded Mobil, there was an implied, I guess -- I don't

14   know how to say it.  Let me think about it for a

15   minute.

16             MR. STORM:  I will add my objection to

17   this as well.

18             THE WITNESS:  Okay.

19   BY MR. YOUNG:

20   Q.    You can continue.

21   A.    There is an expectation of a Mobil credit card

22   or Speedpass holder that if they go to a Mobil branded

23   site with the Mobil sign and Mobil identification and

24   marks, that their Mobil credit card could be accepted.

230

Mark Greco

1    And the fact that they no longer accepted Mobil credit

2    cards at the Mobil site was viewed as a breach of the

3    Mobil agreement.

4        Q.    Did you also have that understanding in June

5    of 2006?

6        A.    Yes.

7                    MR. HUTCHISON:  Objection.

8    BY MR. YOUNG:

9        Q.    And what could the Delmar Mobil or I'll refer

10   to them as the entity that operates as BCG, Inc., or

11   Chesapeake Products & Services, do to remedy what you

12   and Sunoco perceived to be a breach?

13       A.    Had they made the investment, whether it be

14   through JCV or any other contractor of their choice,

15   they had an obligation to make that necessary agreement

16   to continue to accept.

17                    For approximately $4,500, they have a

18   huge investment in the site and they actually, in some

19   of their correspondences that we went through today,

20   said that it took them four years to build the brand.

21   And part of the reason that they chose that brand was

22   the brand recognition of the customer and the Speedpass

23   and all those other things.  And for $4,000 they just

24   alienated a large segment of those Mobil customers who

Mark Greco

1   they were targeting, who they were hoping to make their

2   customers.

3       Q.    To your knowledge, did Delmar Mobil ever

4   remedy the breach that you and Sunoco perceived?

5       A.    No.

6       Q.    In that e-mail or maybe another one, Doris

7   Love also tells you that they are not only breached,

8   but you cannot supply them Mobil branded product and

9   they need to de-identify the station.

10              Do you remember that?

11      A.    Yes.

12      Q.    Did they ever de-identify the station at any

13  time in the year 2006?

14      A.    Off the top of my head, I don't know the date

15  it was debranded, but we sold them Mobil product up

16  until the time that the Mobil signs came down.

17      Q.    Why did you continue to sell them Mobil

18  product until the -- let me back up a second before I

19  get to that question.

20              Do you know why the location wasn't

21  de-identified or debranded between the time you got

22  that e-mail from Dolores Love and the time it

23  eventually was de-identified or debranded, which I

24  believe based on the documents we have seen today, was

Mark Greco

1  January of 2007?

2    A.    Yeah.  I believe that we were still attempting

3  to resolve the issue, and through the additional

4  incentives that Dolores had offered, we were hoping

5  that we were going to be able to convince the dealers

6  to go to Sunoco.  And we didn't want to sell them

7  anything other than Mobil while the Mobil sign was

8  being displayed.

9    Q.    Did you ever tell Charlie or Billy Glenn that

10  they were in breach of their agreement for not having

11  purchased that equipment?

12    A.    Yes, verbally and in writing.

13    Q.    Did you tell them in June of 2006, after you

14  received Dolores' e-mail, that they needed to

15  de-identify the station?

16    A.    I think we actually did it.  I think that we

17  contacted them -- I think we sent them a written

18  correspondence, but we actually had Adam Gray, who was

19  our sales rep, call them in person first because we

20  didn't want to send a contractor down there to take the

21  signs down and have them tell the contractor to leave.

22  So we verbally contacted them first the day prior to,

23  and then they allowed our contractors to come out and

24  de-identify.

233

Mark Greco

1  Q.   And you are talking about the time they

2  eventually de-identified in January of 2007?

3  A.   Yes.  And we did it at our expense.  We sent

4  our own contractors down to do it.

5  Q.   I guess my question was a little different.  I

6  was asking back in the summer of 2006 when Dolores Love

7  first informed you that Sunoco considered the retail

8  facility to be in breach and they were no longer able

9  to accept Mobil credit cards and told you that the

10 station should be de-identified, at that time, did you

11 take any steps to try to de-identify the station?

12 A.   No, it wasn't an evolving process over a very

13 long period of time .  We talked about it for months

14 and I think it was they are going to have to

15 de-identify or we are going to have to do this, but

16 there never really was a specific date, it had to be

17 done by a certain date until it actually happened.

18 Q.   But at the time that they eventually did

19 de-identify, did you consider Delmar Mobil to still be

20 in breach of the Mobil agreement because of their

21 failure to purchase that equipment?

22          MR. HUTCHISON:  Objection.

23          THE WITNESS:  Can you say it one more

24 time?  I just want to be clear.

234

Mark Greco

1    BY MR. YOUNG:

2       Q.    Did the retail facility known as the Delmar

3    Mobil ever remedy the breach that you and Sunoco

4    identified as having occurred in June of 2006?

