**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BCG, INC. and CHESAPEAKE PRODUCTS & SERVICES, INC., | |
| Plaintiffs, | |
| v. | C.A. No. 07-cv-207 (GMS) |
| GLES, INC., d/b/a SWEET OIL COMPANY, | TRIAL BY JURY OF TWELVE DEMANDED |
| Defendant/Third-Party Plaintiff, | |
| v. | |
| SUNOCO, INC., | |
| Third-Party Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF TESTIMONY AND EVIDENCE SEEKING TO AMEND OR MODIFY THE MARCH 1994 COMMISSION AGENCY AGREEMENT**

Defendant GLES Inc. d/b/a/ Sweet Oil Company ("Sweet Oil") has moved *in limine* to preclude the admission of testimony and evidence seeking to amend or modify the March 1994 Commission Agency Agreement. For reasons that follow, the motion must be denied.

I.    <u>Introduction</u>.

Sweet Oil contends at page 2 of its motion that the three page 1994 Commission Agency Agreement attached as Exhibit B to its motion "is clear and unambiguous in its terms, and is a fully integrated representation of the parties' agreement." As a result, Sweet Oil contends that evidence related to the 1990 Commission Agency Agreement should be excluded. In making these arguments, however, Sweet Oil omits material facts, and fails to apply the Uniform Commercial Code ("UCC"), which clearly governs the parties' agreements.

II.    Factual Background.

Sweet Oil came into the contract chain in 2005 through an assignment from Peninsula Oil

Company ("Peninsula"). Prior to the assignment, plaintiffs had a long and relatively harmonious

relationship with Peninsula pursuant to contracts which had been modified several times. For

more than ten years prior to the assignment, the original parties to the contract understood the

contract, and had a mutual basis for understanding the terms and scope of their agreement.

When Sweet Oil took an assignment of Peninsula's contract with plaintiff, Sweet Oil

stepped into whatever rights and duties Peninsula had under its contract. *See* 6. Del. C. §2-210(5)

(assignee assumes the assignor's duties and obligates itself to perform those duties)*; Marcoux v.

Shell Oil Co.*, 524 F.3d 33 (1st Cir. 2008)(oral modification to franchise agreement became part

of contract that was breached by the assignee). Prior to the 2005 assignment, the "contract" was

evidenced by a combination of agreements, documents and course of dealing/performance.[1] An

entire package of contract documents was produced by Sweet Oil in this action with Batestamp

numbers of "SO00094-SO119," and is attached as Exhibit "A".

The  contract documents signed in 1990 included more than just the 1990 Agency

Agreement, and included guaranties, and a Texaco Retailer Travel Card Agreement. *See* Exhibit

"A", pp. SO00094 - SO00104. Several years later, plaintiffs and Peninsula agreed to an

extension of their relationship when certain modifications were made to plaintiffs' premises. A

series of documents were executed in 1994 to extend the term of the 1990 agreement, with the

understanding as expressed by Peninsula that "all of the other terms of the 2/13/90 agreement

remain the same with the exception of the extension of expiration date which will also read

January 31, 2008," *Id.*, p. SO 00105. While the 1990 documents contain an integration clause,

---

[1]    Here the contract between Peninsula and plaintiffs were the 1990 agreements as amended by the 1994
documents and as supplemented by the actual course of dealing and course of performance. Mr. Glenn confirmed
this in his deposition. *See* Glenn Deposition, pp. 118-129, attached as Exhibit "B."

*see* Exhibit "A," p. SO 00105, the 1994 Agency Agreement does not. Moreover, while Sweet Oil

argues that the 1994 Agency Agreement was complete in itself, Sweet Oil fails to mention that

there were additional contract documents executed in <u>1994</u> which completely belie the

suggestion that the 1994 Agency Agreement was "fully integrated." See Exhibit "A", pp. SO111-

119.[2]

> After 1994, plaintiffs and Peninsula continued to operate consistently with the 1990

agreements as modified. This included Peninsula abiding by a provision in the 1990 Agreements

that required Peninsula to keep the retail prices (set by Sweet Oil) on the gasoline competitive,

see Exhibit A, p. SO000100, and a provision capping the wholesale price on diesel fuel at .025

per gallon over the Salisbury Rack price. Id,, at p. SO000095. [3]  Sweet Oil breached both of

these provisions after the assignment.

> III.    <u>Argument</u>.

> An agreement is integrated if it is intended by the parties as a final and complete

expression of their agreement,  *Carrow v. Arnold*, 2006 Del. Ch. WL 3289582, at \*4 (Oct. 31,

2006), considering such factors as the intent of the parties, where such intent is discernable; the

language of the contract itself and whether it contains an integration clause; whether the

instrument was carefully and formally drafted; the amount of time the parties had to consider the

---

[2]    Significantly, while Sweet Oil now claims "1994 integration," Sweet Oil has previously recognized that the agreement assigned to it by Peninsula <u>included</u> the 1990 contract "<u>later amended on March 16, 1994</u> . . ." *See* Exhibit "C", p. SO 000475 (emphasis added).

[3]    Neither the 1994 Commission Agency Agreement, nor any other of the 1994 documents, included any mention of diesel fuel; yet, it is undisputed that Peninsula continued to sell and plaintiffs continued to purchase, diesel fuel (under the same terms as existed under the 1990 agreements). *See* Exhibit "D". In a letter dated July 11, 2006, Sweet Oil wrote to plaintiffs that "your contract states you will purchase all …diesel fuel at 'our posted full transport price' at time of delivery. There is a footnote which states 'not to exceed Salisbury Rack prices by more than .025 per gallon." *See* Exhibit "E". The "contract" and the "footnote" are in the <u>1990</u> agreement, <u>not</u> the 1994 agreement.

terms of the contract; whether the parties bargained over specific terms; and, whether the contract addresses questions that naturally arise out of the subject matter. *Id.*

Applying these factors here leads to the conclusion that the 1994 agreement is not an integrated agreement. Here, Peninsula expressed its intent that the 1990 terms were not going to change, except for the expiration date, *see* Exhibit "A," p. SO 000105, and the parties' course of dealing and performance after 1994 confirmed that; Sweet Oil itself admitted that the 1990 agreements survived, *see* Exhibit "E"; it is clear that the parties did not intend the three page 1994 agreement to be a complete and final expression of their agreement;[4] the 1994 Agency Agreement—unlike the 1990 agreement—does not have an integration clause; the 1994 agreement was not carefully and formally drafted, as it is simply a form agreement; and, the 1994 agreement is silent as to questions that naturally arise out of the subject matter, such as the purchase and sale of diesel fuel at the station and other matters that are governed by the 1990 contract documents. Given these facts, the 1994 Commission Agency Agreement cannot be viewed as an "integrated agreement."

In addition, however, Sweet Oil's motion does not apply the proper law. The UCC is codified at 6 Del. C. §2-101, et seq. The UCC governs "transactions in goods," and motor fuel is a "good." *See* 6 Del. C. §§ 2-102, 2-105(1) (goods "means all things…which are movable"). Under the UCC, the term "agreement" is defined to mean "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance…." 6 Del. C. §1-201(b)(3).[5]

---

[4] Notably, the Court "may consider all relevant evidence, such as the surrounding facts and circumstances, prior or contemporaneous negotiations or agreements of the parties preceding the written contract and mutual understandings of the parties at the time they entered into the contract." *See* 32A C.J.S. *Evidence* § 1280 (2008); *see also Carrow*, at *4, fn. 30.

[5] The UCC also states that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract" 6 Del. C. §2-204(1).

The UCC significantly modifies the common law parol evidence rule. Even when a UCC contract is "intended by the parties as a final expression of their agreement with respect to such terms as are included therein," the agreement may nevertheless be "explained or supplemented (a) [b]y course of performance, course of dealing, or usage of trade; and (b) [b]y evidence of consistent addition terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." *See* 6 Del. C. §§2-202, 1-303 (defining course of dealing, usage of trade and course of performance). *See also, Allapattah Services, Inc. v. Exxon Corporation*, 61 F. Supp. 2d 1308, 1315 (S.D. Fla. 1999)(in a nationwide class action, Court found that "course of dealing ... gives meaning to and supplements or qualifies the terms of a written agreement;" such course of dealing "is determined by considering the language of the agreement, the actions of the parties, commercial standards . . . and other surrounding circumstances.").[6] Whether a course of dealing exists is a question of fact. *Id.* And "the UCC does not presume that a written contract sets forth the parties entire agreement," and "the parties know best what they meant by their words of agreement and their action under that agreement is the best indication of what that meaning was." *Id.* at 1316.

Here, the course of dealing and course of performance all bear witness to the obligation of the supplier to set the price of fuel sold by plaintiffs to the public at a competitive price. Sweet Oil intentionally and knowingly did not price the fuel competitively to plaintiffs' great harm. It must be held to account for this. Accordingly, plaintiffs respectfully request that Sweet Oil's motion *in limine* be denied.

---

[6] The Court added that evidence of trade usage, course of dealing, and course of performance were factors relevant to the threshold inquiry of whether the document is integrated. *Id.* at 1315.

PRICKETT, JONES & ELLIOTT, P.A.

David E. Brand (DE Bar No. 201)
John W. Paradee (DE Bar No. 2767)
D. Benjamin Snyder (DE Bar No. 4038)
11 North State Street
Dover, Delaware 19901
(302) 674-3841

*and*

Harry C. Storm
Lerch, Early & Brewer, Chartered
3 Bethesda Metro Center, Suite 460
Bethesda, MD 20814

Date:   August 20, 2008          *Attorneys for the Plaintiffs*

# EXHIBIT A

MAR.23.2006 13:31 3023689045                                    #5229 P.001 /011

# PENINSULA OIL CO., Inc.

### DISTRIBUTORS OF
## Heating Oils – Gasoline
## Lubricants
## Burner Services

**PLANTS:**
SEAFORD
HARRINGTON
DAGSBORO
MILFORD
GEORGETOWN

P. O. BOX 389
SOUTH MARKET STREET
SEAFORD, DE. 19973
(302) 629-3001

William Glen
Charles Glen
DBA The Laurel Oasis
Route 113
Laurel, Del. 19956
Gentlemen:

As per our meetings and conversations regarding Peninsula Oil Co., performing certain improvements at your location on Route 13, Laurel, Del., I have enclosed the necessary documents for your review and signatures.

As we agreed, our agreement is to supply your location with motor fuels for a period of 10 years, commencing on the 1st day of February 1990 and ending on 31st day of January, 2000. Also the prices charged for credit card gasoline sales will be the posted cash price plus five (5) cents per gallon for each gallon sold and upon completion of the tank work we will issue a "bill of sale" for $50,000.00 to cover the transfer of ownership of all underground tanks and piping thereof.

I'm sure that over the years that we will be associated, our relationship will continue to benefit us all.

Again, I would like to thank you both for continuing to have Peninsula Oil Co. be your supplier and business associate.

Very truly yours,
PENINSULA OIL CO., INC.

John Willey, Jr.

pt
encl.


PLAINTIFF'S
EXHIBIT

# PENINSULA OIL CO., Inc.

### ·DISTRIBUTORS OF
## Heating Oils – Gasoline
## · Lubricants
## Burner Services

**PLANTS:**
SEAFORD
HARRINGTON
DAGSBORO
MILFORD
GEORGETOWN

P. O. BOX 389
SOUTH MARKET STREET
SEAFORD, DE. 19973
(302) 629-3001

Date _____

This agreement is between Peninsula Oil Co., Inc., of Seaford, Delaware, and BCG, Inc. - DBA THe Laurel Oasis of Laurel; Del.

