## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

BCG, INC. and CHESAPEAKE PRODUCTS & SERVICES, INC.,

    Plaintiffs,

v.                                        C.A. No. 07-cv-207 (GMS)

GLES, INC., d/b/a SWEET OIL COMPANY,      JURY TRIAL DEMANDED

    Defendant/Third-Party Plaintiff,

v.

SUNOCO, INC.,

    Third-Party Defendant.

### FINAL PRETRIAL ORDER

The matter having come before the court at a pretrial conference held pursuant to Fed.R.Civ.P. ("Rule") 16, the following actions were taken:

(1)    This action commenced in October 2006 with the filing of a Complaint by plaintiffs in the Superior Court of the State of Delaware.  Defendant filed an Answer with Counterclaim, and later filed a Third Party Complaint for Interpleader and Declaratory Judgment against third party defendant Sunoco, Inc. ("Sunoco"). Plaintiffs filed an Amended Complaint in March, 2007, and defendant filed a timely removal notice, removing the case to this Court.

Plaintiffs' Amended Complaint includes claims for breach of contract, declaratory judgment, tortious interference with contract, bad faith, violation of the Delaware Franchise Security Law, 6 Del. C. §2551, et seq., and the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, et seq., and attorneys' fees. Plaintiffs seek damages, including

punitive/exemplary damages, and the recovery of attorneys and expert witness fees. The defendant's Counterclaim asserts claims for breach of contract and conversion. The defendant's Third Party Complaint asserts claims for Interpleader, Declaratory Judgment and Indemnification. None of these claims will be pursued at trial for the reasons discussed in Attachment H and Sunoco need not participate at the trial.

There are no remaining Third Party Claims. *See S*chedule (h).

The issue of attorneys' fees shall be determined post-trial, pursuant to Local Rule 54.3. Likewise, any issues related to the recovery of expert witness fees and exemplary damages under the PMPA will be determined by the Court post-trial, pursuant to 15 U.S.C. §2805(d).

The jurisdiction of this court is invoked under the PMPA, 15 U.S.C. §2805, 28 U.S.C. §1331, and 28 U.S.C. §1367. Jurisdiction is not disputed.[1]

(2)    The following Schedules setting forth stipulations and statements were submitted and are attached to and made a part of this Order.

(a)    a comprehensive stipulation or statement of all uncontested facts, which will become a part of the evidentiary record in the case (and which, in a jury trial, may be read to the jury by the court or any party) is attached as *Schedule (a);*[2]

---

[1] In diversity cases or other cases requiring a jurisdictional amount in controversy, the Order shall contain either a stipulation that $75,000.00 is involved or a brief written statement citing evidence supporting the claim that such sum could reasonably be awarded.

[2] Counsel for plaintiff has the responsibility to prepare the initial draft of a proposed stipulation dealing with allegations in the complaint. Counsel for any counter-, cross- or third-party complainant has the same responsibility to prepare a stipulation dealing with allegations in that party's complaints. If the admissibility of any uncontested fact is challenged, the party objecting and the grounds for objection must be stated.

(b)    an agreed statement or statements by each party of the contested issues of fact and law and a statement or statements of contested issues of fact or law agreed to is attached as *Schedule (b)*;

(c)    except for rebuttal exhibits, schedules in the form set out in the attached *Schedule (c)* of;

(1)    all exhibits (all exhibits shall be marked for identification before trial), including documents, summaries, charts and other items expected to be offered in evidence; and

(2)    any demonstrative evidence and experiments to be offered during trial;[3]

(d)    a list or list of names and addresses of the potential witnesses to be called by each party, with a statement of any objections to calling, or the qualifications of, any witness identified on that list are attached as *Schedule (d)*;[4]

---

[3] Items not listed will not be admitted unless good cause is shown. Cumulative documents, particularly x-rays and photos, shall be omitted. Duplicate exhibits shall not be scheduled by different parties, but may be offered as joint exhibits. All parties shall stipulate to the authenticity of exhibits whenever possible, and this Order shall identify any exhibits whose authenticity has not been stipulated to and specific reasons for the party's failure so to stipulate. As the attached Schedule (c) indicates, non-objected-to exhibits are received in evidence by operation of this Order, without any need for further foundation testimony. Copies of exhibits shall be made available to opposing counsel and a bench book of exhibits shall be prepared and delivered to the court at the start of the trial unless excused by the court. If the trial is a jury trial and counsel desires to display exhibits to the members of the jury, sufficient copies of such exhibits must be made available so as to provide each juror with a copy, or alternatively, enlarged photographic copies or projected copies should be used.

[4] Each party shall indicate which witnesses *will* be called in the absence of reasonable notice to opposing counsel to the contrary, and which *may* be called as a possibility only. Any witness not listed will be precluded from testifying absent good cause shown, except that each party reserves the right to call rebuttal witnesses (who are not presently identifiable) as may be necessary, without prior notice to the opposing party.

(e)    stipulations or statements setting forth the qualifications of each expert witness in such form that the statement can be read to the jury at the time the expert witness takes the stand are attached as *Schedule (e)*;[5]

(f)    a list of all depositions, or portions thereof, to be read into evidence and statements of any objections thereto are attached as *Schedule (f)*;[6]

(g)    an itemized statement of special damages is attached as *Schedule (g)*;

(h)    waivers of any claims or defenses that have been abandoned by any party are attached as *Schedule (h)*;

(i)    for a jury trial, each party shall provide the following:

    (1)    trial briefs except as otherwise ordered by the court;[7]

---

[5] Only one expert witness on each subject for each party will be permitted to testify absent good cause shown. If more than one expert witness is listed, the subject matter of each expert's testimony shall be specified.

[6] If any party objects to the admissibility of any portion, both the name of the party objecting and the grounds shall be stated. Additionally, the parties shall be prepared to present to the court, at such time as directed to do so, a copy of all relevant portions of the deposition transcript to assist the court in ruling *in limine* on the objection. All irrelevant and redundant material including all colloquy between counsel shall be eliminated when the deposition is read at trial. If a video deposition is proposed to be used, opposing counsel must be so advised sufficiently before trial to permit any objections to be made and ruled on by the court and to allow objectionable material to be edited out of the file before trial. If good cause is shown as to why objections to portions of a video tape deposition could not be made sufficiently before trial to permit the court to rule, objections shall be handled by a procedure prescribed by the court in accordance with D.Del. LR 30.4(e). Video tape depositions shall otherwise be handled at trial in accordance with D.Del. LR 30.4(d).

[7] No party's trial brief shall exceed 15 pages without prior approval of the court **and all briefs and memoranda shall be double-spaced, with 1 inch margins, left justification and Times New Roman 12 pt. font.** Trial briefs are intended to provide full and complete disclosure of the parties' respective theories of the case. Accordingly, each trial brief shall include statements of:

    (a)    the nature of the case,
    (b)    the contested facts the party expects the evidence will establish,
    (c)    the party's theory of liability or defense based on those facts and the uncontested facts,
    (d)    the party's theory of damages or other relief in the event liability is established, and
    (e)    the party's theory of any anticipated motion for directed verdict.

The brief shall also include citations of authorities in support of each theory stated in the brief. Any theory of liability or defense that is not expressed in a party's trial brief will be deemed waived.

     (2)      three sets of marked proposed jury instructions, verdict forms, and special interrogatories, if any;[8] and

     (3)      a list of the questions the party requests the court to ask prospective jurors in accordance with Fed.R.Civ.P. 47(a) and D.Del. LR 47.1(a).[9]

(j)     for a non jury trial, each party shall provide proposed Findings of Fact and Conclusions of Law in duplicate;[10]

(k)     a statement summarizing the history and status of settlement negotiations, indicating whether further negotiations are ongoing and likely to be productive is attached as *Schedule (k)*;

(l)     a statement that each party has completed discovery, including the depositions of expert witnesses (unless the court has previously ordered otherwise).

---

[8] When this Order is filed, it shall be the responsibility of counsel for the plaintiff to file with the Clerk, in triplicate and on diskette, joint instructions with objections (i.e., the parties shall submit three separate, stapled copies of a single set of proposed jury instructions which shall include either side's objections to any given instruction along with their proposed instruction directly on the page following the instruction to which there is an objection). Prior to this submission, counsel must confer and make every reasonable effort to resolve objections and to submit agreed upon proposed jury instructions. The joint instructions shall contain a table of contents. Each proposed jury instruction shall carry a descriptive title. Each instruction shall be numbered in such a way as to identify which party is the proponent or whether it has been submitted jointly. All instructions, including objections, shall be in writing, and include citations of supporting authorities. Failure to object may constitute waiver of any objection.

    At the time of trial, counsel for the plaintiff shall submit an unmarked original set of instructions, verdict sheet, and any special interrogatories to the court in triplicate; to be sent to the jury room after being read to the jury. Supplemental requests for instructions during the course of the trial or at the conclusion of the evidence will be granted solely as to those matters that cannot be reasonably anticipated at the time of presentation of the initial set of instructions.

[9] Special voir dire questions shall be filed in triplicate and on diskette along with this Order but shall otherwise be filed in accordance with D.Del. LR 47.1(a).

[10] These shall be separately stated in separately numbered paragraphs. Findings of Fact should contain a detailed listing of the relevant material facts the party intends to prove. They should not be in formal language, but should be in simple narrative form. Conclusions of Law should contain concise statements of the meaning or intent of the legal theories set forth by counsel.

Absent good cause shown, no further discovery shall be permitted is attached

as *Schedule (l)*;[11] and

(m) motions *in limine*: No party shall file more than five (5) motions in limine

without prior approval of the court. Briefs (opening, answering, and reply) on

all such motions shall be due at the time of the filing of this Pretrial Order.

Opening and answering briefs shall not exceed five (5) pages and reply briefs

shall not exceed three (3) pages. The parties should submit an original and

two (2) copies, excluding appendices, declarations, affidavits and exhibits.

(3) Trial of this case is expected to take four (4) days.

(4) Trial is by jury.

(5) The parties recommend that six jurors and one alternate juror be selected at the

commencement of the trial.

(6) This Order will control the course of the trial and may not be amended except by

consent of the parties and the court, or by order of the court to prevent manifest injustice.

(7) Possibility of settlement of this case was considered by the parties.

/s/ D. Benjamin Snyder
David E. Brand (DE Bar No. 201)
John W. Paradee  (DE Bar No. 2767)
D. Benjamin Snyder (No. 4038)
Prickett, Jones & Elliott, P.A.
11 North State Street
Dover, Delaware 19901
(302) 674-3841

*and*

Harry C. Storm

/s/ Seth J. Reidenberg
Seth J. Reidenberg (DE Bar No. 3657)
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6706

*and*

Hugh J. Hutchison
Leonard, Sciolla, Hutchison,

---

[11] If this is a case in which (contrary to the normal requirements) discovery has not been completed, this Order shall state what discovery remains to be completed by each party.

823334.5                                                                                     79205.001

Lerch, Early & Brewer, Chartered
3 Bethesda Metro Center, Suite 460
Bethesda, MD 20814

*Counsel for the plaintiffs.*                    ·

Leonard & Tinari, LLP
1515 Market Street, 18th Foor
Philadelphia, PA 19102

*Counsel for Gles, Inc.*


/s/ Matthew A. Kaplan_____
Matthew A. Kaplan (DE Bar No. 4956)
Pepper Hamilton, LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
(302) 777-6528

*and*

A. Christopher Young
Pepper Hamilton LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799

*Counsel for Sunoco, Inc.*


**IT IS SO ORDERED** this _____ day of _____, 2008.


_____
CHIEF, UNITED STATES DISTRICT JUDGE

Schedule (a)

Statement of Facts Admitted

(Attached)

.

## SCHEDULE (a)

### STATEMENT OF UNCONTESTED FACTS

1.    The Plaintiffs are BCG, Inc., and Chesapeake Products & Services, Inc., Delaware corporations.

2.    The Defendant is GLeS, Inc., t/a Sweet Oil Company is a Delaware corporation.

3.    Plaintiffs' operate two travel plaza locations in Laurel Delaware (the "Laurel Oasis" location), and Delmar Maryland (the "Delmar" location).

4..    Both locations were supplied with motor fuel by Peninsula Oil Company ("Peninsula").

5.    By notice dated August 16, 2005, Peninsula notified the Plaintiffs in writing that it was transferring its business to Sweet Oil Company as of September 1, 2005.

6.    Sweet Oil was a motor fuel wholesaler that supplied fuel to retail motor fuel facilities.

7.    Sweet Oil was assigned Peninsula's contracts with plaintiffs, assumed those contracts, and thereafter Sweet Oil began supplying gasoline and diesel fuel to the Laurel Oasis location and the Delmar location.

The following facts focus on the Laurel Oasis Location:

8.    The expiration date of any agreement related to the Laurel Oasis location was January 31. 2008.

823883.3

79205.001

**1**

9.    After the assignment to Sweet Oil, Plaintiffs complained that it had not received commission payments on gasoline from Sweet Oil.

10.    After the assignment from Peninsula, Sweet Oil set the retail gasoline prices at the Laurel Oasis location. Plaintiffs complained to Sweet Oil, that the retail prices set by Sweet Oil were not competitive with the surrounding competition.

11.    Plaintiffs claimed that Sweet Oil materially breached the obligations under the contract applicable to the Laurel Oasis location, and by letter dated July 11, 2006 notified Sweet Oil that the contract was terminated. Sweet Oil responded by letter the same day, disputing plaintiffs' allegations.

12.    Plaintiffs purchased no further motor fuel from Sweet Oil after July 11, 2006 related to the Laurel Oasis location, and began buying its motor fuel from other sources.

13.    On July 19, 2006, Sweet Oil sent a letter to certain identified motor fuel suppliers regarding their potential sale of motor fuel to plaintiffs.

The following facts focus on the Delmar location:

14.    The Delmar location was branded "Mobil," under a contract between Plaintiffs and Peninsula dated October 3, 2002. Peninsula assigned its rights and obligations under the Delmar contract to Sweet Oil in September 2005.

15.    Sweet Oil was supplied with "Mobil" motor fuel under a contract between Sunoco, Inc. and Peninsula, which had been assigned to Sweet.

16.     Effective on June 5, 2006, plaintiffs were no longer able to process "Mobil" credit cards at the Delmar location

17.     By letter dated November 2, 2006, Sunoco notified Sweet Oil that Mobil brand motor fuel would no longer be offered by Sunoco after February 2007.

18.     In March 2007, Sweet Oil sold its assets to GPM and is no longer involved in supplying motor fuel.

Schedule (b)

Disputed Facts and Issues

(Attached)

**Schedule (b)**

A.    <u>Plaintiffs' Issues</u>.

1.    Whether defendant materially breached the express or implied terms of the agreement applicable to the Laurel, Delaware location (the "Laurel Oasis Supply Agreement") agreement  by (a) failing to maintain competitive retail gasoline prices;  (b) failing to pay plaintiffs commissions for motor fuel sold; (c) improperly charging credit card fees; (d) failing to pay for equipment repairs, and unlawfully transferring funds electronically from plaintiffs' bank account;  (e) overcharging on diesel fuel and freight in violation of an express price cap in the agreement; and, whether that agreement was lawfully terminated by plaintiffs as a result of defendant's breaches.

2.    The damages suffered by plaintiffs resulting from the material breaches of the Laurel Oasis Supply Agreement.

3.    Whether defendant materially breached the express or implied terms of the agreement related to the Delmar, Maryland location (the "Delmar Supply Agreement") by (a) failing to pay in a timely manner and at all, \$33,726.39 in incentive fee payments;  (b) overcharging for freight by failing to use the least expensive common carrier and charging an additional administrative fee; (c) precluding continued acceptance of Mobil credit cards; (d) unilaterally acting to change the Mobil brand to Sunoco, and removing the Mobil brand.

4.    The damages suffered by plaintiffs resulting from the breach of the Delmar Supply Agreement.

5.    Whether    defendant    tortiously    interfered    with    plaintiffs' contracts/prospective economic advantage through its action in sending a malicious letter to suppliers and prospective motor fuel suppliers in July 2006 after the termination of the Laurel

Oasis Supply Agreement.

6.      The damages suffered by plaintiffs resulting from the tortious interference, including punitive damages.

7.      Whether defendant violated the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§2801- 2806 by actually or constructively terminating the Delmar Supply Agreement by materially breaching the contract, removing the Mobil trademark, ceasing to supply Mobil products, and failing to provide proper notice of termination.

8.      The damages suffered by plaintiffs as a result of any PMPA violation.

9.      The entitlement to and amount of any attorneys' and expert witness fees recoverable under any of the foregoing claims.[1]

---

1       The parties acknowledge, stipulate and agree that any attorneys' fees and expert witness fee issues, as well as any issue of exemplary damages under the PMPA, shall be decided by the Court after trial.