5                MR. HUTCHISON:  Objection.

6                THE WITNESS:  No.

7    BY MR. YOUNG:

8       Q.    So on the day that the Mobil station, the

9    Delmar Mobil was de-identified in January 2007, you

10   considered them to still be in breach of the credit

11   card provision of the Mobil agreement?

12      A.    Yes.

13               MR. STORM:  Objection.

14               MR. HUTCHISON:  Objection.

15   BY MR. YOUNG:

16      Q.    Under Mr. Storm's questioning, you described

17   some of the conversations you had with the Glenns about

18   the alternatives.

19      A.    Uh-huh.

20      Q.    One of which was that you could supply them

21   motor fuel through a different brand; correct?

22      A.    Yes.

23      Q.    And that might have been BP.  I think we even

24   saw an e-mail from Dolores Love indicating that she

Mark Greco

1   thought you would offer them BP?

2      A.    Yes.

3      Q.    And if they chose to go to another brand, even

4   though it was supplied by Sweet Oil, was it your

5   understanding that the penalty due under the incentive

6   agreement would still have to be paid?

7                MR. HUTCHISON:  Objection.

8                THE WITNESS:  Yes.

9   BY MR. YOUNG:

10     Q.    And that's because that change of brand would

11  be considered a debrand under the incentive agreement?

12               MR. HUTCHISON:  Objection.

13               THE WITNESS:  Yes.

14  BY MR. YOUNG:

15     Q.    What's your definition of the word, what do

16  you understand the word debrand to mean?

17               MR. HUTCHISON:  Objection.

18               THE WITNESS:  Removal of anything on the

19  property that has the name, any trademarks, any

20  proprietary product names or specific colors.  Any

21  identification signs or marks that relate to the

22  franchise.

23  BY MR. YOUNG:

24     Q.    Would de-identifying the station be the same,

236

Mark Greco

1   in your mind, as debranding the station?

2       A.     Yes.

3                  MR. HUTCHISON:   Objection.

4   BY MR. YOUNG:

5       Q.     And rebranding would just be de-identifying or

6   debranding and then putting in another brand, is that

7   fair to say?

8       A.     Yes.

9       Q.     Can you take a look at Plaintiffs' Exhibit 65.

10      A.     Okay.

11      Q.     This is a letter to you from Charlie Glenn

12  dated March 15, 2006?

13      A.     Yes.

14      Q.     And it is telling you that you are no longer

15  authorized to EFT sweep any monies from any of

16  plaintiffs' checking accounts pertaining to the Laurel,

17  Delaware station; correct?

18      A.     Yes.

19      Q.     Did you ever send a letter like this to Sunoco

20  at any time?

21      A.     I don't believe so.

22      Q.     Did you ever tell Sunoco at any time that it

23  was no longer authorized to EFT sweep any of your bank

24  accounts?

237

Mark Greco

1    A.    I don't know if we did or not.

2    Q.    If you wanted to find out, what would you do

3    to find out?

4    A.    I don't know if I could now.  At the time, if

5    we were still in operation, I would go to our

6    controller, who ran the accounting department.

7    Q.    Who was that?

8    A.    John McTear.

9    Q.    But you personally don't have a recollection

10   of having told Dolores Love or Dan Moore or Jeff Byard?

11   A.    No, I don't believe so.

12   Q.    Why did the Duck-In Mobil not convert to

13   Sunoco?

14   A.    We actually offered them Sunoco and they were

15   going to go Sunoco.  And the problem was that if the

16   Doughboy's location did not convert to Sunoco, we

17   didn't meet the minimum volume requirement, so we

18   actually had to go back to Duck-In and convince them to

19   do something else.

20   Q.    It was your understanding that the way these

21   stations would be converted would be that because you

22   already had an existing Sunoco distributor branded

23   motor fuel agreement, that the conversion to the Sunoco

24   station would essentially mean that you and Sunoco

Mark Greco

1  would continue under the Sunoco distributor agreement

2  and not the assigned Peninsula agreement; correct?

3                MR. HUTCHISON:  Objection.

4                THE WITNESS:  The Tosco Peninsula

5  agreement had expired.  The only agreement we actually

6  had was the Sunoco agreement.

7  BY MR. YOUNG:

8      Q.    How were you able to sell Mobil branded

9  product to Delmar Mobil up through January of 2007?

10     A.    The way it was explained to us was that there

11  was -- they contemplated some rider, which I don't know

12  that we ever signed, but it was going to transfer the

13  Mobil gallons to our Sunoco jobber agreement until they

14  were converted to Sunoco.

15     Q.    Was it your understanding that the Peninsula

16  agreement was extended on a month-to-month basis after

17  September 30th, 2005?

18     A.    No.

19     Q.    Did Sunoco ever tell you that that agreement

20  had expired and Sunoco was no longer honoring it?