Purchase price of gasoline shall be the retail posted prices less commis= sions as outlined in the Agency Agreement. (dated _____) Diesel Fuel price will be our posted transport price at time of delivery. *

Terms of payment will be cash or net ten (10) days. All deliveries to be made by transport truck upon 24 hours notice by buyer or at the convenience of Peninsula Oil Co., Inc. This agreement is expressly subject to the Agency Agreement and the Recovery Agreement of even date.

In consideration of the installation of pumps and other equipment as specified in the "Equipment Loan Agreement", BCG, Inc. - DBA THe Laurel Oasis agrees to purchase all gasoline motor fuels and diesel fuels exclusively from Peninsula Oil Company for a period of ten (10) years from the date of this agreement and thereafter from year to year until either party shall give the other written notice of cancellation at least sixty (60) days prior to the anniversary date.

Accepted _____ (SEAL)     By _____

Peninsula Oil Company, Inc.
Seaford, Del.

Accepted _____ (SEAL)

* Not to exceed Salisbury Rack prices by more than .025 per gallon.

### ASSENT OF OWNER OR MORTGAGEE

The owner and the mortgagees of the premises described in the foregoing agreement, here called the "Undersigned" hereby consents to said agreement and to all installations of equipment, whether as therein set forth and provided for and now or hereafter made thereunder or otherwise, and agree that no claim shall be made to said equipment by the undersigned, the heirs, legal representatives, successors or assigns of the undersigned and that the undersigned have (had) no mortgage lien upon said property and that said property shall be exempt from levy, sale, attachment or distress and that Peninsula Oil Company, its successors and assignes, may at any time enter upon said premises with such appliances and agents as it may deem necessary in accordance with Delaware law to remove therefrom any or all of said property.

Signed and sealed this _____ day of _Feb_ 1990

_____ (SEAL)

_____ (SEAL)

MAR.23.2006 13:32 3023689045                                              #5229 P.003 /011

# EQUIPMENT LOAN AGREEMENT

Made this _13th_ day of _FEB_ 19 _90_

by and between THE PENINSULA OIL COMPANY, a body corporate of the State of Delaware, with offices at Seaford, Delaware, hereinafter called the "SELLER" and

BCG Inc. DBA The Laurel Oasis _____ of _____ Laurel, Del.

hereinafter called "CUSTOMER" owning or leasing premises above.

No. 1  EQUIPMENT: Seller agrees to lend and hereby lends to Customer the equipment installed at the above premises for the active and continuous storage, handling and dispensing of Seller's products exclusively, as follows:

| QUANTITY | EQUIPMENT |
|---|---|
| 1 | Automated Texaco Credit Card Machine |
| 1 | Automated Cascard Credit Card Machine |
| 8 | Electronic Gasoline and Diesel Fuel dispensers |
| 1 | Electronic Console system for Motor Fuel Sales |
| 1 | 2 pole Texaco ID sign, Module Sign, Island Canopy and signs |
| 1 | Texaco Moduler ID sign |

Said equipment shall remain the property of the Seller and be considered and treated as personal property and in no sense fixtures or part of the real estate regardless of the manner in which the same may be installed or placed on premises. Customer hereby acknowledges receipt of said equipment and agrees not to remove same without written consent, and guarantee to return said equipment upon expiration or termination of contract in good condition and without loss or impairment of Seller's title thereto unless title has been acquired by Customer under bill of sale.

No. 2  ~~MAINTENANCE: Customer shall maintain said equipment in good condition and in event of partial or total destruction of all or any of the same, shall reimburse Seller for damaged equipment at cost of replaced or restored equipment, which shall become the property of the Seller and be governed by this contract.~~

No. 3  DEFAULT AND TERMINATION: If upon the expiration or termination of the contract said equipment is not sold to the Customer or to any other party, the Seller may without notice to the Customer at any time enter upon the premises and remove the equipment.

No. 4  ~~INDEMNITY: Customer shall indemnify and save the Seller harmless from all liability, cost and expense for any loss, damage, injury or expenses to Customer or any person or property in any way caused by said equipment or any property of the Seller or the use or handling thereof, whether or not due to any imperfection therein or arising from negligence or otherwise. Customer hereby waives and releases any claim against the Seller hereunder in respect to the foregoing, however caused and for any losses or shortages arising out of the use of any measuring devices furnished or due to any other matter or anything whatsoever.~~

No. 5  DURATION: This contract shall continue in effect for a period of _10_ year from the date hereof and thereafter from year to year unless terminated at the end of the initial period or any such subsequent year by either party upon sixty days prior written notice to the other party at their above respective addresses.

No. 6  ADDITIONAL EQUIPMENT: Any and all additional equipment loaned or installed or placed for the use of the Customer, shall be deemed to be loaned upon the terms and conditions of this agreement during the period of this contract.

No. 7  ASSIGNMENT: This contract is not assignable by the Customer but otherwise is binding on and for the benefit of the Customer and the Seller and respective legal representatives, successors and assigns.

In Witness whereof, the parties have duly executed this agreement the above day and year.

THE PENINSULA OIL COMPANY

Witness _____

By _____

Customer _____

SO 000096

MAR.23.2006 13:33 3023689045        #5229 P.004 /011

**GUARANTY**

Peninsula Oil Company, Inc.

PO Box 389

Seaford, Del. 19973

           _2/13_ , 19 _90_

Gentlemen:

For value received, and to induce you, your divisions and subsidiaries to under-take or continue to sell goods and/or lease property to  BCG, Inc. DBA, The Laurel Oasis  , hereinafter called the debtor, the under-signed, jointly and severally, hereby unconditionally and absolutely guarantee payment when due of any and all present or future indebtedness owed to you, your divisions and subsidiaries by the debtor and hereby agree to pay such indebtedness punctually if default in payment thereof is made by the debtor.

The undersigned expressly waive notice of acceptance of guaranty, demands and notices of non-payment, and consent to any extensions of time of payment of all or any of the indebtedness hereby guaranteed.

Without in any way limiting the generality of the foregoing, the undersigned ac-knowledge that this guaranty encompasses debtor's purchases of goods on account (includ-ing credit card purchases) and service, handling and delinquency charges incurred there-on, debtor's rental obligations for leased real and personal property, money borrowed by debtor (whether secured or not) and interest thereon, and debtor's obligations to account for goods consigned to or in the care or custody of debtor.

This guaranty is unlimited as to amount and time, but may be revoked by the under-signed effective five (5) days after receipt by you of notice to that effect, signed by the undersigned and delivered to you at the above address, marked for the attention of the Credit Manager, but such revocation shall not affect liability on any indebtedness then existing. Furthermore, the undersigned agree that in the event of the death of one or more of the undersigned, each such decedent's heirs, executors and administrators shall be bound hereby until actual knowledge of such death shall come to the attention of the Credit Manager.

The undersigned will indemnify you, your divisions and subsidiaries for attorneys' fees, court costs and other legal expenses incurred by you in enforcing this guaranty.

Witness _our_ hand(s) and seal(s) this _13_ day of _Fcbuary_ , 19 _90_ .

Witnesses:                   Name: _Charles Glenn VP for_   L.S.
                                Address: _BCG Inc_

                                Name: _William H Glenn Pres_ L.S.
                                Address: _For BCG Inc_

SO 000097

MAR.23.2006 13:34 3023689045          RECOVERY AGREEMENT          #5229 P.005 /011

Date _____7/13/90_____

Peninsula Oil Company, Inc.
Box 389
Seaford, Del. 19973

Gentlemen:

We request that you incur an expenditure in our behalf of _____

Fifty THousand dollars and no cents          ($ 50,000.00        )

at our place of business located at _____ Route 13.

Laurel, Del. 19956.                                    for the following

improvements:

1. Furnish and install (1) 8,000 gallon tank, to replace existing 20,000 gallon, tank,
   for no-lead gasoline.
2. Retrofit Existing 20,000 gallon deisel fuel tank; 6,000 gallon no-lead plus tank
   and 6,000 gallon-super no-lead tank to meet new EPA Federal and State regulations.
3. Furnish and install spill protection containment manholes, valves and in tank
   monitoring.
4. Fill existing no-lead 20,000 gallon tank and 2,000 gallong Kero tank to EPA
   requirements.
5. Furnish and install 2 pole Texaco ID sign with price and diesel fuel modules.
6. Restore paving and concrete areas disturbed during construction.

In consideration of your incurring this expense and making these improve-

ments, we agree that if prior to _____ Jan. 31, 2000 _____, we shall

sell or transfer our business at the above location or discontinue the use at this

location of Texaco products purchased from you, we shall pay you the sum of _____

Fifty Thousand dollars and no cents          ($ 50,000.00 )

less      Four Hundred and Sixteen dollars and 67 cents          ($   416.67    )

for each month which has elapsed from the date hereof to the date of such sale or

transfer or discontinuance.

SO 000098

We specifically understand and agree that all trade fixtures installed by you at our above place of business in accordance with the provisions of this letter are and shall at all times remain your property. (With the exception of all underground storage tanks and piping thereto.)

Will you please signify your acceptance of this arrangement by signing the enclosed copies of this letter in the space provided and return to us.

**

Very truly yours,

By _L H S pes_
For BCG Inc.

Accepted:

Peninsula Oil Company, Inc.

by _____

Date _____

** We understand and you agree that we may terminate this Recovery Agreement and the Agency Agreement dated _____ and the Main Agreement will be void and of no effect upon the payment of the difference of $50,000.00 minus _____ $416.67 for each month elapsed from the date of the Agency Agreement to the date of termination.

**The above listed agreements supersede and cancel any and all previous contracts and agreements between Peninsula Oil Co. Inc. and The Laurel Oasis, B.C.G. Inc., W.H. Glenn Inc., or William and Charles Glenn.

## AGENCY AGREEMENT

This is a Agency Agreement, entered into this __2/13/90__ day

of __FEB.__ , A. D. 1990, between Peninsula Oil Company, Inc., a

corporation of the state of Delaware, hereinafter referred to as "principal."

-AND-

BCG Inc.  DBA The Laurel Oasis

hereinafter referred to as "Agent."

Now, witnesseth, Principal agrees to appoint Agent custody of certain

petroleum products and equipment listed in the Equipment Loan Agreement dated

_____ and _____  installed on Agents real estate

located at __Route 13, Laurel, Delaware.__

subject to the following uses, covenants and conditions:

1) The term of the agreement shall be for a period of 10 years,
commencing the lst 13th day of Feb. A D 1990, to the 31st day of
__FEB__ A D 19 2000 Should the Agency continue at the expiration of
the above noted term, the Agency shall thereafter continue on a year-to-year
basis until either party thereafter gives sixty (60) days notice prior to the
expiration of the term or extension indicating termination of the Agency.

2) It is understood and agreed among the parties hereto that the
oil and gas pumps and other equipment used and needed in the dispensing
of oil and motor fuel products shall be and remain under the exclusive owner-
ship and control of Principal with the exception that Agent shall dispense the
motor fuels supplied by Principal through the equipment owned by Principal.