## Schedule (b)

B.    Defendant's Issues

### Laurel Oasis

1.    Whether BCG materially breached the Commission Agency Agreement by its refusal to purchase fuel oil from Sweet Oil at the Laurel Oasis subsequent to July 16, 2006;

2.    Whether BCG was in breach of its contractual obligations by its failure to provide the information requested by Sweet Oil on a timely basis and in the form required by Sweet Oil;

3.    Whether Sweet Oil was contractually obligated to set the retail price of gasoline at a level that was "competitively priced with locations in the area;"

4.    Whether BCG was entitled to deduct credit card fees from the price it paid to Sweet Oil for diesel fuel;

5.    Whether Sweet Oil was required to pay for equipment repairs to the pumps and equipment relating to the distribution of diesel fuel;

6.    Whether the price Sweet Oil charged BCG for diesel fuel was consistent with the terms of the agreements;

7.    Whether BCG breached its obligations to Sweet Oil by failing to pay for product that was delivered and by failing to pay the balance of the Recapture Agreement; and

8.    Whether Sweet Oil used appropriate means to assert in good faith that it had a legally protected interest that it intended to protect when it sent letters to competing oil distributors advising them of that interest.

9.    Whether Sweet Oil suffered damages as a result of the breach of the agreements by BCG.

10.    Whether BCG converted property belonging to Sweet Oil at the Laurel Oasis to Sweet Oil's detriment and loss.

### Delmar

1.    Whether plaintiffs are required to pay Sweet Oil the incentive fees

that Sweet Oil repaid Sunoco where the Court determined that Sunoco was entitled to the incentive fees because the Delmar station was debranded during the term of the Tosco Incentive Agreement;

       2.      Whether plaintiffs breached the Distributor Agreement with Sweet Oil by failing to upgrade its credit card software to permit it to accept Mobil credit cards, Speedpass and debit cards during the time that it remained a Mobil branded facility;

       3.      Whether plaintiffs breached the Distributor Agreement by refusing to agree to a substitute brand when the Mobil brand became unavailable to Sweet Oil;

       4.      Whether Sweet Oil sustained damages as a result of plaintiffs unilateral rescission of Dealer Agreement; and

       5.      Whether plaintiffs were given appropriate notice, consistent with the provisions of the Petroleum Marketing Practices Act where Sweet Oil lost the right to grant the use of the Mobil brand, where plaintiffs failed to use good faith efforts to comply with the requirements of the Mobil brand and where plaintiffs agreed that the brand could be changed.

Schedule (c)

Exhibits

(Attached)

Schedule (c)

## PLAINTIFFS' EXHIBITS

The following exhibits were offered by plaintiff, received in evidence and marked as indicated:

2.      Sweet Oil/Peninsula Oil Assignment and Assumption Agreement 8/31/05

4.      Dough Boy's Mobil Price Breakdown

5.      Peninsula/Chesapeake Products & Service, Inc. Dealer Agreement 10/3/02

7.      Letter dated 8/23/01 from John Willey

9.      Letter dated 2/7/06 to Dolores Love

10.     Letter dated 4/25/06 to Dolores Love

11.     Indemnity Mortgage Agreement dated 1/2/03

14.     Letter to Sweet Oil dated 3/15/06

15.     Letter from Sweet Oil dated 3/20/06

17.     Email dated 3/16/05 from Greco to Love

19.     Email dated 12/19/05 from Collins to Greco

20.     Email dated 12/20/05 from Love to Greco

23.     Email dated 4/17/06 from Greco to Glenn

24.  Letter from Glenn to Sweet Oil dated 4/18/08

25.  Email dated 4/24/06 from Love to LeRoy

26.  Email dated 4/24/06 from Greco to Love

28.  Letter dated 5/16/06 from Greco to Chesapeake Products & Services, Inc. w/attachments

30.  Email dated 5/31.06 from Love to Greco

31.  Email dated 6/5/06 from Love to Greco

32.  Letter dated 5/22/06 from Glenn to Sweet Oil

33.  Letter dated 6/5/06 from Sweet Oil to Chesapeake Products & Services, Inc.

34.  Email dated 6/9/06 from Greco to Love

35.  Letter dated 6/20/06 from Glenn to Sweet Oil

38.  Email dated 6/28/06 from Greco to Love

39.  Email dated 6/28/06 from Love to Byard

43.  Announcement dated 8/30/06 from Sweet Oil to Operators

44.  Letter dated 11/2/06 from Sunoco to Sweet Oil

47.  Letter dated 1/29/07 from Hutchinson to Snyder

48.  Letter dated 2/7/07 from Storm to Hutchinson

49.  Email dated 1/30/07 from Collins to Greco

55.  Payment to Sweet Oil

56. Fax transmittal to Sweet Oil dated 12/2/05

57. Sweet Oil Account Quick Report 1/1/05 thru 11/21/05

58. Fax Sweet Oil to Laurel Oasis dated 12/6/05

59. Letter dated 8/16/05 from Peninsula to Dealers

60. Fax dated 9/19/05 from Sweet Oil to Laurel Oasis

61. Sweet Oil Accounting Summary

62. Fax dated 12/9/05 from Laurel Oasis to Sweet Oil

63. Credit Card Summary

65. Letter dated 3/15/06 from Glenn to Sweet Oil

66. Letter dated 7/11/06 from Glenn to Sweet Oil

67. Letter dated 7/11/06 from Sweet Oil to Chesapeake Products & Services, Inc.

68. Letter dated 7/19/06 from Sweet Oil to To Whom It May Concern

69. Letter dated 3/15/06 from Glenn to Sweet Oil

70. Letter to 7/20/06 from Glenn to Sweet Oil

71. Memo from Sweet Oil to Coraluzzo

73. Indemnity Mortgage Assignment and Assumption Agreement dated 12/27/06

74. Sunoco Incentive Program Documents

76. Mutual Cancellation Agreement Sunoco/Sweet Oil dated 2/5/07

77. Bank Statement dated 1/2006 Chesapeake Products & Services, Inc.

90.   Equipment Repair Invoices (CPS584-622)

91.   Credit Card Fees Summary
91A.  Credit Card Fee Backup

92.   Sign Expenses – Delmar (CPS970-971)

93.   Sign Expenses – Laurel Oasis (CPS972-975)

94.   Mansfield-Petro Traders Back-up

96.   Fax Communications Re: Commissions (CPS1157-1161)

97.   Payments to Sweet Oil (CPS1162-1183)

98.   Faxes Re: Retails (CPS1184-1199)

99.   Laurel Oasis Retail Sheets  (CPS 1200-1582)

100.  Peninsula Retail Price Comparisons (CPS1583-1606

101.  Incentive $ owed (CPS1609)

102.  Freight Calculation Backup (CPS1615-1696)

103.  Laurel Oasis Volume – M/F (CPS1697-1698)

105.  Delmar M/F Sales (CPS1702-1703)

106.  Delmar Store/Hardees/Restaurant Sales (CPS1704-1706)

110.  Sweet Diesel Summary (CPS0001-0004)
110A.  Back-up for diesel summary (CPS0005-0313)

111.  Peninsula Diesel/Summary (CPS0314)
111A. Back-up for Peninsula Diesel (CPS 0315-0583)

112.  Final Sweet Payment (CPS1616-1625)

114.  First Sweet Oil Invoice (CPS1627-1628)

115.  Peninsula Commission Payments (CPS1629-1633)

116.  Sweet Oil Final Payment (CPS1634-1645)

120.  Photos of Delmar

121.  Photos of Laurel Oasis

  1.  The following exhibits were offered by plaintiff and marked for identification.

Defendant objected to their receipt in evidence on the grounds stated:[1]

| PLAINTIFFS' EXHIBIT 12. | Delaware Market Share Report |
| --- | --- |
| Defendant's Objection: | Lack of foundation under F.R.E. 901; Irrelevant under F.R.E. 402; Hearsay |
| Plaintiffs' Response: | The exhibit was provided by defendant to plaintiffs in an effort to persuade plaintiffs to convert to the Sunoco brand. Defendant attempts to argue that plaintiffs were unjustified in switching to a brand with significantly less market share than the ExxonMobil brand. It is relevant under Fed. R. Evid. 402. And is not hearsay under Rule 801(c), or is subject to exception under 804(c). |

| PLAINTIFFS' EXHIBIT 54. | Laurel Oasis Agreement |
| --- | --- |
| Defendant's Objection: | Document contains outdated and irrelevant matters/objection to non-current portions of Exhibit as irrelevant under F.R.E. 402 |
| Plaintiffs' Response: | This contains the complete agreement under which the parties operated, consistent with their course of dealing, under 6 Del. C. §1-201(b)(3). |

---

[1] Copies of objected-to exhibits should be delivered to the court with this Order, to permit rulings *in limine* where possible.

PLAINTIFFS' EXHIBIT 80-80-O        Heckman Report dated 2/22/08
                                  as supplemented 7/30/08

    Defendant's Objection:        Lack of foundation under F.R.E. 901; Irrelevant
                                  under F.R.E. 402

    Plaintiffs' Response:         The report is relevant as damages are certainly an
                                  issue in the case. The foundation will be
                                  established through the testimony of the plaintiff's
                                  witnesses and Mr. Heckman.


PLAINTIFFS' EXHIBIT 95.        Peninsula Oasis Documents (CPS1127-1156)
    Defendant's Objection:        Lack of foundation under F.R.E. 901;
                                  Irrelevant under F.R.E. 402

    Plaintiffs' Response:         Plaintiffs will testify to the parties course of
                                  dealing prior to the assignment, laying
                                  proper foundation. The document is relevant
                                  to show the course of dealing, under 6 Del. C.
                                  §1-201(b)(3).

PLAINTIFFS' EXHIBIT 100.       Peninsula Retail Price Comparisons
                                  (CPS1583-1606)

    Defendant's Objection:        Lack of foundation under F.R.E. 901;
                                  Irrelevant under F.R.E. 402

    Plaintiffs' Response:         Plaintiffs will testify to the parties course of
                                  dealing prior to the assignment, laying
                                  proper foundation. The document is relevant
                                  to show the course of dealing, under 6 Del. C.
                                  §1-201(b)(3).

PLAINTIFFS' EXHIBIT 104.       Laurel C-Store/Restaurant/Hardees
                                  Sales (CPS1699-1701)

    Defendant's Objection:        Irrelevant under F.R.E. 402

Plaintiffs' Response:        The document is relevant under F. R. Evid.
                             402. The ancillary sales lost, and the trends
                             of the businesses before defendant's contract
                             breaches are an issue in the case.


PLAINTIFFS' EXHIBIT 106.      Delmar Store/Hardees/Restaurant Sales
                              (CPS1704-1706)

        Defendant's Objection:     Irrelevant under F.R.E. 402


        Plaintiffs' Response:      The document is relevant under F. R. Evid.
                                   402. The ancillary sales lost, and the trends
                                   of the businesses before defendant's contract
                                   breaches are an issue in the case.

### DEFENDANT'S EXHIBITS

The following exhibits were offered by defendant, received in evidence and marked as indicated:

146        Photos  (SO 558-562)

The following exhibits were offered by defendant and marked for identification.  Plaintiffs objected to their receipt in evidence on the grounds stated:[2]

125        Sweet Oil Sales Summary

Plaintiffs' Objection:        Irrelevant pursuant to Fed. R. Evid. 402; Lack of Foundation, authenticity pursuant to Fed. R. Evid. 901; Hearsay under Fed. R. 802. Not timely identified.

Defendant's Response:        Relevant under F.R.E. 402; Business record under F.R.E. 803(6); Timely identified and marked at deposition of Defendant. The foundation will be established through the testimony of the defendant's witnesses.

126        Sweet Oil Damage Summary

Plaintiffs Objection:        Irrelevant pursuant to Fed. R. Evid. 402; Lack of Foundation, authenticity pursuant to Fed. R. Evid. 901; Hearsay under Fed. R. 802. Not timely identified.

_____

[2] See footnote 2 of this Schedule.

Defendant's Response:

Relevant under F.R.E. 402; Business record under F.R.E. 803(6); Timely identified and marked at deposition of Defendant. The foundation will be established through the testimony of the defendant's witnesses.

127        3/21/03 Distributor Agreement

Plaintiffs Objection:     Irrelevant pursuant to Fed. R. Evid. 402

Defendant's Response:

Relevant pursuant to F.R.E. 402. Agreement is part of contractual relationship pertinent to case.

128        Notice of Deposition – Wm. Glenn

Plaintiffs Objection:     Irrelevant pursuant to Fed. R. Evid. 402

Defendant's Response:     Relevant pursuant to F.R.E. 402. Witness produced as corporate designee.

129        3/16/94 Peninsula/BCG Agreement (SO 106-107)
130        3/16/94 Commission Agency Agreement (SO 108-110)
131        4/5/94 Recapture Agreement (SO 111)
132        3/16/94 Guarantee Agreement (SO 112)
133        3/16/94 Credit Card Loan Equip Agreement (SO 113)
134        3/16/94 Equipment Loan Agreement (SO 114-119)

Plaintiffs Objection:     Incomplete Agreement. Fed. R. Evid. 106.

Defendant's Response:     Each document is a complete executed agreement.

135        Sweet Oil Quick Report – Oasis-Invoice v. Payment
136        Sweet Oil Quick Report – Oasis-Sales Summary
137        Sweet Oil Quick Report – Oasis-Cost of Goods

138     Sweet Oil Summary Report – Oasis-
139     Sweet Oil Quick Report – Delmar-Invoice v. Payment
140     Sweet Oil Quick Report – Delmar-Invoices
141     Sweet Oil Quick Report – Delmar-Cost of Goods
142     Sweet Oil Summary Report – Delmar

| | |
|---|---|
| Plaintiffs Objection: | Irrelevant pursuant to Fed. R. Evid. 402; Lack of Foundation, authenticity pursuant to Fed. R. Evid. 901; Hearsay under Fed. R. 802. Not timely identified. |
| Defendant's Response: | Relevant pursuant to F.R.E. 402. Business record under F.R.E. 803(6); Audited summaries provided produced by Defendant's accounting system. Timely identified and marked at deposition of Defendant. The foundation will be established through the testimony of the defendant's witnesses. |

144     Sweet Oil CORO Reconciliation

| | |
|---|---|
| Plaintiffs Objection: | Irrelevant pursuant to Fed. R. Evid. 402; Lack of Foundation, authenticity pursuant to  Fed. R. Evid. 901; Hearsay under Fed. R. 802. Not timely identified. |
| Defendant's Response: | Relevant pursuant to F.R.E. 402. Business record under F.R.E. 803(6). The foundation will be established through the testimony of the defendant's witnesses. |

145     9/23/06 Letter Sullivan to Sweet re Debranding Oasis

| | |
|---|---|
| Plaintiffs Objection: | Irrelevant pursuant to Fed. R. Evid. 402 |

Defendant's Response:     Relevant pursuant to F.R.E. 402. Relates to
Plaintiffs' conduct subsequent to their unilateral
rescission of contract.

Schedule (d)

Witness List

(Attached)

## SCHEDULE (d)
## Plaintiffs' Witness List

| | | |
|---|---|---|
| 1. | William Glenn | Will be called |
| 2. | Charles Glenn | Will be called |
| 3. | Mark Greco | Will be called |
| 4. | Arnold Heckman (Expert) | Will be called |
| 5. | Ben LeRoy | Will be called |
| 6. | Edward J. Ellis, Jr. | Will be called |
| 7. | Mike Tucker | Will be called if need arises |
| 8. | John Phelps | Will be called if need arises |
| 9. | Scott Arion | Will be called if need arises |
| 10. | Rich McBride | Will be called if need arises |
| 11. | Herm Rogers | Will be called if need arises |
| 12. | Shelley Dominguez | Will be called if need arises |
| 13. | Pat Thompson | Will be called if need arises |
| 14. | William Sweet | Will be called if need arises |
| 15. | Jeffrey Byard | Will be called if need arises |
| 16. | Eleanor Terrell | Will be called if need arises |

**SCHEDULE (d) DEFENDANT'S WITNESS LIST**

**WILL BE CALLED**
1.     Mark Greco

**MAY BE CALLED**

2.     Ben LeRoy

3.     William Sweet

4.     Terrance Sullivan

5.     John McTear

6.     Andrea Soliday

7.     Chad Deamond

8.     Delores Love

9.     Danielle Moore

10.    William Glenn

11.    Adam Gray

12.    Dave McComas

13.    John Collins

14.    Robert Sanderson, CPA

Schedule (e)

Expert Witness Qualifications

(Attached)

**Schedule (e)**

# Qualifications of Arnold Heckman

Arnold Heckman is being offered as an expert witness by the plaintiffs in the area of business valuations, lost profit and damage analysis. Mr. Heckman is the founder and president of Heckman Associates, Inc. d/b/a Corporate Investment, and is the president and principal broker of Corporate Investment Realty, Inc., located in Calverton, Maryland. Corporate Investment has 12 agents affiliated with it.

Mr. Heckman founded the Corporate Investment businesses in 1982. The businesses are involved in the evaluation and sale of small to medium size closely held companies, and to date Corporate Investment has successfully completed over 1,000 transactions. Mr. Heckman has been personally involved in the analysis and sale of several hundred combination motor fuel/and related ancillary businesses, including convenience stores, auto repair, restaurants and the like including various businesses in Delaware. He is also involved as a licensed real estate broker in Maryland, Virginia and the District of Columbia, and is involved in the sale, leasing and management of commercial real estate.

Mr. Heckman has an AA degree in business administration from Dean Junior College in Franklin Massachusetts, attended the University of Maryland and Benjamin Franklin school of Accounting in Washington, D.C., and has additionally received continuing education at the University of Maryland. He is a past editor of the Washington Business Brokers Association Newsletter.