21     A.    At the time that we were negotiating to buy

22  Peninsula's business, they were given notice by Sunoco

23  that it was not going to be renewed again and they were

24  trying to, I believe they were trying to get Peninsula

239

Mark Greco

1    to go to a Sunoco agreement.  And at the time we came

2    into the picture, I guess they backed off pressure on

3    Peninsula because we had an existing Sunoco agreement

4    already.  And I think that that was the end result that

5    they were hoping to gain anyway, was to have a Sunoco

6    agreement in place.

7        Q.    But it's your understanding that you had the

8    right to purchase Mobil branded fuel from Sunoco from

9    October 1st, 2005, up until February of 2007?

10       A.    Through our Sunoco agreement, yes.

11       Q.    And it's your understanding that that right

12   derived through the Sunoco distributed branded motor

13   fuel agreement?

14       A.    Yes.

15       Q.    The one dated March 21st, 2003?

16       A.    I believe so.

17       Q.    And where did you get that understanding?

18       A.    That's the way it was explained to me at the

19   time we were doing the assignment, that we were going

20   to have assignment of Peninsula's agreement until it

21   expired on the 30th of September, 2005, at which time

22   there was supposed to be an amendment created that

23   would transfer those gallons to our Sunoco agreement.

24       Q.    Did you ever see such an amendment?

240

Mark Greco

1   A.    To the best of my knowledge, it was never

2   issued.  It was never signed.  But that's how the

3   process was explained to me.

4   Q.    Who explained that process to you?

5   A.    It would have been Dolores Love.

6   Q.    Anybody else?

7   A.    I don't believe so, but it's three years ago.

8   I'm not sure.

9   Q.    Did you ever sign a mutual cancellation

10  agreement of the Mobil branded distributor agreement?

11  A.    No.  It just expired.

12  Q.    Would you look at Exhibit 44.

13          You just explained to me your

14  understanding as of the time you signed the assignment

15  and assumption agreement in August or September of 2005

16  when the process was going to take place.  I would like

17  you to take a look at Plaintiffs' Exhibit 44, which is

18  Mr. Byard's letter dated November 2nd, 2006.

19  A.    Yes.

20  Q.    In this letter, is it fair to say that the Re

21  line says Nonrenewal of Mobil Branded Distributor

22  Agreement?

23          Did I read that correctly?

24  A.    That's what it says.

241

Mark Greco

1    Q.    That's a reference, is it not, to the Mobil

2    agreement that was assigned to you by Peninsula;

3    correct?

4    A.    I don't know if I took it to mean that

5    specific agreement or the successor to that agreement,

6    which allowed us to continue to supply Mobil.

7    Q.    What is the successor -- before I ask you that

8    question, would you read the first sentence of that

9    letter?

10    A.    Okay.

11    Q.    It references the Mobil branded distributor

12    agreement dated September 18th, 2000, between Peninsula

13    Oil and Tosco Refining LP, which agreement was assigned

14    to Sunoco by ConocoPhillips on or about April 28th,

15    2004, and was assigned to you by Peninsula on or about

16    September 15th, 2005.

17            Did I read that correctly?

18    A.    Yes.

19    Q.    Isn't that the agreement, the Mobil agreement,

20    isn't he referring to the Mobil agreement that was

21    assigned to you by Peninsula on September 15th, 2005?

22    A.    I believe it is, yes.

23    Q.    And then he goes on to state in the next

24    sentence, "This agreement by its terms expired

242

Mark Greco

1   September 30, 2005, and has been extended on a

2   month-to-month basis since then."

3                   Did I read that correctly?

4       A.   Yes, you read it correctly.

5       Q.   Was that your understanding of what occurred?

6       A.   No.

7       Q.   After you signed the assignment and assumption

8   agreement with Peninsula and on or about

9   September 15th, 2005, did anyone from Sunoco after that

10  tell you what was going to happen or what the process

11  was with regards to what agreement would be effective

12  for Mobil sales?

13      A.   Yes.  What was supposed to happen, the way it

14  was outlined to us, was that we were going to sign the

15  assignment of --

16      Q.   Can I stop right there?

17      A.   Sure.

18      Q.   I understand you explained to me what the

19  process was supposed to be before you signed the

20  assumption and assignment agreement.

21              My question is now after you signed the

22  assignment and assumption agreement, now you stepped in

23  the shoes of Peninsula Oil, did anyone from Sunoco

24  after that date tell you what the process would be?

Mark Greco

1    A.    Yes.

2    Q.    Who?

3    A.    We worked with Dolores Love in an attempt to

4    develop a schedule to convert these locations from

5    Mobil over to Sunoco and as we discussed previously,

6    prior to signing that amendment, it was contemplated

7    that those gallons would then be transferred to our

8    Sunoco agreement and this Mobil agreement was going to

9    be allowed to expire and we would conduct business

10   under our Sunoco agreement for Mobil business until

11   such time as the Mobil gallons became Sunoco gallons.