3) Principal shall supply and maintain, at its own expense and cost,
all motor fuel contemplated to be dispensed during the regular business hours
of the Agent. Agent shall maintain daily records of the motor fuels which are
dispensed. Agent shall pay to Principal net 10 days from billing the sums
received from the sale of gasoline and Agent will pay for diesel fuel 10 days
from the billing date.

4) In the dispensing of gasoline , the price of such fuel shall
at all times be under the absolute control of Principal, except that the price
shall be competitively priced with locations in that area.

(1)

SO 000100

5) Principal shall pay to Agent, no less than once a month,

_____ cents per gallon on gasoline sales as dispensed through the equipment of the Principal

* 1 - No-Lead Gasoline - .04 cents per gallon
  2 - No-Lead Plus Gasoline - .04 cents per gallon
  3 - Premium no-lead Gasoline - .06 cents per gallon.

6) Agent shall be open for business a minimum of One Hundred Twenty-Six (126) hours per week and at least a portion of all seven (7) days of each week.

~~7) Agent shall maintain liability insurance in a sum no less than Two Hundred Fifty Thousand Dollars ($250,000.00) for one (1) person per occurrence, Five Hundred Thousand Dollars ($500,000.00) per occurrence, and Fifty Thousand Dollars for property damage per occurrence, to protect both the Agent and the Principal against any claims filed by any persons, companies, organizations or individuals arising out of the use, lease or ownership of the said property. Each party shall maintain whatever insurance it desires to protect against loss of its equipment or to protect against any liability which may arise against either party from their own acts, omissions or conduct.~~

8) Agent shall not permit refuse to accumulate upon the premises but shall at all times maintain the building and surrounding premises, which shall include the entire area covered under this Agreement, free of refuse. Additionally, Agent shall at all times comply with all local, county, state and federal regulations applicable in the operation of its business.

9) All signs proposed to be erected by the Principal upon the premises herein demised shall be first approved by the Agent before such erection. Such signs shall be in accordance with the local Planning and zoning regulations and at all times in conformity with all city, county, state or federal laws. Agent shall not unreasonalby withhold its consent to the erection of signs which in all ways comply with all local city, county and state and federal regulations.

10) It is further convenanted and agreed that if the Agent shall
from gasoline
fail to pay over the daily receipts intact or shall otherwise fail to comply
with the conditions set forth herein, when and as the same should be done and
as and when the same shall fall due and become due, or shall fail to keep and
perform any of the covenants or agreements herein contained, then the Principal,
at its option, may terminate the Agency and shall have the right to remove all
equipment listed in the Equipment Loan Agreement dated __2/3/90__ and
Principal's gasoline.

11) Agent covenant and agree that they shall not at any time
Principal's
dispose of ∧ inventory, property or equipment except in the usual course
of business when they are delinquent in any manner in the payment of any sums
specified in this agreement.

12) Principal, as hereinbefore set out, shall be the owner of all the
Loan Agreement dated __2/3/90__
equipment listed in the Equipment ∧ and shall, in its sole discretion, supply the
necessary motor fuel equipment which in its sole discretion it deems necessary.
Loan Agreement dated __2/3/90__
The equipment listed in the Equipment shall at all times be maintained by Principal
and shall at all times be subject to Principal's maintenance and control except
that Agent shall at all times during the hours of business have available proper
personnel to dispense the motor fuels which will be available on the premises
for sale as supplied by Principal during the minimum business hours as set forth
herein.  13) This Agency Agreement is expressly subject to the terms and conditions
of the Recovery Agreement dated __2/3/90__
14) This agreement shall be binding upon the parties hereto, their
heirs, successors, administrators and assigns.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals
the day and year aforesaid.

By: _____

Attest: _____

MAR.23.2006 13:36 3023689045                                                          #5229 P.010 /011

# TEXACO RETAILER TRAVEL CARD AGREEMENT

Agreement made this _____ day of _____, 19__, between TEXACO INC., a Delaware corporation, having offices at  303 Fellowship Rd., Moorestown, N.J. 08057  (hereinafter called "TEXACO") and  BCG, Inc. DBA The Laurel Oasis 

having a place of business at  Toute 13, Laurel, Del.  19956  (hereinafter called "Retailer"):

### WITNESSETH THAT:

WHEREAS, Retailer is engaged in the sale of Texaco petroleum products at the above address in connection with which Retailer wishes to avail himself of the benefits of Texaco's Travel Card Program; and

WHEREAS, Texaco is willing to authorize Retailer to honor Texaco Travel Cards and hereinafter set forth:

IT IS THEREFORE AGREED:

(1) Authorized Travel Card Transactions. Texaco hereby authorizes Retailer to honor at his place of business unexpired and uncancelled Texaco Travel Cards and any other special credit cards authorized by Texaco, for the sale on credit of the following goods and services:

(a) All Texaco brand products for motor vehicles, watercraft, home and gardens, but sales of motor fuel may not exceed the capacity of the vehicle's or craft's fuel tank, plus an additional 25 gallons of motor fuel for one case of motor oil.

(b) Other merchandise sold by Texaco to Retailer's or Retailer's suppliers for resale. Tires, tubes, batteries and automotive accessories must be mounted on the vehicle or craft at time of sale. If customer wishes, TBA purchases may be made under Texaco's Time Charge Plan.

(c) Marlak lubrication, Texaco rustproofing, car washing and polishing services.

(d) Emergency and/or mechanical repairs including all parts, labor, and services to a maximum of $250.00 provided that such equipment is attached to or mounted on the vehicle or craft. If customer wishes, such purchases may be made under Texaco's Time Charge Plan.

Credit Cards issued by Texaco Puerto Rico Inc. and Texaco Canada Limited may be honored in the same manner as Texaco Travel Cards, except that Texaco Time Charge Plan purchases are not authorized. Credit Cards other than those referred to above may be honored only in accordance with special written authorization issued to Retailer by Texaco from time to time.

Texaco may tentatively credit to Retailer's account the face value of invoices remitted by him, reserving the right to charge back to his account, within nine (9) months of date of sale, the face value, or any portion thereof, of unauthorized, illegible, improperly prepared and disputed invoices, as more fully set forth in (3) below.

(2) Requirements of a Valid Travel Card Transaction. When a travel card bearing an expiration date is presented, Retailer must check the date to be sure the card is currently valid.

Retailer must seek approval of credit sales of a certain dollar amount as designated by special written notification by telephoning Texaco's Authorization Center; and if credit is approved, Retailer will record on the invoice in the space marked "Authorization Code", the authorization code number furnished. If the sale is disapproved, Retailer will be requested either:

(a) "DO NOT HONOR CARD"

(b) "PICK UP CARD—$20 REWARD."

(c) Since Retailers are independent businessmen, Texaco does not have the right to tell them how to conduct their private business affairs. However, this Agreement will serve to confirm that Texaco has not and will not request and does not authorize any Retailer to accuse any person of a crime or to file any complaint, civil or criminal, against any person for, or in Texaco's name arising out of any credit card or other transaction. The instructions furnished by Texaco's "Charge Authorization Center" in connection with credit card transactions is not intended in any way to represent that any person has violated any law or ordinance.

It is suggested that a Retailer not take steps to make any accusations, file a complaint or otherwise cause the arrest of a customer without first consulting his personal attorney.

After filling in the details of any transaction legibly with a ballpoint pen or pencil, Retailer must insert the invoice and the purchaser's travel card in the imprinter and imprint the travel card account number, the purchaser's name and the total amount of the transaction on the invoice. (The written and imprinted totals must agree. If they do not, the imprinted amount shall prevail). The customer must then sign the invoice for the products and services and to confirm the accuracy of the completed invoice.

The Texaco Travel Card imprinter is the property of Texaco Inc. and may be used by Retailer only to imprint Texaco invoices with Texaco Travel Cards and any other special credit-cards authorized by Texaco.

(3) Texaco's Chargeback Rights. Texaco may charge back to Retailer's account, within nine (9) months of date of sale, the face value, or any portion thereof, of invoices:

(a) bearing an illegible travel card number or pricing entries;

(b) imprinted with an expired travel card;

(c) with missing entries or notations where entries or notations are required by this Agreement;

(d) remitted by Retailer more than 30 days after the date of purchase;

(e) in amount as specified which does not bear an authorization code number;

(f) covering general repairs or replacements, mechanical and body work not specifically authorized by Texaco;

(g) covering sales which subsequently become the subject of disputes between Retailer and his customers, except disputes solely involving the quality or performance of Texaco products;

(h) with a customer's name signed by Retailer or one of his employes without the authority of the travel card holder;

(i) covering fraudulent sales or other activities by Retailer or his employes whether done alone or in concert with others;

(j) covering sales made contrary to special written instructions from Texaco to Retailer; and

(k) bearing incorrect, illegible, or missing license number or state of issue entries.

(l) in any other manner not authorized by or conforming to this Agreement.

From time to time new styled travel card invoices are furnished by Texaco to Retailers. Upon receipt of the new forms all obsolete travel card invoices should not be used. Any credit card sale made on an obsolete invoice will be subject to charge back three (3) months after notification.

Texaco will return, or furnish the Retailer with photocopies of unauthorized, illegible, improperly prepared and disputed invoices which are charged back.

(4) No Waiver of Chargeback and Termination Rights. It is understood that failure by Texaco to charge back to Retailer any such invoices from time to time shall not operate as a waiver of its right thereafter to charge back any invoice, within nine (9) months of the date of sale, which may thereafter be presented in violation of the provisions of this Agreement and shall not operate as a waiver by Texaco of its right to terminate this Agreement or any other contractual arrangements between Texaco and Retailer relating to the place of business at the above address.

(5) In the with this Agreement. It is recommended that the Retailer refer to the booklet Form B-452 (Retailer) "Information on the Handling of Texaco Travel Card Transactions".

(6) Other Agreements Between the Parties. Retailer understands and agrees that any material violation of the provisions of this Agreement shall give Texaco the right, in addition to all other rights it may have hereunder, to terminate forthwith any or all other contractual arrangements between Texaco and Retailer relating to the place of business at the above address.

(7) Modification and Termination. Texaco reserves the right to modify this Agreement by written notice to Retailer. Texaco reserves the right to cancel this Agreement at any-time and to repossess its travel card imprinter, other travel card equipment, completed and blank invoices and other travel card forms. This Agreement shall terminate automatically upon the termination or cancellation of the Agreement of Sale under which Retailer buys petroleum products from Texaco.

SO 000103

(8) Annual Travel Card Service Charge. The Retailer agrees to pay an annual charge for Texaco Travel Card
co. The charge shall equal one-half of one percent (.5%) of the total amount of Texaco Travel Card and unlisted
b card invoices submitted by Retailer to Texaco during a representative month, selected by Texaco in each calendar
but in no event shall the annual Travel Card service charge exceed thirty-six dollars ($36.00).

TEXACO INC.

by

Retailer

# PENINSULA OIL CO., Inc.

PLANTS:

SEAFORD
HARRINGTON
MILLSBORO
MILFORD
GEORGETOWN



**DISTRIBUTORS OF**

**Heating Oils — Gasoline**
**Lubricants**



P. O. BOX 309
SOUTH MARKET STREET
SEAFORD, DE. 19973
(302) 629 - 3001
Fax (302) 629-3870

November 15, 1993

William Glenn
Charles Glenn
T/A Laurel Oasis
Rte 13
Laurel, DE  19956

As per our meeting on November 9, 1993 we agree to participate in the following improvements at your Rte 13 facility.