Mr. Heckman has been qualified as an expert in business valuation and business loss/lost profit analysis by the  analysis by the United States District Courts for the District of Maryland,, as an expert in business valuation and lost profits analysis by the District of Columbia Superior Court, as an expert in business valuation and profitability analysis by the Circuit Courts of Anne Arundel County Maryland, and Prince George's County Maryland, and the Circuit court for Fairfax County, Virginia.  He has been qualified as an expert in business valuation by the Circuit Court for Montgomery County, and as an expert in business valuation and profitability analysis by the Circuit Court of Boulder County, Colorado, and the Family Court in Jefferson County, West VA.

Schedule (e)

Objections to qualifications of witnesses:

Arnold Heckman

Defendant objects to the qualifications of Arnold Heckman as an expert witness. Mr. Heckman does not appear to have completed a college degree nor whatever program he was enrolled in at Benjamin Franklin School of Accounting.

Mr. Heckman has provided a report that does not indicate that it is based on reliable principals or methods nor is it based on adequate facts or data. The report does not include a list of any publications authored by Mr. Heckman although it purports to suggest that he has been involved in the authorship of certain publications. Mr. Heckman's qualifications do not identify any other case in which he has testified as an expert at trial within the preceding four years.

Schedule (f)

Deposition Transcripts To Be Read Into Evidence

(Attached)

13

SCHEDULE F

Deposition Sections from the Deposition of Mark Greco, taken on March 26, 2008, which plaintiffs intend to read into evidence:

| Page | Line | To | Page | Line |
|------|------|-----|------|------|
| 5 | 1 | | 5 | 8 |
| 15 | 11 | | 15 | 14 |
| 17 | 13 | | 18 | 1 |
| 18 | 10 | | 18 | 22 |
| 26 | 1 | | 27 | 13 |
| 28 | 23 | | 30 | 6 |
| 34 | 16 | | 35 | 23 |
| 36 | 21 | | 38 | 16 |
| 38 | 17 | | 39 | 22 |
| 41 | 17 | | 42 | 9 |
| 42 | 23 | | 44 | 24 |
| 45 | 8 | | 46 | 4 |
| 47 | 1 | | 47 | 24 |
| 48 | 22 | | 50 | 4 |
| 51 | 7 | | 52 | 8 |
| 52 | 16 | | 55 | 24 |
| 56 | 10 | | 57 | 20 |
| 64 | 1 | | 64 | 18 |
| 65 | 12 | | 65 | 16 |
| 74 | 4 | | 74 | 16 |
| 74 | 17 | | 75 | 16 |
| 88 | 5 | | 89 | 13 |
| 91 | 2 | | 29 | 3 |
| 110 | 10 | | 111 | 18 |
| 130 | 8 | | 146 | 2 |
| 144 | 19 | | 148 | 13 |
| 158 | 7 | | 159 | 13 |
| 173 | 20 | | 175 | 8 |
| 181 | 21 | | 182 | 7 |
| 188 | 9 | | 189 | 1 |
| 191 | 6 | | 191 | 22 |
| 195 | 18 | | 196 | 1 |
| 202 | 7 | | 202 | 10 |
| 202 | 22 | | 203 | 3 |
| 288 | 7 | | 209 | 8 |
| 210 | 8 | | 211 | 11 |

SCHEDULE F

Deposition Sections from the Deposition of William Glenn, taken on March 27, 2008, which defendants intend to read into evidence: ***

| Page | Line | To | Page | Line |
|------|------|-----|------|------|
| 4 | 3 | | 4 | 16 |
| 13 | 7 | | 15 | 21 |
| 27 | 6 | | 33 | 4 |
| 37 | 14 | | 46 | 23 |
| 47 | 9 | | 47 | 18 |
| 49 | 18 | | 53 | 13 |
| 55 | 8 | | 60 | 10 |
| 62 | 18 | | 63 | 2 |
| 64 | 21 | | 84 | 4 |
| 84 | 11 | | 87 | 19 |
| 96 | 1 | | 97 | 1 |
| 99 | 2 | | 103 | 1 |
| 104 | 2 | | 107 | 5 |
| 113 | 4 | | 113 | 16 |
| 115 | 22 | | 116 | 10 |
| 123 | 7 | | 123 | 23 |
| 133 | 11 | | 133 | 21 |
| 141 | 3 | | 142 | 13 |
| 143 | 3 | | 143 | 6 |
| 148 | 19 | | 148 | 19 |
| 150 | 3 | | 151 | 20 |
| 157 | 7 | | 159 | 21 |
| 160 | 9 | | 164 | 18 |
| 168 | 3 | | 170 | 21 |
| 172 | 3 | | 172 | 20 |
| 185 | 5 | | 187 | 15 |
| 195 | 1 | | 196 | 18 |

***Plaintiffs reserve the right to object to any of the above sections.

Schedule (g)

Special Damages

Attached

## Schedule (g)

## Itemized Statement of Special Damages

1.     The Plaintiffs seek compensatory, punitive and statutory damages from Sweet Oil as set forth below. Plaintiffs also seek a declaratory judgment confirming that Sweet Oil breached the Laurel Oasis Supply Agreement, breached and unlawfully terminated the Delmar Supply Agreement, and declaring that the plaintiffs have no further obligation under the terminated agreements, including the Indemnity Mortgage.

      (a)     Laurel Oasis Station Damages.

| | | |
|---|---|---|
| • | Credit Card Fees: | $66,214.00 |
| • | Pump and Canopy Repairs: | $18,832.00 |
| • | Signage Costs: | $12,855.00 |
| • | Lost Motor Fuel and Ancillary Sales: | |
| | | $293,058.00 |
| • | Interference Damages: | $158,261.00 |
| | **TOTAL:** | **$553,220.00** |

      (b)     Delmar Station Damages:

| | | |
|---|---|---|
| • | Unpaid Mobil Incentive Monies: | $33,726.39 |
| • | Signage Costs: | $13,000.00 |
| • | Freight Overcharges: | $14,557.00 |
| • | Termination Damages: | $43,368.00 |
| | **TOTAL:** | **$104,651.00** |

      (c)     Plus attorneys' and expert witness fees (post trial).

Schedule (g)

Itemized Statement of Special Damages

Defendant, Sweet Oil, seeks special damages as follows:

LAUREL OASIS

|   |   |   |
|---|---|---|
| 1. | Lost profit on anticipated sales for balance of term of agreement | $81,378.19 |
| 2. | Breach of Recapture Agreement | $17, 073.54 |
| 3. | Account Receivable for unpaid product deliveries | $35,332.42 |

DELMAR

|   |   |   |
|---|---|---|
| 1. | Lost profit on anticipated sales for balance of term of agreement | $116,865.18 |
| 2. | Incentive Fees Repaid to Sunoco | $112,306.54 |

Breach of the Recapture Agreement and the unpaid product deliveries also are directed to the conversion claim. Defendant seeks interest on these itemized matters from the date they were originally due. Defendant also seeks attorneys fees where provided by contract.

Schedule (h)

Waived Claims or Defenses

(Attached)

Schedule (h)

Waived Claims or Defenses

Plaintiffs abandon their claim under the Delaware Franchise Security Law, 6 Del. C. §2551 *et seq.*

There are no third party claims to be made against third party defendant, Sunoco, Inc. (R&M) ("Sunoco") at trial. By stipulation approved by the Court on January 23, 2008, third party plaintiff, GLeS, Inc. d/b/a Sweet Oil ("Sweet Oil") dismissed its indemnity claim against Sunoco with prejudice. On July 23, 2008, the Court granted Sunoco summary judgment on Sweet Oil's declaratory judgment claim. By agreement of counsel, Sweet Oil will stipulate to withdraw, for purposes of trial, its conversion claim against Sunoco without prejudice to its right to reinstate the claim should the Court's Order of July 23 2008 be reversed on appeal. Sunoco further agrees that the statute of limitations will not be asserted as a defense if the conversion claim is reinstated. Counsel intend to file a stipulation with the Court shortly.

Schedule (i)

Pretrial Briefs
Proposed Jury Instructions
Voir Dire Questions

(Attached)

1.      Pretrial Briefs are attached hereto as Exhibits "A" and "B".

2.      Proposed Joint Jury Instructions are attached hereto as Exhibit "C".

3.      Proposed Voir Dire Questions are attached hereto as Exhibit "D".

SCHEDULE (i)                                                    A

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

BCG, INC. and CHESAPEAKE PRODUCTS &
SERVICES, INC.,

        Plaintiffs,

    v.                            C.A. No. 07-cv-207 (GMS)

GLES, INC., d/b/a SWEET OIL COMPANY,     JURY TRIAL DEMANDED

        Defendant/Third-Party
        Plaintiff,

    v.

SUNOCO, INC.,

        Third-Party
        Defendant.

## PLAINTIFFS' PRETRIAL BRIEF

Plaintiffs submit this Pretrial Brief in support of their claims and defenses.

I.     Nature of the Case.

This action commenced in October 2006 with the filing of a Complaint by plaintiffs in

the Superior Court of the State of Delaware in and for Kent County. Defendant filed an Answer

with Counterclaim, and later filed a Third Party Complaint for Interpleader and Declaratory

Judgment against third party defendant Sunoco, Inc. ("Sunoco"). Plaintiffs filed an Amended

Complaint in March, 2007, and defendant filed a timely removal notice, removing the case to

this Court.

As more fully described below, the plaintiffs' claims include breach of contract,

1

declaratory judgment, tortious interference with contract, bad faith,  [1]and the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et seq. , with a request for exemplary damages and attorneys' fees.

      II.      Contested Facts Evidence Will Establish.

This case arises out of contracts involving two travel plaza facilities operated by plaintiffs BCG, Inc. and Chesapeake Products & Services, Inc. (collectively referred to as the "plaintiffs") in Laurel, Delaware (the "Laurel Oasis Location") and Delmar, Maryland (the "Delmar Location"). Each facility sells motor fuel and convenience store products, and includes a Hardees and another restaurant.[2] Prior to September 1, 2005, both locations were supplied with motor fuel products by Peninsula Oil Company ("Peninsula") pursuant to separate contracts.

      A.      The Laurel Oasis Location.

Pursuant to a contract signed in 1990 as later modified in 1994 and as modified/supplemented by the parties' course of dealing and course of performance, plaintiffs contracted with Peninsula for the supply of "Texaco" motor fuel to the Laurel Oasis Station (the "Laurel Oasis Supply Agreement"). As part of the agreement, Peninsula provided certain equipment (which was to become plaintiffs' property at the conclusion of the contract). Under the terms of the agreement, Peninsula supplied gasoline under a commission arrangement, pursuant to which Peninsula set the retail prices, and paid plaintiffs a commission for the gasoline sold. The diesel fuel was actually sold by Peninsula to the plaintiffs.

Peninsula paid plaintiffs their gasoline commissions consistently every month. The

---

[1]      Plaintiffs claim under Count VII for breach of the Delaware Franchise Security Law has been abandoned.

[2]      The facilities are integrated facilities, and the businesses at each facility complement and are tied to one another, and are promoted as such.

      

contract also provided that Peninsula would keep the retail gasoline prices it set at the Laurel

Oasis Station "competitively priced with locations in [the] area." Peninsula complied with this

provision. The contract provided that the total delivered price for diesel fuel (which plaintiffs

purchased), would not exceed the Salisbury "rack" price plus 2.5¢ per gallon. Peninsula

complied with this provision. The contract further provided that Peninsula would maintain the

equipment at the facility, and that plaintiffs would have no responsibility for credit card fees.

Peninsula complied with these provisions.

B.    The Delmar Location.

Pursuant to a contract signed in October 2002, as previously negotiated and as

modified/supplemented by the parties' course of dealing and course of performance, plaintiff

CPS contracted with Peninsula for the supply of "Mobil" motor fuel to the Delmar Station (the

"Delmar Supply Agreement") for a term of 10 years. Pursuant to that agreement, plaintiffs

invested in the "Mobil" brand, installing "Speedpass" and taking other action to promote the

brand. Under the terms of the contract, Peninsula was to pay plaintiffs an incentive of 3¢ per

gallon for each gallon sold by plaintiffs between March 1, 2002 and March 1, 2006. Peninsula

regularly paid the incentive. Under the terms of this contract, Peninsula sold motor fuel to

plaintiffs at the posted terminal price, plus taxes and the common carrier freight rate from the

terminal to the facility. The course of dealing and performance was that Peninsula used the most

competitive carrier, such that the freight rate was the most competitive.

The agreement provided that if "the Dealer [CPS] breaches any of the provisions of this

Agreement, the Dealer agrees to reimburse the Company [Peninsula] in the amount of [the 3¢ per

gallon] ... in recognition that the Company will receive from Mobil [3¢] per gallon according to

the following schedule [then listed]." The agreement further provided that if the Mobil brand

3

"becomes unavailable, the Company and the Dealer shall mutually agree on what brand the Dealer will resell." The Dealer reserved the right to terminate the agreement if, among other reasons, there was a failure to pay in a timely manner when due all sums to which the dealer was entitled, or if at any time in its sole discretion, the dealer determined that the Company's fuel prices were not competitive. Upon termination, accrued but unpaid amounts up to and through the date of such termination, including Mobil incentive money, was to be paid "to the party entitled thereto." [3]

### C. The Assignment to Sweet Oil.

Effective September 2005, defendant Sweet Oil assumed Peninsula's rights and obligations under the Laurel Oasis Supply Agreement (the brand at which was later changed to "Citgo") and the Delmar Supply Agreement. After Sweet Oil assumed these obligations, it failed to abide by the terms thereof (including the well-established courses of dealing and performance between the plaintiffs and Peninsula), as explained below. Sweet Oil's conduct was intended, among other things, to force plaintiffs to sign new, long-term agreements which Sweet Oil intended to transfer quickly to a purchaser of its entire business operation. Indeed, Sweet Oil told plaintiffs that it would not comply with the contract it assumed.

Sweet Oil closed on its transaction with its purchaser in March 2007, and was thereafter out of the motor fuel distribution business.

### 1. Laurel Oasis Location.

After the assignment, the evidence will show that Sweet Oil breached the contract in numerous material ways, including:

---

[3]     The agreement also provided for attorneys fees if a party breaches and "the party not in default employs attorneys to protect or enforce its rights [under the agreement] and prevails."

4

- it failed and refused, despite repeated pleas, to maintain competitive retail gasoline prices;

- it failed and refused despite repeated pleas, to pay plaintiffs their commissions due under the contract. Indeed, from the time Sweet Oil took over the contract in September, it failed to make any commission payment until mid-January 2006, and thereafter failed to make any further payment;

- it improperly charged credit card fees;

- it failed to pay for equipment repairs, and unlawfully transferred funds electronically from plaintiffs' bank account;

- it overcharged on diesel fuel and freight in violation of an express price cap in the agreement.

Sweet Oil's material breaches of contract were to the detriment of plaintiffs' sales and profits not only on the gasoline, but also on the ancillary store and restaurant sales. After multiple requests to defendant to comply with the Laurel Oasis contract, plaintiffs terminated that contract in July of 2006.

Following the termination, plaintiffs incurred credit card fees, signage expenses, and equipment repair costs in the amount of nearly $100,000 that they would not have otherwise incurred if Sweet Oil had complied with its contract. Plaintiffs also seek the recovery of the lost profits from motor fuel, restaurant and other ancillary sales in the amount of nearly $300,000.

## 2. The Tortious Interference by Sweet Oil.

Following the termination of the Laurel Oasis agreement, defendant Sweet Oil, with actual knowledge of the effect that such communications would have (and intending to have that effect), sent letters dated July 19, 2006 to other motor fuel suppliers falsely stating that any

5

supply to plaintiffs would be deemed tortious interference with contract. Sweet falsely represented that it had initiated legal action to "**enjoin** any company from selling or transporting motor fuel with the intention that it be sold to the public from this location." (Emphasis in original). The letter ended with an admonition to "cease and desist" any fuel sales to the plaintiffs. As a direct and proximate result of the letters, plaintiffs were unable to obtain motor fuel from other sources at the most competitive prices, and seek compensatory damages of approximately $160,000 related to this claim, in the form of excess motor fuel costs.

3.    Delmar Location .

As described above, at the Delmar location, plaintiffs had contracted with Peninsula for the station to be a "Mobil" station for a ten year term. As part of the agreement, plaintiffs were to receive incentive payments from Peninsula in the amount of $0.03 per gallon for each gallon purchased between March 1, 2002 and March 1, 2006. Under the terms of the contract plaintiffs would be required to repay incentive monies received only if they breached the Delmar agreement.[4] Peninsula regularly and consistently paid plaintiffs its incentive monies and performed its obligations under the agreement for more than three and one-half years.

After the assignment, however, Sweet Oil failed and refused to pay $33,726.39 in incentive fee payments. Additionally, Sweet Oil overcharged for freight by failing to use the least expensive common carrier as Peninsula had previously done and charging an additional administrative fee, all in breach of the Delmar Supply Agreement as modified and supplemented by the courses of dealing and performance established with Peninsula.

Moreover, even before the assignment from Peninsula to Sweet Oil took effect, Peninsula had unilaterally agreed with Sunoco, in breach of a provision of the Delmar agreement that

---

[4]    This obligation purports to be secured by an Indemnity Mortgage dated January 3, 2003.