12   Q.    Between September 15th, 2005, and

13   November 2nd, 2006, did you ever receive a letter from

14   Sunoco telling you that it was non-renewing the Mobil

15   branded distributor agreement?

16   A.    No, it wasn't put to us that it would renew.

17   It was put to us that it was going to expire.

18   Q.    Did you ever receive a letter from Sunoco sent

19   pursuant to its obligations under the Petroleum

20   Marketing Practices Act informing you that Sunoco was

21   non-renewing the Mobil branded distributor agreement?

22   A.    I don't know that it would even be possible

23   because PMPA requires greater than 30 days' notice and

24   the agreement at the time we signed it was due to

Mark Greco

1    expire in 30 days.

2      Q.     Whether or not it was possible or not, did

3    Sunoco, to your knowledge, did Sunoco ever send you a

4    letter purporting to attempt to non-renew the Mobil

5    branded distributor agreement prior to Plaintiffs'

6    Exhibit 44?

7      A.     I don't know.

8      Q.     Who in your organization would you ask to find

9    out the answer to that question?

10     A.     Well, this letter was addressed to Bill Sweet.

11   It would have gone to one of the principals of the

12   company.

13     Q.     You are not here as a representative of the

14   company.

15           MR. HUTCHISON:  Yes, he is.

16   BY MR. YOUNG:

17     Q.     As representative of the company, do you know

18   whether you received such a letter?

19     A.     As a representative of the company, I don't

20   know that we did.

21     Q.     So you would ask Mr. Sweet if you wanted to

22   find out the answer to that question?

23           MR. HUTCHISON:  Objection.

24           THE WITNESS:  I would ask my two

245

Mark Greco

1   partners, the other two principals in the company, if

2   either of them had seen one.

3   BY MR. YOUNG:

4       Q.    If Sunoco had sent such a letter, would you

5   expect it to exist within the Sweet Oil or GLeS

6   organization as it exists today?

7       A.    If it had existed at the time, regardless of

8   which principal that it would have been addressed to,

9   I'm sure that all three principals would have received

10  copies of it.

11      Q.    Do you think it would still exist within Sweet

12  Oil's possession today?

13      A.    I don't know that it ever existed.

14              MR. YOUNG:  I'd make a request on the

15  record at least that it be produced if it exists, if

16  you determine that exists.

17              MR. HUTCHISON:  This is a letter from

18  Sunoco?

19              MR. YOUNG:  Any letter prior to

20  November 2nd, 2006 purporting to terminate or to

21  non-renew, that expresses Sunoco's intention to

22  non-renew the Mobil branded distributor agreement

23  written pursuant to the Petroleum Marketing Practices

24  Act.

246

Mark Greco

1          THE WITNESS:  I know that they definitely

2    sent us non-renewal mutual cancellations for the

3    Coastal and Sunoco agreements, but I don't recall ever

4    seeing a letter for the Mobil agreement.

5    BY MR. YOUNG:

6        Q.    You don't recall ever having signed a mutual

7    cancellation agreement for the Mobil branded

8    distributor agreement?

9        A.    No.

10       Q.    No, you don't recall or no, you didn't sign

11   one?

12       A.    No, I didn't sign one.  I signed the Coastal

13   and the Sunoco agreement.

14       Q.    In answering that question, you're speaking on

15   behalf of the corporation Sweet Oil; correct?

16       A.    Yes.

17       Q.    Were you supplying the Duck-In #2 Mobil with

18   product up until you sold the assets to GPM?

19       A.    Yes.

20       Q.    And after January of 2007, what brand of motor

21   fuel did you sell to the Duck-In Mobil?

22       A.    For a period of time between when Sunoco told

23   us to stop supplying him Mobil and our closing with

24   GPM, they were unbranded, they had no brand, and then

247

Mark Greco

1   GPM later branded them -- I'm not sure if it was Valero

2   or Exxon.  I'm not sure.  I know GPM has branded them

3   since, but I don't know what it is now.

4       Q.    Did you de-identify the Duck-In Mobil?

5       A.    Yes, we de-identified all three Mobils.

6       Q.    Were they all done at the same time?

7       A.    Yes.

8       Q.    So roughly January/early February 2007?

9       A.    Yes.

10      Q.    And when you said you de-identified all of

11  them, you physically went in or your contractors

12  physically went in and removed all indicia of the Mobil

13  trademark, tradename, correct?

14      A.    Yes, that's correct.

15            MR. YOUNG:  Why don't we take a break.  I

16  think we are just about finished.

17            (Recess.)

18  BY MR. YOUNG:

19      Q.    Mr. Greco, in response to some of Mr. Storm's

20  questioning, he asked you about the offers that you

21  made to the plaintiffs to change their brands; correct?