An expenditure in the amount of $130,000 towards the purchase and installation of new pumps, canopy, console, signage, etc. needed for the resale of motor fuels.

An extension of your present contract by eight years which will now expire in January 31, 2008.

The signing of a new recovery agreement with the 31,249.85 remainder of the existing payout, and the $130,000 we are agreeing to expend with this new arrangement for a total of $161,249.85 to be recovered at the rate of $948.53 per month for 170 months ending 1/31/2008.

All of the other terms of the 2/13/90 agreement remain the same with the exception of the extension of expiration date which will also read January 31, 2008.

Yours truly,
PENINSULA OIL CO., INC,

Donald W. Williams

pt

#2578 P.001 / 015

JAN.25.2006 14:11

SO 000105

Jul 12 05 06:05p    Mark L. Greco        856-863-1795    EXHIBIT    p.29

PENINSULA OIL CO., INC.

Date ___3/16/94___

This agreement is between Peninsula Oil Co., Inc. of Seaford, Delaware and
___BC+G INC.___ T/a ___LAUREL OASIS___

Purchase price of gasoline shall be ___As outlined in Commission___
___Agent Agreement dated March 16, 1994___

Terms of payment will be ___CASH or NET(10) days___. All deliveries to be
made by transport truck upon 24 hours notice by buyer or at the convenience of
Peninsula Oil Co., Incorporated.

In consideration of the installation of pumps and other equipment as
specified in the "Equipment Loan Agreement", ___dated 3/16/94___, BC+G Inc. T/a Laurel Oasis
agrees to purchase motor fuels ___Exxon___ exclusively from Peninsula Oil Company
for a period of __14__ years from the date of this agreement and thereafter from
year to year until either party shall give the other written notice of cancellation
at least sixty (60) days prior to the anniversary date.

Accepted _____(SEAL)    By _____
          BC+G INC.                    Peninsula Oil Company, Inc.
                                       Seaford, Delaware

Accepted _____(SEAL)

### ASSET OF OWNER OR MORTGAGEE

The owner and the mortgagees of the premises described in the foregoing
agreement, here called the "Undersigned" hereby consents to said agreement and to
all installations of equipment, whether as therein set forth and provided for and
now or hereafter made thereunder or otherwise, and agree that no claim shall be made
to said equipment by the undersigned, the heirs, legal representatives, successors or
assigns of the undersigned and that the undersigned have (had) no mortgage lien upon
said property and that said property shall be exempt from levy, sale, attachment or
distress and that Peninsula Oil Company, its successors and assigns, may at any
time enter upon said premises with such appliances and agents as it may deem
necessary and without recourse to legal proceedings remove therefrom any or all of
said property.

Page (1)

PENINSULA OIL CO., INC.
SEAFORD, DELAWARE

Exhibit B

*see Exhibit B attached*

DATE: _3/16/94_

This agreement is between Peninsula Oil Co., Inc. of Seaford, Delaware and _B, C & B Inc.   T/A Laurel Oasis_

Purchase price of gasoline shall be _retail posted prices less commissions out-lined in the existing agreement_
Terms of payment will be _cash in net (0) day_. All deliveries will be made by truck upon 24 hours notice by buyer or at the convenience of Peninsula Oil Co., Inc.

In consideration of _Fuel dispensing equipment_ as specified in the "Equipment Loan Agreement". _B, C & B Inc. T/A Laurel Oasis_ agrees to purchase motor fuels _____ exclusively from Peninsula Oil Co., Inc. for a period of _1/4_ years from the date of this agreement and thereafter from year to year until either party shall give the other written notice of cancellation at least sixty (60) days prior to the anniversary date.

Accepted: _____(SEAL)  By: _____
                    _BC-B Inc._                   Peninsula Oil Co., Inc.
Accepted: _____(SEAL)          Seaford, Delaware

ASSET OF OWNER OF MORTGAGEE

   The owner and the mortgagees of the premises described in the foregoing agreement, here called the "Undersigned" hereby consents to said agreement and to all installations of equipment, whether as therein set forth and provided for and now or hereafter made thereunder or otherwise, and agree that no claim shall be made to said equipment by the undersigned, the heirs, legal representatives, successors or assigns of the undersigned and that the undersigned have (had) no mortgage lein upon said property and that said property shall be exempt from levy, sale, attachment or distress and that Peninsula Oil Co, its successors and assigns, may at any time enter upon said premises with such appliances and agents as it may deem necessary and without recourse to legal proceedings remove therefrom any or all of said property.

   Signed and sealed this _5th_ day of _April_ 19_94_.

                                    _____(SEAL)
                                              _BC-B Inc._
Witness _____              _____(SEAL)

Jul 12 05 06:06p    Mark L. Greco              856-863-1795        P.31
                                                               Exhibit    E·

PENINSULA OIL COMPANY

COMMISSION AGENCY AGREEMENT

This is a Agency Agreement entered into this ___*16th*___ day
of *March*_____, A. D. 19*94*, between Peninsula Oil Company, Inc., a
corporation of the state of Delaware, hereinafter referred to as "Principal"
and _*B.C. & Y Inc.   The Leased Casing'*_____.

hereinafter referred to as "Agent."

Now, witnesseth, Principal agrees to appoint Agent custody of its
petroleum products dispensing equipment, ·              bulk petroleum products
and other appurtenant equipment installed on Agents real estate located at ____

___*Rte. 13 Laurel, Del. 1995%*_____

subject to the following uses, convenants and conditions:

1) The term of the agreement shall be for a period of _*14*_ years,
commencing the *16th* day of *March* A D 19*94*, to the _*31st*_ day of
*January*___ A D *2008*. Should the Agency continue at the expiration of the
above noted term, the Agency shall thereafter continue on a year-to-year basis ·
until either party thereafter' gives sixty (60) days notice prior to the ex-
piration of the term or extension indicating termination of the Agency.

2) It is understood and agreed among the parties hereto that the oil
and gas pumps          and equipment used and needed in the dispensing of oil
and motor fuel products shall be and remain under the exclusive ownership and
control of Principal with the exception that Agent shall dispense the motor fuels
supplied by Principal through the equipment owned by Principal.

3) Principal shall supply and maintain, at its own expense and cost,
all motor fuel contemplated to be dispensed during the regular business hours of
the Agent. Agent shall maintain daily records of the motor fuels which are dispensed.
Agent shall pay to Principal weekly the sums received from the sale of the motor
fuel products.

4) In the dispensing of motor fuels, the price of such fuels shall at
all times be under the absolute control of Principal.

(1)

STO/ 400.P 8752#                                    JAN.25.2006 14:12

                                                               SO 000108

PENINSULA OIL COMPANY

COMMISSION AGENCY AGREEMENT

5)  Principal shall pay to Agent, no less than once a month on all
motor fuel sales as dispensed through the equipment of the Principal,
as follows:

    ___04___  Cents per gallon for Unleaded Regular

    ___04___  Cents per gallon for Unleaded Plus

    ___06___  Cents per gallon for Unleaded premium

6)  Agent shall be open for business a minimum of *One Hundred Twenty Six*
(_126_) hours per week and at least a portion of all seven (7) days of each
week.

7)  Agent shall maintain liability insurance in a sum no less than
Two Hundred Fifty Thousand Dollars ($250,000.00) for one (1) person per
occurrence, Five Hundred Thousand Dollars ($500,000.00) per occurrence, and
Fifty Thousand Dollars for property damage per occurrence, to protect both
the Agent and the Principal against any claims filed by any persons, companies,
organizations or individuals arising out of the use, lease or ownership of the
said property.  Each party shall maintain whatever insurnace it desires to
protect against loss of its equipment or to protect against any liability ——
which may arise against either party from their own acts, omissions or conduct.

8)  Agent shall not permit refuse to accumulate upon the premises but
shall at all times maintain the building and surrounding premises, which shall
include the entire area covered under this Agreement, free of refuse.
Additionally, Agent shall at all times comply with all local, county, state
and federal regulations applicable in the operation of its business.

9)  All signs proposed to be erected by the Principal upon the premises
herein demised shall be first approved by the Agent before such erection.
Such signs shall be in accordance with the local Planning and zoning regulations
and at all times in conformity with all city, county, state or federal laws.
Agent shall not unreasonably withhould its consent to the erection of signs
which in all ways comply with all local city, county and state and federal
regulations.

(2)

SO 000109

## PENINSULA OIL COMPANY

### COMMISSION AGENCY AGREEMENT

10) It is further convenanted and agreed that if the Agent shall fail to pay over the daily receipts intact or shall otherwise fail to comply with the conditions set forth herein, when and as the same should be done and as and when the same shall fall due and become due, or shall fail to keep and perform any of the covenants or agreements herein contained, then the Principal, at its option, may terminate the Agency and shall have the right to remove all bulk petroleum dispensing equipment, inventory and other appurtenant equipment.

11) Agent covenant and agree that they shall not at any time dispose of any inventory, property or equipment except in the usual course of business when they are delinquent in any manner in the payment of any sums specified in this agreement.

12) Principal, as hereinbefore set out, shall be the owner of all motor fuel dispensing equipment and shall, in its sole discretion, supply the necessary motor fuel equipment which in its sole discretion it deems necessary. The motor fuel dispensing equipment shall at all times be maintained by Principal and shall at all times be subject to Principal's maintenance and control except that Agent shall at all times during the hours of business have available proper personnel to dispense the motor fuels which will be available on the promises for sale as supplied by Principal during the minimum business hours as set forth herein.

13) This agreement shall be binding upon the parties hereto, their heirs, successors, administrators and assigns.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year aforesaid.

By: _____
    PENINSULA OIL CO. INC
    _____ BCG INC
    BG+G INC.

Attest: _____

(3)

SO 000110

Jul 12 05 06:07p    Mark L. Greco    856-863-1795    p.34

PENINSULA OIL CO., INC.
SEAFORD, DELAWARE

EXHIBIT A

RECAPTURE AGREEMENT

*Bal. Due of operators contract    31,249.1*
*add'l expenditures    130,000 ±*
*161,249.85*

We request that you incur an expenditure in our behalf of
B. C. & H. Inc. T/a Laurel Oasis    ($ 161,249.85    )
at our place of business located at Rt. 113 Laurel, De. 19956
for the following improvements:

4- Wayne MPD V580D3/EQY
2- Wayne DL 3/357 411L/19K
3- Wayne Satellite dispensers
1- Console & equip. for fuel dispensing
1- 50x36 Graham Canopy

*Jefress I.D.*
*major equip per*
*quote attached.*

In consideration of your incurring this expense and making these improvements, we agree that if prior to January 31, 2008 we shall sell or transfer our business to the above location or discontinue the sale at this location of Petroleum products, we will pay you the sum of One Hundred Sixty One Thousand, Two Hundred Forty Nine dollars & 85/100 ($161,249.85) less Nine Hundred Forty Eight dollars & 53/100 ($948.53) for each month which has elapsed from the date hereof to the date of such sale or transfer or discontinuance.

(We specifically understand and agree that all trade fixtures installed by you at our above place of business in accordance with the provisions of this letter are and shall at all times remain in your property.)

Will you please signify your acceptance of this agreement by signing the enclosed copies of this agreement in the space provided and return to us.

Accepted:
Peninsula Oil Co., Inc.

By: _____

Date: _____

Accepted:
BC+G Inc.