6

required mutual agreement to any brand change, that the Delmar location would be changed to a "Sunoco" station. [5]

Sunoco and Sweet exerted pressures on plaintiffs to switch the brand at the Delmar location to "Sunoco," a much less desirable brand, and indeed Sunoco had apparently agreed with ConocoPhillips Company (successor to Tosco from which Sunoco obtained the "Mobil" licensing agreement") that the use of the Mobil brand would be discontinued in February 2007. By June, 2006, plaintiffs could no longer process "Mobil" credit cards. In November 2006, Sunoco notified Sweet Oil that it was non-renewing Sweet Oil's distributor agreement with Sunoco (as related to the Mobil brand) due to Sweet Oil's failure to re-brand three remaining Mobil sites, including the Delmar location to Sunoco. The termination was to be effective on February 2, 2007.

By letter dated January 29, 2007, Sweet Oil's counsel notified plaintiffs through counsel that it would take steps to de-identify the Delmar location as a Mobil facility, which Sweet Oil did, in addition to ceasing further deliveries of Mobil branded fuels to the Delmar Station. By letter dated February 7, 2007, plaintiffs' counsel notified Sweet Oil that its actions amounted to a termination of the franchise.

Following that termination and as a result thereof, plaintiffs incurred charges for new signage. Their ability to obtain motor fuel products following the termination was hampered by the continued impact of the Sweet Oil interference letter to suppliers in July 2005, and they were unable to acquire motor from sources at the best price as a result.

On or about March 7, 2007, Sweet Oil sold its motor fuel distribution business and assets

---

[5]     Peninsula had contracted with Tosco Refining, L.P. ("Tosco"), for the right to purchase and resell "Mobil" products pursuant to a written agreement. Sunoco succeeded to Tosco's interests.

to GPM Investments, LLC and is no longer in the motor fuel distribution business.

### III.    Plaintiffs Theories of Liability.

Plaintiffs theories of liability include breach of contract at both the Laurel Oasis and Delmar locations, *See Leeds v. First Allied Connecticut Corp.*, Del. Ch., 521 A.2d 1095 (1986), including a claim for breach of the implied covenant of good faith and fair dealing. *See Dunlap v. State Farm and Casualty Co.*, 878 A.2d 434 (Del. 2005). Plaintiffs seek declaratory relief as necessary related to these locations to establish that the contracts are indeed terminated, *see* 28 U.S.C. §2201, and assert claims for tortious interference with contract related to defendant's sending of the false letter to other suppliers with the intent to interfere with plaintiffs' ability to obtain motor fuel from other sources. *See Irwin & Leighton, Inc. v. W.M. Anderson Co.*, Del. Ch., 532 A.2d 983, 992-93 (1987); RESTATEMENT (SECOND) OF TORTS 766, 767 (1965)

Finally, plaintiffs assert a claim under the federal Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§2801, *et seq.* Under this claim, plaintiffs assert that the Mobil franchise at the Delmar location was actually or constructively terminated by Sweet Oil as a result of Sweet Oil's material breaches of contract following the assignment of the contract to it, and when the Mobil trademark was removed. *See Marcoux v. Shell Oil Co.*, 524 F.2d 33 (1st Cir. 2008); *Chestnut Hill Gulf v. Cumberland Farms, Inc.*, 940 F.2d 744 (1st Cir. 1991); *Barnes v. Gulf Oil Co.*, 795 F.2d 358 (4th Cir. 1986); *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917 (6th Cir. 1989). Plaintiffs also claim that proper notice was not provided under the PMPA, 15 U.S.C. §2804 (90 days notice of termination required).

### IV.    Plaintiffs' Theory of Damages.

Plaintiffs' special damages are summarized on Exhibit G to the Pretrial Order, and

8

include the damages directly resulting from the breaches of contract, and lack of good faith including credit card fees, pump and canopy repair charges and signage costs that would not otherwise have been incurred; freight overcharges; and lost profits from the motor fuel and ancillary sales. *See e.g., Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1163-64 (Del. 1978). Plaintiffs seek contract damages to put them in the position they would have occupied had the contract been performed. *Ridley Inv. Co. v. Croll*, Del. Supr., 192 A.2d 925, 926-27 (1963); *Hudson v. D&V Mason Contractors, Inc.*, Del. Super., 252 A.2d 166, 169-70 (1969).

Plaintiffs seek the recovery of damages in tort that were directly caused by the intentional interference with plaintiffs' contractual relationship with others, in addition to punitive damages. *De Bonaventura v. Nationwide Mut. Ins.*, Del. Ch., 419 A.2d 942 (1980), *aff'd*, Del. Supr., 428 A.2d 1151 (1981); *Bowl-Mor Company Inc. v. Brunswick Corp.*, Del. Ch., 297 A.2d 61, *appeal dismissed*, 297 A.2d 67 (1972); *Murphy v. Godwin*, Del. Super., 303 A.2d 668 (1973). *See also* RESTATEMENT (SECOND) OF TORTS, § 774A (1965).

Plaintiffs also seek damages related to the unlawful franchise termination at the Delmar location. These damages include signage costs, and costs resulting from the termination in the form of excess alternative motor fuel supply costs. *See* PMPA, 15 U.S.C. §2805(d). [6]

Finally, plaintiffs seek the recovery of attorneys' fees. This issue will be determined by the Court post trial. *See* Local Rule 54.3.

V.    Theory of Directed Verdict.

Plaintiffs believe the evidence will show that defendant materially breached the contracts

---

[6]    The question of any exemplary damages under the PMPA is for the Court. See 15 U.S.C. §2805(d)(2).

at both locations, and that plaintiffs will be entitled to judgment as a matter of law in their favor on the issue of liability.  Upon a determination that defendant materially breached the contract at Delmar following the assignment to Sweet Oil of that contract, such breach will be sufficient to also show that defendant violated the PMPA.

Respectfully Submitted,

/s/ D. Benjamin Snyder
D. Benjamin Snyder
David E. Brand (DE Bar No. 201)
John W. Paradee  (DE Bar No. 2767)
D. Benjamin Snyder (No. 4038)
Prickett, Jones & Elliott, P.A.
11 North State Street
Dover, Delaware 19901
(302) 674-3841

Harry C. Storm
Lerch, Early & Brewer, Chartered
3 Bethesda Metro Center, Suite 460
Bethesda, MD 20814
(301)907-2817

Counsel for Plaintiffs

10

**B**

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| BCG, INC., a Delaware corporation, : | |
| CHESAPEAKE PRODUCTS & : | C.A. No. 07-cv-207 (GMS) |
| SERVICES, INC., a Delaware corporation : | |
| : | TRIAL BY JURY |
| Plaintiffs, : | DEMANDED |
| v. : | |
| : | |
| GLES, INC., a Delaware corporation, : | |
| d/b/a SWEET OIL COMPANY, : | |
| : | |
| Defendant/Third-Party Plaintiff : | |
| v. : | |
| : | |
| Sunoco, Inc. : | |
| : | |
| Third-Party Defendant : | |
| : | |

### DEFENDANT'S TRIAL BRIEF

Defendant, GLeS, Inc., d/b/a/ Sweet Oil Co. submits this trial brief in support of
its claims and defenses at trial.

### I.    Nature of the Case

Plaintiff commenced this action in the Superior Court of Delaware in October,
2006, asserting a claim for breach of contract and intentional interference with
prospective contract. Defendant filed an Answer and Counterclaim, asserting breach of
contract and conversion against Plaintiffs. In March, 2007, Plaintiffs filed an Amended
Complaint, adding a claim under the federal Petroleum Marketing Practices Act and
Defendant thereafter removed the case to this Court. Defendant also filed a Third Party
Complaint for Interpleader and Declaratory Judgment against Sunoco, Inc. The Court has
recently granted a motion for summary judgment in favor of Sunoco and it is not
anticipated that Sunoco will participate further in these proceedings.

**II.    Contested Facts to be Established by the Evidence**

Plaintiffs operate two travel plazas in Delmar, MD. (the "Delmar Station") and Laurel, DE ("Laurel Oasis") respectively. Prior to September 1, 2005, both stations were supplied with motor fuel products by Peninsula Oil Company under separate contracts. Defendant is a distributor of motor fuel products. Peninsula assigned its rights in the contracts to Sweet Oil in September, 2005. The evidence will show that the Plaintiffs immediately resisted the manner in which Sweet Oil did business at both locations, despite the fact that Sweet Oil's performance was in full compliance with its contractual obligations. Plaintiffs insisted that Sweet Oil comply with whatever practice Peninsula utilized and refused to accept the fact that the conduct of the parties was guided by the written contracts rather than an alleged "course of performance" about which Sweet Oil had no knowledge. The working relationship deteriorated over the course of time until Plaintiffs unilaterally rescinded the agreements and refused to engage in any further business with Sweet Oil. Sweet Oil seeks damages for the Plaintiff's breach of contract at both locations and for Plaintiffs' improper retention of Sweet Oil's property at the Laurel Oasis.

**A.    Laurel Oasis**

Laurel Oasis is a travel plaza for truckers and the motoring public. The vast majority of its fuel sales are diesel. Motor fuel products were supplied to the Laurel Oasis in two separate methods. Gasoline was supplied under a Commission Agency Agreement dated March 16, 1994, expiring on January 31, 2008. The Commission Agency Agreement was an updated agreement that superseded a similar agreement dated February 13, 1990. Under the Agreement, Peninsula (Sweet Oil) agreed to install fuel

2

pumps and other specified equipment at the station. Plaintiffs were responsible for the maintenance of all of the equipment installed at their location under an Equipment Loan Agreement and entered into a Recapture Agreement whereby the cost of the equipment was repaid pursuant to a set amortization schedule over the life of the contract. Plaintiffs acknowledge that they have retained the equipment owned by Sweet Oil and have never paid for it.

Sweet Oil supplied gasoline to the station where it was sold by Plaintiffs in exchange for a set commission of four to six cents per gallon, depending on the grade of gasoline. Sweet Oil retained ownership of the gasoline until it was sold and retained the "absolute control" to set the price of the gas.

Diesel fuel was sold directly to Plaintiffs who then sold it to the public at prices and terms set solely by them. The price at which Sweet Oil sold the diesel to Plaintiffs is not addressed in the Commission Agency Agreement. However, a previous document provided that Sweet Oil could markup the price of diesel up to 2.5 cents per gallon over a published industry price (Salisbury Rack Price). Sweet Oil sold the diesel to Plaintiffs at a markup of one cent per gallon. Delivery costs, taxes and surcharges were then added to the price of the diesel. The delivery costs added by Sweet Oil were calculated in the same manner that was utilized to deliver fuel to Plaintiffs at their Delmar location. Plaintiffs insisted that the allowable markup of 2.5 cents per gallon was intended to include delivery costs and disputed Sweet Oil's charge for delivery on top of the markup price of one cent per gallon.

The primary dispute arose when Plaintiffs insisted that Sweet Oil was obligated to set the retail price of gasoline in the manner specified in the prior, superseded agreement.

That agreement contained a specific provision that the retail price of gasoline set by the supplier (Peninsula at the time) had to be "competitively priced with locations in the area." That provision was deleted from the agreement that was assigned to Sweet Oil. Plaintiffs insisted that the superseding agreement was never intended to change the terms of the prior agreement and claimed that the refusal of Sweet Oil to maintain "competitive" prices was a breach of the agreement. Further, Plaintiffs asserted that it was Sweet Oil's responsibility to maintain the diesel equipment. That argument again relied on a superseded Equipment Loan Agreement. The current agreement specifically required the Plaintiffs to maintain the equipment after it was installed at their location.

When a product is purchased using a credit card, a credit card fee is deducted from the sale price. Credit card fees were absorbed by Sweet Oil on gasoline sales where they maintained ownership of the product until the time of sale. However, Sweet Oil sold diesel fuel directly to Plaintiffs at a set price and thereafter had no interest in the product, its pricing or its retail sale. Nevertheless, Plaintiffs insisted that credit card fees deducted from the sale of diesel fuel should be absorbed by Sweet Oil as well. There is no provision in any agreement that supports that contention. Plaintiffs insisted that the failure of Sweet Oil to absorb the credit card fees on the sale of diesel fuel was a breach of the agreement as well.

When Sweet Oil began supplying plaintiffs, it requested that Plaintiffs provide daily records of gasoline sales. The records were never provided in a format that made sense or in compliance with the requests of Sweet Oil. As a result, Sweet Oil was forced to engage in a significant effort to reconcile sales information. It was Sweet Oil's understanding that Plaintiffs were deducting the commissions from the receipts from the

4

sale of gasoline before remitting the proceeds of those sales. Plaintiffs subsequently claimed that they were not deducting the commissions and asserted that Sweet Oil was in breach of the agreement by failing to tender commission payments in a timely fashion.

In July, 2006, with eighteen months remaining on the contract for the exclusive sale of fuel oil products to the Laurel Oasis, Plaintiffs unilaterally deducted all amounts they claimed to be due from the funds owing to Sweet Oil and terminated the agreements, alleging that Sweet Oil was in material breach of the agreements for the foregoing reasons. Sweet Oil was not in breach of its obligations under the current agreements and seeks damages for the losses it sustained when the agreements were prematurely terminated by Plaintiffs.

When Plaintiffs unilaterally terminated the agreements, Sweet Oil wrote to a number of competing fuel oil suppliers and advised them that it had a valid agreement to be the exclusive supplier for Laurel Oasis and that it intended to protect its legal rights under those agreements. Plaintiffs have asserted that the letter constituted an intentional interference with its prospective agreements with one or more of the competing suppliers.

### B.    Delmar Station

Fuel oil products were distributed to the Delmar Station pursuant to a Dealer Agreement dated October 3, 2002. The price of gasoline was a markup of one cent over the published terminal price plus the cost of delivery, taxes and surcharges. Sweet Oil began deliveries subsequent to the assignment of the Dealer Agreement from Peninsula. Plaintiffs promptly complained that Sweet Oil was in breach of the agreement because it was not charging the "lowest available freight rate." The Dealer Agreement does not require the "lowest available freight rate."

The Dealer Agreement permitted Sweet Oil to "change, discontinue, add and/or adopt any product, grade, brand and/or trade name of its products" sold to Plaintiffs. However, the product initially provided to Plaintiffs was Mobil. At the time that Peninsula and Plaintiffs entered into the Dealer Agreement, all parties knew that the Mobil brand would not be available for the entire term of the Agreement. The Agreement therefore specified that when "the Mobil Brand becomes unavailable, [Sweet Oil] and [Plaintiffs] shall mutually agree on what brand [Plaintiffs] will sell."

Sunoco acquired the rights to the Mobil brand and notified Sweet Oil that the Mobil brand would no longer be available in mid-2006. Sunoco desired all former Mobil branded stations to be converted to Sunoco. Sweet Oil approached Plaintiffs and advised them that the Mobil brand would no longer be available and that the Delmar Station would have to be rebranded. Numerous incentives were offered to encourage the change to a Sunoco branded station. Throughout the summer of 2006, when all of the other Mobil stations in the region were changing to Sunoco, Plaintiffs remained uncommitted about whether they would convert to Sunoco. Sweet Oil continued to supply Mobil branded gasoline, through its supply contract with Sunoco, for as long as possible.

By late summer 2006, the Mobil credit card and Speedpass software was replaced with an upgraded system. Plaintiffs refused to upgrade their software and were advised that they were in violation of their obligations under the Mobil brand by being unable to process Mobil credit cards and Speedpass. The Dealer Agreement required that Plaintiffs pay all costs associated with the acceptance of credit cards.

Numerous attempts were made to reach an agreement with Plaintiffs about what brand they would convert to when Mobil was no longer available. Plaintiffs refused to

6

make any commitment. Finally, in February, 2007, Sunoco advised that it would no longer continue to supply any Mobil branded fuel products. Sweet Oil offered to supply unbranded gasoline to Plaintiffs until Plaintiff and Sweet Oil could "mutually agree" on what brand Plaintiffs would sell. Plaintiffs refused to engage in any good faith discussion about converting to any other brand and unilaterally rescinded the Dealer Agreement, claiming that Sweet Oil breached the agreement by refusing to continue to provide Mobil branded products.

Peninsula entered into an incentive agreement with Mobil whereby Mobil agreed to pay Peninsula three cents per gallon for each gallon of gasoline sold at the Delmar Station for the first four years. Peninsula was required to repay any incentive payments it received if it was in violation of the terms of the incentive agreement. The Dealer Agreement between Plaintiffs and Peninsula provided that these incentive payments would be passed along to Plaintiffs. It was agreed that Plaintiffs would repay the incentive payments if they breached the terms of the Dealer Agreement. The Dealer Agreement also provided that if Peninsula was required to repay the incentive payments to Mobil because the Delmar station was "debranded" prior to 2012, Plaintiffs would pay to Peninsula any amount it was required to repay Mobil. By Order of this Court, Sweet Oil was required to repay the incentive payments to Sunoco because the Delmar Station was debranded prior to 2012. Plaintiffs have refused to repay Sweet Oil the amount of incentive payments that Sweet Oil was required to repay to Sunoco.

As a result of the debranding of the Delmar Station, the Sweet Oil's distributor agreement with Sunoco was terminated.

7

Plaintiffs assert that they did not receive the notice required by PMPA that they would no longer be permitted to use the Mobil brand. Sweet Oil always anticipated that the conversion from Mobil to a substitute brand would be by mutual agreement. Plaintiffs refused to engage in good faith discussions and forced Sweet Oil to ultimately discontinue the supply of Mobil branded products.