22      A.    Yes.

23      Q.    And one of them was if they didn't convert to

24  Sunoco, you offered the other brands that you could

248

Mark Greco

1   offer, such as Exxon, BP, CITGO?

2       A.    Correct.

3       Q.    If I understand your testimony correctly, did

4   you offer to them that if they accepted one of the

5   brands that you offered and continued to purchase

6   through you, that you would pay the penalty to Sunoco?

7       A.    As part of rebranding, we agreed that we would

8   absorb that cost, yes.

9       Q.    Why did you do that?

10      A.    As incentive to get them to continue to stay

11  with us.

12      Q.    And it was your understanding that if they

13  chose not to go to Sunoco, that the penalty would have

14  to be paid?

15              MR. HUTCHISON:  Objection.

16              THE WITNESS:  It was our understanding

17  that it was their obligation, but if we could continue

18  to supply them, whether it be Sunoco or any other

19  brand, then we would be -- we were willing at that

20  time, and we made them an offer in writing, to pay that

21  expense on their behalf.

22  BY MR. YOUNG:

23      Q.    It was your understanding that under the

24  dealer agreement you had with Delmar Mobil or BCG,

249

Mark Greco

1   Inc., and Chesapeake Products & Services, that if they

2   chose not to go with Sunoco and went with another

3   brand, that that penalty would be due?

4              MR. HUTCHISON:  Objection.

5   BY MR. YOUNG:

6   Q.    Under the Tosco distributor incentive program?

7              MR. HUTCHISON:  Same objection.

8              THE WITNESS:  It was my understanding

9   that if they were no longer Mobil or Sunoco, as

10  successor to Mobil, that that money would have to be

11  paid back by them.

12  BY MR. YOUNG:

13  Q.    To you?

14  A.    To you.

15  Q.    Under your agreement to you; correct?

16  A.    Yeah.  The agreement that was assigned to us

17  from Peninsula stated that any obligation that we had

18  to pay you would be reimbursed by them.  So ultimately

19  it would be their expense.

20  Q.    Ultimately.  But in looking at the particulars

21  of the contractual relationships, that penalty would be

22  due under your dealer agreement with them; correct?

23  A.    Yes.

24             MR. YOUNG:  That's all I have.

250

Mark Greco

1          MR. HUTCHISON:  Anything else?

2          MR. STORM:  Yes, a couple.

3    BY MR. STORM:

4    Q.    This issue about the credit card processing in

5    June, that came to a head in June of 2006, did that

6    involve what's known generally as electronic point of

7    sale equipment?

8    A.    Yeah.  The point of sale equipment is the cash

9    register or whatever processor that, whether the card

10   is accepted inside or outside at the pump, it processes

11   through the point of sale.

12   Q.    So it is part of that whole generic point of

13   sale equipment?

14   A.    Well, it's not generic.  Every manufacturer

15   makes different types and --

16   Q.    When I was talking about generic, I was

17   talking about, when we are talking about electronic

18   point of sale equipment, this would be a part of that,

19   or not?

20   A.    I'm not sure if I follow exactly the question.

21   If you are using point of sale as just a broad term as

22   any type or any manufacturer, then yes.

23   Q.    Did you ever offer to pay for that, the

24   $4,500?

251

Mark Greco

1    A.    I don't believe we did, no.

2    Q.    And you didn't undertake to install it; right?

3    A.    No.

4    Q.    Let me direct your attention to the

5    distributor agreement, the Tosco distributor agreement,

6    Exhibit 8.  Page 16 of that agreement, Paragraph 15 (B)

7    says, "Distributor shall install or cause to be

8    installed approved electronic point of sale equipment

9    at the stations for the processing of credit card and

10   debit card transactions."

11                  Do you see that?

12   A.    Yes.

13   Q.    You never did that, did you, at this site?

14   A.    This contract preceded us.

15   Q.    I understand.  But this was the contract that

16   was assigned to you by Peninsula, was it not?

17   A.    Yes.  At the time that this contract was

18   signed, whether by Peninsula or the dealer, by some

19   method, there was an approved POS installed at the

20   site, which operated from 2002 until this end of life

21   issue occurred.

22   Q.    And who had installed that?

23   A.    Again, it happened many years before we came

24   into the picture.

252

Mark Greco

1    Q.    But at some point you are notified by Sunoco

2    that this site has to have revised POS equipment?

3    A.    The notices actually came in the beginning

4    from ExxonMobil, and they came from ExxonMobil to

5    Peninsula prior to us and eventually to us and then

6    additional notices from Sunoco to us.

7    Q.    But my client didn't have any agreement with

8    ExxonMobil, did it, as related to that site at Delmar?

9    A.    I don't believe so.

10    Q.    And you didn't either, for that matter, you

11    had an agreement with or Peninsula had an agreement

12    with Tosco; right?