By: _____

Date: 4/5/06

SO 000111

PENINSULA OIL CO., INC.
SEAFORD, DELAWARE

GUARANTY AGREEMENT

3/16 19 94

For value received, and to induce Peninsula Oil Co., Inc., it's divisions and subsidiaries to undertake or continue to sell goods and/or lease property to *Delta One To Laurel Class*, hereinafter called the debtor, the undersigned, jointly and severally, hereby unconditionally and absolutely guarantee payment when due of any and all present or future indebtedness owed to you, your divisions and subsidiaries by the debtor and hereby agree to pay such indebtedness punctually if default in payment thereof is made by the debtor.

The undersigned expressly waive notice of acceptance of guaranty, demands and notices of non-payment, and consent to any extensions of time of payment of all or any of the indebtedness hereby guaranteed.

Without in any way limiting the generality of the foregoing, the undersigned acknowledge that this guaranty encompasses debtor's purchases of goods on account (including credit card purchases) and service, handling and delinquency charges incurred thereon, debtor's rental obligations for leased real and personal property, money borrowed by debtor (whether secured or not) and interest thereon, and debtor's obligations to account for goods consigned to or in the care or custody of debtor.

This guaranty is unlimited as to amount and time, but may be revoked by the undersigned effective five (5) days after receipt by you of notice to that effect, signed by the undersigned and delivered to you at the above address, marked for the attention of the Credit Manager, but such revocation shall not affect liability on any indebtedness then existing. Furthermore, the undersigned agree that in the event of the death of one or more of the undersigned, each such decedent's heirs, executors and administrators shall be bound hereby until actual knowledge of such death shall come to the attention of the Credit Manager.

The undersigned will indemnify you, your divisions and subsidiaries for attorney's fees, court costs and other legal expenses incurred by you in enforcing this guaranty.

Witness _ky_ hand(s) and seal(s) this _5_ day of _April_ 1994.

Witnesses: _____   Name: _____
           _____   Address: _Rt. 13_
                                        _Laurel De 19956._
                               Name: _____
                               Address: _____

SO 000112

PENINSULA OIL CO., INC.
SEAFORD, DELAWARE

CREDIT CARD LOAN EQUIPMENT AGREEMENT

This agreement made this _16 th_ day of _March_, 19 _94_ by and between _Peninsula Oil Co Inc_ and _B6 x G Inc T/A Laurel Oasis_ of _Laurel De 19956_ hereafter called retailer owning or leasing premises above.

The monthly charges for leasing this ~~_____~~ automated Credit Card Terminal with electronic printer will be as follows:

1.) ~~_____~~
2.) ~~_____~~
3.) ~~_____~~

~~_____~~

~~_____~~
~~_____~~

This agreement shall be in effect for _14_ years, commencing on _March 16, 1994_ and ending on _Jan 31, 2008_.

Retailer agrees to be responsible to _Peninsula Oil Co Inc_ for the performance of his employees using the automated system and all conditions set forth in _the Texaco_ manual of "Handling Credit Cards" and any further changes they may make to the program from time to time.

PENINSULA OIL CO., INC.

_____        BY _____
Witness

_____        _B6 + G Inc._
Witness                              Retailer

SO 000113

Jul 12 05 06:08p     Mark L. Greco                    856-863-1795                    p.37

## EQUIPMENT LOAN AGREEMENT

Made this _16th_ day of _Mar_ 19 _94_

by and between THE PENINSULA OIL COMPANY, a body corporate of the State of Delaware, with offices at Seaford, Delaware, hereinafter called the "SELLER" and

_Boy & Bri Th Lowell Cassin_ of _Seaford, De. 199.5 T_

hereinafter called "CUSTOMER" owning or leasing premises above.

No. 1   EQUIPMENT: Seller agrees to lend and hereby lends to Customer the equipment installed at the above premises for the active and continuous storage, handling and dispensing of Seller's products exclusively, as follows:

| QUANTITY | EQUIPMENT | |
|---|---|---|
| 4 _Wayne HM Visto 03/864_ | | 1- _Dwyer T.D. Petro 1 Digi_ |
| 2 _Wayne DL 31354 M4/194_ | | _Trigg equip pump_ |
| 2 _Wayne Satellite Dispensers_ | | _attached printer_ |
| 1- _Oracle 1 fuel disp. equip_ | | 1- _Gilbco Authorise A Cl. Cash machine_ |
| 1- _50 x 361 Moduct Canopy_ | | 1- _Gascard. Cn'l'd Machine_ |

Said equipment shall remain the property of the Seller and be considered and treated as personal property and in no sense fixtures or part of the real estate regardless of the manner in which the same may be installed or placed on premises. Customer hereby acknowledges receipt of said equipment and agrees not to remove same without written consent, and guarantee to return said equipment upon expiration or termination of contract in good condition and without loss or impairment of Seller's title thereto unless title has been acquired by Customer under bill of sale.

No. 2   MAINTENANCE: Customer shall maintain said equipment in good condition and in event of partial or total destruction of all or any of the same, shall reimburse Seller for damaged equipment or cost of replaced or restored equipment, which shall become the property of the Seller and be governed by this contract.

No. 3   DEFAULT AND TERMINATION: If upon the expiration or termination of the contract said equipment is not sold to the Customer or to any other party, the Seller may without notice to the Customer at any time enter upon the premises and remove the equipment.

No. 4   INDEMNITY: Customer shall indemnify and save the Seller harmless from all liability, cost and expense for any loss, damage, injury or expenses to Customer or any person or property in any way caused by said equipment or any property of the Seller or the use or handling thereof, whether or not due to any imperfection therein or arising from negligence or otherwise. Customer hereby waives and releases any claim against the Seller hereunder in respect to the foregoing, however caused and for any losses or shortages arising out of the use of any measuring devices furnished or due to any other matter or anything whatsoever.

No. 5   DURATION: This contract shall continue in effect for a period of _14_ year from the date hereof and thereafter from year to year unless terminated at the end of the initial period or any such subsequent year by either party upon sixty days prior written notice to the other party at their above respective addresses.

No. 6   ADDITIONAL EQUIPMENT: Any and all additional equipment loaned or installed or placed for the use of the Customer, shall be deemed to be loaned upon the terms and conditions of this agreement during the period of this contract.

No. 7   ASSIGNMENT: This contract is not assignable by the Customer but otherwise is binding on and for the benefit of the Customer and the Seller and respective legal representatives, successors and assigns.

In Witness whereof, the parties have duly executed this agreement the above day and year.

THE PENINSULA OIL COMPANY

Witness _____     By _____

_____     Customer _____

_B & G Inc._

SO 000114



# COASTAL
## PUMP & TANK

P.O. Box 177
Harrington, DE 19952

November 17, 1993
Revised Quote: #1481 A

Oasis Truck Stop
P.O.Box 311
Laurel, Delaware  19956

Attn: Mr. William Glenn

    Coastal Pump & Tank is pleased to quote you on the following
equipment and installation, per your request.

MAJOR EQUIPMENT:
4- Dresser Wayne  Model #V580D3/GQY, two hose, three grade fixed
   ratio blenders with the following specifications:
            -Valance/unlighted
            -Major oil specifications
            -Prepay/Postpay operation
            -Spin-On filters
            -Self-Diagnostics
            -Speakers
            -Cash Credit

2- Dresser  Wayne Model #DL3/357MIL/19K, lane oriented Duo-1
   master truck stop dispensers with  the following
specifications:
            -Hose Hangers
            -Remote Price setting capability
            -Self-Diagnostics
            -Prepay/Postpay operation
            -Cash Credit
            -Option: Stainless steel doors    COST...$79.00 per set

1- Dresser Wayne Model #DL1/357-SU/KR, satellite truck stop
   dispenser with the following specifications:
            -Lane oriented
            -Single sided unit
            -Option: Stainless steel doors    COST...$79.00 per set

1- Dresser Wayne Model #DL1/358-SU/K, satellite truck stop
   dispenser with the following specifications:
            -Lane oriented
            -Duo-2 satellite
            -Option Stainless steel doors     COST...$79.00 per set

SO 000115

Oasis Truck Stop
Revised Quote: #1481 A
Page 2

1- Dresser Wayne Plus-2 Terminal generic  keyboard and the
   following specifications:
          -Site controller with Wayne Plus software and hardware
          -Receipt journal printer.
          -Cash drawer
          -Data distribution cabinet-16 fueling points
          -All required cables

1- 50' X 36' four-column fashion  canopy with the following
   specification:
          -Column spacing 26' lengthwise, 26' widthwise
          -30# live load/25# wind load
          -Texaco Specifications
          -44" Laminated smooth facade  (Texaco flat black)
          -2 26" X 4" thick X 26' long and 2-24" high X 4" thick X
           26' long (red message board).
          -12 400 watt SMH  canopy lights
          -Non union installation of canopy and lights
          -Freight to job site

1-Veeder Root Model #TLS-350 monitoring console with continuous
  statistical leak detection and integral printer.

1-Veeder Root, input probe interface module
4-Veeder Root, 0.2 GPH magnetostrictive probes
4-Veeder Root, probe installation kits
4-Veeder Root, cap and ring kits
4-Veeder Root, piping sump sensor
1-Veeder Root, interstitial/liquid sensor interface module
2-Formex stainless steel bumper ends 18" high (gasoline island)
4-Formex 4' X 10' X  18" stainless steel island forms (diesel
  Island)
16-6" Black iron steel pipe bollards-filled with concrete
8-Environ dispenser sumps
3-Environ pump sumps
450-Foot Environ flex ii double wall piping, with related elbows,
  couplings,tees, and adapters
150-Foot Ameron fiberglass vent  and vapor line piping, with
  related elbows, glue kit, coupling and adapters
3-36" Steel traffic manholes
2-Universal dry breaks with caps
3-Environ tank adapters
4-Environ flex entry boots
4-2" Brass ball valves

SO 000116

Oasis Truck Stop
Revised Quote: #1481 A
Page 4

WORK SCOPE----GAS SYSTEM
A.) Fill out necessary permits for D.N.R.E.C. and Fire Marshall
B.) Demo existing gas island and dispose of properly
C.) Repair concrete disturbed at this area
D.) Demo concrete over tanks and dispose of properly
E.) Remove and dispose of blacktop to complete new island work
F.) Excavate over tank and expose pump and tank openings
G.) Remove on submerge pump and manifold the 6,000 and 4,000
    gallon tank together
H.) Install (2) new containment sumps at existing submerge gas
    pump
I.) Trench from tanks to new island location
J.) Set up 4 Stainless steel dogbone islands and dispenser
    containment sumps, and finish with concrete
K.) Excavate and install 4-3' X 3' X 5' concrete canopy footers,
    with anchor bolts
L.) Pipe the new double wall product piping from tanks to
    dispensers
M.) Install the  fiberglass piping for future stage II vapor
    recovery
N.) Install new fiberglass vent lines to building with pressure
    vacuum vents
O.) Backfill all piping to grade with clean washed sand
P.) Install new conduit from dispenser over to existing conduit
    at building
Q.) Relocate relay boxes and wiring to new counter area
R.) Install the proposed 50' X 36' canopy and lights
S.) Install new conduit and wiring to lights and hook to existing
    conduits from old canopy
T.) Install the new blender dispenser and make all piping and
    electrical connections between console and printer, hooking
    to existing intercom system in store
U.) Form and repair concrete area 8' X 8' X 8" and 15' X 26' X 8"
    over tanks
V.) Form and pour a 50' X 36'  X 8" concrete island mat under
    canopy
W.) Start up and test new gas system and train personnel on the
    operations of new system