## III.    Defendant's Theory of Liability and Defense

### A.    Breach of Contract - Delmar Station / Oasis Station:

Breach of contract is defined as the violation of an obligation or engagement. It is the nonperformance of any contractual duty of immediate performance.  Under Delaware law, to establish a claim for Breach of Contract, a party must establish by a preponderance of the evidence: (1) the existence of a contractual obligation between the plaintiff and defendant; (2) a breach of that contractual obligation; and (3) a resulting damage.  H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch.2003)). Plaintiffs breached the contractual obligations under the agreements for both locations as set forth above.

Plaintiffs claim that the written agreements were modified by a "course of conduct" established between Plaintiffs and Peninsula before the agreements were assigned to Sweet Oil. This evidence constitutes inadmissible parol evidence.  By definition, course of performance and course of dealing are varieties of extrinsic evidence. See Amkor Technology, Inc. v. Motorola, Inc., 2007 WL 3360039

8

(Del.Super.2007)(citing Margaret N. Kniffin, *Corbin on Contracts* § 24:13 (rev. ed.1998)).  "A course of performance is a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." 6 Del. C. § 1-303(a). "A course of dealing is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." 6 Del. C. § 1-303(b). Evidence of course of dealing and performance can only supply incidents to a contract where the contract is ambiguous on the point to which the party seeks to apply the course of dealing or performance. 12 Williston on Contracts §34:7 (4th ed.).  Where a contract is not ambiguous, the type of extrinsic evidence that Plaintiffs seek to admit is inadmissible. Plaintiffs seek throughout to vary the unambiguous terms of the agreements by reliance on inadmissible extrinsic evidence.

### B.    Conversion – Laurel Oasis:

Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it...." CIT Communications Finance Corp. v. Level 3 Communications, LLC, 2008 WL 2586694 (Del.Super.2008).  Rockwell Automation, Inc. v Kall, 2004 WL 2965427 (Del.Ch.2004); Goodrich v. E.F. Hutton Group, Inc., 542 A.2d 1200, 1203 (Del. Ch.1988).  Damages will be calculated based on the fair market value of the converted property at the time the conversion occurred.

**C.    Implied Covenant of Good Faith and Fair Dealing:**

An implied covenant of good faith and fair dealing is inherent to every contract. Caldera Properties - Lewes/Rehoboth VII, LLC v. Ridings. 2008 WL 3323926 (Del.Super.2008) (citing Chamison v. Healthtrust, Inc., 735 A.2d 912, 920-21 (Del. Ch.1999)). As such, upon entering a contract, each party makes an implied covenant to interpret and act reasonably upon contractual language that is on its face reasonable. Id. "This implied covenant is... designed to protect the spirit of an agreement, when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." Id. The implied covenant of good faith and fair dealing "is breached only when one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other. The mere exercise of one's contractual rights, without more, cannot constitute such a breach." Shenandoah Life Ins. Co. v. Valero Energy, 14 Del. J. Corp. L. 396, 411 (Del. Ch. 1988). "The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." Caldera Properties, 2008 WL 3323926.

**D.    Intentional Interference with Prospective Contract –Laurel Oasis:**

Plaintiffs assert that Sweet Oil intentionally interfered with its prospective contractual relations after it unilaterally attempted to rescind its contractual agreement at the Laurel Oasis. The elements of the tort of wrongful interference with prospective contractual relationship requires proof of: (1) the existence of a valid business relation or a reasonable expectancy of entering a valid business relationship, (2) the interferer's

knowledge of the relationship or expectancy, (3) intentional interference that (4) induces or causes a breach or termination of the relationship or expectancy and that (5) causes resulting damages to the party whose relationship or expectancy is disrupted. <u>Spanish Tiles, Ltd. v. Hensey</u>, 2005 WL 3981740 (Del.Super.2005.  The elements of the cause of action must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." <u>DeBonaventura v. Nationwide Mutual Insurance Company</u>, 428 A.2d 1151, 1153 (Del.1981). Factors considered when determining whether conduct is improper include: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties.  Restatement (Second) of Torts § 767 (1979); see also <u>International Business Machines Corp. v. Comdisco, Inc.</u>, 1993 WL 259102 (Del.Super.1993).

Further, "[o]ne who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another *does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction*."  Restatements (Second) of Torts § 773 (emphasis added).

11

Sweet Oil had a legally protected interest in the Laurel Oasis contract that was threatened by the unilateral conduct of Plaintiffs as they attempted to contract with other distributors. Defendants, in good faith, acted to protect its interest by informing the third-parties of its interest in its contractual relationship with Plaintiffs. Further, Defendant's threat to protect its interest was neither improper nor unlawful.

### E.    Petroleum Marketing Practices Act:

The Petroleum Marketing Practices Act ("PMPA" or "Act"), 15 U.S.C § 2802, precludes a distributor from (1) terminating any franchise prior to the conclusion of the term, or the expiration date, stated in the franchise; or (2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed)." 15 U.S.C § 2802(a). A distributor may terminate a franchise if (A) the notification requirements are satisfied; and (B) such termination is based upon a ground authorized by the statute. 15 U.S.C § 2802(b).

Among the reasonable grounds for termination of a franchise or nonrenewal of a franchise relationship are a failure by the franchisee to comply with any reasonable and material provision of the franchise, a failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise or the occurrence of an event which is relevant to the franchise relationship and that makes the termination or non-renewal of the franchise reasonable. 15 U.S.C. § 2802(b)(2). Among the recognized reasonable grounds to terminate a franchise is the loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise. 15 U.S.C. § 2802(c). Further, a franchise may be

12

terminated where the distributor and the franchisee cannot agree to reasonable changes to the terms of the franchise. 15 U.S.C. § 2802(b)(3). Sweet Oil lost the right to use the Mobil brand and therefore properly terminated the availability of the brand to Plaintiffs.

The PMPA also requires that notice be given not less than 90 days prior to the date on which the termination is to take effect. However, under circumstances in which it would not be reasonable for the franchisor to furnish such notice, the franchisor must give notice to the franchisee on the earliest date on which furnishing such notice is reasonably practical. What qualifies as reasonable is a question of fact for the jury. 15 U.S.C. § 2804(3)(A). Sweet Oil provided notice about its loss of a right to use the Mobil brand repeatedly over the course of many months and it was only by continuing to provide Plaintiffs with every possible opportunity to "mutually agree" on a substitute brand that the termination took place at the last possible moment. See, also, Marathon Petroleum Co. v. Pendleton, 889 F.2d 1509 (6th Cir 1989); Desfosses v. Wallach Energy Inc., 836 F.2d 22, 29 (1st Cir.1987); Wisser Co., Inc. v. Mobil Oil Corp.,730 F.2d 54 (2d Cir. 1984)

## IV.    Defendant's Theory of Damages

Defendant seek damages for Plaintiffs' breach of its contractual obligations at both sites. The measure of damages is based on lost profits caused by the premature, unilateral rescission of the agreements by Plaintiffs. The amount of special damage is set forth in Schedule (g) to the Pretrial Order. Defendant also seeks compensation under the terms of the Delmar Dealer Agreement for the amount of incentive fees that it was required to repay to Sunoco as a result of the debranding of the site. Sweet Oil seeks

13

damages for the unamortized value of the Recapture Agreement at Laurel Oasis as well as the amount of the unpaid receivable for product delivered to the site. These damages seek to restore Sweet Oil to the financial position it would have enjoyed had Plaintiffs not breached their agreements. Sweet Oil further seeks damages for the value of its property converted by Plaintiffs at Laurel Oasis. The property includes gasoline and equipment that Plaintiffs retained but refused to pay for.

Even if liability is established, any damages claimed by Plaintiffs are completely or substantially reduced by their failure to mitigate.

Defendant also disputes the right of Chesapeake Products to any damage relating to contracts to which it is not a party. The issue is the subject of a pending motion in limine.

## V.    Defendant's Theory of Anticipated Motion for Directed Verdict

Sweet Oil anticipates moving for a directed verdict based on Plaintiff's inability to prove a cause of action that requires the use of extrinsic evidence to vary the terms of an unambiguous contract. Plaintiff has conceded that the written contracts are unambiguous.

Defendant will seek a directed verdict based on the Court's prior ruling that Sweet Oil was required to repay incentive fees to Sunoco because the Delmar site was debranded during the term of the agreement. Further, Plaintiffs have conceded that they owe the unpaid balance of the Recapture Agreement.

Respectfully submitted,

_____

Seth J. Reidenberg, Esquire (No. 3657)
YOUNG CONAWAY STARGATT

14

& TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th 19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

Hugh J. Hutchison, Esquire
Leonard, Sciolla, Hutchison,
Leonard & Tinari, LLP
1515 Market Street, 18th Floor
Philadelphia, PA 19102
(215) 567-1530
(215) 564-4611 (fax)

Attorneys for Defendant/ Third-Party Plaintiff
GLES, Inc., A Delaware Corporation, d/b/a Sweet
Oil Company

C

## Index to Jury Instructions

*Page:*

**I.  Preliminary  Jury Instruction**
Preliminary Jury Instructions – Introduction:
The Parties and their Contentions:                                    1
Duties of the Jury:                                                   2
Evidence:                                                            3
Credibility of Witnesses – Weighing Conflicting Testimony:           5
Summary of Applicable Law:                                           6
Burden of Proof:                                                     7
Conduct of the Jury:                                                 8
Course of the Trial:                                                 10
Trial Schedule:                                                      11

**II.  Final Jury Instructions**
Final Jury Instructions – Introduction:                              1
Evidence Defined:                                                    3
Direct and Circumstantial Evidence:                                  4
Consideration of Evidence:                                           5
Statements of Counsel:                                               6
Credibility of Witnesses:                                            7
Expert Testimony:                                                    9
Number of Witnesses:                                                 10
Burden of Proof; Preponderance of the Evidence                      11
Deliberation and Verdict:                                            12
Nature of Case                                                       14
Corporations and Their Agents                                       16
Breach Of Contract                                                  17
Determining The Contract                                            18
Good Faith                                                          19
Construction Of Ambiguous Terms – Breach Of Contract                20
Material Breach Of Contract                                         21
Anticipatory Breach                                                 22
Assignments                                                        23
Recovery Of Damages For Breach Of Contract                         24
Damages – Breach Of Contract – General                             25
Duty To Mitigate Damages – Contract                                26
Substantial Performance                                            27
Intentional Interference With A Contractual Relationship           28
Damages:  Intentional Interference With Contractual Relations       30
Punitive Damages                                                   31
(Introduction – The PMPA)                                          33
(PMPA-Burden Of Proof)                                             34
(PMPA – Termination Prohibited)                                    35

(Plaintiffs' PMPA Claims)                                          36
(PMPA Notification Explained)                                      37
(Notice Requirements Mandatory)                                    38
(PMPA – Constructive Terminations Prohibited)                      39
(PMPA Damages)                                                     40

Parole Evidence/Course of Dealing/Course of Performance:          41
Course of Dealing-Only Defines Ambiguous Contracts                42
Express Terms of Agreement Prevail Over Course of Conduct         43
Tortious Interference with a Potential Contractual Relationship:  44
Elements
Tortious Interference with a Potential Contractual Relationship:  45
Wrongful Conduct
PMPA – Notice Requirements                                        47
PMPA – Reasonable Grounds for Termination/Nonrenewal             48
Conversion                                                        49
Contract Language Governs In the Absence of Ambiguity            51

**III. Verdict Form:**                                             1

i

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BCG, INC. and CHESAPEAKE PRODUCTS & SERVICES, INC., | |
| Plaintiffs, | |
| v. | C.A. No. 07-cv-207 (GMS) |
| GLES, INC., d/b/a SWEET OIL COMPANY, | JURY TRIAL DEMANDED |
| Defendant/Third-Party Plaintiff, | |
| v. | |
| SUNOCO, INC., | |
| Third-Party Defendant. | |

## PRELIMINARY JURY INSTRUCTIONS

### INTRODUCTION

Members of the jury: Now that you have been sworn, I am now going to give you some preliminary instructions to guide you in your participation in the trial.

### THE PARTIES AND THEIR CONTENTIONS

Before I begin with those instructions, however, allow me to give you an overview of who the parties are and what each contends.

The parties in this case are the plaintiffs, BCG, Inc., and Chesapeake Products and Services, Inc. the defendant is GLeS, Inc., doing business as Sweet Oil Company.

This case involves contract and other claims relating to two travel plaza facilities operated by plaintiffs in Laurel, Delaware and Delmar, Maryland. The stations were originally supplied with motor fuel through Peninsula Oil Company, and later supplied with motor fuel by

1

defendant GLeS, Inc. t/a/ Sweet Oil after Peninsula assigned its contracts to Sweet Oil.

Plaintiffs and defendant assert claims and counterclaims against each other arising out of the relationship following that assignment. The relationships were eventually terminated, and the plaintiffs and defendant now seek damages and other relief from each other.

## DUTIES OF THE JURY

So, let me begin with those general rules that will govern the discharge of your duties as jurors in this case.

It will be your duty to find from the evidence what the facts are. You and you alone will be the judges of the facts. You will then have to apply to those facts to the law as I will give it to you both during these preliminary instructions and at the close of the evidence. You must follow that law whether you agree with it or not. Again, of course, you are bound by your oath as jurors to follow these and all the instructions that I give you, even if you personally disagree with them. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way. Also, do not let anything that I may say or do during the course of the trial influence you. Nothing that I may say or do is intended to indicate, or should be taken by you as indicating, what your verdict should be.

823945.2                                                                                    79205.001

## EVIDENCE

The evidence from which you will find the facts will consist of the testimony of witnesses; (the testimony of witnesses consist of the answers of the witnesses to questions posed by the attorneys or the court – you may not ask questions). Evidence will also consist of documents and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that I may instruct you to find.

Certain things are not evidence and must not be considered by you. I will list them for you now:

1.     Statements, arguments, and questions by lawyers are not evidence.

2.     Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

3.     Testimony that the court has excluded or told you to disregard is not evidence and must not be considered.

4.     Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence: direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts from

which you may infer or conclude that other facts exist. As a general rule, the law makes no distinction between these two types of evidence, but simply requires that you find facts from all the evidence in the case, whether direct or circumstantial or a combination of the two.

4

## CREDIBILITY OF WITNESSES - WEIGHING CONFLICTING TESTIMONY

You are the sole judges of each witness' credibility. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if you can't do this, then it is your duty and privilege to believe the testimony that, in your judgment, is most believable and disregard any testimony that, in your judgment, is not believable. This instruction applies to the testimony of all witnesses, including expert witnesses.

## SUMMARY OF APPLICABLE LAW

I will give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and decision. But in order to help you follow the evidence, I will now give you a brief summary of the elements which plaintiffs must prove to establish their case: [here summarize elements]

823945.2                                                                79205.001

## **BURDEN OF PROOF**

As I told you during the voir dire, this is a civil case. Here the plaintiffs have the burden of proving their case by what is called a preponderance of the evidence. That means the plaintiffs have to produce evidence which, considered in the light of all the facts, leads you to believe that what the plaintiffs' claims are more likely true than not. To put it differently, if you were to put the plaintiffs' and the defendant's evidence on opposite sides of a scale, the evidence supporting the plaintiffs would have to make the scale tip somewhat on their side. If the plaintiffs fail to meet this burden, the verdict must be for the defendant. The plaintiffs must also prove their damages by a preponderance of the evidence.

Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt. That requirement does not apply to a civil case; therefore, you should put it out of your mind.

79205.001

## CONDUCT OF THE JURY

Now, a few words about your conduct as jurors.

First, I instruct you that during the trial you are not to discuss the case with anyone or permit anyone to discuss it with you. Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about this case. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, remember it is because they are not supposed to talk with you nor you with them. In this way, any unwarranted and unnecessary suspicion about your fairness can be avoided. If anyone should try to talk to you about it, bring it to the court's attention promptly.

Second, do not read or listen to anything touching on this case in any way.

Third, do not try to do any research or make any investigation about the case on your own.

Finally, do not form any opinion until all the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

During the trial, I will permit you to take notes. A word of caution is in order. There is always a tendency to attach undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory and you should not compare your notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, your

memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

So, if you do take notes, leave them in your seat at the end of the day, and my Deputy will collect them and return them to your seat the next day. And, remember that they are for your own personal use.

I will give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and decision.

823945.2                                                                79205.001

## COURSE OF THE TRIAL

This trial, like most jury trials, comes in seven stages or phases. We have already been through the first phase, which was to select you as jurors. The remaining stages are:

(2)     These preliminary instructions to you;

(3)     Opening statements which are intended to explain to you what each side intends to prove and are offered to help you follow the evidence. The lawyers are not required to make opening statements at this time or they may defer this opening until it is their turn to present evidence.

(4)     The presentation of the evidence which will include live witnesses and may also include previously recorded testimony, as well as documents and things;

(5)     My final instructions on the law to you;

(6)     The closing arguments of the lawyers which will be offered to help you make your determination; and, finally,

(7)     Your deliberations where you will evaluate and discuss the evidence among yourselves and determine the outcome of the case.

Please keep in mind that evidence is often introduced somewhat piecemeal. So, as the evidence comes in, you as jurors need to keep an open mind.

We will begin shortly, but first I want to outline the anticipated schedule of the trial.

## TRIAL SCHEDULE

Though you have heard me say this during the voir dire, I want to again outline the schedule I expect to maintain during the course of this trial.