13    A.    Correct.

14    Q.    Is it normal practice for distributor

15    agreements like this, meaning Exhibit 8, for there to

16    be a schedule of sites and the schedule gets modified

17    over the years as sites get added or deleted?

18    A.    All sites have to be approved by the oil

19    companies.  Generally what gets modified is the volume

20    schedule, how many gallons and where it is coming from.

21    Q.    And the company then has to authorize, for

22    example, if you were going to go to Sunoco with a

23    proposed site, Sunoco would have to approve that site

24    and then that site would get added as a site that was

253

Mark Greco

1   included in your distributor agreement?

2       A.    Yes.

3       Q.    Correct?

4       A.    Yes.

5       Q.    Was there a fee that was associated with the

6   Mobil sites for a monthly fee related to the processing

7   of cards?

8       A.    There's a transaction fee, but I don't know if

9   there's a monthly fee.  I'm not sure exactly what you

10  are asking.

11      Q.    Here is what I am trying to figure out.  If

12  you go back to the end of this exhibit, starting at

13  Page 47, there's something called maintenance and

14  information services agreement for electronic point of

15  sale terminal and related equipment.

16              MR. HUTCHISON:  Now you are talking about

17  Bates stamp 47?

18              MR. STORM:  Yes.

19  BY MR. STORM:

20      Q.    It identifies the parties as Tosco, Peninsula

21  Oil as the system user; okay?

22      A.    Okay.

23      Q.    And then attached to that is an Exhibit A,

24  which identifies certain of the locations, and I guess

254

Mark Greco

1   those were the locations that were already in place

2   with Peninsula at the time that this agreement was

3   signed back in October of 2000.

4                   Do you see that?

5   A.      Okay.

6   Q.      And included there is Deluxe Dairy, which I

7   guess was the location we talked about earlier; right?

8   A.      Yes.

9   Q.      And Duck-In #2?

10  A.      Right.

11  Q.      Millsboro Mobil, Berlin Uncle Willie's and

12  Laurel Uncle Willie's; right?

13  A.      Yes.

14  Q.      Those, I guess, were sites that were operated

15  by Uncle Willie that Peninsula operated directly?

16  A.      Uh-huh.

17  Q.      Right?

18  A.      I don't know if they operated directly or

19  through dealers or what method?

20  Q.      It talks about an EPOS fee of 140 a month for

21  owned equipment and 75 a month for leased equipment.

22  Do you see that?

23  A.      Yes.

24  Q.      And was that charged to those sites, do you

255

Mark Greco

1   know?

2       A.    I don't know.

3       Q.    Because what I'm confused about is under 3.1,

4   going back to Page 47, it says that Tosco agrees to

5   maintain the Tosco authorized equipment set forth in

6   Exhibit A for use by system user to access the Tosco

7   EPOS program at the marketing premises and that the

8   system user will pay the rate, the services rate set

9   forth in Section 3.3, and the system user agrees that

10  Attachment A may be amended from time to time by Tosco.

11              Do you see that?

12      A.    I think what this is talking about, and I'm

13  not sure -- I wasn't a party to this agreement at the

14  time, but it appears that this is a fee for Tosco-owned

15  equipment or Tosco equipment that's leased to the

16  dealer.  At this location, the dealer happens to own

17  his own equipment, so this doesn't really apply.

18      Q.    Wasn't there an EPOS fee, though, for owned or

19  leased equipment that was like an access fee?

20      A.    There may have been a VSAT rental fee or

21  something like that, but not an EPOS fee.

22      Q.    If you go to 5.3 it says, "Notwithstanding

23  Section 5.1, this agreement shall automatically

24  terminate," and then it goes to subpart B, "in the

256

Mark Greco

1   event system user" -- meaning Peninsula -- "elects not

2   to participate in the Tosco credit debit card program

3   at the marketing premises."

4                    Do you see that?

5       A.    Yes.

6       Q.    So this certainly seems to imply that the

7   system user has that election to participate or not

8   participate?

9       A.    I guess that's possible, yes.

10      Q.    Was this part of the agreement, do you know,

11  that was assigned to you by Peninsula?

12      A.    Yes.  This agreement was assigned to us -- now

13  wait a minute.  No, I don't believe it is.  It says the

14  term of this agreement was to go through September 30th

15  of 2010.  We didn't take any agreement that went

16  through 2010.  Our agreement expired in September of

17  2005.

18      Q.    Well, if you look back -- actually that's an

19  interesting question also, because if you look back at

20  the page that's Bates stamped 07 of this same exhibit,

21  distributor had one additional renewal term commencing

22  on 10-1, 2005 and ending on 9-30, 2010, provided, and

23  then it goes on, and has provided that the agreement,

24  distributor shall not have been previously non-renewed.

257

Mark Greco

1    Distributor shall prior to commencement execute Tosco's

2    then current Mobil branded distributor agreement.  Do

3    you see that?

4        A.    Uh-huh.

5        Q.    A Mobil branded distributor agreement wasn't

6    offered to you to continue after 2005, was it?