Oasis Truck Stop
Revised Quote #1481 A
Page 5

WORK SCOPE----DIESEL SYSTEM
A.) Demo the existing diesel islands and  concrete around old
    island
B.) Remove piping back to tank
C.) Excavate over tank and expose pump
D.) Install the new containment sump at existing sub pump
E.) Trench from tank to new islands
F.) Set up 4 Stainless steel islands and dispenser sumps, and
    finish with concrete
G.) Excavate and install 2-3' X 3' X 5' concrete canopy footers,
    with anchor bolts
H.) pipe the new double wall piping from tank to dispenser
I.) Backfill all piping sand
J.) Install new conduit from dispensers to existing conduit
    at building
K.) Install the new master dispenser, and satellites and make all
    piping connections and electrical connections between console
    and printer
L.) Form and pour 3-14' X 18' X 8" concrete mats
M.) Repair area disturbed at tank with concrete
N.) Remove and reinstall the existing canopy at diesel island
O.) Wire existing lights and signs on canopy
P.) Start up and test new diesel system for proper operation
Q.) Remove the existing TLS-250 Veeder Root console and probes
R.) Install the proposed Veeder Root TLS-350 console, probes,
    and sump monitoring system

MATERIAL AND LABOR NET PRICE.....................$145,000.00

NOT INCLUDED IN ABOVE QUOTE:
1.) Blacktopping
2.) Owner related variances or permits
3.) Changes or additions to existing electrical service

     Thank You for the opportunity to present this quotation.  If
I can be of any further assistance, please feel free to call me
at 302-396-3061.

                              Very Truly Yours,

                              Rubin R. Hughes
                              Project Manager


RRH/dm

# EXHIBIT B

BCG, Inc. and Chesapeake Products & Services, Inc. v. GLES, Inc., d/b/a Sweet Oil Company

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BCG, INC., and CHESAPEAKE )
PRODUCTS & SERVICES, INC., )
                                        )
          Plaintiffs, )
                                        )Civil Action No.
     v. )07-CV-207 GMS
                                        )
GLES, INC., d/b/a SWEET OIL )
COMPANY, )
                                        )
          Defendant/Third-Party )
          Plaintiff, )
                                        )
     v. )
                                        )
SUNOCO, INC., )
                                        )
          Third-Party Defendant. )

          Rule 30(b)(6) deposition of PLAINTIFFS,
taken through their corporate designee, WILLIAM GLENN,
pursuant to notice at the law offices of Young,
Conaway, Stargatt & Taylor, The Brandywine Building,
1000 West Street, Wilmington, Delaware, beginning at
10:07 a.m., on Thursday, March 27, 2008, before Julie
H. Parrack, RMR-CRR and Notary Public.

APPEARANCES:

          HARRY C. STORM, ESQUIRE
          Lerch Early & Brewer
             Three Bethesda Metro Center, Suite 460
             Bethesda, Maryland  20814-5367
             On behalf of Plaintiffs


                    WILCOX & FETZER
          1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

                    www.wilfet.com

BCG, Inc. and Chesapeake Products & Services, Inc. v. GLES, Inc., d/b/a Sweet Oil Company
## William Glenn

|  | 118 |  | 120 |
|---|---|---|---|
| 1 | A. Right. | 1 | A. To extend it to that length of time and all the |
| 2 | Q. They each have a different heading on them. | 2 | other agreements would be, remain the same. |
| 3 | And this one refers to the fact that what -- | 3 | Q. Is there a reason that you can think of why |
| 4 | A. All of the 2-13-90 contract agreements. | 4 | when you signed a new agreement it didn't have the |
| 5 | Q. Are going to be extended as per this letter of | 5 | same terms as the prior? |
| 6 | November 15th; is that right? | 6 | A. Because the letter said that it, that we were |
| 7 | A. That's what it says. | 7 | going to extend the agreement so that the exact same |
| 8 | Q. All right. But it also says you're going to | 8 | thing was the same. |
| 9 | sign a new recovery agreement, right? | 9 | Q. Okay. And when you saw the letter of November |
| 10 | A. Correct. | 10 | 15th, 1993, did you understand that you were going to |
| 11 | Q. And that's the only thing it says about | 11 | enter into the new agreements? |
| 12 | extending the prior agreements. That's how you're | 12 | A. To extend it to the end of the term. |
| 13 | going to do it. You're going to have this letter and | 13 | Q. Did you understand that you were going to enter |
| 14 | you're going to sign a new recovery agreement, right? | 14 | into new agreements? |
| 15 | A. I'm not sure. | 15 | A. With the same agreements that we had in the '90 |
| 16 | Q. Well, isn't that what it says? | 16 | agreement. |
| 17 | A. I'm going to read it. All of the other terms | 17 | Q. Okay, that's what you agreed to? |
| 18 | of the 2-13-90 agreement will remain the same with the | 18 | A. Yes. |
| 19 | exception of the extension date which will also read | 19 | Q. As of November 15th of 1993, right? |
| 20 | January 2000, okay. | 20 | A. Agreed that we were going to sign a new |
| 21 | Q. Okay, is that right? | 21 | contract with those same terms. |
| 22 | A. That's what it says. | 22 | Q. Did you sign a new contract with those same |
| 23 | Q. So what happened after this letter was signed | 23 | terms? |
| 24 | that led to the execution of the rest of the documents | 24 | A. Yes. |

|  | 119 |  | 121 |
|---|---|---|---|
| 1 | that are in this packet? | 1 | Q. And let's take a look at the commission agency |
| 2 | A. That's the extension that they signed. | 2 | agreement dated March 16, 1994. Does that extend the |
| 3 | Q. Well, no, the extension was this letter of | 3 | term of the relationship for a period of 14 years? |
| 4 | November 15th extended the prior agreement. | 4 | A. What's the date? Extends it to 14 years, yep. |
| 5 | A. No, that just agreed to that we were agreeing | 5 | Extends it to 14 -- |
| 6 | to do that. That wasn't the actual agreement. | 6 | Q. That effectively accomplishes that, right? |
| 7 | That's, there's not -- it's not signed there. That | 7 | A. Yeah. |
| 8 | was then here's what we're going to do. | 8 | Q. But there are other terms in this agreement, |
| 9 | Q. Okay. So then you signed new agreements? | 9 | aren't there? There's more to this than just an |
| 10 | A. Signed that, that we were going to extend that | 10 | extension. |
| 11 | agreement for the same terms. | 11 | A. It's basically the same. That's what we were |
| 12 | Q. But then you did sign brand new agreements, | 12 | agreeing to, the same thing. |
| 13 | didn't you? | 13 | Q. Well, you were agreeing to what was in this |
| 14 | A. To extend it just the same as the other. | 14 | agreement, weren't you? |
| 15 | Q. Okay. So what was the purpose of, for example, | 15 | A. We were agreeing to extend the other contract |
| 16 | signing a new commission agency agreement? | 16 | with the same terms. |
| 17 | A. To extend the agreement till the end of the | 17 | Q. Is there a reason why you didn't put the same |
| 18 | term. | 18 | terms in a separate contract, or the subsequent |
| 19 | Q. You already said that in the letter of November | 19 | contract? |
| 20 | 15th. | 20 | A. Because we had the agreement that it was going |
| 21 | A. That was their letter to us of exactly what we | 21 | to be the same terms. |
| 22 | were going to do. | 22 | Q. Well, that's as of '93. How about 1994, is |
| 23 | Q. And you were going to sign a new agreement | 23 | there a reason you didn't put the same terms into this |
| 24 | setting forth -- | 24 | commission agency agreement? |

31 (Pages 118 to 121)

BCG, Inc. and Chesapeake Products & Services, Inc. v. GLES, Inc., d/b/a Sweet Oil Company
William Glenn

---

122

1　A. By that letter in the agreement that we had
2　with them at the time, that was what we were agreeing
3　to.
4　Q. So even though you wrote a new agreement, what
5　you're saying is these terms didn't necessarily -- the
6　terms of this new agreement didn't necessarily guide
7　your performance if it was different from the
8　original?
9　A. We agreed that we would be operating under the
10　same agreement that, the '90 contract.
11　Q. I understand that's what you agreed to in 1993.
12　But by the time you actually entered into a separate
13　agreement, it doesn't have the same terms, does it?
14　A. There is missing little notes so that on this
15　new agreement, correct.
16　Q. Were they important little notes?
17　A. That's why we made sure we wanted to extend the
18　'90 agreement.
19　Q. Did you read the agreement that's dated March
20　16th, 1994 before you signed it?
21　A. I thought I was signing an agreement to extend
22　it, the '90 agreement.
23　Q. I didn't ask you that. I asked you if you read
24　it?

---

123

1　A. It's a good question --
2　Q. Well --
3　A. -- if I read the whole thing.
4　Q. So you did read the whole thing?
5　A. I said it's a good question if I read the whole
6　thing.
7　Q. Well, you've told us that you were personally
8　involved in negotiating the contract for Delmar. Were
9　you personally involved in negotiating the new
10　agreements at Oasis?
11　A. Yep, that's why we wanted to have them extend
12　the exact same contract.
13　Q. Okay. Is there a reason then -- well, let me
14　ask it this way: At some point you've read this
15　commission agency agreement dated March 16th, 1994,
16　haven't you?
17　A. Yes.
18　Q. And is that the reason you didn't include it as
19　an exhibit in your complaint?
20　A. No.
21　Q. Why was it that you didn't make reference to
22　this agreement in your complaint?
23　A. Don't know.
24　Q. Is it because the very term that supports the

---

124

1　major claim in your complaint isn't in the revised
2　agreement? .
3　A. I wouldn't say that.
4　Q. That wasn't important to you?
5　A. I didn't say that.
6　Q. Does the March 16th, 1994 agreement supersede
7　the February 1990 agreement?
8　A. It's an extension of it.
9　Q. And to the extent that it changes the terms,
10　does it change the terms of the relationship?
11　A. No.
12　Q. What possible purpose was there in entering
13　into a new commission agency agreement if it was
14　simply a matter of having an agreement that says the
15　prior agreement is extended?
16　A. To update the date.
17　Q. Just to update the date? No other purpose?
18　A. No.
19　Q. How would somebody who doesn't have the earlier
20　agreement know that?
21　A. Because it says here that going to extend the
22　agreement.
23　Q. Well, no, no. That predates the March 1994
24　agreement. How would somebody that just has the 1994

---

125

1　agreement that appears to be the agreement in force
2　subsequent to March 16, 1994, how would they know that
3　the terms of this agreement don't really apply but
4　that you're really just referring to terms from an old
5　agreement?
6　　　MR. STORM: Objection.
7　A. I guess they'd have to know the course of
8　business.
9　Q. And the course of business was to sign a new
10　agreement with different terms, but that was intended
11　to simply extend the old agreement?
12　A. The course of business was that it did extend
13　the exact same terms of it.
14　Q. Well, it extended the date, didn't it?
15　A. Extended the date and the terms of it, and we
16　operated under those exact same terms till Peninsula
17　was no longer involved in it.
18　Q. Is the commission agency agreement dated March
19　16th, 1994 also an agreement that is clear and
20　unambiguous?
21　　　MR. STORM: Objection.
22　A. Excuse me? Is the what?
23　Q. Is the March 16th, 1994 agreement also an
24　agreement that is clear and unambiguous?