This case is expected to take 4 days to try. We will normally begin the day at 9:00 A.M. promptly. We will go until 1:00 P.M. and, after a one hour break for lunch, from 2:00 p.m. to 4:30 P.M. There will be a fifteen minute break at 11:00 A.M. and another fifteen minute break at 3:15 P.M. The only significant exception to this schedule may occur when the case is submitted to you for your deliberations. On that day, the proceedings might last beyond 5:00 p.m. We will post a copy of this schedule for the your convenience in the jury deliberation room.

823945.2

79205.001

# Schedule (i) continued

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BCG, INC. and CHESAPEAKE PRODUCTS & SERVICES, INC., | |
| Plaintiffs, | |
| v. | C.A. No. 07-cv-207 (GMS) |
| GLES, INC., d/b/a SWEET OIL COMPANY, | JURY TRIAL DEMANDED |
| Defendant/Third-Party Plaintiff, | |
| v. | |
| SUNOCO, INC., | |
| Third-Party Defendant. | |

## FINAL JURY INSTRUCTIONS

### INTRODUCTION

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer, however, I would encourage you to focus your attention on me while the instructions are being read. You will be able to take your copies with you into your deliberations and refer to them at that time, if necessary.

I will start by explaining your duties and the general rules that apply in every civil case.

Then I will explain some rules that you must use in evaluating particular testimony and evidence.

I will explain the positions of the parties and the law you will apply in this case.

1

Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say.

Members of the Jury, it is important that you bear in mind the distinction between your duties and my duties. You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. You are the sole judges of the facts. It is your judgment, and your judgment alone, to determine what the facts are, and nothing I have said or done during this trial was meant to influence your decisions about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, by a preponderance of the evidence, the defendants are liable.

Now, as far as my duty is concerned, I have the duty of advising you about the law that you should apply to the facts as you find them. You are not to consider whether the principles I state to you are sound or whether they accord with your own views about policy. You are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. You must accept them despite how you feel about their wisdom. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

823492.4                                                      79205.001

*Instruction No. 1 (No Objection)*

## <u>EVIDENCE DEFINED</u>

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations to which the lawyers agreed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions the lawyers asked. I may also have ruled that you could not see some of the exhibits that the lawyers wanted you to see. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

823492.4                                                                                              79205.001

*Instruction No. 2 (No Objection)*

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

You have heard the terms direct and circumstantial evidence.

Direct evidence is evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it way that one is any better than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

4

*Instruction No. 3 (No Objection)*

## CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

823492.4                                                                79205.001

*Instruction No. 4 (No Objection)*

## STATEMENTS OF COUNSEL

A further word about statements and arguments of counsel. The attorney's statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented. If you remember the evidence differently from the attorneys, you should rely on your own recollection.

The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law. An attorney may argue all reasonable conclusions from evidence in the record. It is not proper, however, for an attorney to state an opinion as to the truth or falsity of any testimony or evidence. What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence that an attorney has offered during opening or closing statements, or at any other time during the course of the trial.

823492.4                                                                    79205.001

*Instruction No. 5 (No Objection)*

## CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You should consider each witness' means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness' biases, prejudices, or interests; the witness' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if you can't do this, then it is your duty and privilege to believe the testimony that, in your judgment, is most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there is evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he or she gave at trial. You have the right to distrust such witness' testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was

7

simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.

This instruction applies to all witnesses.

823492.4                                      79205.001

*Instruction No. 6 (No Objection)*

## EXPERT TESTIMONY

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.

9

*Instruction No. 7 (No Objection)*

## NUMBER OF WITNESSES

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified.

What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

10

*Instruction No. 8 (No Objection)*

## BURDEN OF PROOF; PREPONDERANCE OF THE EVIDENCE

This is a civil case. The party with the burden of proof has the burden of proving their claims, damages or defenses by what is called a preponderance of the evidence. Proof by a preponderance of the evidence means proof that something is more likely true than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not.

Preponderance of the evidence does not depend on the number of witnesses. If the evidence as to a particular element or issue is evenly balanced, the party has not proved the element by a preponderance of the evidence and you must find against that party. In determining whether any fact has been proven by a preponderance of the evidence, you may consider the testimony of all witnesses, regardless of who called them and all exhibits received into evidence regardless of who produced them.

Those of you who are familiar with criminal cases will have heard the term proof beyond a reasonable doubt. That burden does not apply in a civil case and you should therefore put it out of your mind in considering whether or not plaintiffs have met their burden of proof on various Issues.

I will further address the burdens of proof as I describe the claims, counterclaims and defenses.

11

*Instruction No. 9 (No Objection)*

### DELIBERATION AND VERDICT

How you conduct your deliberations is up to you. But, however you conduct those deliberations, please remember that your verdict must represent the considered judgment of each Juror.

It is your duty, as jurors, to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges - judges of the facts, not me. Your sole interest is to seek the truth from the evidence in the case. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

A form of verdict has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the courtroom, your foreperson will give the form to my Deputy Clerk and your verdict shall be announced.

It is proper to add the caution that nothing said in these instructions, and nothing in the form of a verdict, is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility .

12

That concludes the part of my instructions explaining the rules for considering the testimony and evidence. Now let me finish up by explaining how you may communicate questions or messages to the court.

Once you start deliberating, do not talk to the Jury Officer, to my Deputy Clerk, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the Jury Officer. The question will be given to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally sent to me through the foreperson, who by custom of this court is juror Number 1.

One more thing about messages. Do not ever write down or tell anyone else how you stand on your votes. For example, do not write down or tell anyone else that you are split 6-2, or 4-4, or whatever your vote happens to be. That should stay secret until you are finished.

Let me finish by repeating something I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in favor of either party. You must decide the case yourselves based on the evidence presented.

*Instruction No. 10 (No Objection)*

## NATURE OF CASE

This is a civil action brought by the plaintiffs Chesapeake Products and Services, Inc. and BCG, Inc. against the defendant GLeS, Inc., t/a Sweet Oil Company. Plaintiffs claim that defendant, following the assignment of the contracts from Peninsula Oil Company, breached the contracts in various material ways.

First as to the Laurel Oasis Citgo location. Plaintiffs claim that as a result of the material breach of the Laurel Oasis (Citgo) contract, plaintiffs were justified in terminating that contract. Defendants claim that the termination was not justified, and claim that by terminating the contract it was the plaintiffs who materially breached it. Defendant also claims that plaintiff converted various of defendant's credit card transaction receipts. The parties seek damages from each other resulting from these claims.

Plaintiffs further claim that after the Laurel Oasis contract was terminated, defendant unlawfully interfered with plaintiffs' relationships with other motor fuel suppliers and prospective suppliers, and that as a result of that interference, plaintiffs were damaged through their inability to purchase motor fuel from these suppliers. Defendant denies that it acted unlawfully, and claims that it was justified in contacting the other suppliers.

As for the Delmar Mobil location, Plaintiffs claim that defendant materially breached that contract as well by failing to pay incentive fees, eliminating the Mobil credit card and brand and attempting to impose unilaterally the Sunoco brand, charging administrative fees and overcharging for freight. Plaintiffs claim that the elimination of the Mobil trademark without proper notice also constituted an unlawful termination of the franchise in violation of the federal Petroleum Marketing Practices Act – the PMPA. Plaintiffs seek damages from defendant for breach of contract and violation of the PMPA.

14

Defendant claims that it was plaintiffs which improperly terminated and breached the Delmar contract. Defendant seeks damages from plaintiff for breach of contract.

823492.4

79205.001

*Instruction No. 11 (No Objection)*

## CORPORATIONS AND THEIR AGENTS

All parties to this case are corporations. A corporation is considered a person within the meaning of the law. As an artificial person, a corporation can only act through its servants, agents, or employees. Thus, the acts of a corporation's personnel are deemed the acts of the corporation.

The fact that a party is a corporation should not affect your decision in any way. All persons, whether corporate or human, appear equally in a court of law and are entitled to the same equal consideration.[1]

---

[1] *Fisher v. Townsends, Inc.*, Del. Supr., No. 308, 1996, Holland, J. (June 11, 1997)(discussing in great detail agency relationships); *Gutheridge v. Pen-Mod, Inc.*, Del. Super., 239 A.2d 709, 710-11 (1967).

823492.4                                                                          79205.001

*Plaintiffs' Requested Instruction No. 12*

## BREACH OF CONTRACT

A contract is a legally binding agreement between two or more parties.  Each party to the contract must perform according to the agreement's terms, and a party's failure to perform a contractual duty constitutes breach of contract.  If a party breaches the contract and that breach causes injury or loss to another party, then the injured party may claim damages for the breach.[2]

In this case, plaintiffs and defendant claim that the other breached the contracts.  It is for you to decide which, if any party, breached a contract.

---

[2] Generally:  *Leeds v. First Allied Connecticut Corp.*, Del. Ch., 521 A.2d 1095, 1101-02 (1986); *Norse Petroleum A/S v. LVO International, Inc.*, Del. Super., 389 A.2d 771, 773 (1978).

17

*Plaintiffs' Requested Instruction No. 13* ▦

DETERMINING THE CONTRACT

In determining whether a contract has been breached, you will first have to determine the scope of the contract or agreement. An agreement means the bargain of the parties in fact as found in their language or by implication from other dcircumstances including course of dealing or course of performance. A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. Where a contract involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement. Course of dealing and course of performance is used to explain or supplement the parties' agreement. [3]

▦ DEFENDANT OBJECTS TO THIS INSTRUCTION

---

[3]     6 Del. C., §1-201(b)(3); §1-205; *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, 261-62 (11th Cir. 2003).

823492.4                                                                              79205.001

*Plaintiffs' Requested Instruction No. 14*
GOOD FAITH

Every contract imposes an obligation of good faith in its performance or enforcement.

As applied to the facts of this case, good faith means honesty in fact, and the observance of

reasonable commercial standards of fair dealing in the trade. [4]

---

[4]        6 Del. C. §1-201(b)(20), § 1-304.

19

*Plaintiffs' Requested Instruction No. 15*

## CONSTRUCTION OF AMBIGUOUS TERMS - BREACH OF CONTRACT

There are certain rules to consider in interpreting contractual terms that appear ambiguous or unclear.

The construction and interpretation of contractual terms is generally a question of law for the Court. Accordingly, I will instruct you regarding the meaning of the contract and the parties obligations thereunder. However, when a contractual term is ambiguous, you must look to the construction given to the terms by the parties as shown through their conduct during the period after the contract became effective and before the institution of this lawsuit. The parties' conduct after a contract is made should be given great weight in determining its meaning.[5]

DEFENDANT OBJECTS TO THIS INSTRUCTION

---

[5] Rhone-Poulenc v. American Motorists Ins. Co., Del. Supr., 616 A.2d 1192, 1195 (1992)(discussing rules of construction); Graham v. State Farm Mut. Auto Ins. Co., Del. Supr., 565 A.2d 908, 912 (1989)(same); Artesian Water Co. v. State Dep't of Highways & Trans., Del. Supr., 330 A.2d 441, 443 (1974)(same); State v. Dabson, Del. Supr., 217 A.2d 497, 500 (1966); B.S.F. Co. v. Philadelphia Nat. Bank Co., Del. Supr., 204 A.2d 746, 750 (1964); Holland v. National Automotive Fibers, Del. Ch., 194 A. 124, 127 (1937); Goodman v. Continental Cas. Co., Del. Super., 347 A.2d 662, 665 (1975); Hudson v. D&V Mason Contractors, Inc., Del. Super., 252 A.2d 166, 168-69 (1969); Hajoca Corp. v. Security Trust Co., Del. Super., 25 A.2d 378, 381, 383 (1942); Pope v. Landy, Del. Super., 1 A.2d 589, 594 (1938);Rohner v. Niemen, Del. Supr., 380 A.2d 549, 552 (1977)(construction of a deed is a question of law).

823492.4                                                    79205.001

*Plaintiffs' Requested Instruction No. 16*

## MATERIAL BREACH OF CONTRACT

A material breach of a contract by one party entitles the other party to terminate that contract, cease further performance under the contract, and recover damages for the breach. The question of whether a breach is sufficiently material to justify the other party ceasing performance is one of degree. Several factors are considered, including the extent to which the injured party will be deprived of the benefit he reasonably expected, the extent to which the injured party can be adequately compensated for the part of that benefit which he will be deprived, the extent to which the party failing to perform or to offer to perform will suffer forfeiture, the likelihood that the party failing to perform or to offer to perform will cure his failure (taking account of all the circumstances including reasonable assurances), and the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. [6]

---

[6]     *Biolife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d  268. ( Del. Ch.,  2003).

21

*Plaintiffs' Requested Instruction No. 17*

ANTICIPATORY BREACH

A party who clearly indicates by words or conduct that it will no perform a duty under a contract repudiates that contract and is responsible for damages. A statement of intent not to perform unless terms different from the original contract are met constitutes a repudiation. A repudiation excuses the other party from performing under the contract. If you find that one party clearly indicated to the other that it would not perform under the contract unless the terms were changed, then you may find that the other party repudiated the contract, which excused the other from performing under that contract. [7]

---

[7] *Pami-Lemb I, Inc. v. EMH-NHC, LLC*, 857 A.2d 998, 1014 (Del. Ch. 2004)

823492.4                                    79205.001

*Plaintiffs' Requested Instruction No. 18*

## ASSIGNMENTS

An assignment is any transfer of rights under a contract.  Generally, an assignment of contractual

rights is valid unless the contract involves personal services, is contrary to public policy, or is

expressly prohibited in the contract.[8]  Under an assignment, the party to which a contract has

been assigned steps into the shoes of the assignor, and has the same obligations under the

contract as the party from which the assignment was taken. As related to this case, an assignment

of a contract is also deemed a delegation of duties and its acceptance by the assignee constitutes

a promise by the assignee to perform those duties. [9]

---

[8] *Industrial Trust Co. v. Stidham*, Del. Supr., 33 A.2d 159, 160-61 (1942)(judgments arising from contract not involving personal services are assignable); *FinanceAmerica Private Brands, Inc. v. Harvey E. Hall, Inc.*, Del. Super., 380 A.2d 1377, 1380 (1977); *Paul v. Chromalytics Corp.*, Del. Super., 343 A.2d 622, 625-26 (1975).
[9]      6 Del. C. 2-210.

23

*Plaintiffs' Requested Instruction No. 19*

## RECOVERY OF DAMAGES FOR BREACH OF CONTRACT

A party is entitled to damages shown to have resulted from another party's breach of contract. For a party to recover damages for breach of contract, a party must prove that one or more terms of the contract with the other party have not been performed and that the complaining party has sustained damages as a result of the other party's failure to perform.[10]

---

[10] *Ridley Inv. Co. v. Croll*, Del. Supr., 192 A.2d 925, 926-27 (1963); *Hudson v. D&V Mason Contractors, Inc.*, Del. Super., 252 A.2d 166, 169-70 (1969); *Emmett S. Hickman Co. v. Emelio Capaldi Developer, Inc.*, Del. Super., 251 A.2d 571, 572-73 (1969).

24

*Plaintiffs' Requested Instruction No. 20*

## DAMAGES -- BREACH OF CONTRACT -- GENERAL

If you find that one party committed a breach of contract, the other party is entitled to compensation in an amount that will place it in the same position it would have been in if the contract had been properly performed. The measure of damages is the loss actually sustained as a result of the breach of the contract.[11] In an action for breach of contract, the plaintiff may recover those damages which naturally arise from the breaking of the contract. Those damages are the consequences of breaking the contract which the other party had reason to foresee would take place or such damages as may reasonably be supposed to have been contemplated by both parties when they made the contract.

---

[11] E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 446 (Del. 1996); Pierce v. Int'l Insurance Co. of Illinois, 671 A.2d 1361, 1367 (Del. 1996); Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc., 394 A.2d 1160, 1163-64 (Del. 1978)(loss of profits); American General Corp. v. Continental Airlines, 622 A.2d 1, 11 (Del. Ch. 1992), aff'd, 620 A.2d 856 (Del. 1992); Farny v. Bestfield Builders, Inc., 391 A.2d 212, 214 (Del. Super. Ct. 1978); Gutheridge v. Pen-Mod, Inc., 239 A.2d 709, 714 (Del. Super Ct. 1967)(nominal damages); J.J. White, Inc. v. Metropolitan Merchandise Mart, 107 A.2d 892, 894 (Del. Super. Ct. 1954).

823492.4                                                                79205.001

*Plaintiffs' Requested Instruction No. 21*

## DUTY TO MITIGATE DAMAGES – CONTRACT

Generally, the measure of damages for one who is harmed by a breach of contract is tempered by a rule requiring that the injured party make a reasonable effort, whether successful or not, to minimize the losses suffered. To mitigate a loss means to take steps to reduce the loss. If an injured party fails to make a reasonable effort to mitigate its losses, its damage award must be reduced by the amount a reasonable effort would have produced under the same circumstances. This reduction, however, must be measured with reasonable probability.[12]

---

[12] *Lynch v. Vickers Energy Corp.*, Del. Supr., 429 A.2d 497, 504 (1981)(plaintiff with out-of-pocket expenses has duty to mitigate them); *McClain v. Faraone*, Del. Super., 369 A.2d 1090, 1093 (1977)(duty to mitigate losses in liquidation of property at foreclosure sale of injured party); *Nash v. Hoopes*, Del. Super., 332 A.2d 411, 414 (1975)(duty in contractual breach to mitigate losses when reasonably possible); *Katz v. Exclusive Auto Leasing, Inc.*, Del. Super., 282 A.2d 866, 868 (1971)(common law of contracts requires injured party to minimize losses); *See also* RESTATEMENT (SECOND) OF CONTRACTS ' 350 (1979).