7        A.    Correct.

8        Q.    Mr. Young asked you a couple questions about

9    the debranding of the site, and my clients had actually

10   inquired of you in April of 2006 pursuant to

11   Exhibit 24, had they not, asking when do you intend to

12   remove the Mobil brand from our Delmar location?

13       A.    Okay.

14       Q.    And then I think they asked you that again on

15   May 22nd, pursuant to Exhibit 32, when do you intend to

16   remove the Mobil brand, do you see that?

17       A.    On May 22nd?  What exhibit number is that?

18       Q.    That's 32.

19       A.    Yes, both of these letters came from Charlie,

20   and I believe during this same time I was still

21   negotiating with Bill for furnishing him information

22   from Sunoco with fee schedules and satellite fees and

23   whatever else was involved in the potential conversion.

24   So the reason that it wasn't scheduled is because we

258

Mark Greco

1    were still talking to them about the possibility of

2    converting.

3                    MR. STORM:  I think that's all I have.

4                    MR. HUTCHISON:  Nothing.

5                    COURT REPORTER:  Reading and signing?

6                    MR. HUTCHISON:  Yes, we will read and

7    sign.

8                    (Witness excused.)

9                    (The deposition concluded at 5:10 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

259

```
  1                    I N D E X

  2   DEPONENT:  Mark Greco                      PAGE

  3   Examination by Mr. Storm         2, 163, 164, 250
      Examination by Mr. Young            160, 163, 219
  4

  5                  E X H I B I T S

  6   PLAINTIFF'S DEPOSITION EXHIBITS             MARKED

  7     1    Notice of Depositions                 7

  8     2    Assignment and Assumption Agreement   22
             SO 000069 through SO 000073
  9
        3    Newspaper article, "Oil Pricing Method 37
 10          Not Crude"

 11     4    Doughboy's Mobil Price Breakdown 9/1/05 53
             through 9/8/05, SO 000173 through
 12          SO 000176

 13     5    Contract between Peninsula and Chesapeake 59
             Product & Service, SO 000055 through
 14          SO 000060

 15     6    Tosco Distributor Image Incentive     65
             Program Agreement, SO 000053 through
 16          SO 000054

 17     7    Letter of understanding, SO 000052    68

 18     8    Mobil Branded Distributor Agreement,  26
             SO 000005 through SO 000051
 19
        9    Letter dated February 7, 2006, with   74
 20          Attachments, SO 000167 through SO 000242

 21    10    Letter dated April 25, 2006, with     75
             Attachment, SO 000241 through SO 000242
 22
       11    Indemnity Mortgage                    76
 23
       12    Lundberg Survey, Delaware Share of Market 79
 24          Report, SO 000192 through SO 000193
```

260

```
 1                    E X H I B I T S  (cont'd):

 2   PLAINTIFF'S DEPOSITION EXHIBITS                  MARKED

 3      13   Letter dated February 21, 2008, from     81
            Mr. Sanderson to Mr. Hutchison, with
 4          attachments

 5      14   Letter dated 3/15/06 from Charlie Glenn   106
            To GLeS
 6
        15   Letter dated March 20, 2006, from        106
 7          Mr. Greco to Chesapeake Products &
            Services, Inc.
 8
        16   WSFS Bank Statement, SO 000092           110
 9
        17   E-mail, SO 000120 through SO 000122      111
10
11      18   E-mail, with attachment, SO 000123       115
            through SO 000125
12
        19   E-mail, SO 000129                        116
13
        20   E-mails, with attachments, SO 000144     118
14          through SO 000147

15      21   E-mail, SO 000149 and SO 000150          118

16      22   E-mail, SO 000169                        119

17      23   E-mail, SO 000198 and SO 000199          120

18      24   Letter dated 4/18/06, SO 000203          121

19      25   E-mail string, SO 000217 and SO 000218   121

20      26   E-mail, SO 000219                        122

21      27   E-mail string, SO 000232 through         123
            SO 000236
22
        28   Letter dated May 16, 2006, with attachment, 123
23          SO 000246 through SO 000266

24
```

261

```
 1                E X H I B I T S (cont'd):

 2    PLAINTIFF'S DEPOSITION EXHIBITS                MARKED

 3       29    UPS receipt and letter dated May 9, 2006,   124
              SO 000243 through SO 000245
 4
         30    E-mail string, SO 000268                128
 5
         31    E-mail, SO 000270                      128
 6
         32    Letter dated 5/22/06 from Charlie Glenn   129
 7            to GLeS

 8       33    Letter dated June 5, 2006, SO 000271   130
              through SO 000272
 9
         34    E-mail, SO000339 and SO 000340         134
10
         35    Letter dated 6/20/06, SO 000343        134
11
         36    E-mail, SO 000344                      136
12
         37    E-mail string, SO 000346 through       137
13            SO 000348

14       38    E-mail, SO 000350                      138

15       39    E-mail string, SO 000358 and SO 000359   139

16       40    E-mail, with attachments, SO 000379    139
              through SO 000392
17
         41    E-mail string, SO 000383 through       140
18            SO 000390

19       42    E-mail, SO 000405                      143

20       43    Announcement dated August 30, 2006,    144
              SO 000408
21
         44    Letter dated November 2, 2006, SO 000074   151
22            through SO 000084

23       45    Letter dated November 27, 2006, SO 000422   151
              and SO 000423
24
```