---

32 (Pages 122 to 125)

BCG, Inc. and Chesapeake Products & Services, Inc. v. GLES, Inc., d/b/a Sweet Oil Company
## William Glenn

|  | 126 |
|---|---|
| 1 | A. Along with the letter that says that it's going |
| 2 | to extend the terms. |
| 3 | Q. Let's talk about the relationship generally. |
| 4 | What does the commission agency agreement relate to? |
| 5 | A. I'd say commissions to be paid on gasoline. |
| 6 | Q. What it says is that Peninsula is going to |
| 7 | supply gasoline that you're going to pump from your |
| 8 | site, right? |
| 9 | A. Yes. |
| 10 | Q. And as a result, for every gallon pumped, |
| 11 | you're going to get some specified commission? |
| 12 | A. Correct. |
| 13 | Q. Is that right? Does it say anything else in |
| 14 | there of any consequence? |
| 15 | A. Does the agreement -- do the agreements say |
| 16 | anything more of consequence? |
| 17 | Q. Yeah, do the rest of the terms of the agreement |
| 18 | say anything else that means anything? |
| 19 | A. I'm sure there's all kinds of terms in there. |
| 20 | Q. Did you ever read it and understand those |
| 21 | terms? |
| 22 | A. Yes, I hope so. |
| 23 | Q. Does the commission agency agreement dated |
| 24 | March 16th, 1994, say in dispensing motor fuels, the |

|  | 128 |
|---|---|
| 1 | 20-some years. They signed a letter stating they were |
| 2 | going to extend the agreement. All they were going to |
| 3 | do was use the exact same terms of that agreement, |
| 4 | because we fought long and hard to make sure we had |
| 5 | everything just so and that we were happy with it, |
| 6 | they were happy with it, we were signing an extension. |
| 7 | Q. And so after fighting long and hard, you never |
| 8 | read the document to see if in fact it did have the |
| 9 | same terms? |
| 10 | A. Because we were extending the contract, we were |
| 11 | extending the contract. So we were using those same |
| 12 | terms and conditions. |
| 13 | Q. But you would agree on paper it doesn't have |
| 14 | the same terms and conditions, does it? |
| 15 | A. There is a couple differences. |
| 16 | Q. And when you read this commission agency |
| 17 | agreement, didn't you say we agreed to have the same |
| 18 | terms and conditions so why don't we put the same |
| 19 | terms and conditions in? |
| 20 | A. I thought they were in there. |
| 21 | Q. So you're saying when you read it, you didn't |
| 22 | understand it or didn't look at it carefully? |
| 23 | A. No, I thought for sure, I thought for sure, |
| 24 | because of what we had signed, that we were extending |

|  | 127 |
|---|---|
| 1 | price of the fuels shall at all times be under the |
| 2 | absolute control of Peninsula. |
| 3 | A. And with the agreement that we had, it would |
| 4 | be -- |
| 5 | Q. No, I'm not talking about -- |
| 6 | MR. STORM: Objection, objection. He |
| 7 | needs to answer the question. |
| 8 | A. And with the agreement that we had, that it |
| 9 | would be the same carry-forth agreement that it would |
| 10 | be competitively priced. |
| 11 | Q. Yeah, but isn't it true that if that was the |
| 12 | case, you would have put those same terms in this |
| 13 | agreement, wouldn't you? |
| 14 | A. No, we had it drawn up that it would extend the |
| 15 | exact same terms. |
| 16 | Q. Well, how hard is it to type in a little note? |
| 17 | Was that something that couldn't be done if that was |
| 18 | the intention in this agreement? |
| 19 | A. It was our -- it was our understanding that |
| 20 | that is what we were signing, was an extension of the |
| 21 | terms exactly like they were. |
| 22 | Q. Well, couldn't you go through the agreement to |
| 23 | see if it did have the same terms? |
| 24 | A. We had been dealing with those people for |

|  | 129 |
|---|---|
| 1 | the agreement with the same terms. We had a signed |
| 2 | agreement with them to do that. |
| 3 | Q. Have you ever heard of the possibility that |
| 4 | having signed a general letter of intent when you get |
| 5 | down to finishing the long and hard discussions, you |
| 6 | would actually finalize an agreement that had some |
| 7 | variations with the letter of intent? Did you ever |
| 8 | hear of that happening? |
| 9 | A. Didn't think we would have that worry. |
| 10 | Q. Well, weren't you worried when you read this |
| 11 | agreement and it didn't have the same terms? |
| 12 | A. No, we had been -- as a course of business we |
| 13 | had never varied from the same terms we had agreed |
| 14 | upon all along. |
| 15 | Q. Did you think that when you read the complaint |
| 16 | that it would be important to have the entire |
| 17 | agreement attached as an exhibit to the complaint? |
| 18 | A. I didn't go over it that close, I guess, that |
| 19 | it wasn't an issue with me. |
| 20 | Q. When is the first time you realized that the |
| 21 | 1994 agreements weren't attached to the complaint? |
| 22 | A. You just told me. |
| 23 | Q. You didn't know that before today? |
| 24 | A. No. |

33 (Pages 126 to 129)

# EXHIBIT C

**From:** Mark L Greco (mgreco@sweetoil.com)
**To:** BILLGLENN4@aol.com
**Date:** 12/27/2005 12:49:17 PM
**Subject:** Re: Oasis Agreement

Bill,

See attached Mutual Termination & Bill of Sale.

Happy Holidays,

Mark


CONFIDENTIALITY NOTICE: This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone

>>> <BILLGLENN4@aol.com> 12/25 10:30 AM >>>
Mark,

Hopefully after the attorney reviews the contracts and paperwork we can move forward quickly. Please send the Laurel contract termination, equipment transfer, and anything else we will need to sign so we can take care of this all at one time.

Thanks

Bill



PLAINTIFF'S EXHIBIT
64

SO 000473

## BILL OF SALE

This Bill of Sale is made this _____ day of **January 2006,** by **GLeS, Inc. t/a Sweet Oil by assignment of agreements and interest of Peninsula Oil Company** (hereinafter "Transferor") in favor of **BC & G, Inc. t/a Oasis Travel Plaza** (hereinafter "Transferee").

**WHEREAS,** Transferor and Transferee are parties to that certain Equipment Loan Agreement between the parties dated **March 16, 1994,** (the "ELA"); and

**WHEREAS,** in consideration of value received over the term of the ELA, Transferor hereby transfers to Transferee all the Fixtures and Equipment owned by Transferor used for the purpose of selling motor fuels at Transferee's Retail Station, including but not limited to canopy, MPD's, console, tanks & piping (where applicable), monitoring systems, and except for oil company "brand" identification which must remain the property of the Transferor.

**NOW THEREFORE,** Transferor hereby transfers to Transferee all of Transferor's right, title and interest in and to the Fixtures and Equipment as provided in the ELA. Transferor hereby warrants to Transferee that Transferor has good title to all of the Fixtures and Equipment and such Fixtures and Equipment is being transferred by Transferor free and clear of all liens, charges and encumbrances and Transferor will defend Transferee's title to the Fixtures and Equipment against any claims made by anyone claiming by, through or under Transferor.

**IN WITNES WHEREOF,** Transferor intending to be legally bound hereby, has caused this Bill of Sale to be duly executed the day and year first above written.

WITNESS:                                    Transferor: **GLeS, Inc. t/a Sweet Oil**


_____          BY:_____(SEAL)
                                                    Mark L. Greco V.P.


WITNESS:                                    Transferee: **BC &G, Inc. t/a Oasis Travel Plaza**


_____          BY:_____(SEAL)

                                                    Print: _____

SO·000474

## TERMINATION OF SALES AGREEMENT
## AND MUTUAL RELEASE

THIS TERMINATION OF SALES AGREEMENT AND MUTUAL RELEASE AGREEMENT (the "Agreement") is made effective as of January _____, 2006, between GLeS, INC., t/a SWEET OIL COMPANY a Delaware corporation (hereinafter the "Seller") and BC & G, Inc. t/a Laurel Oasis Travel Plaza with office located at Rt 13 Laurel, Delaware 19956 (hereinafter "Operator").

### BACKGROUND

WHEREAS, on or about February 13, 1990 and later amended on March 16, 1994, Operator entered into that certain Supply, Commission Agency, Loaned Equipment, Recapture, Guaranty, Mortgage, and Credit Card Agreements (collectively the "Sales Agreement") with Seller; and

WHEREAS, Seller and Operator have agreed to amicably resolve their differences with respect to the Sale and the obligations and liabilities of the Operator under the Sales Agreement and whereby the Sales Agreement shall be terminated and in consideration of the termination of the Sales Agreement, and the release by Seller of all its claims and causes of actions against Operator with respect to the Sales Agreement.

NOW THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid by each of the parties to the other, the receipt and sufficiency of which are hereby acknowledged and confessed, and in consideration of the mutual promises and agreements exchanged and contained herein below, the Seller and Operator hereby mutually agree that the Sales Agreement shall be, and hereby is, terminated effective as of January _____, 2006 (the "Termination Date"), and neither party thereto shall have any further rights and/or obligations thereunder except as follows:

1.      Subject to the provisions of this Agreement, it is further agreed that Operator, in consideration of the foregoing release by Seller, hereby releases, remises, and forever discharges Seller from any and all claims, demands, debts, obligations, covenants, actions and causes of actions which Operator may have had, now has or ever may have, arising under the Sales Agreement.

2.      Subject to the provisions of this Agreement, Seller and Operator covenant and agree that they will not directly or indirectly abet, encourage, suggest, promote, commence, aid, prosecute, cause or permit to be commenced or prosecuted against the other, any action, legal or otherwise, or any other proceeding based upon any claims, liens, demands, causes of action, obligations and damages or liabilities which arise out of or pertain to the Sales Agreement.

3.      Seller and Purchaser acknowledge and warrant that no promise, inducement or agreement not expressed in this Agreement has been made to either of them in connection with this Agreement, and that the provisions herein constitute the entire agreement between the parties.  No modification of this Agreement shall be effective unless it is in writing and signed by the party charged with such modification.

4.      This Agreement may be executed in one or more counterparts, any or all of which shall constitute one and the same instrument.

5.      This Agreement shall binding upon and inure to the benefit of the parties and their respective heirs, personal representatives, successors, and assigns.

6.      Each of the parties signing below on behalf of Seller and Purchaser hereby represents and warrants to the other party that he or she is duly authorized to execute and deliver this Agreement on behalf of the party for whom such person is acting.

IN WITNESS WHEREOF, intending to be legally bound hereby, the parties have executed this Agreement under their hands and seals as of the date first referenced above.

SELLER: GLeS, Inc. d.b.a. Sweet Oil Company            PURCHASER: BC & G, Inc.