26

*Plaintiffs' Requested Instruction No. 22*

## SUBSTANTIAL PERFORMANCE

To recover under a contract, the non-breaching party must show that it has substantially complied with its obligations under the contract. [13]

---

[13] Emmett S. Hickman Co. v. Emelio Capaldi Developer, Inc., Del. Super., 251 A.2d 571, 572-73 (1969).

27

*Plaintiffs' Requested Instruction No. 23* 🮐

## INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

The plaintiffs contend that the defendant has committed the wrongful tort of intentional interference with contractual relationships.  There are three ways in which a party is liable for intentional interference with contractual relationships.

First, one is liable who intentionally and improperly  causes a third party not to perform a contract with another party.

Second, one is liable who intentionally and improperly prevents another from performing a contract with a third party or makes the performance of the contract more costly.

And third, one is liable who intentionally and improperly causes a third party not to enter into or continue a prospective contractual relation with another.

You must determine whether or not Defendant's conduct was improper.  In doing so, you may consider the following factors:

(1)   the nature of defendant's conduct;

(2)   defendant's motive;

(3)   plaintiff's interests;

(4)   the expectations of the parties involved;

(5)   the relations between the parties involved;

(6)   the interest that defendant's sought to advance;

(7)   whether defendant's act was done for the purpose of causing the interference or whether it was merely incidental to another purpose;

(8)   the proximity or remoteness of defendant's conduct to the interference; and

(9)   society's interest in protecting business competition as well as its interest in protecting the individual against interference with the pursuit of gain.

28

If you find that the defendant is liable for committing the wrongful tort of intentional interference with contractual relationships, the defendant is responsible for the loss suffered as a result of the interference.[14]

**DEFENDANT OBJECTS TO THIS INSTRUCTION**

---

[14] *Irwin & Leighton, Inc., v. W.M. Anderson Co.*, Del. Ch., 532 A.2d 983, 992-93 (1987); *Bowl-Mor Company Inc. v. Brunswick Corp.*, Del. Ch., 297 A.2d 61, 64 (1972); *De Bonaventura v. Nationwide Mut. Ins.*, Del. Ch., 419 A.2d 942, 947 (1980), *aff'd*, Del. Supr., 428 A.2d 1151, 1153 (1981). *Connolly v. Labowitz*, Del. Super., 519 A.2d 138, 143 (1986); *Stoltz v. Delaware Real Estate Comm'n*, Del. Super., 473 A.2d 1258, 1263-64 (1984); *Andres v. Williams*, Del. Supr., 405 A.2d 121, 122-23 (1979); *Murphy v. Godwin*, Del. Super., 303 A.2d 668 (1973); *Metropolitan Convoy Corp. v. Chrysler Corp.*, Del. Super., 173 A.2d 617, 626 (1961); *Regal Home Distributors v. Gordon*, Del. Super., 66 A.2d 754, 754-55 (1949). *See also* RESTATEMENT (SECOND) TORTS " 766, 767 (1965).

*Plaintiffs' Requested Instruction No. 24*

## DAMAGES:
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

The plaintiff is entitled to be fairly and adequately compensated for:

(1)    the monetary loss of the contractual benefits suffered by the plaintiff;

(2)    all other losses suffered by the plaintiff as a direct result of the defendant's act;

(3)    the emotional distress and harm to the plaintiff's reputation suffered by the plaintiff as a result of the defendant's act.[15]

---

[15]    *De Bonaventura v. Nationwide Mut. Ins.*, Del. Ch., 419 A.2d 942 (1980), *aff'd*, Del. Supr., 428 A.2d 1151 (1981); *Bowl-Mor Company Inc. v. Brunswick Corp.*, Del. Ch., 297 A.2d 61, *appeal dismissed*, 297 A.2d 67 (1972); *Murphy v. Godwin*, Del. Super., 303 A.2d 668 (1973). *See also* RESTATEMENT (SECOND) OF TORTS ' 774A (1965).

823492.4                                                                          79205.001

*Plaintiffs' Requested Instruction No. 25*

### PUNITIVE DAMAGES

If you find that defendant interfered with a contractual relationship, and decide to award compensatory damages to plaintiffs, you must determine whether defendant is also liable to plaintiffs for punitive damages.

Punitive damages are different from compensatory damages. Compensatory damages are awarded to compensate the plaintiff for the injury suffered. Punitive damages, on the other hand, are awarded in addition to compensatory damages.

You may award punitive damages to punish a party for outrageous conduct and to deter a party, and others like *it*, from engaging in similar conduct in the future. To award punitive damages, you must find by a preponderance of the evidence that defendant acted intentionally or recklessly. Punitive damages cannot be awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence.

Intentional conduct means it is the person's conscious object to engage in conduct of that nature. Reckless conduct is a conscious indifference that amounts to an "I don't care" attitude. Reckless conduct occurs when a person, with no intent to cause harm, performs an act so unreasonable and dangerous that it knows or should know that there is an eminent likelihood of harm that can result. Each requires that the defendant foresee that its conduct threatens a particular harm to another.

The law provides no fixed standards for the amount of punitive damages.

In determining any award of punitive damages, you may consider the nature of defendant's conduct and the degree to which the conduct was reprehensible. Finally, you may assess an amount of damages that will deter defendant and others like it from similar conduct in the future. You may consider defendant's financial condition when evaluating deterrence. Any

31

award of punitive damages must bear a reasonable relationship to plaintiffs' compensatory damages. If you find that plaintiffs are entitled to an award of punitive damages, state the amount of punitive damages separately on the verdict form.

Defendant's financial condition must not be considered in assessing compensatory damages.[16]

---

[16] *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003); *BMW of North American, Inc. v. Gore*, 517 U.S. 559, 575 (1996); *Wilhelm v. Ryan*, 2006 Del. LEXIS 399, at *13-14 (Del. Jul. 18, 2006)(civil jury may consider criminal punishment in determining punitive damages); *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1190 (Del. 2000); *Devaney v. Nationwide Mut. Auto Ins. Co.*, 679 A.2d 71, 76-77 (Del. 1996); *Tackett v. State Farm Fire and Cas. Ins. Co.*, 653 A.2d 254, 265-66 (Del. 1995)(punitive damages available in bad faith action if breach is particularly egregious); *Jardel Co. v. Hughes*, 523 A.2d 518, 527-31 (Del. 1987); *Jones v. Del. Cmty. Corp. for Individual Dignity*, 2004 Del. Super. LEXIS 133, at *14-15, *aff'd, Del. Cmty. Corp. for Individual Dignity v. Jones*, 2005 Del. LEXIS 152 (Del. Apr. 12, 2005)(ORDER).

823492.4                                                                                        79205.001

*Plaintiffs' Requested Instruction No. 26*

**(INTRODUCTION – THE PMPA)**

Another claim for your consideration is a claim under the federal Petroleum Marketing Practices Act – the "PMPA." Plaintiffs claim that Defendant unlawfully terminated the franchise at the Delmar Mobil station, in violation of the PMPA, which is a statute passed by Congress to provide protection for service station dealers from arbitrary and discriminatory terminations of their franchises by their franchisor.

*N.I. Petroleum Ventures, Corp. v. GLeS, Inc. t/a Sweet Oil Co.,* 333 F. Supp. 2d 251, 256 (D. Del. 2004).

823492.4                                                                 79205.001

*Plaintiffs' Requested Instruction No. 27*

**(PMPA- BURDEN OF PROOF)**

Under the PMPA claim, the burdens of proof are different. Plaintiff has the burden of proving the termination of the franchise. The defendant bears the burden of establishing as an affirmative defense that the termination was permitted under the Act.

PMPA, l5 U.S.C. §2805; *N.I. Petroleum Ventures, Corp. v. GLeS, Inc. t/a Sweet Oil Co.,* 333 F. Supp. 2d 251, 256 (D. Del. 2004).

34

*Plaintiffs'* Requested Instruction No. 28

## (PMPA - TERMINATION PROHIBITED)

Under the PMPA, the termination of a petroleum franchise is prohibited unless the termination meets specific requirements of the statute. Unless and until there is a legitimate ground for terminating the franchise, the law envisions that the relationship will be a continuing one.

Darling v. Mobil Oil Corp., 864 F.2d 981 (2d Cir. 1989).

823492.4                                                                79205.001

*Plaintiffs' Requested Instruction No. 29*

## (PLAINTIFFS' PMPA CLAIMS)

Plaintiffs claim that defendant violated the PMPA, actually or constructively, by terminating the Delmar franchise in February 2007 when it removed the Mobil trademark and otherwise breached the contract. Plaintiffs claim that proper grounds did not exist to terminate the franchise, and that defendant violated the notice requirements of the Act.

36

*Plaintiffs' Requested Instruction No. 30*

**(PMPA NOTIFICATION REQUIREMENT EXPLAINED)**

The PMPA requires, prior to the termination of any franchise, that a franchisor such as defendant furnish notification of such termination to the plaintiff, the franchisee, which:

> **First:** Is in writing; and
>
> **Second:** Is posted by certified mail or personally delivered to the franchisee; and
>
> **Third:** Contains:
>
>> (a) a statement of intention to terminate the franchise, together with the reasons therefor, and
>>
>> (b) the date on which such termination takes effect, and
>>
>> (c) a summary statement of the provisions of the applicable law, including a statement of the respective responsibilities of, and the remedies and relief available to the franchisor and franchisee.

You are further instructed that the Act provides that the above-outlined notification shall be given not less than 90 days prior to the date on which the termination is to take effect. The Act also provides that under circumstances in which it would not be reasonable for the franchisor to furnish notification prior to the 90-day period, then the franchisor shall furnish notification to the franchisee on the earliest date on which furnishing of such notification is reasonably practicable. What is "reasonable" is to be determined by you upon a consideration of all the facts, circumstances and evidence appearing in this case. You are instructed that in considering the notice issue, the "less than 90 days notice requirement is not an "'all or nothing' requirement that permits no notice at all when 90 days would be unreasonable."

*N.I. Petroleum Ventures, Corp. v. GLeS, Inc. t/a Sweet Oil Co.,* 333 F. Supp. 2d 251, 257 (D. Del. 2004); Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions,* §91.08;

37

*Plaintiffs' Requested Instruction No. 31*

### (NOTICE REQUIREMENTS MANDATORY)

PMPA's strict notice requirements are mandatory.  If you find that Defendant failed to comply with a notice requirement, you must find for the plaintiffs on the PMPA claim.



*N.I. Petroleum Ventures, Corp. v. GLeS, Inc. t/a Sweet Oil Co.,* 333 F. Supp. 2d 251, 256  (D. Del. 2004); *Zipper v. Sun Company, Inc.,* 947 F. Supp. 62, 69 (E.D.N.Y. 1996)

38

*Plaintiffs' Requested Instruction No. 32*
**(PMPA - CONSTRUCTIVE TERMINATIONS PROHIBITED)**

The PMPA also prohibits constructive terminations. Under the PMPA, one of the components of a PMPA franchise is the right to use a refiner's trademark. Another component is the contract for the supply of motor fuel.

A constructive termination in violation of the PMPA occurs where a franchisor materially breaches a component part of the franchise. If you find that a component part of a PMPA franchise was materially breached, either through the removal of the refiner's trademark or otherwise, you should find that the franchise was constructively terminated, in violation of the PMPA. The question is whether the breach was serious enough to effectively end the relationship. There is no requirement, however, that the franchisee actually go out of business.

*Marcoux v. Shell Oil Co.*, 524 F.3d 33 (1st Cir. 2008); *Barnes v. Gulf Oil Co.*, 795 F.2d 358 (4th Cir. 1986), *after remand,* 824 F.2d 300 (4th Cir. 1987).

39

*Defendant's Requested Instruction No. 1*▨

**Parole Evidence / Course of Dealing / Course of Performance:**

Where the parties have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement. The rule applies once a writing is determined to be the entire contract of the parties, and the terms of the parties agreement are not ambiguous.

▨ PLAINTIFFS OBJECT TO THIS INSTRUCTION – SEE 6 Del. C. §1-303, 2-202, 2-204

Hynansky, 2003 WL 21976031; see also Pellaton v. Bank of New York, 592 A.2d 473 (Del.Supr.1991).

41

*Defendant's* Requested Instruction No. 2⬚

**Course of Dealing – Only Defines Ambiguous Contracts**

You heard references to a course of performance. I instruct you that a course of performance is a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection. A course of dealing is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. Evidence of course of dealing and performance can only supply incidents to a contract where the contract is ambiguous on the point to which the party seeks to apply the course of dealing or performance.

A party cannot be bound by a "course of performance" about which he has no knowledge or with which he never directly acquiesced. A party cannot be bound by the course of performance of another person or party.


PLAINTIFFS OBJECT TO THIS INSTRUCTION - SEE 6 Del. C. §1-305 2-202 2-204

6 Del. C. § 1-303(a),(b)

42

*Defendant's* Requested Instruction No. 3 ▨

**Express Terms of Agreement Prevail Over Course of Conduct**

The express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other. If such a construction is unreasonable: (1) Express terms prevail over course of performance, course of dealing, and usage of trade.

PLAINTIFFS OBJECT TO THIS INSTRUCTION—SEE 6 De. C. §1-303 (instruction requested not complete)

6 Del. C. § 1-303(e).

*Defendant's Requested Instruction No. 4*

**Tortious Interference with a Potential Contractual Relationship: Elements**

The Plaintiffs have brought a claim against the Defendant for Tortious Interference with a Prospective Contractual Relationship. One who purposely and improperly induces or otherwise purposely causes a third party not to enter into or continue a prospective contractual relation with another is responsible to that other party for the loss suffered as a result of the prevention or interference with the contractual relationship.

To establish its claim for tortious interference, it is the Plaintiffs burden to prove the following elements by a preponderance of the evidence:

(1) the existence of a valid business relation or a reasonable expectancy of entering a valid business relationship,

(2) the interferer's knowledge of the relationship or expectancy,

(3) intentional interference that

(4) induces or causes a breach or termination of the relationship or expectancy and that

(5) causes resulting damages to the party whose relationship or expectancy is disrupted.

Each of the foregoing requirements must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner.

Spanish Tiles, Ltd. v. Hensey, 2005 WL 3981740 (Del.Super.2005)(citing CPM Indus., Inc. v. Fayda Chemicals & Minerals, Inc., Del. Ch., C.A. No. 15996, Jacobs, V.C. (Nov. 26, 1997); In re Frederick's of Hollywood, Inc., 1998 WL 398244 (Del.Ch.)); nternational Business Machines Corp. v. Comdisco, Inc., 1993 WL 259102 (Del.Super.1993); DeBonaventura v. Nationwide Mutual Insurance Company, 428 A.2d 1151, 1153 (Del.1981); Delaware State Pattern Jury Instructions for Civil Practice, §12.7.

**PLAINTIFF OBJECTS TO THIS INSTRUCTION AS INCLUDING PURPOSEFUL LANGUAGE**

44

*Defendant's* Requested Instruction No. 5 ▓

**Tortious Interference with a Potential Contractual Relationship: Wrongful Conduct**

In determining whether the Defendant's conduct was wrongful, you must do so in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner. In certain instances, a party is privileged to interfere with the contractual relations of another party. Where a party acts with such justification or privilege, the party's conduct is not improper or unlawful, and the party cannot be held liable for tortious interference of prospective contractual relations.

Where a party acts in good faith to assert a legally protected interest of its own or threatens in good faith to protect its interest by appropriate means, and intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another, the party's conduct does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction."

You must determine whether the Defendant's conduct was justified or privileged as I just described. To do so, you should determine whether (1) the defendant had a legally protected interest in its contracts with the plaintiff; (2) whether the defendant acted in good faith the assert or threaten to protect its interest; and (3) whether the threat to protect its interest was made by appropriate means.

If you are satisfied that these elements have been established, the party's interference is not improper even if it knows that its conduct will cause another to break

823492.4                                                                79205.001

his contract or otherwise refuse to do business with a third person.

**PLAINTIFF OBJECTS TO THIS INSTRUCTION PLAINTIFFS HAVE HAD INADEQUATE TIME TO REVIEW THIS**

Corning Inc. v. SRU Biosystems, LLC, 292 F.Supp.2d 583 (D.Del.2003); Upjohn Co. v. Riahom Corp., 650 F.Supp. 485 (D.Del.1986); DeBonaventura v. Nationwide Mutual Insurance Company, 428 A.2d 1151, 1153 (Del.1981); Restatement (Second) of Torts § 767 (1979); Restatements (Second) of Torts § 773 (1979); Restatement (First) of Torts, § 773 (1939); Delaware State Pattern Jury Instructions for Civil Practice, §12.7.

79205.001

*Defendant's* Requested Instruction No. 6

**Petroleum Marketing Practices Act:**
**Notice Requirements**

A franchisor seeking to terminate or not renew a franchise agreement must provide notice to the franchisee. The notice is intended to inform the franchisee as to why the franchise is being terminated or not being renewed.   In determining the sufficiency of notice of termination or nonrenewal, you should consider not only the reason stated in the notice, but all the facts about nonrenewal known to the franchisee.