262

```
 1               E X H I B I T S (cont'd):

 2  PLAINTIFF'S DEPOSITION EXHIBITS              MARKED

 3     46   Letter dated January 23, 2007, SO 000430   152
           through SO 000432
 4
       47   Letter dated January 29, 2007, with       149
 5         attachments

 6     48   Letter dated February 7, 2007, from       149
           Mr. Storm to Mr. Hutchison
 7
       49   E-mail string, SO 000435 through          150
 8         SO 000437

 9     50   E-mail, SO 000438                          156

10     51   E-mail string, SO 000441 and SO 000442    165

11     52   E-mail string, SO 000443 through SO 000445  168

12     53   Distributor Branded Motor Fuel Agreement,  168
           SO 000068
13
       54   Peninsula documents, SO 000094 through    169
14         SO 000119

15     55   Check 10761 and SO 001052 through         184
           SO 1078 and Check 10913
16
       56   Fax, SO 001095 through SO 001098           198
17
       57   Sweet Oil Company Account Quick Report,    199
18         SO 001094

19     58   Fax cover sheet, dated 12-6-06 from Chad   199
           To Shelly Domingo
20
       59   Letter dated August 16, 2005, from         200
21         Mr. Williams to "Dear Retail Dealer"

22     60   Fax dated 9-19-05 from Chad to Shelly,     200
           SO 000809 and SO 000810
23
       61   SO 001013 through SO 001020                201
24
```

263

```
 1              E X H I B I T S (cont'd):

 2    PLAINTIFF'S DEPOSITION EXHIBITS                MARKED

 3      62    Fax, SO 001039 and SO 001040            202

 4      63    Nine-page document, first being Check   203
              Stub No. 7305
 5
        64    Documents, SO 000473 through SO 000475  203
 6
        65    Memo dated 3/15/06, SO 000542           204
 7
        66    Termination letter dated 7/11/06        102
 8
        67    Letter dated July 11, 2006, from Mr. Greco  204
 9            to Chesapeake Products & Services, Inc.,
              three pages
10
        68    Letter dated July 19, 2006, SO 000556   207
11
        69    Letter dated 3/15/06 from Charlie Glenn to  212
12            GLeS

13      70    Letter dated 7/20/06 from Charles Glenn  212
              To GLeS
14
        71    Memo dated 3/16/06 from Chad to Coraluzzo  214
15            Dispatch

16      72    Laurel Oasis CITGO Daily Sales          215
              Reconciliation, SO 000572 through SO 000807
17
        73    Indemnity Mortgage Assignment and Assumption  77
18            Agreement, SO 000085 through SO 000088

19      74    Documents, SO 001160 through SO 001184  218

20      75    GLeS customer Quick Report              84

21      76    Mutual Cancellation Agreement           158

22      77    Statement from The Bank of Delmarva      218

23      78    Tosco Distributor Image Incentive Program  221
              Agreement
24
```

264

```
 1                I   N   D   E   X (cont'd):

 2   ERRATA SHEET/DEPONENT'S SIGNATURE          PAGE 265

 3   CERTIFICATE OF REPORTER                    PAGE 266

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

265

1

2

3

4

5          REPLACE THIS PAGE

6          WITH THE ERRATA SHEET

7          AFTER IT HAS BEEN

8          COMPLETED AND SIGNED

9          BY THE DEPONENT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

266

```
 1   State of Delaware     )
                           )
 2   New Castle County     )

 3

 4                    CERTIFICATE OF REPORTER

 5
             I, Terry Barbano Burke, RMR-CRR and Notary
 6   Public, do hereby certify that there came before me on
     Wednesday, March 26, 2008, the deponent herein, MARK
 7   GRECO, who was duly sworn by me and thereafter examined
     by counsel for the respective parties; that the
 8   questions asked of said deponent and the answers given
     were taken down by me in Stenotype notes and thereafter
 9   transcribed by use of computer-aided transcription and
     computer printer under my direction.
10
             I further certify that the foregoing is a true
11   and correct transcript of the testimony given at said
     examination of said witness.
12
             I further certify that I am not counsel,
13   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
14

15

16

17
                     Terry Barbano Burke, RMR-CRR
18                   Certification No. 233-RPR
                     (Expires January 31, 2011)
19

20   DATED:

21

22

23

24
```