By:                                                                          By:
    Mark L. Greco            - Vice President                                                    – President

                                                                              By:
                                                                                                  –Secretary

SO 000475

# EXHIBIT D

Page 1

PENINSULA OIL & PROPANE
P.O. BOX 389
SEAFORD, DELAWARE 19973
PHONE#: (302) 629-3001

*** INVOICE ***
#252517

(302) 875-7107        LOC #: 1 (1) 875-7107

DPS NAME: (DIESEL ACCT)

VOID LOCATION

ACCOUNT#

CLERK: COM
SALESMAN:

TERMS: NET 10 DAYS
SHIPPED: 03/04/05        INVOICED: 3/07/05

| STOCK # | QUANTITY | SHIP-REF | DESCRIPTION | QUANTITY | UNIT | PRICE PER UNIT | EXTENDED |
|---------|----------|----------|-------------|----------|------|----------------|----------|
| 7 | SBC | 7501 | LOW SULFER DIESEL | 7501.000 | GALS | 1.621300 | 12161.37 |
|  |  | 120 | DELAWARE HAZARDOUS TAX |  |  | 0.9000002 | 109.45 |
|  |  | 120 | FEDERAL EXCISE TAX | 7501.000 |  | 0.244000 | 1830.24 |

TRUCK STOP RT 13

SUBTOTAL                14101.06

RECEIVED PAYMENT

CUSTOMER SIGNATURE

B/L #203137

BY _____        PLEASE PAY FROM THIS INVOICE DATE

PENINSULA OIL & PROPANE

P. O. BOX 1389

SEAFORD, DELAWARE 19973

PHONE# (302) 629-3001

** INVOICE **

#2525440

Page 1

B75-7107

ACCOUNT # LAUREL DE 149956

SHIP TO: LAUREL DE 149956
Stated

INVOICE# 3/07/05    TERMS: NET 10 DAYS    SALESMAN:    CLERK: COM

INVOICED: 3/08/05

| QUANTITY | UNIT | QUANTITY | PRICE PER UNIT | EXTENDED |
|---|---|---|---|---|
| STOCK #: | DESCRIPTION | | | |
| 7501 | LOW SULFER DIESEL | 7501.000 GALS | 1.592600 | 11946.09 |
| | DELAWARE HAZARDOUS TAX | 0.900000X | 107.51 |
| | FEDERAL EXCISE TAX | 7501.000 | 0.244000 | 1830.24 |

TOTAL    13883.84

CUSTOMER SIGNATURE

BY    B/L #202473    DATE

**PLEASE PAY FROM THIS INVOICE**

CPS000319

# EXHIBIT E



# GLeS, Inc.
## t/a
## Sweet Oil Company

Chesapeake Products & Services Inc.
Mr. Charlie Glenn
PO Box 311
Laurel, Delaware
19956

July 11, 2006

Dear Sir,

I am in receipt of your letter today dated July 11, 2006 in which you assert you believe we have "failed to provide you with adequate response to your multiple attempts to obtain our compliance with the contracts we assumed from Peninsula Oil Company." I must again dispute this statement. I have responded to you verbally, via email, and by letter on numerous occasions. You don't seem to like my answer and are looking for a different response than you are getting and therefore not accepting the answer you receive. I will again attempt to explain our position to you, and must be perfectly clear WE WILL DO EVERYTHING LEGALLY PERMISSABLE TO ENFORCE OUR POSITION UNDER THE CONTRACTS WE PURCHASED FROM PENINSULA OIL, and furthermore, we do not recognize your right to terminate this agreement without proper authorization, and dispute your statement "In essence, you have indicated your intent to terminate, actually or constructively". If you do not like the answer you get to a question, it does not mean the answer is wrong. You must accept the fact a business relationship is a two way street not a one way street going your way. People in business together have disagreements, but these disagreements do not give the other the right to summarily dismiss the rights of the other as you are attempting.

To address the numbered points in your letter:

1. Peninsula Oil was supplying you Texaco branded products through a supply agreement with Motiva Enterprises, LLC. Motiva's right to sell Texaco products did in fact terminate on June 30, 2006 as part of a Federal Trade Commission (FTC) decree. At the time of our purchase of Peninsula Oil's agreement with you we informed you we did not have a supply agreement with Motiva, nor would we attempt to obtain one since their right to the Texaco brand was due to terminate prior to your supply agreement and a brand change was inevitable. We discussed this with you the menu of brands we had to offer and as per your contract, we "mutually agreed" to the replacement brand (Citgo) after several meetings, some of which including Terry Sullivan, Territory Manager for Citgo Petroleum.

2. It is difficult to determine when you are referring too in you comment "You placed our retail prices up to 20 cents higher than our competition" as you have been inconsistently providing us with price surveys. Without this information which is required to be provided daily, we must price based on product cost rather than competitive street prices, until you furnish us with this required information. As per the Commission Agency Agreement, we reserve the exclusive right to price our product as we determine responsible. I understand you would like us to be the lowest price on the street all of the time, but we must react to product cost changes, and be fiscally responsible in our actions.

3. This is the first time I have been told we charged you the incorrect price on the diesel fuel

---

**2604 EASTBURN CENTER • NEWARK, DELAWARE • 19711**
**PHONE: 302.368.9095 • FAX: 302.368.9045**



· 2.                                                                                                    July 11, 2006

delivered to Oasis Citgo. I will be happy to review any documentation you have to validate this new claim of pricing error. We have provided you documentation on every other claim of inaccurate pricing you have made, showing our records to be correct. We will be happy to investigate this latest claim if you can provide us any documentation to back up your request. Your contract states you will purchase all gasoline at "Retail posted price less commission" and diesel fuel at "our posted full transport price" at time of delivery. There is a footnote which states " Not to exceed Salisbury Rack prices by more than .025 per gallon". In fact, we have been charging you Salisbury rack price plus only .01 per gallon which means we have the right to charge you more than we have been charging you in the past. Your comments in your letter dated 5/22/06 about "the most cost competitive common carrier freight company to haul our fuels" is of course an ideal situation to request. You stated "historically your previous carrier was .0075 per gallon less expensive". This may be a true statement, however rates change now almost weekly due to federal department of transportation fuel surcharge rates which are posted on the DOT website. We routinely bid our common carrier freight every year to get a very competitive rate, but no where in your contract, or any other Peninsula Oil dealers contract is it mandated we use any specific carrier, nor does it state we must use the cheapest one, or the one you chose for any other reason. I will state again as I have in many of my previous letters responding to your letters, WE ARE NOT OVERCHARGING YOU FOR FREIGHT. You do not have the right in any of your agreements to audit, accept, or not accept any transport carrier we hire to make deliveries to your locations. The carrier we are currently using is certified by the refinery and terminal owners where your products come from, and carry all licenses, permits, and insurances legally required to make these deliveries.

4.   We have not "unlawfully transferred monies Electronically" from your bank account. It was mutually agreed in September 2005 we would EFT your account every Wednesday for diesel fuel product delivered to Oasis Citgo over the previous week, until you notified us in writing in March 2006 that you wanted to discontinue this practice and pay future invoices by check. We have not EFT'd your account since receipt of your letter.

5.   You allege we have refused to pay you your commission for gasoline sold under the Commission Agency Agreement. In fact, we paid you for the period of September 2005 through January 2006 based on our best estimate of what we believe due to you since you have refused to provide us with the daily sales reports which our Verifone Ruby equipment (loaned equipment) provides everyday at the time of closing of business, in addition to the reconciliation forms provided to you when you, your brother Bill, Adam Gray, Bill Sweet and I met with you live in your office back in September. We would like nothing more than to pay you properly, but without your cooperation in providing us with this very basic information we can not determine exactly what you are due. We have made numerous requests over several months, and still to this day have not received this information. If you provide us with this information in a timely manner, we can issue you checks immediately for any money which you are due.

Now that I have responded to your items, I must address additional items. It has come to our attention you have tampered with and damaged our loaned equipment by deleting proprietary software required by Citgo to process Citgo branded credit cards through our gasoline dispensers which are also loaned equipment. You do not have the right to take this action, and as required by your Citgo franchise, must pay to have this repaired. In addition, you have illegally seized possession of our credit card transaction receipts for all sales of gasoline owned by Sweet Oil Company, beginning with your tampering on June 19, 2006. This action must be corrected immediately, and all monies due to Sweet Oil must be immediately paid in full, or we will seek criminal prosecution for this theft.

We are in receipt of two checks from you which accompanied your letter today in which you have deducted what you believe to be your commission due from the sale of gasoline under the Commission Agency Agreement. We will be applying these checks toward your open balance due for diesel fuel sold to you at the Oasis Citgo location, as well as any money due to us which you collected from the cash sales of our

– 3 –                                                          July 11, 2006

gasoline at Oasis Citgo. These checks are # 12137 in the amount of $39,870.99 and # 12136 in the amount of $36,369.27.

Your letter states "our actions indeed force the termination of the contract" which we must again dispute. We have not violated any written agreement. We have no intention of terminating this agreement, or allowing you to unlawfully terminate this agreement and any action on your part to remove our signage, or any of the other loaned equipment on your site will trigger legal action on our part to defend our position to the full extent of the law under the contracts we purchased from Peninsula Oil Company, including but not limited to removing our loaned equipment from your location as allowed in the loaned equipment agreement if necessary.

We look forward to your response.

Sincerely Yours,

Mark L. Greco

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| BCG, INC. and CHESAPEAKE PRODUCTS & SERVICES,<br><br>        Plaintiffs,<br><br>    v.<br><br>GLES,INC., d/b/a SWEET OIL COMPANY<br><br>        Defendant/Third-Party Plaintiff,<br><br>    v.<br><br>SUNOCO, INC.,<br><br>        Third-Party Defendant | C.A. No. 07-cv-207(GMS)<br><br>TRIAL BY JURY OF TWELVE DEMANDED |

## CERTIFICATE OF SERVICE

I, D. Benjamin Snyder, hereby certify that on this 22nd day of August, 2008, I caused to be electronically filed a true and correct copy of the **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF TESTIMONY AND EVIDENCE SEEKING TO AMEND OR MODIFY THE MARCH 1994 COMMISSION AGENCY AGREEMENT** with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

| | |
|---|---|
| Seth J. Reidenberg, Esquire<br>Young, Conaway, Stargatt & Taylor, LLP<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>P.O. Box 391<br>Wilmington DE  19899-0391 | Matthew A. Kaplan, Esquire<br>Pepper Hamilton, LLP<br>Hercules Plaza, Suite 5100<br>1313 Market Street<br>P.O. Box 1709<br>Wilmington DE  19899-1709 |
| Hugh J. Hutchinson, Esquire<br>Leonard, Sciolla, Hutchinson,<br>Leonard & Tinari, LLP<br>1515 Market Street, 18th Floor<br>Philadelphia, PA 19102 | A. Christopher Young, Esquire<br>Pepper Hamilton, LLP<br>3000 Two Logan Square<br>18th and Arch Streets<br>Philadelphia, PA 19103-2799 |
| | |

I further certify that on this 22nd day of August, 2008, I caused a copy of the foregoing

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF TESTIMONY AND EVIDENCE SEEKING TO AMEND OR MODIFY THE MARCH 1994 COMMISSION AGENCY AGREEMENT** to be served

by U.S. Mail, postage prepaid, to the above-listed counsel of record.

PRICKETT JONES & ELLIOTT, P.A.

By:_____

David E. Brand (DE Bar No. 201)
John W. Paradee (DE Bar No. 2767)
D. Benjamin Snyder (DE Bar No.. 4038)
11 North State Street
Dover, Delaware 19901
(302) 674-3841

and

Harry C. Storm
Lerch, Early & Brewer, Chartered
3 Bethesda Metro Center, Suite 460
Bethesda, MD 20814

*Attorneys for the Plaintiffs*

DATED:  August 22, 2008