Generally, notice of termination or nonrenewal must be given to the franchisee not less than 90 days prior to the date on which the termination is to take effect.   However, under circumstances in which it would not be reasonable for the franchisor to furnish such notice, the franchisor need not comply with the 90 day notice requirement.   The lengthy notice requirement is dispensed with by such exigent circumstances as where franchisee committed defaults of the franchise agreement.

Where it would not be reasonable for the franchisor to furnish notice at least 90 days before termination, the franchisor must give notice to the franchisee on the earliest date on which furnishing such notice is reasonably practical. What qualifies as reasonable is to be determined by you upon a consideration of all the facts, circumstances and evidence presented in this case.

PLAINTIFF OBJECTS TO THIS INSTRUCTION. IT IS INCONSISTENT WITH CASE LAW.   *See Nj Petrol Ventures Corp. v. GLES, Inc.* 333 F. Supp. 2d 251, 258 (D. Del. 2004). PLAINTIFFS HAVE HAD INADEQUATE TIME TO REVIEW THIS.

15 U.S.C. § 2804(3)(A); <u>Marathon Petroleum Co. v. Pendleton</u>, 889 F.2d 1509, (C.A.6 Ohio,1989); <u>Wisser Co., Inc. v. Mobil Oil Corp.</u>, 730 F.2d 54 (C.A.N.Y.1984)(citing S.Rep. No. 120, 94th Cong., 1st Sess. 8 (1975)).   <u>Sutton v. Atlantic Richfield Co.</u>, 539 F.Supp. 658 (D.C.Cal. 1982).

823492.4                                          79205.001

*Defendant's* Requested Instruction No. 7

**Petroleum Marketing Practices Act:**
**Reasonable Grounds for Termination/ Nonrenewal**

Under the PMPA, franchisor may terminate or fail to renew any franchise or franchise

relationship any of the following grounds:

(1)    A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship.

(2)    A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise.

(3)    The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable. The term "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" includes events such as loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise

(4)    A franchisor is also permitted to refuse renewal of any franchise or

franchise relationship if:

The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if--(i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

PLAINTIFFS OBJECT TO THIS INSTRUCTION AS NO SUCH GROUNDS WERE DESCRIBED IN THE NOTICE.

N.I. Petroleum Ventures Corp. v. GLeS, Inc., 333 F. Supp. 2d 251 (D.Del. 2004); 15 U.S.C. § 2802(b)(2); 15 U.S.C. § 2802(b)(3); 15 U.S.C. § 2802(c).

823492.4                                                  79205.001

*Defendant's Requested Instrucion No. 7*

**Conversion:**

Conversion is any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it. The necessary elements of conversion that a plaintiff must establish are that:

(1) the plaintiff had a property interest in the property;

(2) that the plaintiff had a right to possession of property; and

(3) that the property was converted, thereby causing the plaintiff to sustain damages.

For a plaintiff to recover under a theory of conversion, he must prove precisely what property the defendant converted and that his interest in the property was viable at the time of the conversion.

CIT Communications Finance Corp. v. Level 3 Communications, LLC, 2008 WL 2586694 (Del.Super.2008); Rockwell Automation, Inc. v Kall, 2004 WL 2965427 (Del.Ch.2004); Goodrich v. E.F. Hutton Group, Inc., 542 A.2d 1200, 1203 (Del. Ch.1988).

823492.4                                                                        79205.001

_Defendant's_ Requested Instruction No. 8

## Contract Language Governs In the Absence of Ambiguity

Delaware adheres to the objective theory of contracts, under which it is presumed that contract language governs in the absence of ambiguity.

**PLAINTIFF OBJECTS TO THIS INSTRUCTION AS INCONSISTENT WITH THE UCC STANDARD, AND AS HAVING INSUFFICIENT TIME TO REVIEW.**

51

79205.001

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

BCG, INC. and CHESAPEAKE PRODUCTS &
SERVICES, INC.,

          Plaintiffs,

      v.

GLES, INC., d/b/a SWEET OIL COMPANY,

          Defendant/Third-Party
          Plaintiff,

      v.

SUNOCO, INC.,

          Third-Party
          Defendant.

C.A. No. 07-cv-207 (GMS)

JURY TRIAL DEMANDED

## VERDICT FORM

### *LAUREL OASIS*

(1)    Do you find that defendant Sweet Oil breached its agreement with [plaintiffs] [BCG, Inc.] [Chesapeake Products & Services, Inc. ] related to the Laurel Oasis Station?

       \_\_\_\_\_ YES         \_\_\_\_\_ NO

If your answer to Question #1 is "YES," go to Question #2.  If your answer to Question # 2 is "NO," proceed to Question #9.\_\_

(2)    Do you find that [plaintiffs] [BCG, Inc] [Chesapeake Products & Services, Inc. ] have suffered damages as a result of defendant's breach of its  agreement with plaintiffs related to the Laurel Oasis Station?

       \_\_\_\_\_ YES         \_\_\_\_\_ NO

If your answer to Question #2 is "YES," go to Question #3.  If your answer to Question #2 is "NO," proceed to Question #4.

1

(3)    In a lump sum, state the amount of your award of compensatory damages to [plaintiffs] [BCG,Inc] [Chesapeake Products & Services, Inc. ]for the breach of contract related to the Laurel Oasis Station.

$ _____

(4)    Do you find that Defendant intentionally interfered with [plaintiffs'][BCG's] [Chesapeake Products & Services, Inc. ] prospective contractual relations as related to the Laurel Oasis Station?

_____ YES              _____ NO

If your answer to Question #4 is "YES," go to Question #5.  If your answer to Question #4 is "NO," go to Question #12.

5.    Has [plaintiffs][BCG, Inc.] [Chesapeake Products & Services, Inc. ] proven that it suffered damage as a result of the intentional interference with  prospective contractual relations as related to the Laurel Oasis Station?

        If your answer to Question #5 is "YES," go to Question #6.  If your answer to Question #5 is "NO," proceed to Question #7.

6.    In a lump sum, state the amount of your award of compensatory damages to [plaintiffs][BCG, Inc.] [Chesapeake Products & Services, Inc. ] for the intentional interference with  prospective contractual relations as related to the Laurel Oasis Station, and proceed to Question No. 7.

$ _____

7.    Do you find that plaintiffs are entitled to punitive damages for defendant's actions for interfering with [plaintiffs'][BCG's] [Chesapeake Products & Services, Inc. ] prospective contractual relations as related to the Laurel Oasis Station?
        _____ YES              _____ NO

If your answer to Question #7 is "YES," go to Question #8.  If your answer to Question #7 is "NO," go to Question #12.

8.    In a lump sum, state the amount of your award of punitive damages to [plaintiffs][BCG] [Chesapeake Products & Services, Inc. ]for the intentional interference with  prospective contractual relations as related to the Laurel Oasis Station, and proceed to Question #12.

2

$ _____

9.    If your answer to Question #1 was NO, do you find that the [plaintiffs][BCG] [Chesapeake Products & Services, Inc. ]breached their  contractual obligations to defendant Sweet Oil related to the Laurel Oasis Station?

_____ YES                    _____ NO

If your answer to Question #9 is "YES," go to Question #10.  If your answer to Question #9 is "NO," proceed to Question #12.


10.    Do you find that defendant Sweet Oil has suffered damages as a result of plaintiff's breach of its agreements with defendant Sweet Oil related to the Laurel Oasis Station?

_____ YES                    _____ NO

If your answer to Question #10 is "YES," go to Question #11.  If your answer to Question #10 is "NO," go to Question #12


11.    In a lump sum, state the amount of your award of compensatory damages, if any, to defendant Sweet Oil for the plaintiffs' breach of contract related to the Laurel Oasis Station.

$ _____


***DELMAR***

12.    Do you find that defendant breached its agreement with plaintiffs related to the Delmar Station?

_____ YES                    _____ NO

If your answer to Question #12 is "YES," go to Question #13.  If your answer to Question # 12 is "NO," proceed to Question #15.


13.    Do you find that defendant terminated the franchise at the Delmar Station in violation of the Petroleum Marketing Practices Act (the "PMPA")?

_____ YES                    _____ NO

3

If your answer to Question #12 or #13 is "YES," go to Question #14. If your answer to Question #12 and #13 is "NO," go to Question #16.

14.    Do you find that plaintiffs suffered damages as a result of defendant's breach of its obligations with plaintiffs related to the Delmar Station?

_____ YES                    _____ NO

If your answer to Question #14 is "YES," go to Question #15. If your answer to Question #14 is "NO," proceed to Question #16.

15.    In a lump sum, state the amount of your award of compensatory damages to plaintiffs for the breach of contract and/or the PMPA as related to the Delmar Station.

$ _____

16.    Do you find that plaintiffs breached their agreement with defendant Sweet Oil related to the Delmar Station?

_____ YES                    _____ NO

If your answer to Question #16 is "YES," go to Question #17. If your answer to Question #16 is "NO," you have completed your deliberations.

17.    Do you find that defendant Sweet Oil suffered damages as a result of plaintiffs' breach of their agreement with Sweet Oil related to the Delmar Station?

_____ YES                    _____ NO

If your answer to Question #17 is "YES," go to Question #18. If your answer to Question #17 is "NO," you have completed your deliberations.

18.    In a lump sum, state the amount of your award of compensatory damages, if any, to Sweet Oil for the breach of contract related to the Delmar Station.

$ _____

4

_____
Jury Foreperson

79205.001

SCHEDULE (i)                                           **D**

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BCG, INC. and CHESAPEAKE PRODUCTS & SERVICES, INC., | |
| Plaintiffs, | |
| v. | C.A. No. 07-cv-207 (GMS) |
| GLES, INC., d/b/a SWEET OIL COMPANY, | JURY TRIAL DEMANDED |
| Defendant/Third-Party Plaintiff, | |
| v. | |
| SUNOCO, INC., | |
| Third-Party Defendant. | |

## JOINT PROPOSED EXAMINATION ON VOIR DIRE

**I..    Brief Explanation of the Case:**

This case involves contract  and other claims relating to two travel plaza facilities

operated by plaintiffs in Laurel, Delaware and Delmar, Maryland.  The stations were originally

supplied with motor fuel through Peninsula Oil Company, and later supplied with motor fuel by

defendant GLeS, Inc. t/a/ Sweet Oil after Peninsula assigned its contracts to Sweet Oil.

Plaintiffs and defendant assert claims and counterclaims against each other arising out of

the relationship following that assignment. The relationships were eventually terminated, and the

plaintiffs and defendant now seek damages and other relief from each other.

**II. Voir Dire Questions.**

1.    Does any member of the prospective jury panel know anything about this case

1

other than just stated?

2.      The plaintiffs in this case are Chesapeake Products& Services, Inc. and BCG, Inc., Delaware corporations controlled by William Glenn and Charles Glenn. Plaintiffs own and operate two travel plazas. One is  located in Laurel, Delaware and is known as the "Laurel Oasis." The other is in Delmar, Md., and is known generally as "Delmar" or "Pizza Boys." Does any member of the prospective jury panel know or know of any of these persons or parties, or have a business, personal or professional relationship with any of them?

3.      The defendant is a GLeS, Inc., a Delaware corporation that does business under the name of Sweet Oil. Sweet Oil is owned by William Sweet, Mark Greco and Ben LeRoy. Sweet Oil was in the business of distributing motor fuel and related products in the mid-Atlantic region. Does any member of the prospective jury panel know or know of any of these persons or parties, or have a business, personal or professional relationship any of them?

4.      The Plaintiffs are represented by:

--      Harry C. Storm of the firm of Lerch, Early & Brewer, Chartered, Bethesda, Maryland?

--      D. Benjamin Snyder, of the firm Prickett, Jones &Elliott, PA, Dover, Delaware?

5.      Does any member of the prospective jury panel know or know of any of the attorneys for the plaintiff or have you, members of your immediate family or close personal friends ever been represented by the attorneys for the plaintiffs?


6.      The defendant is represented by:

--      Seth J. Reidenberg, Esq. of the firm of Young, Conaway, Stargatt & Taylor, Wilmington, DE?

--      Hugh J. Hutchison, of the firm of Leonard, Sciolla, Hutchison, Leonard &

Tinari, LLP, Philadelphia, PA?

Does any member of the prospective jury panel know or know of any of the attorneys for

the plaintiff or have you, members of your immediate family or close personal friends ever been

represented by the attorneys for the defendant?


6      Does any member of the prospective jury panel know any of the following

persons who may be called as witnesses:

> William Glenn
>
> Charles Glenn
>
> Mark Greco
>
> William Sweet
>
> Ben LeRoy
>
> Edward J. Ellis, Jr.
>
> Mike Tucker
>
> John Phelps
>
> Scott Arion
>
> Rich McBride
>
> Herm Rogers
>
> Shelley Dominguez
>
> Pat Thompson
>
> Arnold Heckman
>
> Robert Sanderson, CPA

Jeffrey Byard

John McTear

Andrea Soliday

Chad Deamond

Dolores Love

Daniel Moore

Terrence Sullivan

Eleanor Terrell

7.    Is any member of the prospective jury panel or member of your immediate family or close personal friend employed by an oil company, oil distributor or otherwise involved in an occupation relating to petroleum products, production or sales?

8.    Is any member of the prospective jury panel or member of your immediate family or close personal friend employed in the retail motor fuel, convenience store or restaurant business?

9.    Has any member of the prospective jury panel or member of your immediate family been a party in a civil case?  If so:

-- what kind of case was it?

--were you or the family member a plaintiff or defendant in the case?

--what was the result?

-- were you or the family member satisfied with result and with the judicial process?

11.    Is any member of the prospective jury panel or member of your immediate family or close personal friend a franchisee or franchisor of any business or have they ever been a

franchisee or franchisor of any business?

     12.    Is any member of the prospective jury panel an accountant, auditor, bookkeeper or otherwise involved in accounting or a similar profession?

     13.    Has any member of the prospective jury panel had legal training or do you, a member of your immediate family or close personal friend work in a law-related field?

     14.    Has any member of the prospective jury panel served on a jury?

              ----Was it a criminal case or civil case?

              -----What Court?

     15.    Would any member of the prospective jury panel need any special accommodations to see, hear or understand the testimony and evidence?

     16.    Is there anything about this case that would make it difficult for any member of the prospective jury panel to be fair and impartial and render a verdict based solely on the evidence and the law as presented by the Court.?

828912.2

79205.001

Schedule (j)

Non-Jury Trial Proposed Findings of Fact and Conclusions of Law

Not Applicable.

Schedule (k)

History of Settlement Discussions

Pursuant to 28 U.S.C. §636, this matter was referred to the United States Magistrate for mediation. Despite the parties' efforts, a settlement could not be reached. Further negotiations are not ongoing. The parties do not believe that further settlement discussions will likely be productive.

Schedule (l)

Status of Discovery

Discovery has been completed.

Schedule (m)

Motions in Limine

(Attached)

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| BCG, INC. and CHESAPEAKE PRODUCTS & SERVICES, <br><br>      Plaintiffs, <br><br>    v. <br><br> GLES, INC., d/b/a SWEET OIL COMPANY <br><br>      Defendant/Third-Party Plaintiff, <br><br>    v. <br><br> SUNOCO, INC., <br><br>      Third-Party Defendant | C.A. No. 07-cv-207(GMS) <br><br> TRIAL BY JURY OF TWELVE DEMANDED |

## CERTIFICATE OF SERVICE

  I, D. Benjamin Snyder, hereby certify that on this 22nd day of August, 2008, I caused to be electronically filed a true and correct copy of the **FINAL PRETRIAL ORDER** with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

| | |
|---|---|
| Seth J. Reidenberg, Esquire <br> Young, Conaway, Stargatt & Taylor, LLP <br> The Brandywine Building <br> 1000 West Street, 17th Floor <br> P.O. Box 391 <br> Wilmington DE  19899-0391 | Matthew A. Kaplan, Esquire <br> Pepper Hamilton, LLP <br> Hercules Plaza, Suite 5100 <br> 1313 Market Street <br> P.O. Box 1709 <br> Wilmington DE  19899-1709 |
| | |

| | |
|---|---|
| Hugh J. Hutchinson, Esquire<br>Leonard, Sciolla, Hutchinson,<br>Leonard & Tinari, LLP<br>1515 Market Street, 18th Floor<br>Philadelphia, PA 19102 | A. Christopher Young, Esquire<br>Pepper Hamilton, LLP<br>3000 Two Logan Square<br>18th and Arch Streets<br>Philadelphia, PA 19103-2799 |
| | |

I further certify that on this 22nd day of August, 2008, I caused a copy of the foregoing

**FINAL PRETRIAL ORDER** to be served by U.S. Mail, postage prepaid, to the above-listed

counsel of record.

PRICKETT, JONES & ELLIOTT, P.A.

By:_____
David E. Brand (DE Bar No. 201)
John W. Paradee (DE Bar No. 2767)
D. Benjamin Snyder (DE Bar No.. 4038)
11 North State Street
Dover, Delaware 19901
(302) 674-3841

and

Harry C. Storm
Lerch, Early & Brewer, Chartered
3 Bethesda Metro Center, Suite 460
Bethesda, MD 20814

*Attorneys for the Plaintiffs*

DATED:  August 22, 2008